# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

THE NEW GEORGIA PROJECT, REAGAN JENNINGS, and CANDACE WOODALL,

        Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board; REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as Members of the Georgia State Election Board; MARY CAROLE COONEY, MARK WINGATE, VERNETTA NURIDDIN, KATHLEEN RUTH, and AARON JOHNSON, in their official capacities as Members of the FULTON County Board of Registration and Elections; SAMUEL E. TILLMAN, ANTHONY LEWIS, SUSAN MOTTER, DELE LOWMAN SMITH, and BAOKY N. VU, in their official capacities as Members of the DEKALB County Board of Registration and Elections; PHIL DANIELL, FRED AIKEN, JESSICA M. BROOKS, NEERA BAHL, and DARRYL O. WILSON, JR., in their official capacities as Members of the COBB County Board of Elections and Registration; BEAUTY BALDWIN, BEN SATTERFIELD, JOHN MANGANO, STEPHEN DAY, and ALICE O'LENICK, in their official capacities as Members of the GWINNETT County Board of Registrations

Civil Action File No.

and Elections; COLIN MCRAE, WANDA ANDREWS, WILLIAM L. NORSE, JON PANNELL, and RANDOLPH SLAY, in their official capacities as Members of the CHATHAM County Board of Registrars; DARRY HICKS, ADDISON LESTER, and AARON WRIGHT, in their official capacities as Members of the FAYETTE County Board of Elections and Voter Registration; CAROL WESLEY, DOROTHY FOSTER HALL, PATRICIA PULLAR, DARLENE JOHNSON, and DIANE GIVENS, in their official capacities as Members of the CLAYTON County Board of Elections and Registrations; JUNE WOOD, JOHNNY WILSON, DEE CLEMMONS, GARY BARHAM, and VIVIAN THOMAS, in their official capacities as Members of the HENRY County Board of Elections and Registration; MARGARET JENKINS, UHLAND ROBERTS, DIANE SCRIMPSHIRE, LINDA PARKER, and ELEANOR WHITE, in their official capacities as Members of the COLUMBUS-MUSCOGEE County Board of Elections; DAVID C. FEDACK, TALULA MARTIN, ROBERT PROCTOR, DANIEL ZIMMERMANN, and MYESHA GOOD, in their official capacities as Members of the DOUGLAS County Board of Elections and Registration; PAMELA MIDDLETON, DONTRAVIOUS M. SIMMONS, BENNY G. HAND, ANNABELLE T. STUBBS, and FREDERICK WILLIAMS, in their official capacities as Members of the ALBANY-DOUGHERTY County Joint Board of Registration and Elections; ALDREN SADLER, SR., KAREN JAMES, and

GERALD BARGER, in their official capacities as Members of the ROCKDALE County Board of Elections and Voter Registration; PHIL JOHNSON, KELLY ROBINSON, and DUSTIN THOMPSON, in their official capacities as Members of the NEWTON County Board of Elections and Registration; TIM MCFALLS, SHERRY T. BARNES, MARCIA BROWN, TERENCE DICKS, and BOB FINNEGAN, in their official capacities as Members of the RICHMOND County Board of Elections; HENRY FICKLIN, MIKE KAPLAN, HERBERT SPANGLER, CASSANDRA POWELL, and RINDA WILSON, in their official capacities as Members of the MACON-BIBB County Board of Elections; JESSE EVANS, CHARLES KNAPPER, WILLA FAMBROUGH, and ANN TILL, in their official capacities as Members of the ATHENS-CLARKE County Board of Elections and Voter Registration; and BARBARA LUTH, MATTHEW BLENDER, JOEL NATT, CARLA RADZIKINAS, and RANDY INGRAM, in their official capacities as Members of the FORSYTH County Board of Registrations and Elections,

           Defendants.

## **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiffs, THE NEW GEORGIA PROJECT, REAGAN JENNINGS, and CANDACE WOODALL, through the undersigned attorneys, file this COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board; REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as Members of the Georgia State Election Board; MARY CAROLE COONEY, MARK WINGATE, VERNETTA NURIDDIN, KATHLEEN RUTH, and AARON JOHNSON, in their official capacities as Members of the FULTON County Board of Registration and Elections; SAMUEL E. TILLMAN, ANTHONY LEWIS, SUSAN MOTTER, DELE LOWMAN SMITH, and BAOKY N. VU, in their official capacities as Members of the DEKALB County Board of Registration and Elections; PHIL DANIELL, FRED AIKEN, JESSICA M. BROOKS, NEERA BAHL, and DARRYL O. WILSON, JR., in their official capacities as Members of the COBB County Board of Elections and Registration; BEAUTY BALDWIN, BEN SATTERFIELD, JOHN MANGANO, STEPHEN DAY, and ALICE O'LENICK, in their official capacities as Members of the GWINNETT County Board of Registrations and Elections; COLIN MCRAE, WANDA ANDREWS, WILLIAM L. NORSE, JON PANNELL, and RANDOLPH SLAY, in their official capacities as

Members of the CHATHAM County Board of Registrars; DARRY HICKS, ADDISON LESTER, and AARON WRIGHT, in their official capacities as Members of the FAYETTE County Board of Elections and Voter Registration; CAROL WESLEY, DOROTHY FOSTER HALL, PATRICIA PULLAR, DARLENE JOHNSON, and DIANE GIVENS, in their official capacities as Members of the CLAYTON County Board of Elections and Registrations; JUNE WOOD, JOHNNY WILSON, DEE CLEMMONS, GARY BARHAM, and VIVIAN THOMAS, in their official capacities as Members of the HENRY County Board of Elections and Registration; MARGARET JENKINS, UHLAND ROBERTS, DIANE SCRIMPSHIRE, LINDA PARKER, and ELEANOR WHITE, in their official capacities as Members of the COLUMBUS-MUSCOGEE County Board of Elections; DAVID C. FEDACK, TALULA MARTIN, ROBERT PROCTOR, DANIEL ZIMMERMANN, and MYESHA GOOD, in their official capacities as Members of the DOUGLAS County Board of Elections and Registration; PAMELA MIDDLETON, DONTRAVIOUS M. SIMMONS, BENNY G. HAND, ANNABELLE T. STUBBS, and FREDERICK WILLIAMS, in their official capacities as Members of the ALBANY-DOUGHERTY County Joint Board of Registration and Elections; ALDREN SADLER, SR., KAREN JAMES, and GERALD BARGER, in their official capacities as Members of the ROCKDALE

County Board of Elections and Voter Registration; PHIL JOHNSON, KELLY ROBINSON, and DUSTIN THOMPSON, in their official capacities as Members of the NEWTON County Board of Elections and Registration; TIM MCFALLS, SHERRY T. BARNES, MARCIA BROWN, TERENCE DICKS, and BOB FINNEGAN, in their official capacities as Members of the RICHMOND County Board of Elections; HENRY FICKLIN, MIKE KAPLAN, HERBERT SPANGLER, CASSANDRA POWELL, and RINDA WILSON, in their official capacities as Members of the MACON-BIBB County Board of Elections; JESSE EVANS, CHARLES KNAPPER, WILLA FAMBROUGH, and ANN TILL, in their official capacities as Members of the ATHENS-CLARKE County Board of Elections and Voter Registration; and BARBARA LUTH, MATTHEW BLENDER, JOEL NATT, CARLA RADZIKINAS, and RANDY INGRAM, in their official capacities as Members of the FORSYTH County Board of Registrations and Elections. Based upon information and belief, Plaintiffs allege as follows:

## **NATURE OF THE CASE**

1.      Plaintiffs bring this case to ensure that all eligible Georgia voters have a fair and safe opportunity to exercise their right to vote in the November 3, 2020 general election ("November Election"), as required by the U.S. Constitution. A novel coronavirus pandemic is sweeping through the country, with known infections

of over one million and fatalities exceeding the total deaths in the Vietnam War. No states are being spared. In Georgia, as of May 8, 2020, there are 31,605 confirmed cases, and 1,352 people have died; tragically—and notwithstanding Governor Kemp's recent lifting of the stay-at-home order—there is no end in sight. Georgia continues to see a significant number of new positive cases daily, its death rate is estimated to quadruple by August, five of the ten counties with the highest death rate per capita in America are in southwest Georgia as of the date of this Complaint, and the Centers for Disease Control and Prevention ("CDC") has reported that Georgia's "burden continues to grow." And while the country still has not reached its "peak" of infections, public health officials are already warning about a likely "second wave" of the virus in the fall, which because of its interaction with flu season, could be even worse than the first. The pandemic's impact is not limited to Georgians' health; it also poses a serious threat to their right to vote.

2.     Secretary of State Raffensperger (the "Secretary") has twice postponed the spring primary election due to the pandemic, and recognizing the strain it is placing on election resources—e.g., causing significant decreases in poll workers, polling locations, and reduced staff capacity—as well as its impact on public health, has taken the extraordinary step of sending absentee ballot applications to 6.9 million Georgia voters for that election. Georgia voters have responded in kind, by applying

to vote absentee at unprecedented rates. While the Secretary's actions are laudable first steps toward protecting the right to vote, they fall far short of what is needed to protect that right in the upcoming November Election, as social distancing measures continue and even more Georgians vote absentee.[1] Without injunctive relief from this Court, multiple laws and practices governing mail voting that already threaten to burden and disenfranchise thousands of Georgia voters even in ordinary elections are certain to abridge and deny the right to vote of thousands more in the current crisis.

3.     In 2018, over 219,700 voters voted absentee by mail in Georgia, marking the highest turnout for absentee mail voting since the inception of no excuse absentee voting in the state. Although the election was a high watermark for absentee turnout rate, it represented a mere 1% increase over absentee turnout in the 2016 general election. Even then, it was evident that Georgia's absentee voting rules resulted in the disenfranchisement of a substantial number of lawful, registered voters: nearly 1,000 absentee ballot applications were rejected, over 3,500 voters—

---

[1] It is also unclear what, if any, actions the Secretary will be able to take absent court order in the November Election given that his actions thus far have been premised on the Governor's emergency orders and extension of the State stay-at-home orders. The Secretary will not be able to move the November Election date, as it is mandated by federal statute.

most of whom mailed their ballots before Election Day—were disenfranchised merely because their ballots arrived at county election offices after 7:00 p.m. on Election Day, and almost 4,000 voters were disenfranchised for failure to include immaterial information on their absentee ballot or because election officials mistakenly concluded that their signatures on their ballot envelopes did not "match" the signatures on file.

4.    Georgia has spent the last two years mired in litigation over many of these issues, and courts across the state have repeatedly found aspects of Georgia's absentee regime unconstitutional or in violation of the Civil Rights Act, 52 U.S.C. § 10101(a)(B). *See, e.g.*, *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1341 (N.D. Ga. 2018) (finding plaintiffs likely to succeed on Civil Rights Act claim regarding Georgia's rejection of absentee ballots for missing birthdates); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (same); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339-40 (N.D. Ga. 2018) (finding plaintiffs likely to succeed on due process challenge to Georgia's signature match procedures); *Democratic Party of Ga. v. Burkes*, No. 1:18-cv-00212-WLS (M.D. Ga. Nov. 9, 2018), Dkt. No. 5 (finding plaintiffs likely to succeed on challenge to Dougherty County's rejection of ballots received after 7:00 p.m. on Election Day).

5.    Nevertheless, four aspects of Georgia law continue to disenfranchise

lawful voters and, unless immediately rectified, guarantee that Georgia's absentee regime will be ill-equipped to handle the anticipated increase in absentee voting in the November Election: (1) the lack of standards governing the process for notifying voters regarding incomplete absentee ballot applications ("Absentee Applicant Notification Process"), O.C.G.A. § 21-2-381(b)(4); (2) the failure to provide prepaid postage on absentee ballots ("Absentee Postage Tax"); (3) the rejection of absentee ballots be received by 7:00 p.m. on Election Day ("Election Day Receipt Deadline"), *id.* § 21-2-386(a)(1)(F); and (4) Georgia's prohibition on third-party assistance for absentee ballots ("Voter Assistance Ban"), *id.* § 21-2-385(a).

6.    Even under normal circumstances, Georgia's Absentee Applicant Notification Process, which provides simply for "prompt" notification to the voter in instances where elections officials are unable to determine the identity of the voter who submitted the absentee application, would be constitutionally problematic. *See id.* § 21-2-381(b)(4). But under the current circumstances, where hundreds of thousands of absentee voters are expected to request absentee ballots for the first time, it is a recipe for unconstitutional differential treatment of voters across the state and, even within counties. As elections officials become increasingly inundated with absentee ballot requests, from voters who have not previously voted absentee and, as such, are more likely to make a mistake in filling out their form, thousands of

lawful voters are at serious risk of not being notified that their application is faulty and cannot be processed. Voters who are notified too late or not at all, will be effectively denied their right to vote safely from their homes in the November Election, and forced to choose between their health or their right to vote, as voting in-person will be their only remaining option.

7.    Georgia's Absentee Postage Tax, which mandates that voters pay for postage to mail their absentee ballot, unconstitutionally increases the monetary and transaction costs associated with voting. Not only must an absentee voter pay for postage to vote, they also must acquire the postage. In this digital age when many people do not keep stamps at home this often requires a trip to the post office or other essential business. Voters with access to stamps must accurately determine the correct amount of postage, which varies by ballot size and weight. As a result, they, too, may have to leave their homes to travel to the post office, a trip that can impose significant temporal and monetary costs for those with limited access to transportation, even in ordinary times, but in the current public-health crisis, may also impose significant health risks. Moreover, as the U.S. Postal Service ("USPS" or "postal service") continues to face massive budget shortfalls, there is no guarantee that local post offices will be open and available to answer questions, and it is all but certain that for many voters, the time used to determine the correct postage amount

will delay the voting process and place voters at greater risk of disenfranchisement due to the Election Day Receipt Deadline.

8.      Georgia's Election Day Receipt Deadline disenfranchises thousands of voters who complete and mail their ballot prior to Election Day, but whose ballots—through no fault of their own—do not arrive in the mail by 7:00 p.m. on Election Day. O.C.G.A. § 21-2-386(a)(1)(F). In 2018 alone, nearly 45% of all absentee ballots rejected were rejected simply because they arrived after the Election Day Receipt Deadline. While this arbitrary and burdensome cut-off was constitutionally infirm before the pandemic, under the current circumstances— where the pandemic will lead to a significant increase in mail voting while at the same time severely burdening an already compromised postal service and thinly-stretched local election officials—it cannot survive judicial scrutiny. If left in place, the Election Day Receipt Deadline is certain to disenfranchise countless more voters this fall and, as a result, necessitates the precise change that the U.S. Supreme Court accepted in Wisconsin for its recent primary election—a postmark deadline.[2] *See*

---

[2] The term "postmark" as used herein refers to any type of imprint applied by the postal service to indicate the location and date the postal service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark, it should be presumed to have been mailed

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702, at *2 (2020).

9.      Finally, Georgia's Voter Assistance Ban, codified at O.C.G.A. § 21-2-385(a), also significantly raises the risk that lawful, eligible voters will be disenfranchised. The Voter Assistance Ban prohibits a voter from seeking assistance delivering their signed, sealed, voted ballot from anyone outside of a limited set of family members, a household member, a caregiver, or detention center employee. This hamstrings the ability of organizations like The New Georgia Project to assist voters in making the transition to absentee voting—a transition that many of their constituents will make this fall due to the pandemic—and to ensure that voters' ballots arrive on time to be counted. It also eliminates critical assistance for voters who live alone and do not have family or household members available to deliver ballots.

10.     As the Secretary has explained, "times of turbulence and upheaval require decisive actions if the liberties we hold dear are to be preserved." This sentiment applies equally to federal courts, which have an ongoing duty, especially

_____

on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day.

in times such as these, to ensure that voters can exercise their fundamental right to vote. This Court should abide by that duty by ensuring that Georgia's absentee voting regime complies with the Constitution and does not erect unconstitutional hurdles to unduly burden or deny the right to vote to Georgia's electorate in the upcoming November Election.

## **JURISDICTION AND VENUE**

11.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution and under 52 U.S.C. §§ 10301 and 10302.

12.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 52 U.S.C. §§ 10301, 10302, 10308(f), and 10310(e).

13.     This Court has personal jurisdiction over Defendants, who are sued in their official capacity only.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Plaintiff New Georgia Project's headquarters are located in Atlanta, Georgia, and a significant portion of the registration and voter education activities it conducts take place in Fulton County. Plaintiffs Reagan Jennings and Candace

Woodall are registered voters in Fulton County as well.

15.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

16.    Plaintiff THE NEW GEORGIA PROJECT ("NGP") is a nonpartisan, community-based organization with its principal place of business in Fulton County. NGP is dedicated to registering Georgians to vote and to helping them become more civically engaged citizens. To achieve its mission, NGP engages in voter education and registration activities in churches, college campuses, and neighborhoods across the state to reach voters and help them to register and, eventually, vote. NGP's goal is to register all eligible, unregistered citizens of color in Georgia, and as of September 2019, NGP had registered almost half a million Georgians in all 159 of Georgia's counties, the majority of whom are people of color and/or members of other underrepresented and vulnerable populations, such as Georgians with disabilities and the elderly. NGP considers these half a million individuals to be a core part of its constituency, and NGP actively works to assist the voters whom it helps to register to ensure that they are then successfully able to exercise the franchise. Georgia's Absentee Applicant Notification Process, Absentee Postage

- 15 -

Tax, Election Day Receipt Deadline, and Voter Assistance Ban all frustrate NGP's mission and cause NGP to divert resources from other programs and initiatives to assist Georgia voters generally, and NGP's core constituency specifically, with overcoming the burdens imposed on them by these laws. In the context of COVID-19, these burdens are even more severe, and the resources that NGP will need to divert from its other programs to combat the burdens imposed by these laws are even more substantial.

17. As new registrants and voters, the majority of NGP's constituents have never voted absentee by mail and will require additional support from NGP to ensure that they obtain and properly return their absentee ballots. As new absentee voters, they are far more likely to have errors on their absentee ballot applications and to require follow-up with elections officials to complete the application process. Without a uniform notification requirement due to the Absentee Applicant Notification Process, NGP must divert additional time and resources to confer with its constituents, not only to make sure that they have mailed applications, but to ensure that they have confirmed its receipt and/or have checked with elections officials to confirm that they were accepted and do not require changes. Likewise, the Election Day Receipt Deadline also requires NGP to divert additional resources to significant outreach prior to Election Day to ensure that voters are able to mail or

drop off their ballots in time and, where they have not been able to send it in time to be received on Election Day—including in cases where the ballot was not sent to or did not arrive at the voter's address in a timely fashion—to assist voters in getting to the polls to vote. The time and resources diverted to these efforts are resources that NGP would otherwise spend on its core registration and civic engagement activities for the broader community—including, but not limited to, radio and television advertisements to engage the community in voting, parties at the polls to encourage broader community participation in voting, and college student organizing— which are a critical component of achieving NGP's mission.

18. The majority of NGP's constituents are African American, lower income, and also at high risk for COVID-19 complications. As a result, they are less likely to have access to reliable, convenient transportation and it is far more costly and riskier for them to leave their homes to obtain stamps and potentially expose themselves to the virus. NGP must assist them in overcoming the Absentee Postage Tax by providing stamps for absentee ballots. This entails significant diversion of resources by NGP, resources that it would otherwise spend on its core registration and community civic engagement activities. Finally, as a trusted messenger among Georgia's communities of color and particularly among its core constituency of registrants, NGP could better serve its constituency and effectuate its mission by

collecting and delivering completed, signed, and sealed absentee ballots. These services would ensure that such ballots arrive on time to be counted and are particularly needed during the current pandemic as many of NGP's constituents are already at high risk for contracting COVID-19 and experiencing complications from the disease, and are less likely to leave their homes to mail a ballot as a result. However, the Voter Assistance Ban prevents NGP from assisting voters in this way, burdening not only NGP's constituents, but also preventing NGP from engaging in a core form of political speech.

19.      Plaintiff REAGAN JENNINGS is a United States citizen and registered Georgia voter in Fairburn, Georgia. Ms. Jennings is in her seventies and does not regularly keep stamps in her home. When she has to use stamps, she must go to the post office to purchase them. Ms. Jennings is unsure how much postage to apply to her absentee ballot and does not have a postage scale at home, therefore, she believes it is important to go to the post office to confirm the amount of postage she needs to send her ballot. Since the COVID-19 crisis began, Ms. Jennings has attempted to purchase stamps to vote in the spring primary election at least two times at great risk and hardship to herself. On one occasion, due to social distancing, a long line wrapped around the post office, but Ms. Jennings, who suffers from knee and back problems and must use a cane, was unable to wait in the line. On another occasion,

Ms. Jennings attempted to purchase stamps, but the majority of the people waiting in line inside the post office were not practicing social distancing, and Ms. Jennings, who also suffers from two other conditions that place her at high risk for complications from COVID-19, was unable to wait in the line for fear of exposing herself to the disease. Ms. Jennings fears that she will face similar challenges in the November Election and, as a result, will be unable to safely leave her home to purchase a stamp. She is also concerned that even if she is able to purchase a stamp, her ballot may not arrive in time to be counted. Ms. Jennings lives alone and does not have a housemate or relative nearby who could assist her with mailing or delivering her ballot, and she is unable to send mail from her house. Therefore, she must travel to the post office to send her ballot herself. Given her health conditions, Ms. Jennings would benefit from assistance with turning her ballot in to the election office. Ms. Jennings typically votes in person and does not like to vote by mail because she does not trust that her vote will be counted, but given the pandemic and her health, she does not feel that she has any other choice for the November Election. As an African American, Ms. Jennings believes it is important to be able to exercise her right to vote, as many others have died before her to gain that right.

20.    Plaintiff CANDACE WOODALL is a United States citizen and registered Georgia voter in Atlanta, Georgia. Ms. Woodall is almost sixty and lives

alone in a senior facility, and she is currently unemployed due to the pandemic. Ms. Woodall does not typically keep stamps in her home, and when she has to use stamps, she purchases them at her post office, which is not in walking distance of the facility where she lives. To reach the post office Ms. Woodall must take MARTA, which costs $5.00 round trip, and then she must walk to the post office from the MARTA station. Because she is unemployed and on a restricted budget, she does not have money to buy a book of stamps. As a result, she would have to spend at least $5.00 to use MARTA to buy just one or two stamps. Ms. Woodall is recovering from an operation related to cancer and at high risk for contracting COVID-19 and experiencing complications. As a result, she would be significantly exposing herself to potential health risks during the pandemic by leaving her home to travel to the going to the post office and also having to use public transportation to reach it. Ms. Woodall would also have significant difficulty voting in person. Her typical polling location is very far from her home, and there is no public transportation to it; therefore, she would have to walk to her location to vote. Because she is recuperating from surgery, walking long distances is challenging. This also makes traveling to get a stamp challenging. Voting is very important to Ms. Woodall. She has voted in every election since she became age-eligible to vote and believes it is her right and duty to vote as a citizen. Moreover, as an African

American woman, she believes it is important to be able to exercise her right to vote, as many others have died before her to gain that right.

21. Defendant BRAD RAFFENSPERGER is sued for declaratory and injunctive relief in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board. The Secretary is a state official subject to suit in his official capacity because his office "imbues him with the responsibility to enforce the [election laws]." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Specifically, the Secretary is the chief elections officer of the state and is therefore responsible for the administration of the state laws affecting voting, including the absentee voting system. *See* O.C.G.A. § 21-2-50(b). The Secretary is further responsible for "furnish[ing] . . . applications for absentee ballots, envelopes and instruction sheets for absentee ballots, and such other supplies as the Secretary of State shall deem necessary and advisable from time to time, for use in all elections and primaries" to the county election officials. *Id.* The Secretary also publishes instructions on absentee voting directly to voters, including instructions on the payment of postage. *See* Ga. Sec'y of State Elections Div., Absentee Voting: A Guide for Registered Voters, at 5 (2020), https://sos.ga.gov/admin/uploads/Absentee_Voting_Guide_20142.pdf ("If mailing, you must affix postage to the ballot envelope."). The Secretary serves as the Chair of the State Election Board,

which is the body responsible for ensuring uniform election practice in Georgia. And most recently, the Secretary sent absentee ballot applications to all active, registered voters in Georgia.

22. Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE (hereinafter, "State Election Board" or "State Election Board Members"), are members of the State Election Board in Georgia, responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1). The State Election Board is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at § 21-2-31(2). Likewise, the State Election Board "promulgate[s] rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system" in Georgia. *Id.* § 21-2-31(7). The State Election Board Members, personally and through the conduct of the Board's employees,

officers, agents, and servants, acted under color of state law at all times relevant to this action and are sued for declaratory and injunctive relief in their official capacities.

23.     Through their uniformity powers, the Secretary and the State Election Board have the authority to direct the officials in each county who administer elections on the local level to ensure that the counties are uniformly following state standards and law. *See id.* § 21-2-31.

24.     Defendants MARY CAROLE COONEY, MARK WINGATE, VERNETTA NURIDDIN, KATHLEEN RUTH, AARON JOHNSON, SAMUEL E. TILLMAN, ANTHONY LEWIS, SUSAN MOTTER, DELE LOWMAN SMITH, BAOKY N. VU, PHIL DANIELL, FRED AIKEN, JESSICA M. BROOKS, NEERA BAHL, DARRYL O. WILSON, JR., BEAUTY BALDWIN, BEN SATTERFIELD, JOHN MANGANO, STEPHEN DAY, ALICE O'LENICK, COLIN MCRAE, WANDA ANDREWS, WILLIAM L. NORSE, JON PANNELL, RANDOLPH SLAY, DARRY HICKS, ADDISON LESTER, AARON WRIGHT, CAROL WESLEY, DOROTHY FOSTER HALL, PATRICIA PULLAR, DARLENE JOHNSON, DIANE GIVENS, JUNE WOOD, JOHNNY WILSON, DEE CLEMMONS, GARY BARHAM, VIVIAN THOMAS, MARGARET JENKINS, UHLAND ROBERTS, DIANE SCRIMPSHIRE, LINDA PARKER,

ELEANOR WHITE, DAVID C. FEDACK, TALULA MARTIN, ROBERT PROCTOR, DANIEL ZIMMERMANN, MYESHA GOOD, PAMELA MIDDLETON, DONTRAVIOUS M. SIMMONS, BENNY G. HAND, ANNABELLE T. STUBBS, FREDERICK WILLIAMS, ALDREN SADLER, SR., KAREN JAMES, GERALD BARGER, PHIL JOHNSON, KELLY ROBINSON, DUSTIN THOMPSON, TIM MCFALLS, SHERRY T. BARNES, MARCIA BROWN, TERENCE DICKS, BOB FINNEGAN, HENRY FICKLIN, MIKE KAPLAN, HERBERT SPANGLER, CASSANDRA POWELL, RINDA WILSON, JESSE EVANS, CHARLES KNAPPER, WILLA FAMBROUGH, ANN TILL, BARBARA LUTH, MATTHEW BLENDER, JOEL NATT, CARLA RADZIKINAS, and RANDY INGRAM, are sued in their official capacities only, and are appointed officials in Georgia counties who are responsible for administering elections in their respective counties. They are generally appointed by the county governing authority, county executive committee, members of the General Assembly representing all or part of the county, or a combination thereof. *See, e.g.*, H.B. 656, Ga. L. 2019 § 2 (describing process for appointing members of the Fulton County Board of Registration and Elections); Code of Dekalb County, GA. App. B 171 (describing process for appointing members of the Dekalb County Board of Registration and Elections); H.B. 1790, Ga. L. 1998 § 3 (describing the

governing authority that must appoint each member of the county Board of Elections and Registrations in Newton County); H.B. 623, Ga. L. 1985 § 2(b) (describing process for appointing members of the Cobb County Board of Elections and Registration). Their responsibilities include, in pertinent part, processing absentee ballot applications, distributing absentee ballots to voters, evaluating the date and time absentee mail-in ballots arrive, and accepting or rejecting absentee ballots according to the laws set out by the State and the rules, regulations, and interpretations set forth by the Secretary and State Election Board. *See* O.C.G.A. § 21-2-40(a) (designating boards of elections and registration with powers and duties of election superintendent and assigning it powers related to absentee balloting procedures); *id.* § 21-2-381(b)(1) (processing absentee ballot applications); *id.* § 21-2-384 (preparing and delivering absentee mail-in ballots); *id.* § 21-2-386(a)(1)(B) (requiring county board to review day and hour each absentee mail-in ballot is returned); *id.* § 21-2-386(a)(1)(C) and Ga. Comp. R. and Regs. § 183-1-14-.13 (process for rejecting absentee mail-in ballots).

## STATEMENT OF FACTS AND LAW

### A.  Absentee Voting in Georgia

25.  Georgia has conferred the right to cast an absentee ballot by mail without excuse in any primary, election, or runoff to any eligible voter since 2005.

O.C.G.A. § 21-2-380(b).

26.     Historically only about 5% of eligible Georgia voters have utilized absentee voting by mail in each election. The highest rate of absentee voting to date was in the November 2018 general election, when absentee turnout rose to 6%.

27.     Thus, in prior elections, the vast majority of Georgia voters have cast their ballots in person, either during early voting or at polling locations on Election Day.

28.     As compared to in-person voting, absentee voting requires additional steps that must be taken deliberately and well in advance of Election Day to ensure that a voter's ballot is counted.

29.     To vote absentee, a voter must correctly complete the absentee ballot application and request an absentee ballot by the statutory deadline.

30.     Next, the voter must receive the absentee ballot in the mail and complete the required information, signature fields, and, sometimes, provide a copy of an identification document.

31.     Finally, a voter must mail the absentee ballot with sufficient time and postage for it to arrive at the local election office by the Election Day Receipt Deadline.

32.     The steps described above, which are required to successfully vote

absentee, are not insubstantial, often requiring voters to expend significant time and effort to complete. A misstep at any point—including by the elections officials, not the voter—often results in complete disenfranchisement.

### (i) Absentee Applicant Notification Process

33.     Georgia voters may submit an absentee application by mail, facsimile, email, or in person beginning 180 days before the election and until the Friday before Election Day. O.C.G.A. §§ 21-2-381(a)(1)(A); 21-2-384(a)(2).

34.     An absentee application must include sufficient information to identify the voter—e.g., the voter's name, date of birth, phone number, email address, registration address—as well as the address the voter would like the ballot mailed to, the election in which the voter wishes to participate, and the name and relationship of the person requesting the ballot if other than the voter. *Id.* at § 21-2-381(a)(1)(A), (C).

35.     If the election official reviewing the application verifies the voter's eligibility to vote, the voter's signature, and is able to identify the voter based on the information, the voter is mailed an absentee ballot within three business days of receiving the application. *Id.* at § 21-2-381(b)(1)-(2); Ga. Comp. R. and Regs. 183-1-14-.11.

36.     Absentee ballots may be mailed to voters from 49 days before Election

Day up to the Friday before Election Day. *See* O.C.G.A. § 21-2-384(a)(2).

37.     Where the election official reviewing the absentee ballot application cannot determine the identity of the voter, Georgia law provides that the official must "promptly write to request the additional information." *Id.* § 21-2-381(b)(4).

38.     No other guidelines are provided to govern, for example, when or how a voter must be notified that their identity cannot be determined, and "promptly" is not defined.

39.     As a result, counties are at liberty to notify voters that they are unable to process their absentee application at their leisure.

40.     Upon information and belief, voters are not notified of such issues in their absentee ballot applications in a uniform manner between and across Georgia's 159 counties.

41.     When voters are not notified of such issues with their absentee ballot applications until later in the election cycle, they are more likely to be at risk of being disenfranchised. This is because, even if they are able to rectify the issues, the delay in notification consequently delays the issuance of their ballot, giving the voter less time to return their ballots in time to be counted.

42.     The risk that there are substantial delays in notifying significant numbers of voters of issues with their absentee ballot applications is acutely

heightened during the current pandemic, where county election officials are likely to be inundated with absentee ballot requests, many (indeed, likely the majority) of which will be submitted by voters who have no prior experience voting absentee, and thus are more likely to inadvertently err in filling out the application, necessitating notification and additional communication before their application can be processed.

43. For those voters with disabilities, limited access to transportation, or who are immunocompromised or have other high-risk factors for COVID-19, in-person voting may not be a realistic option, and they will be entirely disenfranchised.

**(ii) Absentee Postage Tax**

44. Georgia requires voters who return their ballots by mail to obtain and pay for their own postage. *See* Ga. Sec'y of State Elections Div., Absentee Voting: A Guide for Registered Voters, at 5 (2020), https://sos.ga.gov/admin/uploads /Absentee_ Voting_Guide_20142.pdf ("If mailing, you must affix postage to the ballot envelope.").

45. The Absentee Postage Tax imposes both monetary and transaction costs that bear most heavily on individuals who are least likely to be able to overcome them.

46. In this digital era, many voters do not regularly keep postage stamps in their homes, and therefore must visit a post office or other essential business to obtain the correct postage.

47. Purchasing a book of 20 stamps online will cost voters $11—an unnecessary expense that could be cost-prohibitive for individuals with lower incomes, posing a significant hurdle to returning the ballot and voting.

48. The amount of postage required for a mail ballot is also not readily apparent to voters. Absentee ballots are generally a non-standard size, include two envelopes,[3] and have varying weight depending on the number of races on the ballot. O.C.G.A. § 21-2-384(b)-(c). As a result, even where a voter has stamps, mailing their ballot may still necessitate a trip to the post office to weigh the envelope and determine the proper amount of postage to affix.

---

[3] Georgia state law requires the use of two envelopes, an inner envelope containing the elector's ballot and an outer envelope used for mailing and to print the oath the elector must sign, ostensibly to protect the secrecy of the ballot. O.C.G.A. § 21-2-385(a). The Secretary of State's office nevertheless has authorized mailing of the ballots from its vendor to the electors, and from absentee electors to county election offices, with only one envelope for the forthcoming June 9, 2020 primary election. Atlanta Journal-Constitution, *Georgia absentee voting instructions to be corrected* (Apr. 28, 2020) https://www.ajc.com/news/state--regional-govt--politics/georgia-absentee-voting-instructions-corrected/kzkuKmLufxIRcwIW0oEzCN/.

49. For elderly voters, voters with disabilities, voters who live far from a post office, voters with limited access to transportation, or voters who are immunocompromised or have other high-risk factors for COVID-19, the Absentee Postage Tax may very well deter them from voting, because any trip outside the home poses additional burdens and costs, as well as grave health and safety risks.

50. Extra time spent acquiring postage or inquiring about the amount of postage needed also increases the transaction cost of voting, slowing down the voting process and making the voter more likely to mail the ballot later in the election cycle. In turn, this places these voters at heightened risk of their absentee ballot arriving after the Election Day Receipt Deadline.

51. Even where a voter is able to overcome the hurdles placed on them by Georgia's Absentee Postage Tax, their risk of disenfranchisement remains high. Each year, Georgia rejects a significant number of ballots that arrive after the Election Day Receipt Deadline.

### (iii) Election Day Receipt Deadline

52. Georgia law requires that, for an absentee ballot to be counted, it must be received by 7:00 p.m. on Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(F).

53. Ballots that arrive after the Election Day Receipt Deadline—regardless of whether they were completed and mailed by the voter prior to or on Election

Day—are not counted.

54.    In 2018, over 3,500 ballots—45% of all absentee ballots rejected—were rejected simply because they arrived after the Election Day Receipt Deadline.

55.    In 2016, at least 42% of all absentee ballots rejected were rejected for arriving after the Election Day Receipt Deadline.

56.    In Dougherty County ballots were rejected for failing to arrive by the Election Day Receipt Deadline in 2018 even when the late arrival was due to delayed mail delivery and failure of the county election officials to send ballots out to voters by the statutory deadline due to an impending hurricane. It was only after a lawsuit and intervention by a federal court that the county counted the late ballots. *Democratic Party of Ga.*, No. 1:18-cv-00212-WLS (M.D. Ga. Nov. 9, 2018), Dkt. No. 5. As the court explained, "because external circumstances prevented certain voters from casting an absentee ballot, [the court's] intervention [was] necessary to protect those voters' rights," as "external circumstances . . . subject[ed] vote-by-mail voters to an unreasonable risk that their ballot will be tossed." *Id.* at 2 (quotation marks and citations omitted).

57.    There is no reason to believe that voters will not experience similar delays in the November Election. If anything, such delays are likely to become more

common, as the public health crisis exacerbates both the pressures on the postal service as well as election officials' abilities to keep up with mailing absentee ballots at the volume and clip requested.

58.     For the upcoming primary election, statewide mailing delays have already been reported due to high printing demands for ballots. Demand is likely to be far higher in the November Election, making it increasingly likely that Georgia voters—through no fault of their own—will be at increased risk of receiving their ballots late and, in turn, making it all the more likely that they are disenfranchised by the Election Day Receipt Deadline.

### (iv) Voter Assistance Ban

59.     Georgia's Voter Assistance Ban prohibits assisting anyone who is not part of a limited category of family members, household members, caregivers, or employees of detention facilities from assisting voters with returning their signed, sealed absentee ballots. O.C.G.A. § 21-2-385(a).

60.     As a result, a substantial number of voters, including those among the over 64,000 Georgians who live alone, are cut off from any assistance with delivering their ballot.

61.     Moreover, organizations like NGP are unconstitutionally prohibited from exercising their First Amendment rights to assist voters, and particularly,

vulnerable populations such as disabled voters, elderly voters, and voters with limited access to the mail or transportation, and voters with inflexible schedules, as well as voters who receive their absentee ballots with insufficient time to return them by mail and have limited options for help delivering their ballots.

62.     While these inadequacies in Georgia's absentee system are constitutionally problematic in their own right, they will only be exacerbated by the current coronavirus crisis, burdening and disenfranchising significantly more voters in the upcoming November Election.

## B.     The Exacerbating Effect of the COVID-19 Crisis on Georgia's Absentee System

63.     COVID-19, the severe and sometimes deadly disease caused by the novel coronavirus, has been spreading through Georgia for several months.

64.     To date, there are 31,605 confirmed cases of the novel coronavirus in the state, and 1,352 Georgians' deaths have been officially attributed to COVID-19, a shockingly disproportionate number of individuals impacted—approximately 80% of those hospitalized and 53% of people who have died from COVID-19—are African Americans. Yet, African Americans comprise only 32.4% of Georgia's total population.

65.     Current models predict that over 4,000 people could die in Georgia from COVID-19 by August.

66.    Despite Governor Kemp's recent lifting of a statewide stay-at-home order, Georgians across the state are engaging in social distancing to protect their health and to continue to slow the spread of the virus.

67.    These social distancing actions have helped protect Georgians' health, but they have also had a severe economic impact on the state, with estimates showing that up to 608,000 people will lose their jobs by the summer.

68.    The federal government is preparing for the COVID-19 crisis to last 18 months and has warned that the pandemic could come in "multiple waves."

69.    The White House's coronavirus advisor and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, was asked at a White House press conference whether the United States was "prepared for [coronavirus] to strike again, say, in the fall?" Dr. Fauci responded, "[i]n fact I would anticipate that that would actually happen because of the degree of transmissibility."[4]

70.    Similarly, the Director of the National Center for Immunization and Respiratory Diseases at the CDC, Dr. Nancy Messionnier, has stated that she expects the virus to continue spreading in the United States until next year.

---

[4] The White House, *Remarks by President Trump and Members of the Coronavirus Task Force in a Press Briefing* (Mar. 30, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-members-coronavirus-task-force-press-briefing/.

71.     These sentiments are also shared by scientists outside the United States government. The COVID-19 Response Team at the Imperial College of London has estimated that social distancing and other preventative measures will be required until a vaccine is developed and distributed widely, which they predict could take "18 months or more."[5]

72.     Even if the community spread of COVID-19 in Georgia has significantly decreased by this upcoming election season—which is unlikely given the strong possibility of a second wave and Georgia's early re-opening—CDC guidelines recommend that individuals take meaningful social distancing measures even if there is a "minimal" threat of community transmission of COVID-19 in the area.

73.     This guidance is necessitated by the reality that asymptomatic carriers appear to be contributing significantly to community spread, and until there is a vaccine or "herd immunity" (i.e., at least 60% of the population has been infected and recovered), Americans will remain at serious risk of contracting the virus.

---

[5] Imperial College COVID-19 Response Team, *Report 9: Impact of non-pharmaceutical interventions (NPIs) to reduce COVID-19 mortality and healthcare demand* (Mar. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

74. Recognizing that the COVID-19 crisis will also impact Georgia's elections, the Secretary has made changes to the upcoming primary election, joining at least fourteen other states that have all postponed their primary election to avoid public health risks posed by the virus, and he is encouraging widespread absentee voting by sending absentee ballot applications to the 6.9 million voters coded as registered and active in the Secretary's statewide voter registration database.

75. The Secretary is right to make changes. The CDC, anticipating difficulties in conducting elections during the COVID-19 crisis, has now recommended that jurisdictions encourage voting by mail and reduce methods of voting that lead to direct contact with other voters or poll workers.

76. Other federal, state, and local officials have increasingly come to the same realization. Congress, for example, recently authorized $400 million to help states transition to voting-by-mail.

77. States that have not postponed their elections and have attempted to conduct in-person voting have seen utter chaos result.

78. In Wisconsin, for example, which held a primary election in April, Milwaukee was forced to reduce its polling locations from 180 to just *five* locations because of a severe shortage of poll workers. Despite the fact that Wisconsin has no-excuse absentee voting, a substantial number of voters had no choice but to vote in

person, including those who did not receive absentee ballots in time to cast and return them. Those voters were forced to decide whether to risk their health to cast their ballot and, ultimately, leading to thousands of Wisconsin citizens stood in long lines for hours to cast their ballots, many wearing masks, gloves, and other protective gear as they congregated together to vote in several hour-long lines at the polls. At least fifty individuals who participated in the election have been diagnosed with COVID-19—a number that is anticipated to grow.

79. The inherent challenges to voting in-person during this pandemic led voters in Wisconsin to request absentee ballots at unprecedented rates, with more than one million voters requesting absentee ballots for the recent primary, four times the number who did so in the 2016 general election. This increased interest in voting by mail, combined with decreases in available elections staff and other social distancing efforts, placed a significant strain on local election boards, several of which were not able to send voters a ballot in time for it to be returned—or even delivered to them—by the normal Election Day deadline. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at *38-39 (W.D. Wis. Apr. 2, 2020). This crisis ultimately necessitated federal litigation that reached the U.S. Supreme Court and resulted in the implementation of a postmark rule, whereby ballots postmarked by Election Day could be counted as long as they are

received within six days of Election Day. *See Republican Nat'l Comm.*, 2020 WL 1672702, at *2. Over 100,000 ballots in Wisconsin were postmarked by, but arrived after, Election Day.

80.    This chaos is not limited to Wisconsin. Florida experienced significant shortages in poll workers and polling locations, with 800 poll workers withdrawing from Palm Beach County alone in its primary election held on March 17, 2020.

81.    Likewise, Arizona's most populous county, Maricopa, was forced to close over 80 polling locations at the last minute as locations serving high risk communities backed out and poll workers cancelled in its March 17, 2020 primary election.

82.    And as Georgia prepares for its postponed primary election, it is experiencing a number of these same challenges. Election officials continue to see massive poll worker cancellations, as well as shortages in in-person polling locations as assisted living centers and buildings with other high-risk populations that have historically served as polling locations are increasingly unwilling to do so under the current circumstances.

83.    Fulton County, for example, typically has more than 1,600 poll workers; however, fewer than 500 people have committed to working this election. And at least five assisted living centers and two churches have already refused to

serve as polling locations in the county on Election Day. Paulding County has lost at least one-third of its 325 poll workers. Lowndes County has lost 40% of its poll workers.

84.    Record numbers of voters have also requested absentee ballots, with more than half a million absentee ballot applications being processed thus far. In Fulton County, Elections Director Rick Barron has reported that emailed absentee ballot applications are coming in "every 10 seconds." And other county officials have stated that they have "never seen anything like this before," are being "inundated" with requests, and that "applications . . . are coming in by the bucket loads."

85.    Multiple counties are already reporting being strained under the load of processing the ballots and have had to reach out to county staff and personnel outside of the elections departments for assistance.

86.    These challenges will only grow worse in November as absentee requests increase—both as a result of the continuing public health crisis and the inevitable increase in overall turnout as voters seek to participate in the presidential election.

87.    Thus, the changes the Secretary has sought, while laudable, are not enough to ensure that the right to vote is not unconstitutionally burdened or, in many

cases, outright denied. More must be done to ensure that Georgians' right to vote is preserved in the November Election.

88.     Moreover, an increase in absentee voting in November also means that a significant number of voters who typically vote in person will be voting by mail, and many of those will be voting by mail for the first time. These voters differ from current absentee voters in important respects that make them even more likely to be burdened by the absentee application, having to pay for postage, and by being required to deliver their ballots by Election Day instead of postmarked on or before Election Day.

89.     Compared to absentee voters, lower socio-economic status voters tend to vote in-person, meaning that as they transition to mail voting, they are far more likely to face challenges in paying for or obtaining postage and, as new absentee voters, are less likely to know how much postage is needed.

90.     Moreover, given the devastating economic impacts of the coronavirus, many voters' sources of income have been substantially negatively impacted, further increasing the number of individuals who likely will find the costs of stamps prohibitive in this increasingly desperate economic situation.

91.     Many voters who switch to mail voting will also be doing so precisely because they are immunocompromised, have conditions placing them at high risk

for COVID-19, or are generally concerned about their health or the health of their family and friends. This is particularly true in Georgia where African Americans have been both disproportionately likely to vote in person in the past and are also at a heightened risk of contracting COVID-19 and experiencing severe complications from the disease. As such, they will be far less likely to venture out to purchase stamps if they do not already have them in their home or to leave home to go to the post office to determine the proper amount.

92.     Those voters transitioning to absentee voting from Election Day voting also tend to be "late deciders;" that is, they decide who they will vote for later in the process, typically at the end of the campaign. Because of that, they are more likely to cast an absentee ballot at the end of the voting process with only a few days to go until Election Day.

93.     It is unremarkable that these voters would be more likely to cast their absentee ballots later given that they are also likely to be less familiar with the absentee voting process, including the Election Day Receipt Deadline. Nor would it be unreasonable for them to think that their ballots can be mailed later in the election cycle as long as they are postmarked by Election Day, as many other deadlines in Georgia voters' lives—including voter registration deadlines—are postmark deadlines. *See, e.g.*, O.C.G.A. § 21-2-224 (accepting voter registrations postmarked

by the deadline); *id.* § 48-7-57 (applying a postmark deadline to tax returns); *id.* § 48-2-46 (applying a postmark deadline to tax assessment protests); *id.* § 40-3-42 (applying a postmark deadline to title applications).

94.     For the same reasons, these voters are much more likely to need assistance with delivering their ballots so that they can avoid the pitfalls that too often lead to rejection. And, as new absentee voters, they are more likely to make mistakes in completing their absentee ballot applications, mistakes that would necessitate being notified by election officials so that they can still receive a ballot.

95.     Finally, as mail balloting increases, USPS is facing a budget crisis that will likely lead to delays in mail delivery, raising particular concerns for Georgia, which has experienced slow and unreliable mail service in some counties. As a result, the postal service already asked voters to mail their ballots up to a week before Election Day even before COVID-19. Yet even when that advice is followed, there is simply no guarantee that ballots will arrive on time. Together, these circumstances guarantee that as the COVID-19 crisis continues, Georgia voters will find it increasingly difficult to ensure that their ballots arrive before the Election Day Receipt Deadline without assistance.

**C. The State Has No Adequate Interest in the Challenged Laws and Policy Generally, and Even Less Interest During the Pandemic**

96. Even before the COVID-19 crisis, the State's interest in the Absentee Applicant Notification Process, Absentee Postage Tax, Election Day Deadline, and Voter Assistance Ban were thin. In the context of COVID-19, they cannot possibly outweigh the serious burdens that they impose on impacted voters' fundamental right to vote.

97. The State has no legitimate interest in failing to provide a uniform standard for notification to voters whose absentee application contains insufficient information. Indeed, in the context of other factors such as signature matching, the State provides clear rules for notification. *See* Ga. Comp. R. and Regs. 183-1-14-.13 (providing notification within three business days or, in some circumstances, the next business day for rejected absentee ballots). There is simply no reason that it cannot do the same here.

98. The State's justification for imposing the Absentee Postage Tax is also lacking. Providing postage to allow citizens to complete voting, as well as other important government-related functions, is a common practice that has been adopted by federal, state, and county governments. For instance, at least sixteen states prepay postage on absentee ballots. *See* Ariz. Rev. Stat. § 16-542; Cal. Elec. Code § 3010; 15 Del. Code § 5504; Haw. Rev. Stat. § 11-102; Ind. Code § 3-11-4-20; Iowa Code

Ann. § 53.8; Minn. Stat. Ann. § 203B.07; Mo. Rev. Stat. § 115.285; Mont. Code § 13-13-214; Nev. Rev. Stat. § 293.323; N. M. Stat. Ann. § 1-6-8; Ore. Rev. Stat. § 254.473; R.I. Gen. Laws § 17-20-10; Wash. Rev. Code § 29A.40.091; W. Va. Code Ann. § 3-3-5; Wis. Stat. Ann. § 6.87. Likewise, the United States Census Bureau sends census surveys with postage-prepaid return envelopes. Georgia provides, as the National Voter Registration Act requires, a postage-prepaid return envelope when it asks voters to verify their address for the purpose of voter registration. And in its coronavirus stimulus package, Congress allocated $400 million for elections, which can be used to cover the cost of prepaying postage, among other expenses.

99.    Studies have shown that sending absentee ballots in postage-prepaid envelopes has a direct and dramatically significant impact on mail voting turnout, as well as turnout generally.

100.  When King County, Washington launched prepaid postage pilot programs during the 2017 and 2018 primary elections, the county found that voters returned their absentee ballots via USPS at higher rates when they received return envelopes with postage prepaid. In the 2016 general election, before prepaid postage was implemented, 48% of the tested group of voters returned their absentee ballots via USPS. In 2017, after prepaid postage was implemented, 81% of those same voters did.

101.   Voters were not only more likely to return their ballots by mail, they were also more likely to *vote*. In King County's 2017 primary, turnout rose 10%. In the 2018 primary, it rose 6%.

102.   Following these pilot programs, King County sent all absentee ballots with postage-prepaid return envelopes. Shortly after that, the Governor and Secretary of State of Washington funded prepaid postage for every county in the state. This experience shows, not surprisingly, the enfranchising effects of prepaid postage and, conversely, the impediments to voting that result from voters having to pay for postage.

103.   The justifications for the Election Day Receipt Deadline also cannot hold water. While Georgia may set a reasonable deadline for receiving ballots to ensure the finality of election results, the Election Day Receipt Deadline is not reasonable: voters do not reasonably expect that they must submit their ballots a week in advance of Election Day. This is particularly true where the vast majority of deadlines voters encounter in their daily lives, including the voter registration deadline, are postmark deadlines. *See supra* at ¶ 93.

104.   Moreover, history proves that the Deadline disenfranchises voters for reasons entirely outside their control, even under more normal circumstances. During the current pandemic, with its consequent pressures on elections officials and

the post office, the numbers of voters disenfranchised is certain to grow exponentially.

105.   The Election Day Receipt Deadline is also unnecessary to ensure that all ballots are received and counted within a reasonable time. In fact, ballots from overseas voters are not required to be received until three days after Election Day, Ga. Comp. R. and Regs. § 183-1-14-.10, and state law allows voters until the Friday after Election Day to perfect their provisional ballots and cure absentee ballots that have been flagged for rejection, O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c). Thus, vote tallies are not final on Election Day, and the Secretary does not even certify results until at least seventeen days after Election Day. *Id.* § 21-2-499.

106.   Finally, the State's justifications for the Voter Assistance Ban are also weak. Indeed, voter fraud in Georgia is exceedingly rare. And where it does occur, Georgia has other protections in place that would better protect directly against such actions, such as prohibiting fraud in connection with casting a vote, O.C.G.A. § 21-2-573, destroying or delaying delivery of ballots, *id.* § 21-2-576, as well as "vote-buying" and "vote-selling," *id.* § 21-2-570. This is particularly true in the current crisis where new absentee voters are far more likely to need assistance and, as a result, will need more options for people to assist them with delivering their ballots.

107. Absent relief from this Court, the individual and cumulative impacts of the Absentee Applicant Notification Process, Absentee Postage Tax, Election Day Receipt Deadline, and Voter Assistance Ban will impose a severe burden on Georgia voters, deterring them from participating in the November Election and disenfranchising them. If these laws stand, many Georgia voters will find themselves faced with the same unconscionable choice that Wisconsin voters faced on April 7—their health and safety versus their right to vote. The Constitution not only empowers the Court to ensure that both are protected, and it requires it to do so.

## CLAIMS FOR RELIEF

### COUNT I
### First Amendment and Equal Protection
### U.S. Const. amends. I, XIV, 42 U.S.C. § 1983
### *Undue Burden on the Right to Vote*

108. Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

109. Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the right to vote. A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that a plaintiff seeks to vindicate against the justifications put

forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

110. This balancing test utilizes a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318-19 (11th Cir. 2019).

111. Courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448-49 (9th Cir. 2018) (citing *Pub. Integrity All. Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 (9th Cir. 2016)); *see also* C*rawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) ("However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*." (citation and quotation marks omitted) (emphasis added)); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 ("And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more

a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law.").

112.   Georgia's Absentee Applicant Notification Process, Absentee Postage Tax, Election Day Receipt Deadline, and Voter Assistance Ban impose a severe burden on all Georgia voters who vote by mail.

113.   Voters who are notified of absentee application deficiencies late in the process, or not at all, due to the Absentee Applicant Notification Process may no longer be able to vote absentee and instead will have to vote in-person or not at all. Given the grave health risks that in-person voting poses during the pandemic, as well as the general difficulties of voters who have disabilities, a lack of transportation, or inflexible work schedules, these voters may have no choice at all and will be completely disenfranchised as a result. There is simply no justification for this.

114.   Georgia's Absentee Postage Tax imposes monetary costs on the only safe alternative to voting for individuals who would otherwise have to subject themselves to the health risks of waiting to vote at the few consolidated and potentially crowded polling locations available. These costs bear most heavily on low-income voters and those who are affected by the devastating economic impact of the ongoing public health emergency. Even for voters able to withstand the economic costs, the postage requirement imposes practical burdens—i.e., traveling

to a post office to purchase stamps—that will dissuade voters with disabilities and limited access to transportation and voters concerned about the attendant health risks.

115. Even prior to the pandemic, studies showed that failing to provide postage for voters depressed voter turnout over all. In the current circumstances, the state lacks any adequate justification for its refusal to provide postage, where doing so is highly likely to result in the disenfranchisement of significant numbers of voters. And although the comparatively nominal costs of providing postage could not in any event justify the burdens that follow from refusing to do so, under the current circumstances this is all the more so, where there is a ready source of funding provided by the federal government. Thus, Georgia's refusal to ensure that voters are not burdened or disenfranchised as a result of the Absentee Ballot Postage Tax violates the First and Fourteenth Amendments.

116. The Election Day Receipt Deadline also poses a severe burden on voters' rights to vote. Voters must first learn about the Election Day Receipt Deadline and accurately guess when their ballot must be mailed for it to be counted, if they have even received their ballot in time to mail it. For those voters who, misjudge how long it will take for their ballot to arrive at the county, or for those whose ballots do not even reach them until a day or two before Election Day (even

if the delay is entirely attributable to the overwhelming pressures currently being experienced by elections officials and the postal service and not the fault of the voter), the punishment is swift and severe: total disenfranchisement.

117. But Georgia's Election Day Receipt Deadline also severely burdens all voters who vote by mail even if those voters' ballots are successfully counted. By requiring voters to cast their absentee ballots a week before the election for those ballots to be counted, Georgia's Election Day Receipt Deadline effectively moves election day forward for absentee voters—depending on postal delays, potentially by a week or more—foreclosing them from considering what could be critical, late-breaking information about the election or the candidates that may arise in the final week leading up to Election Day. Georgia's Election Day Receipt Deadline thus deprives voters of the ability to engage in this robust period of civic engagement, because it effectively requires them to have already cast their vote. Moreover, the number of voters substantially burdened—and potentially entirely disenfranchised—by the Election Day Receipt Deadline is certain to rise in the November Election in light of the current public-health emergency due to increased mail delays and processing times needed to mail absentee ballots out.

118. Similarly, the Voter Assistance Ban imposes a severe burden on the right to vote because it will effectively disenfranchise voters who require assistance

turning in their absentee ballots, but lack access to a family or household member who is able to provide such assistance. The State's interest in enforcing the Voter Assistance Ban cannot justify disenfranchising voters who require assistance but whose personal circumstances mean that they do not have individuals within their family or household willing and able to provide it. Other Georgia laws already criminalize any exercise of undue influence or voting fraud that might be captured by the Voter Assistance Ban.

119. In short, Georgia's Absentee Applicant Notification Process, Election Day Receipt Deadline, Voter Assistance Ban, and Absentee Postage Tax are not supported by a state interest that is sufficient to justify the resulting burden on the right to vote, and thus unduly burden the right to vote of all Georgia voters in violation of the First and Fourteenth Amendments.

## COUNT II
### Poll Tax
### U.S. Const. Amends. XIV, XXIV, 42 U.S.C. § 1983
### *Imposition of Poll-Tax*

120. Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs below as though set forth fully herein.

121. The Twenty-Fourth Amendment to the United States Constitution provides that: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice

President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax." U.S. Const. Amend. XXIV, § 1.

122. But Georgia requires individuals who cast a mail ballot to pay for postage to return their ballots by mail. Requiring voters to spend money to submit a mail ballot imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment. Indeed, Georgia voters—and particularly voters who are low-income, disabled, or homebound due to COVID-19—are being forced to pay "a price for the privilege of exercising the franchise." *Harman v. Forssenius*, 380 U.S. 528, 539 (1965).

123. Based on the foregoing, the Secretary has deprived and will continue to deprive Plaintiffs and their constituents of their right to vote in federal elections, secured to them by the Twenty-Fourth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983.

## COUNT III
### Due Process
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983
#### *Denial of Procedural Due Process*

124. Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

125. The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. Amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976); *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015). Courts must first consider "the nature of the interest that will be affected" by the government's action, as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F. 3d at 1192-93. Second, "courts must consider the 'fairness and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id.* at 1193 (quoting *Mathew*s, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures." *Id.* (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quotation and citation omitted).

126. Georgia's absentee procedures must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting

by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

127. "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)). A state's election system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Id.* at 1185.

128. The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most precious liberty interest of all because it is preservative of all other basic civil and political rights.

129. Due process requires that all voters in Georgia be afforded meaningful notice that their absentee ballot application is deficient so that they can cure it before it is too late for the voter to receive an absentee ballot at all. The current "prompt

notification" law set out in O.C.G.A. § 21-2-381(b)(4) fails to provide such process and, as a result, voters' absentee applications are not fairly considered under the Absentee Applicant Notification Process, even where the voter is wholly eligible to vote and, with proper notice, could have cured his or her absentee ballot application.

130.    Georgia's law governing absentee ballots too often deprives voters of having their ballot counted because (1) many voters do not learn of the Election Day Receipt Deadline before Election Day, and (2) even voters who do learn of the Election Day Receipt Deadline may not have their ballots counted if those ballots do not arrive in the mail at the county supervisor's office, through no fault of their own, by 7:00 p.m. on Election Day. Georgia's Election Day Receipt Deadline further deprives all Georgia voters who vote by mail of the ability to cast a meaningful and informed vote by requiring voters to cast their ballots a full week before Election Day if they wish to ensure that their ballots will actually be counted.

131.    Georgia's Election Day Receipt Deadline is neither a reliable nor fair way to administer voting by mail. The Election Day Receipt Deadline and the corresponding cutoff for casting ballots is, in fact, devoid of reliability because many voters may not even be sent their absentee ballots until after the date by which they must put their ballots in the mail to ensure their timely return to the appropriate election officials. Nor is the Election Day Receipt Deadline fair because it forces

those voters to cast their ballots with incomplete information and before candidates have delivered their final pitches to the voters.

132. The value of additional or substitute procedural safeguards to ensure that the votes of Georgia's mail voters are both meaningfully cast and actually counted is readily apparent. A substitute procedure—which was recently approved by the U.S. Supreme Court in connection with the Wisconsin primary—that requires that absentee ballots be postmarked on or before Election Day and received by the county within, at a minimum, five business days after Election Day to be counted, solves the inequities inherent in Georgia's Election Day Receipt Deadline. A postmark date not only offers a reliable date to Georgia voters by which they must cast their ballots, but also ensures that voters who receive their ballots late through no fault of their own are still able to engage in the franchise. A postmark date additionally ensures that all of Georgia's voters can consider any information that may arise and influence voters' choices in the last week of the election.

133. Because Georgia is not required to finalize its election results until seventeen days after the election, *see* O.C.G.A. § 21-2-499, requiring Georgia to accept ballots that are postmarked on or before Election Day and that arrive within five business days after Election Day would put no administrative burden on the State. And as the Supreme Court has explained, "administrative convenience"

cannot justify the deprivation of a constitutional right. *See Taylor v. Louisiana*, 419

U.S. 522, 535 (1975).

134. Having induced its voters to vote by mail, Georgia must establish

adequate procedures to ensure that voters have a reliable, fair, and effective method

to cast their ballots. Because Georgia's Election Day Receipt Deadline is inadequate

in all of those respects, and Georgia is readily capable of instituting a substitute

procedure that would protect those voters' rights with minimal burden to the State,

Georgia's Election Day Receipt Deadline violates Georgia voters' procedural due

process rights.

**COUNT IV**
**Equal Protection**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
*Arbitrary and Disparate Treatment*

135. Plaintiffs incorporate by reference and reallege all prior paragraphs of

this Complaint and the paragraphs in the counts below as though set forth fully

herein.

136. The Equal Protection Clause of the Fourteenth Amendment to the

United States Constitution prohibits a state from "deny[ing] to any person within its

jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. This

constitutional provision requires that "all persons similarly situated should be treated

alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

137. The Equal Protection Clause's protections extend to voting. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters" based on which county or local jurisdiction they live in. *Id.* at 106-07.

138. Georgia's Absentee Applicant Notification Process arbitrarily fails to provide a uniform standard for notifying voters that their absentee ballot is missing required identifying information, placing voters across the state at differing risks of disenfranchisement as counties are afforded the opportunity to interpret "promptly" in distinct ways, with some inevitably contacting voters sooner and others later. As a result, similarly-situated voters are placed on unequal terms, and their right to vote is burdened.

139. These burdens are likely to be substantially exacerbated for potentially hundreds of thousands of more voters in the context of the pandemic where counties will inevitably face a larger volume of absentee applications, making it all the more likely that counties with larger volumes of applications to process will contact voters

later and at differing times than counties with significantly smaller numbers of applications to process.

## COUNT V
### Freedom of Speech and Associational Rights
### U.S. Const. Amends. I, XIV, 42 U.S.C. § 1983
### *Infringement on Speech and Associational Rights*

140. Plaintiffs incorporate by reference and reallege all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

141. The First Amendment protects against the promulgation of laws "prohibiting the free exercise [of] or abridg[ment] [of] freedom of speech." U.S. Const. Amend. I. The Supreme Court has applied "exacting scrutiny" to review laws governing election-related speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345-46 (1995); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association— go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'" (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989))). Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and are "not

warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 (1999).

142.     Voter turnout efforts, including assisting voters with the submission of absentee ballots, are a means by which Plaintiff NGP communicates its belief in the power and importance of participating in democratic elections. Such activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988); *see League of Women Voters*, 400 F. Supp. 3d at 720 ("Encouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity." (quotation marks and alterations omitted)). The act of assisting voters to submit ballots by any individuals is inherently expressive, and an individual or organization that conducts such activities engages in speech by encouraging voting. *See Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (rejecting argument that regulating an election "process" raises no First Amendment concerns).

143.     Furthermore, under the United States Constitution, First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably

central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986)).

144. The conversations and interactions between Plaintiff NGP, its organizers, and voters surrounding the submission of ballots are forms of protected political speech and association. *See Williams v. Rhodes,* 393 U.S. 23, 30 (1968) (describing "overlapping" rights "of individuals to associate for the advancement of political beliefs" and "of qualified voters . . . to cast their votes effectively"); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006) (explaining "participation in voter registration implicates a number of both expressive and associational rights which . . . belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process"). Georgia's Voter Assistance Ban violates that speech by "limit[ing] the number of voices who will convey [NGP's] message," and "the size of the audience they can reach." *Meyer*, 486 U.S. at 422-23.

145. These burdens are severe, and the Voter Assistance Ban is not narrowly tailored to advance a compelling state interest. The Voter Assistance Ban thus represents an overbroad restriction on political speech and political organizing that infringes NGP's and other Georgians' rights under the Constitution.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.      Declaring that Georgia's Absentee Applicant Notification Process, Absentee Postage Tax, Election Day Receipt Deadline, and Voter Assistance Ban violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

B.      Declaring that the Absentee Postage Tax violates the Fourteenth and Twenty-Fourth Amendments as an unconstitutional poll tax;

C.      Declaring that the Absentee Applicant Notification Process and Election Day Receipt Deadline violate the Due Process Clause;

D.       Declaring that the Absentee Applicant Notification Process violates the Equal Protection Clause;

E.      Declaring that the Voter Assistance Ban violates the First Amendment as an unreasonable restriction on speech;

F.      Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from requiring that voters provide postage on their absentee

ballots and further require that Georgia provide prepaid postage on all absentee ballots;

G.     Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked by Election Day and arrive at their respective county's office within, at a minimum, five business days after Election Day;

H.     Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Voter Assistance Ban, allowing voters to designate any third party to assist in the collection and submission of their absentee ballots;

I.     Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from notifying voters of absentee application deficiencies under a non-uniform standard;

J.     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

K.     Granting such other and further relief as the Court deems just and proper.

Dated: May 8, 2020                          Respectfully submitted,

**<u>Adam M. Sparks</u>**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
K'Shaani Smith*
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
ACallais@perkinscoie.com
KShaaniSmith@perkinscoie.com

Kevin Hamilton*
Stephanie Holstein*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
KHamilton@perkinscoie.com
SHolstein@perkinscoie.com

Lilian Timmermann*
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5222
Telephone: (303) 291-2354
Facsimile: (303) 291-2454
LTimmermann@perkinscoie.com

*Counsel for Plaintiffs*
*\*Pro Hac Vice Applications Forthcoming*