# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

THE NEW GEORGIA PROJECT,
REAGAN JENNINGS, CANDACE
WOODALL, and BEVERLY PYNE,

       Plaintiffs,

         v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State
and the Chair of the Georgia State Election
Board, *et al.*,

       Defendants.

Civil Action File
No. 1:20-CV-01986-ELR

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................... - 1 -

II.  BACKGROUND ............................................................................ - 2 -

   A.  The COVID-19 pandemic has upended daily life and Georgia elections...- 2 -

   B.  Georgia's absentee system will disenfranchise thousands in November....- 5 -

      1.  Notification Process ................................................................... - 6 -

      2.  Absentee Age Restriction........................................................... - 7 -

      3.  Absentee Postage Tax ................................................................ - 7 -

      4.  Receipt Deadline ....................................................................... - 9 -

      5.  Voter Assistance Ban .............................................................. - 12 -

III. ARGUMENT................................................................................ - 14 -

   A.  Plaintiffs are likely to succeed on the merits............................ - 14 -

      1.  Plaintiffs' Right-to-Vote Claim............................................... - 14 -

      2.  Plaintiffs' Procedural Due Process Claim............................... - 22 -

      3.  Plaintiffs' Equal Protection Claim ......................................... - 25 -

      4.  Plaintiffs' Twenty-Sixth Amendment Claim ......................... - 27 -

      5.  Plaintiffs' Poll Tax Claim....................................................... - 28 -

      6.  Plaintiffs' First Amendment Claim ........................................ - 30 -

      7.  Plaintiffs' Section 208 Preemption Claim.............................. - 32 -

   B.  Plaintiffs will suffer irreparable harm absent an injunction. ..................... - 33 -

   C.  The balance of the equities and the public interest favor an injunction....- 34 -

IV. CONCLUSION............................................................................. - 35 -

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Ass'n of People with Disabilities v. Herrera*,
690 F. Supp. 2d 1183 (D.N.M. 2010) ................................................................30

*Buckley v. Am. Constitutional Law Found., Inc.*,
525 U.S. 182 (1999) ..........................................................................................30

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..............................................................................................30

*Burdick v. Takushi*,
504 U.S. 428 (1992) ..........................................................................................15

*Bush v. Gore*,
531 U.S. 98 (2000) ............................................................................................26

*Common Cause/Ga. v. Billups*,
406 F. Supp. 2d 1326 (N.D. Ga. 2005) ............................................................29

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008) ..........................................................................................15

*Curling v. Raffensperger*,
403 F. Supp. 3d 1311 (N.D. Ga. 2019) .......................................................24, 26

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ...................................................................15, 16

*Democratic Nat'l Comm. v. Bostelmann*,
No. 20-cv-249-wmc, 2020 WL 1638374 (W.D. Wis. Apr. 2, 2020) ................20

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30 ............................................20

*Democratic Party of Ga., Inc. v. Crittenden*,
347 F. Supp. 3d 1324 (N.D. Ga. 2018) .............................................................33

*Democratic Party of Ga. v. Burkes*,
No. 1:18-CV-00212-WLS (M.D. Ga. Nov. 9, 2018) .........................................10

*Doe v. Walker*,
746 F. Supp. 2d 667 (D. Md. 2010) ..................................................................19

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Driscoll, et al. v. Stapleton*,
  No. DV 20-408 (Mont. D. Ct. May 22, 2020) .............................................19, 20

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...................................................................................33

*Fla. Democratic Party v. Scott*,
  215 F. Supp. 3d 1250 (M.D. Fla. 2016) ......................................................34

*Fla. State Conference of N.A.A.C.P. v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) (Barkett, J., concurring and
  dissenting in part) ......................................................................................24

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
  347 F. Supp. 3d 1251 (N.D. Ga. 2018) ...............................................19, 34, 35

*Ga. State Conference NAACP v. Georgia*,
  No. 1:17-CV-1397-TCB, 2017 WL 9435558 (N.D. Ga. May 4,
  2017) ........................................................................................................34

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992) .....................................................................................32

*GeorgiaCarry.org v. U.S. Army Corps of Eng'rs*,
  788 F.3d 1318 (11th Cir. 2015) ..................................................................14

*Grayden v. Rhodes*,
  345 F.3d 1225 (11th Cir. 2003) ..................................................................23

*Hadnott v. Amos*,
  394 U.S. 358 (1969) ..............................................................................30, 31

*Harman v. Forssenius*,
  380 U.S. 528 (1965) ..............................................................................28, 30

*Harper v. Virginia State Board of Elections*,
  383 U.S. 663 (1966) ...................................................................................29

*Hunter v. Hamilton Cty. Bd. of Elections*,
  635 F.3d 219 (6th Cir. 2011) ......................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Jones et al. v. DeSantis et al.*,
   No. 4:19-cv-00300, slip op. (N.D. Fla. May 24, 2020) ................................28, 29

*League of Women Voters of Fla., Inc. v. Detzner*,
   314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...........................................15, 27, 28, 33

*League of Women Voters of Fla. v. Browning*,
   863 F. Supp. 2d 1155 (N.D. 2012) ..............................................................31, 34

*League of Women Voters of N.C. v. North Carolina ("LWV NC")*,
   769 F.3d 224 (4th Cir. 2014) .......................................................................21, 33

*M.L.B. v. S.L.B.*,
   519 U.S. 102 (1996)............................................................................................29

*Martin v. Crittenden*,
   347 F. Supp. 3d 1302 (N.D. Ga. 2018).............................................................35

*Martin v. Kemp*,
   341 F. Supp. 3d 1326 (N.D. Ga. 2018), *appeal dismissed sub nom.*
   *Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL
   7139247 (11th Cir. Dec. 11, 2018) .......................................................17, 23, 25

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)............................................................................................22

*Meyer v. Grant*,
   486 U.S. 414 (1988)......................................................................................30, 31

*Middleton v. Andino*,
   No. 3:20-cv-01790, ECF No. 31 (D.S.C. May 25, 2020)...................................20

*Minnesota v. Thao*,
   No. 62-CR-18-827 (Minn. Dist. Ct. Oct. 23, 2018) .....................................32, 33

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)............................................................................................29

*Ne. Ohio Coal. for Homeless v. Husted*,
   696 F.3d 580 (6th Cir. 2012) ......................................................................19, 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Norman v. Reed*,
  502 U.S. 279 (1992)...................................................................15, 22

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ...............................................33

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ...............................................32

*One Wis. Inst., Inc. v. Thomsen*,
  198 F. Supp. 3d 896 (W.D. Wis. 2016) .......................................19, 21

*Ownby v. Dies*,
  337 F. Supp. 38 (E.D. Tex. 1971)...........................................27

*Priorities USA et al. v. Nessel*,
  No. 4:19-cv-1334, ECF No. 59 (E.D. Mich. May 22, 2020)...........................32

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016).......................................34

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  140 S. Ct. 1205 (2020).....................................................20

*Reynolds v. Sims*,
  377 U.S. 533 (1964)........................................................23

*Saucedo v. Gardner*,
  335 F. Supp. 3d 202 (D.N.H. 2018)..........................................23, 25

*Stamos v. Genesee Cty. Bd. of Canvassers*,
  46 Mich. App. 636 (1973) .................................................19

*Tashjian v. Republican Party of Conn.*,
  479 U.S. 208 (1986)........................................................31

*Taylor v. Louisiana*,
  419 U.S. 522 (1975)........................................................18, 34

*Touchston v. McDermott*,
  234 F.3d 1133 (11th Cir. 2000) ...........................................33

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*United States v. Texas*,
   445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v.
   United States*, 439 U.S. 1105 (1979) ...............................................27

*Walgren v. Bd. of Selectmen of Town of Amherst*,
   519 F.2d 1364 (1st Cir. 1975)...........................................................28

*Williams v. Rhodes*,
   393 U.S. 23 (1968)..............................................................................31

*Worden v. Mercer Cty. Bd. of Elections*,
   294 A.2d 233 (N.J. 1972) ...................................................................27

### STATUTES OTHER AUTHORITIES

52 U.S.C.A. § 10508 ..................................................................................32

Ariz. Rev. Stat. § 16-542 ...........................................................................18

Cal. Elec. Code § 3010 ...............................................................................18

Del. Code § 5504 ........................................................................................18

Ga. Comp. R. & Regs. 183-1-14-.01(1)......................................................7

Haw. Rev. Stat. § 11-102 ............................................................................18

Ind. Code § 3-11-4-20 ................................................................................18

Iowa Code Ann. § 53.8 ...............................................................................18

Minn. Stat. Ann. § 203B.07 ........................................................................18

Mo. Rev. Stat. § 115.285 ............................................................................18

Mont. Code § 13-13-214 .............................................................................18

N. M. Stat. Ann. § 1-6-8 .............................................................................18

Nev. Rev. Stat. § 293.323 ...........................................................................18

O.C.G.A. § 40-3-42......................................................................................12

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

O.C.G.A. § 48-2-46 ................................................................................12

O.C.G.A. § 48-7-57 ................................................................................12

O.C.G.A. § 21-2-381(b)(4) .......................................................................6

O.C.G.A. § 21-2-224 ..............................................................................12

O.C.G.A. § 21-2-234(c) ..........................................................................18

O.C.G.A. § 21-2-380(b) ............................................................................5

O.C.G.A. § 21-2-381(a)(1)(A), (C) ..........................................................6

O.C.G.A. § 21-2-381(a)(1)(G) ...........................................................7, 17

O.C.G.A. § 21-2-384(a)(2) ......................................................................10

O.C.G.A. § 21-2-384(b)-(c) ......................................................................8

O.C.G.A. § 21-2-385 ..............................................................................32

O.C.G.A. § 21-2-385(a) ..........................................................................13

O.C.G.A. § 21-2-386(a)(1)(F) ..................................................................9

O.C.G.A. § 21-2-499 ..............................................................................19

O.C.G.A. § 21-2-573 ..............................................................................21

O.C.G.A. § 2-21-570 ..............................................................................21

O.C.G.A. § 2-2-576 ................................................................................21

O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c) ..........................................19

Ore. Rev. Stat. § 254.473 ........................................................................18

R.I. Gen. Laws § 17-20-10 ......................................................................18

S. Rep. No. 97-417 (1982) ......................................................................33

U.S. Const. amend. XIV, § 1 ...................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

U.S. Const. Amend. XXIV, § 1 ...............................................................28

W. Va. Code Ann. § 3-3-5 ....................................................................18

Wash. Rev. Code § 29A.40.091............................................................18

Wis. Stat. Ann. § 6.87 .........................................................................18

# I.    INTRODUCTION

Yesterday, the nation watched Georgia's election system completely meltdown. Voters clad in masks waited hour long lines that snaked around city blocks to cast their ballot in the June Primary Election. Many of these voters—in the interest of safety during the pandemic and to avoid the chaos that ensued due to machine malfunctions, shortages of experienced poll workers, and overly packed polling locations—had applied for absentee ballots. But Georgia failed them. The deluge of absentee requests led to delayed ballot processing and mailing, and voters either did not receive their absentee ballots, or received them too late to timely return them.

With this motion, Plaintiffs seek to avoid this result in November by addressing several provisions of law that, separately and together, unless enjoined, will disenfranchise thousands of lawful, eligible Georgia voters. *First*, Georgia lacks uniform standards for notifying voters when their absentee ballot applications are incomplete ("Notification Process"). *Second*, it discriminates against voters under 65, requiring them to submit an absentee request for every election in an election cycle instead of one application per cycle like their older counterparts ("Absentee Age Restriction"). *Third*, Georgia requires voters to bear the burden and cost of postage to vote by mail ("Postage Tax"). *Fourth*, Georgia rejects mail ballots that

arrive after 7 p.m. on Election Day, even if the ballot was mailed before Election Day ("Receipt Deadline"). *Fifth*, with limited exceptions, Georgia prohibits third-parties from assisting voters with absentee ballots—a vital need given the influx of voters unfamiliar with absentee voting who will be voting for the first time in the pandemic ("Voter Assistance Ban").

Even before the pandemic—and the resulting uptick in absentee voting—Georgia rejected thousands of absentee ballots cast by eligible, registered voters each election, including more than 11,449 in 2018 alone for arriving late, omitting immaterial information, or purported signature problems. This widespread disenfranchisement is all but certain to dramatically increase in the November 3 election as voters increasingly turn to absentee voting to ensure that they can cast their ballots safely in the pandemic and to avoid the very chaos that they witnessed yesterday. Ordinarily, the impacts of these provisions on the right to vote are deeply troubling. But in the ongoing pandemic, they are constitutionally indefensible.

## II.   BACKGROUND

**A.   The COVID-19 pandemic has upended daily life and Georgia elections.**

A novel coronavirus has killed nearly 115,000 Americans and continues to spread. Ex. 73. There are now more than 50,000 known infections in Georgia, and

over 2,000 fatalities. Ex. 2 ¶20 (Ball Rpt.); Ex. 19.[1] These numbers underrepresent the virus's spread. *See* Exs. 19; 22; 23. Projections show the crisis persisting into the fall; social distancing will likely be required until a vaccine is developed and distributed in 2021. *See* Ex. 2 ¶¶27-28; Exs. 24; 25; 26; 27. This fall is likely to see another wave of infections "even more difficult than the one we just went through." Ex. 24; *see also* Ex. 2 ¶¶27-29. Even as Georgia has reopened, many have stayed home to stay safe. *See* Exs. 28; 29; *see also* Exs. 3 ¶¶6-7; 4 ¶3; 5 ¶4; 9 ¶3; 11 ¶5; 12 ¶9; 17 ¶7; 67 ¶3; 69 ¶3; 71 ¶9; *see also* Exs. 2 ¶20; 30.

The pandemic is also upending elections. *See* Ex. 2 ¶¶24-26. The Secretary twice postponed Georgia's primary as a result, Exs. 31; 32, and sent absentee ballot applications to 6.9 million active voters, encouraging them to vote by mail to protect their health, Ex. 33; *see also* Ex. 34. Georgia voters responded by requesting absentee ballots at record rates—over 1.9 million as of June 10. Ex. 1 at 3, 9 (Mayer Rpt.). Multiple counties were strained under the load of ballot processing, pulling in staff from other departments for assistance.[2] Exs. 39; 40. And the high demands led

---

[1] The exhibits are attached to the Declaration of Kevin J. Hamilton in support of this motion that is filed herewith. Notably, despite comprising only 32.4% of Georgia's population, approximately 80% of those hospitalized and 35% of those who have died from COVID-19 are African Americans. Ex. 2 ¶21; *see also* Exs. 19; 20; 21.

[2] As of May 26, just two weeks before the election, Fulton had over 25,000 ballots still waiting to be processed, leaving little to no time for those ballots to make it to the voter and back again using the mail. Ex. 41; *see* Exs. 42; 43; 44; 58.

to mailing delays, with nearly 84,000 ballots still in the mail just one week before the election. Exs. 38; 45.

At the same time, election officials encountered significant challenges with in-person voting: polling locations were unavailable, many poll workers—most over 65 and at high risk for COVID-19—cancelled, and election officials contracted COVID-19 resulting in more location closures and, tragically, at least one death.[3] Exs. 2 ¶24; 33; 34; 35; 36. Nevertheless, many would-be mail voters who did not receive their ballots in time, or who feared they could not return it in time to be counted, were forced to vote at those understaffed and over-run polling places. Exs. 3 ¶¶12-16; 11 ¶¶13-14; 13 ¶¶4-6; 14 ¶¶4-6; 16 ¶¶12-21; 17 ¶¶9-10; 18 ¶¶6-9; 67 ¶5; 68 ¶9; 69 ¶5-6; 71 ¶¶3-9; 91 ¶¶6-9; *see also* Ex. 74. The result was tragic: substantial numbers of voters had to wait in hours-long lines, clad in masks and gloves while risking their health to vote in person. *Id.*; *see also* Ex. 1 at 8-10; *see also* Exs. 45; 46; 75; 76; 77; 78; 79; 80; 81; 82; 83; 84; 85; 86; 87; 88. In some instances, even after hours of waiting, they were sent to another area to continue waiting to cancel

---

[3] In Fulton, at least 30 locations have refused to serve as polling locations and fewer than 500 of the county's typical 1,600 poll workers committed to work the election. Exs. 35; 37; *see also id.* (Paulding lost one-third of 325 workers; Lowndes and Cobb lost 40%). And there will be nearly 80 fewer places to vote in the greater metro-Atlanta, which is home to the bulk of the state's voting population. Ex. 66. More than 10% of polling places have been relocated statewide. *Id.*

their absentee ballot or cast a provisional ballot or turned away altogether because inexperienced poll workers thought they could not vote if they had an absentee request on file. Exs. 3 ¶15; 79; *see also* Ex. 1 at 8-10.

The primary election was not just a disaster, it was a dire warning of things to come. The challenges Georgia failed to overcome will be far worse in November as absentee ballot requests increase—both due to the pandemic, Ex. 2 ¶¶26-29, and the increase in turnout in a presidential general election, Ex. 1 at 3-4, 10-11, 32-33. Absentee ballot turnout in November could be twice that of the June Primary—reaching up to 4 million voters. *Id*. at 10-11. Many of these voters will be first-time or new mail voters, less familiar with absentee voting and more likely to make mistakes. *Id.* at 5-6, 9, 11, 23, 25-28.

**B.    Georgia's absentee system will disenfranchise thousands in November.**

Georgia voters have the right to vote by mail. O.C.G.A. § 21-2-380(b). Normally, mail ballots are essential for voters whose temporary location, disabilities, work schedules, family care responsibilities, or lack of access to transportation or polling places make in-person voting difficult or impossible. *See* Ex. 1 at 6; *see also* Exs. 5 ¶7; 6 ¶3; 7 ¶¶2-3; 10 ¶3; 15 ¶3; 70 ¶4; 90 ¶2. During the pandemic, mail voting is essential to protect voters' health. *See* Ex. 2 ¶26; *see also* Exs. 3 ¶¶ 6-7; 4

¶3; 8 ¶9; 9 ¶3; 11 ¶¶3-5; 13 ¶3; 14 ¶3; 16 ¶¶20-22; 17 ¶7; 18 ¶3; 67 ¶3; 68 ¶4; 69 ¶¶9-10; 89 ¶13; 91 ¶¶4-5. But the challenged provisions impose significant burdens.

### 1.    Notification Process

To vote absentee, a voter must submit an application with sufficient identifying information—i.e., name, date of birth, phone number, email address, registration address. O.C.G.A. § 21-2-381(a)(1)(A), (C). If the official reviewing the application is unable to identify the voter, they must "promptly write [the voter] to request additional information." *Id.* § 21-2-381(b)(4). "Promptly" is not defined.

Even in ordinary times, the Notification Process risks disenfranchising voters. Voters notified of application issues late in the cycle may not be able to rectify them in time to cast an absentee ballot. *See* Exs. 3 ¶¶8-10; 7 ¶6; 89 ¶8. Out-of-state and disabled voters, or those without transportation access, cannot utilize in-person voting, and will be disenfranchised. Ex. 1 at 6; *see also* Exs. 5 ¶7; 6 ¶3; 7 ¶¶2-3; 10 ¶3; 15 ¶3; 70 ¶4; 89 ¶9; 90 ¶7; 91 ¶9.

This risk is heightened during the pandemic as substantially more voters request absentee ballots. Ex. 1 at 3, 7-11, 33-34; *see also* Exs. 38; 39; 40; 41; 45; 72 (absentee processing delays due to "historically high volume of [] requests"). Many are new voters, or new absentee voters, who are less familiar with the application and, thus, more likely to make mistakes requiring "prompt" attention. *See* Ex. 1 at

5-7, 26-29; *see also* Ex. 3 ¶¶6-8; 89 ¶¶4-5. Given that there is no uniform standard, voters in different counties (and even within counties) will be notified of errors at different times, with voters in some counties being notified later than others, creating a disparate risk of disenfranchisement across Georgia's 159 counties. *See* Ex. 1 at 14-15.

### 2. Absentee Age Restriction

Voters of "advanced age," i.e., 65 or older at the time of the request, Ga. Comp. R. & Regs. 183-1-14-.01(1), may submit one application for a presidential preference primary, primary, and any resulting runoffs (commonplace in Georgia) or general elections, O.C.G.A. § 21-2-381(a)(1)(G). No justification is required. *See* Ex. 47. Younger voters, however, cannot make a single request and must submit a separate application for each election, *see* O.C.G.A. § 21-2-381(a)(1)(G), increasing the likelihood of application errors and the risk of receiving their ballot late. Ex. 1 at 15-16. As the pandemic ensues and requests rise, delays will grow, increasing the gap between younger and older voters as officials come under more strain. *Id.*

### 3. Absentee Postage Tax

Georgia requires voters to pay for postage to return their mail ballot. Ex. 48 at 5. The Postage Tax imposes monetary and transaction costs on voting. The cost to vote a mail ballot starts at $0.55 for a USPS Forever Stamp but can increase if the

ballot is several pages long, requiring more postage. *See, e.g.*, Ex. 49 ($1.50 in postage). In the 2017 Postal Omnibus Survey, a quarter of respondents considered the then $0.49 Forever Stamp to be "expensive."[4] Ex. 50; *see also* Ex. 1 at 12-13. As unemployment skyrockets in the pandemic—to date, nearly 1.9 million Georgians are unemployed, *see* Ex. 53—the Postage Tax creates obstacles for many more voters now in dire financial straits.[5] *See* Ex. 5 ¶2; *see also* Ex. 1 at 12-13.

Even where a voter has stamps, absentee ballots are generally a non-standard size, include two envelopes, and have varying weight. O.C.G.A. § 21-2-384(b)-(c). Thus, the correct postage is far from apparent. Exs. 4 ¶7; 6 ¶11; 7 ¶8; 12 ¶5; 15 ¶7 (election official: put "however much [postage] you think" on ballot envelope); 70 ¶11; 71 ¶11; *see also* Ex. 1 at 12. This ambiguity drives many voters to make one or more costly—and now dangerous—trips to the post office. Exs. 4 ¶¶4-7; 5 ¶¶5-6; 6

---

[4] Voters do not always have stamps. Exs. 3 ¶17; 4 ¶4; 5 ¶¶5-6; 9 ¶7; 10 ¶¶4-7; 12 ¶4; 15 ¶6; 16 ¶24; 67 ¶9; 89 ¶7. Unless a voter can order a sheet of stamps online for $11.00, pay for shipping, and wait 7-10 days for delivery, or has access to a stamps.com account and printer, *see* Exs. 1 at 12-14; 51; *see also* Exs. 15 ¶6 (paid $12.30 to vote in Primary); 69 ¶12 (purchased stamps online but never received them), obtaining postage requires an in-person purchase, *see* Ex. 1 at 1-14.

[5] The crisis also exacerbates the ancillary burdens of obtaining postage: voters must break social-distancing protocol and have in-person interactions that risk spreading or contracting COVID-19. *See* Ex. 1 at 12-14; Ex. 2 ¶¶17; Exs. 24; 25. Given that many requesting mail ballots will do so precisely because of health concerns, purchasing stamps if they do not already have them will impose significant burdens. *See* Exs. 3 ¶17; 4 ¶¶4-7; 5 ¶¶5-6; 15 ¶6; 17 ¶13; 67 ¶9; 69 ¶12. Thus, such voters will be delayed in, or unable to, return their ballot by mail. Exs. 10 ¶¶ 4-7; 16 ¶24.

¶11; 12 ¶5; 16 ¶24; 69 ¶12; 70 ¶11; *see also* Ex. 1 at 13-14. For voters who are elderly, disabled, live far from a post office, or have limited transportation, the Postage Tax imposes significant transaction costs on mail voting. *See* Ex. 1 at 13-14 ("pre-paid ballot postage . . . concretely and noticeably reduces direct and time costs of absentee voting."); *see also* Exs. 4 ¶¶4-7; 5 ¶¶5-6; 10 ¶¶4-7; 15 ¶6; 89 ¶7; 91 ¶5.

### 4. Receipt Deadline

Georgia rejects mail ballots received after 7:00 p.m. on Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(F). This is true regardless of the date the voter mails the ballot, even if it is postmarked by Election Day, and even if late arrival is entirely beyond the voter's control.

In the 2018 general election, over 3,500 ballots were rejected because of the Receipt Deadline, a number which is certainly an undercount. Ex. 1 at 4, 20-23, 33-34. In 2016, at least 47% of all rejected absentee ballots were rejected for arriving after the Deadline. Ex. 1 at 4. The Deadline is particularly likely to disenfranchise young voters: voters under 26 have rejection rates of between 4% and over 8% (for 18-year-olds). Ex. 1 at 3-7, 26-29. Voters temporarily living out-of-state who have no other way to vote in Georgia are also acutely impacted, with a rejection rate of 7.2%. *Id.* Nearly half of these voters (43.2%) are between 18 and 24. Ex. 1 at 26-29. The rate of disenfranchisement has increased over time. Ex. 1 at 22.

The Receipt Deadline means that ballots are rejected even when voters have completed and mailed them by Election Day. Exs. 6 ¶¶4-7; 7 ¶5; 8 ¶¶4-7. Because election officials fail to "immediately" send absentee ballots to voters, *see* O.C.G.A. § 21-2-384(a)(2), or because of mail delays, many voters who timely request absentee ballots receive them when it is too late to return them by mail.[6] Exs. 6 ¶¶4-7 (temporarily out of state, received ballot day before election); 70 ¶¶6-8 (same); 90 ¶¶4-6 (never received ballot out of state); *see also* Exs. 74; 78; 79; 81; 82; 84; 85; 87. USPS recommends that voters mail their ballots a week before Election Day. *See* Ex. 42 at 19; Ex. 1 at 18. But neither Georgia nor its counties advise voters of this. And, even if they did, even a week appears likely to be insufficient under the current circumstances, where USPS is under significant pressures as a result of the virus and substantial increases in absentee voting. *See infra* 12; Ex. 8 ¶¶4-7 (ballot mailed weeks before Election Day discarded due to Receipt Deadline). In some cases, the Receipt Deadline disenfranchises even voters who have dropped their ballot off at the election office on Election Day. Exs. 10 ¶5 (ballot dropped off on Election Day discarded due to Receipt Deadline); 12 ¶¶6-8. Worse yet, countless voters cannot

---

[6] For example, after the 2018 General Election, it took a lawsuit to force Dougherty County to count ballots that arrived after the Receipt Deadline because officials had failed to timely mail them due to a hurricane and even though the ballots were further delayed due to the shutdown of a USPS distribution facility. Exs. 56; 57, *Democratic Party of Ga. v. Burkes*, No. 1:18-CV-00212-WLS (M.D. Ga. Nov. 9, 2018).

meet the Deadline because they are not sent a ballot with adequate time to mail and return it. Exs. 3 ¶¶9-10, 18-20; 11 ¶¶13-14; 13 ¶6; 14 ¶¶14; 16 ¶¶4-12; 17 ¶¶10-11; 18 ¶¶6-8; 67 ¶¶4-7; 68 ¶9; 69 ¶¶4-6; 71 ¶5; 89 ¶8; 90 ¶5; 91 ¶¶6-10 *see also* Exs. 74; 78; 79; 81; 82; 84; 85; 87. These are not isolated incidents and will increase in November given the historic volume of absentee applications, and the increasingly late mailing of ballots.[7] Exs. 34; 38; 39; 40; 43; 44; 45; 74; *see also* Ex. 1 at 2, 4, 7-10, 24, 33-34.

This year's anticipated surge of mail ballots will not only put an unprecedented strain on election officials, but it also threatens to overwhelm USPS, which is suffering from severe budgetary shortfalls, staffing shortages, and reduced capacity. *See* Exs. 43; 44; 58. The consequences of which are already playing out in Georgia and nationwide in the form of delayed mail. Exs. 6 ¶10; 7 ¶9; 10 ¶8; 12 ¶¶ 11-12; *see also, e.g.*, Ex. 59 ("numerous reports of absentee ballots not being delivered" in time); Ex. 60 (Ohio mail delays 7 to 9 days long).

---

[7] A mere two weeks out, Georgia's most populous county had a 25,000-application backlog—which, even if promptly cleared, left at most, seven days for ballots to be mailed to voters and returned. Ex. 41. Six days before Election Day, roughly 84,000 ballots were still on their way to voters. Ex. 45. This timeframe is well short of the one-week mailing time recommended by USPS, Ex. 42, and forced thousands to risk their health to ensure their right to vote, Exs. 9 ¶4 (waiting for ballot days before election); 11 ¶13 (same); 16 ¶¶3-22 (forced to vote in person due to late ballot); 17 ¶10 (same); 18 ¶8 (same); 67 ¶5; 68 ¶9 (same); 71 ¶5 (same); *see also* 45, 46, 60.

Thus, it is nearly certain that the Receipt Deadline will disenfranchise substantial numbers of Georgians who vote by mail in November. Expert analysis conservatively estimates that if mail voting rejection rates occur at the same rates, they did in 2018 and 2016, over 60,000 voters could be disenfranchised. Ex. 1 at 2, 4, 7-10, 24, 33-34.

This is hardly surprising. In addition to the sheer increase in vote-by-mail turnout, many of these voters are typically in-person voters and are likely to be "late deciders" who make determinations closer to Election Day, will be less familiar with mail-voting requirements, e.g., the Receipt Deadline, and more likely to mail ballots later.[8] Ex. 1 at 27-29 (2% rejection rate inexperienced voters; 0.2% experienced); Exs. 3 ¶¶6-7; 4 ¶¶8-9; 10 ¶9; 89 ¶4; 91 ¶4.

## 5.   Voter Assistance Ban

Georgia's disenfranchisement of voters due to the Receipt Deadline shows that voters need assistance returning ballots. This assistance is crucial for voters for whom personally returning their ballot (particularly if received too late to mail) will

---

[8] Nor would it be unreasonable for voters to think that their ballots would be counted if postmarked by Election Day, as many other deadlines in their lives—including voter registration deadlines—are postmark deadlines. *See, e.g.*, O.C.G.A. § 21-2-224 (accepting voter registrations postmarked by deadline); *id.* § 48-7-57 (applying postmark deadline to tax returns); *id.* § 48-2-46 (applying postmark deadline to tax protests); *id.* § 40-3-42 (applying postmark deadline to title applications).

impose significant burdens—including those voters who are or who have close contact with someone vulnerable to COVID-19, voters with disabilities, low-income voters, and young voters, many of whom lack transportation access. *See* Ex. 1 at 5-7, 31-32. Georgia law, however, prohibits anyone who is not part of a limited category of family and household members, caregivers, or detention facility employees from assisting with returning signed, sealed absentee ballots. O.C.G.A § 21-2-385(a). A substantial number of voters—including those among the nearly 1 million Georgian single-member household residents, 338,193 of whom are 65 or older, Ex. 1 at 31-32—are cut off from assistance. Exs. 4 ¶10; 5 ¶8. The 27.2% of Georgians who are disabled are limited in their choice of assistance. Ex. 61.

Even under normal circumstances, the Ban makes it needlessly difficult for certain voters to receive help, especially those who live alone, have no family members to deliver ballots, and have disabilities but no caretakers. Ex. 1 at 5-7, 31-33; Exs. 4 ¶10; 5 ¶8; 10 ¶10; 89 ¶6. But the Ban presents even greater obstacles in the ongoing pandemic. Family and household members who previously assisted with hand-delivering mail ballots may be reluctant to do so due to safety concerns. *See* Ex. 10 ¶10. With the expected surge in mail voters, particularly from voters who are most vulnerable to COVID-19, voters will need help from organizations that are able to deploy trained organizers to ensure voters' ballots are returned in time to be

counted. *See* Ex. 1 at 31-33; Exs. 3 ¶21; 4 ¶10; 5 ¶8; 8 ¶10; 9 ¶8; 10 ¶10; 11 ¶18; 12 ¶10; 89 ¶6; 91 ¶10. Third-parties who are trained can also remind voters to sign their ballots and include necessary identifying information—missteps that have resulted in the disenfranchisement of thousands before and are likely to do so again, and in greater numbers, in November. Ex. 1 at 31-33. The Ban prevents voters from accepting (and organizations from deploying) that help.

## III.    ARGUMENT

Plaintiffs are entitled to a preliminary injunction because: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury absent such relief; (3) their injury outweighs possible harm Defendants will suffer; and (4) an injunction is in the public interest. *GeorgiaCarry.org v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015).

## A.    Plaintiffs are likely to succeed on the merits.

### 1.    Plaintiffs' Right-to-Vote Claim

The challenged provisions severely burden the right to vote with unjustifiable barriers to casting an absentee ballot, particularly during a public health crisis.

Under the *Anderson/Burdick* balancing test, the Supreme Court requires courts to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the

State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). This inquiry is fact-specific and may not be undertaken by rote. The court applies a "flexible standard," *id.*: the more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318, 1319 (11th Cir. 2019).

When voting rights are severely restricted, a law "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even less severe burdens remain subject to balancing: "However slight" the burden may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).[9] Complete disenfranchisement is—obviously—a "severe" burden. *See Lee*, 915 F.3d at 1321 ("it is a 'basic truth that even one disenfranchised voter—let alone several thousand—is too many'") (quoting *League of Women Voters of N.C.*

---

[9] In evaluating burden, a court must focus not only on the burden on the general electorate, but also on the burden on the actual individuals impacted. *Id.* at 201. "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216-20 (N.D. Fla. 2018).

*v. North Carolina ("LWV NC")*, 769 F.3d 224, 244 (4th Cir. 2014)).

The challenged provisions separately and cumulatively inflict undue burdens on Plaintiffs' voting rights that cannot be justified by Georgia's interests in them.

*First*, Georgia's Notification Process threatens voters with the severe burden of disenfranchisement. Without uniform guidelines, notifying voters of application insufficiencies takes place solely at the discretion of local officials, treating voters differently depending on where they live, and the strain officials are under at the time.[10] The consequences can be severe, as later notification reduces the time a voter has to receive, vote, and return their ballot. *Supra* II, B1. During the pandemic, with absentee ballot applications overwhelming officials, these burdens will only increase—as will the disparities between the counties. *Supra* II, B1.

There is no justification for the lack of uniform standards. In other contexts, such as signature matching, the State provides clear rules for prompt notification. *See* Ga. Comp. R. and Regs. 183-1-14-.13 (election officials must notify voters

---

[10] *Supra* II, B1; *see also Democratic Exec. Comm. of Fla.*, 915 F.3d at 1320 (finding severe burden because "Florida allows each county to apply its own standards and procedures [] virtually guaranteeing a crazy quilt of enforcement of the requirement from county to county").

within three business days of absentee receipt or by next business day, during eleven days before election). There is no reason the State cannot do so here.[11]

*Second*, the Absentee Age Restriction imposes substantial burdens on voters under 65, forcing them to apply for absentee ballots each election, increasing the risk of errors, substantial processing times, and late ballot returns. *Supra* II, B2. During the pandemic, these risks are even more severe as absentee ballot requests are skyrocketing, placing more pressure on election officials and corresponding delays in application processing and ballot mailing. *Supra* II, B2. There is no justification for these burdens. Not only is a streamlined request process by which a voter can submit one request for absentee ballots each cycle already available to voters 65 and over, *see* O.C.G.A. § 21-2-381(a)(1)(G); *Martin*, 341 F. Supp. 3d at 1339-40, but including younger voters would decrease administrative burdens, reducing the number of applications that need to be processed. *See* Ex. 1 at 15-16.

*Third*, the Postage Tax imposes monetary costs on voters, a burden that is particularly severe this year, when mail voting offers voters the safest method of voting. *Supra* II, B3. It forces voters to risk their health to obtain postage, deterring

---

[11] *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339-40 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) ("Because many of the procedures Plaintiffs request are already in place, the Court finds that additional procedures would involve minimal administrative burdens[.]").

voters with disabilities, limited access to transportation, and concerns about contracting COVID-19 from voting. *Supra* II, B3. The State has no adequate justification for failing to pre-pay postage for such ballots. Georgia provides prepaid postage in other voting contexts.[12] *See* O.C.G.A. § 21-2-234(c) (confirmation notice of voter's address "shall be a postage prepaid"). Its failure to do so here—at most— is purely a matter of administrative convenience, which cannot outweigh burdens on fundamental rights. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975). And Congress has allocated $10 million for Georgia to use for COVID-related election expenses, which can cover the cost of postage. *See* Ex. 62.

*Fourth*, even before the onset of the pandemic, the Receipt Deadline severely burdened the right to vote, disenfranchising thousands of lawful voters—more than 6,600 in statewide general elections since 2014, *see* Ex. 1 at 4—simply because their ballots were received after 7:00 p.m. on Election Day. *Supra* II, B4. For those voters who, through no fault of their own, do not receive a mail ballot until shortly before Election Day, or whose ballots take longer than expected to arrive in the mail, the

---

[12] At least sixteen states prepay postage on absentee ballots. *See* Ariz. Rev. Stat. § 16-542; Cal. Elec. Code § 3010; 15 Del. Code § 5504; Haw. Rev. Stat. § 11-102; Ind. Code § 3-11-4-20; Iowa Code Ann. § 53.8; Minn. Stat. Ann. § 203B.07; Mo. Rev. Stat. § 115.285; Mont. Code § 13-13-214; Nev. Rev. Stat. § 293.323; N. M. Stat. Ann. § 1-6-8; Ore. Rev. Stat. § 254.473; R.I. Gen. Laws § 17-20-10; Wash. Rev. Code § 29A.40.091; W. Va. Code Ann. § 3-3-5; Wis. Stat. Ann. § 6.87.

burden is severe: total disenfranchisement. The number of voters disenfranchised by the Deadline is all but certain to increase as election officials and USPS are crushed under a surge of requests for mail ballots. *Supra* II, B4; *see also* Ex. 1 at 7-10, 24, (60,000 disenfranchised due to Deadline). This is a severe and unjustifiable burden.[13]

The State has no adequate justification for discarding these mail ballots.[14] Provisional and absentee ballots can be cured up to three days after Election Day, *see* O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c), and Georgia does not even finalize results for 17 days after the election, *see* O.C.G.A. § 21-2-499. Thus, extending the Deadline would not jeopardize the State's ability to finalize election results. *See* Ex. 55, *Driscoll*, at *11 (no adequate interest where no impact on election certification).

Wisconsin's recent experience is instructive. In April, a Wisconsin federal court extended the deadline for receipt of absentee ballots because voters were at risk of being disenfranchised by Wisconsin's election day receipt deadline. *See*

---

[13] Courts have regularly found a severe burden where laws disenfranchised far fewer voters than the number of Georgians disenfranchised here. *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (severe burden where 3,141 individuals impacted); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 948–49 (W.D. Wis. 2016) (same; fewer than 100 voters).

[14] *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) ("NEOCH") (likely constitutional violation after state failed to identify "precise interests" justifying "substantial burden" when ballots were rejected due to no fault of the voter); *see also Doe v. Walker*, 746 F. Supp. 2d 667, 681–83 (D. Md. 2010) (extending deadline for overseas ballots where ballots sent too late for timely return); *Stamos v. Genesee Cty. Bd. of Canvassers*, 46 Mich. App. 636, 645–46 (1973).

*Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at *5, *12, n.14 (W.D. Wis. Apr. 2, 2020). The court concluded that "the state's general interest in the . . . deadline is not so compelling as to overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by" its enforcement." *Id.* at *17. The Seventh Circuit affirmed. *See* Order, *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30. The Supreme Court, evaluating the extension under *Anderson-Burdick*, agreed it was appropriate to require the state to count ballots mailed by Election Day. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020); Ex. 54, at 7 (postmark deadline resulted in counting nearly 80,000 ballots); Ex. 55, *Driscoll, et al. v. Stapleton*, No. DV 20-408, at *17 (Mont. D. Ct. May 22, 2020) (preliminarily enjoining receipt deadline, instituting postmark deadline).[15] Plaintiffs seek the same relief here.

 *Finally*, the Voter Assistance Ban imposes undue burdens on Georgia voters, prohibiting voters from obtaining help in casting their mail ballot. Those without

---

[15] Although one court recently declined to enjoined South Carolina's Receipt Deadline, *see Middleton v. Andino*, No. 3:20-cv-01790, ECF No. 31 (D.S.C. May 25, 2020), the court did so after attributing late ballots to South Carolina voters' failure to submit their ballots on time. Here, Plaintiffs have presented extensive evidence that Georgia voters are being disenfranchised by the Receipt Deadline for reasons outside their control, and the state cannot disenfranchise these voters in a manner consistent with the Constitution. *See NEOCH*, 696 F.3d at 597.

access to postage, who lack easy access to reliable transportation, who are concerned about the risk in-person voting poses to their health or the health of their loved ones, and who do not have a family or household member or caretaker who can assist them—including, the nearly 1 million Georgians who live alone, Ex. 1 at 31-32—will be unable to return their ballot. *Supra* II, B5. These burdens disproportionately fall on Georgia's minority voters and vulnerable populations. *See id.* They are also exacerbated during the pandemic: voters who are at high risk for complications from COVID-19 cannot take trips outside of their home—even to deliver their ballot, or to deliver that of a family or household member—without risking their health. *Supra* II, B5. A generalized interest in promoting "election integrity" is insufficient to outweigh these burdens.[16] This is particularly so where *many* other Georgia laws already criminalize undue influence or voting fraud and where ballot collection fraud is virtually nonexistent. [17]

The challenged provisions compound each other, cumulatively burdening

---

[16] *One Wis. Inst.*, 198 F. Supp. 3d at 903 ("[A] preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections."); *LWV NC*, 769 F.3d at 246 ("states cannot burden the right to vote [] to address dangers that are remote and only theoretically imaginable," such as "election integrity and fraud protection,") (quotation omitted).
[17] *See, e.g.*, O.C.G.A. § 21-2-573 (prohibiting fraud in connection with casting a vote); id. § 2-2-576 (prohibiting destruction or delay in delivery of ballots); *id.* § 2-21-570 (preventing vote-buying and vote-selling); Ex. 1 at 32-33.

Georgia voters. The time spent obtaining postage, for example, makes it more likely that a voter will mail their ballot later and, therefore, that it will be rejected for arriving late. Likewise, voters unable to obtain postage are more likely to need assistance and are at risk of having their ballot arrive late without it. Delays in informing voters about application problems and resultant delays in sending ballots to voters all lead to ballots being returned late and voters disenfranchised.

Even if this Court determines that any of the challenged provisions impose minimal burdens on the right to vote, it must still consider whether Georgia's interests are "sufficiently weighty" to impose those burdens. *Norman*, 502 U.S. at 288–89. There are no state interests sufficient to outweigh these increasing burdens on Georgian's voting rights, particularly during the present pandemic.

### 2.    Plaintiffs' Procedural Due Process Claim

The Notification Process and Receipt Deadline deprive voters of their liberty interest in voting without adequate procedural safeguards. The Due Process Clause prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. Which protections are due requires a careful analysis of the importance of the rights and interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Courts must consider (1) "the private interest" affected, (2) "the risk of an erroneous deprivation" of that interest due to

current procedures, and (3) the "probable value . . . [of] additional or substitute procedures," accounting for any "administrative burdens." *Grayden v. Rhodes*, 345 F.3d 1225, 1233 (11th Cir. 2003) (quoting *Mathews*, 424 U.S. at 335).

These factors weigh in Plaintiffs' favor. *First*, the nature of the private interest—voting and having one's ballot counted—is extraordinarily important. *See Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964). This interest extends to mail voting, which Georgia has conferred upon its citizens. *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1338; *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018).

*Second*, the risk of erroneous deprivation from these provisions are high. Public data from Georgia establishes that thousands of voters' mail ballots have been rejected as late every election cycle. *Supra* II, B4. The "cutoff" to mail a ballot varies depending primarily on USPS's state, *supra* at II, B4, making it patently unreliable and confusing. The problems in Georgia's processing of applications leads directly to these delays as many voters are not even notified of issues until they affirmatively reach out, *see* Exs. 9 ¶4; 11 ¶¶10-13, and other ballots are mailed too late for voters to timely return them, *see* Ex. 6 ¶¶4-6; 14 ¶14; 16 ¶¶6-12; 67 ¶¶4-5; 68 ¶¶5-8; 71 ¶¶3-4. *See, e.g.*, *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("To disenfranchise citizens whose only error was relying on poll-worker instructions [is] fundamentally unfair."). Not only can the Notification Process leave

voters without meaningful notice that their applications have not been accepted due to missing information, but it permits election officials among Georgia's 159 counties to interpret "promptly" in differing and arbitrary ways—which is neither fair nor reliable. *See Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1336 (N.D. Ga. 2019) ("[W]hen a state accords arbitrary and disparate treatment to voters, [they] are deprived of their constitutional rights to due process and equal protection."). A state's elections system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1185 (11th Cir. 2008) (Barkett, J., concurring and dissenting in part).

*Third*, the value of additional or substitute procedural safeguards to ensure that mail voters' votes are counted is readily apparent. A substitute procedure—requiring Georgia to count mail ballots that are mailed on or before Election Day and received within five-business days after solves the inequities inherent in the Receipt Deadline. It not only offers Georgia voters a reliable date by which to cast their ballots, it also ensures that voters who receive their ballots shortly before Election Day are able to access the franchise and helps protect against postal service

delays. *See* Ex. 1 at 17-18 (85% of late ballots arrived 5 business days after election). Counting these ballots also imposes little administrative burden on the State. *Supra* III, A1. Likewise, requiring election officials to uniformly notify voters about missing information by text message, email, and mail within three days of receiving the ballot or by the next day, during the eleven days prior to the Election—a procedure nearly identical to that used to notify voters of a rejected ballot for signature mismatch, *see* Ga. Comp. R. & Reg. 183-1-14-.13—would put little additional burden on the State.[18]

Having conferred the right to vote by mail, Georgia must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. *Cf. Saucedo*, 335 F. Supp. 3d at 217. Because the Receipt Deadline and Notification Process are inadequate in all those respects, and Georgia can institute a substitute procedure to protect voters' rights with minimal burden, these provisions violate Georgia voters' procedural due process rights.

### 3.    Plaintiffs' Equal Protection Claim

Georgia's Notification Process, which allows different counties to apply different standards to notify voters of problems with their absentee application, is

---

[18] *See Martin*, 341 F. Supp. 3d at 1339-40 ("Because [] the procedures Plaintiffs request are already in place, . . . additional procedures would involve minimal administrative burdens").

"[in]consistent with [the] obligation to avoid arbitrary and disparate treatment of the members of [the] electorate." *Bush v. Gore*, 531 U.S. 98, 105 (2000). "[O]nce granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05; *see also Curling*, 403 F. Supp. 3d at 1336 ("Voters also enjoy a Fourteenth Amendment right 'to participate equally in the electoral process.'") (quoting *Democratic Executive Comm. of Fla.*, 915 F.3d at 1319). But the Notification Process allows counties to do just that, inviting them to interpret "promptly" however they choose and to notify voters on their own timetable about issues with their absentee applications. The timing and method of notification is left to a county's discretion and the result depends solely on where a voter lives, and the time election officials have to process the application. *See Bush*, 531 U.S. at 103, 105-107 (finding "standardless manual recounts" violated Equal Protection Clause where different counties used "varying standards to determine what was a legal vote"). Thus, similarly situated voters are placed on unequal terms, and their right to vote is burdened without justification. *Supra* II, B1. Without "specific rules designed to ensure uniform treatment" to prevent "arbitrary and disparate treatment to voters" based on which county or local jurisdiction they live in, *Bush*, 531 U.S. at 106-07, the Notification Process violates the Equal Protection Clause.

### 4.    Plaintiffs' Twenty-Sixth Amendment Claim

Georgia's Absentee Age Restriction targets voters under 65 on its face, violating the Twenty-Sixth Amendment, which forbids abridging or denying voting rights on account of age.[19] Although commonly known as the Amendment that lowered the voting age to 18, its text is more expansive and reflects that its goal "was [to] . . . affirmatively [] encourage [youth] voting, through the elimination of unnecessary burdens and barriers." *Worden*, 294 A.2d at 243. A state cannot make it harder for younger voters (or anyone) to vote simply because of their age, but that is precisely what the Absentee Age Restriction does.

Georgia's requirement that voters under 65 submit an absentee application each election (versus one each cycle, as voters over 65 are permitted to do), serves no purpose other than to make it harder for younger voters to vote absentee. The repeated submission of absentee applications makes younger voters more susceptible to application rejections and concomitant delays in mailing and receipt of their ballots. *Supra* II, B2. These burdens are stark in the pandemic where absentee

---

[19] *See League of Women Voters of Fla., Inc*., 314 F. Supp. 3d at 1222; *see also Ownby v. Dies*, 337 F. Supp. 38, 39 (E.D. Tex. 1971) (Twenty-Sixth Amendment violated by statute that required heightened standard for individuals under 21 to establish residency for voting); *United States v. Texas*, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (same); *Worden v. Mercer Cty. Bd. of Elections*, 294 A.2d 233, 245 (N.J. 1972) (same).

voting is the only form of voting that may be safe for many younger voters, particularly those with high risk health conditions. *Supra* II, 1; II, B2.

When a law is "unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters," the law is "facially discriminatory" in violation of the Twenty-Sixth Amendment.[20] There is no reason that the same opportunity to submit one absentee application cannot be afforded to younger and older voters alike. *Supra* II, B2. The restriction discriminates against younger Georgia voters on the basis of age and in violation of the Twenty-Sixth Amendment.

### 5.  Plaintiffs' Poll Tax Claim

Plaintiffs are likely to succeed on their claims that the Postage Tax violates the Fourteenth and Twenty-Fourth Amendments. The latter Amendment provides that the right to vote "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. Amend. XXIV, § 1; *see also Harman v. Forssenius*, 380 U.S. 528, 540-41 (1965); *Jones et*

---

[20] *League of Women Voters of Fla., Inc*., 314 F. Supp. 3d at 1222; *see also Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1367 (1st Cir. 1975) (where a law is "imposed solely or with marked disproportion on the exercise of the franchise by the benefactors of [a particular] amendment," it is likely unexplainable on other grounds and is discriminatory).

*al. v. DeSantis et al.*, No. 4:19-cv-00300, slip op. at 73 (N.D. Fla. May 24, 2020). The Fourteenth Amendment also prohibits imposing fees on the franchise.[21]

Georgia does what the Twenty-Fourth Amendment and the U.S. Supreme Court's decision in *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 666 (1966), prohibit: conditions casting a mail ballot on paying a fee. Unlike incidental voting costs, Georgia instructs that postage is *required* to cast a mail ballot. *Supra* II, B3. Fees imposed on voting violate the Twenty-Fourth Amendment if they function as taxes, *see Jones*, at *73, and courts must use a "functional approach" to determining whether a fee is a "tax."[22] The "essential feature of any tax" is that "i[t] produces at least some revenue for the Government." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 564. USPS stamps are one of the primary streams of revenue for the Postal Service, raising billions of dollars for the agency. *See* Ex. 63; *see also* Ex. 64 ("The Postal Service relies on the sale of postal products . . . to fund our operations"). While such a fee is always unconstitutional, during the pandemic postage has

---

[21] *See M.L.B. v. S.L.B.*, 519 U.S. 102, 124 n.14 (1996) ("[V]oting cannot hinge on ability to pay . . . for it is a 'fundamental political right . . . preservative of all rights.'" (*quoting Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This analysis is the same regardless of whether a voter is able to pay. *See Harper*, 383 U.S. at 668 (fee unconstitutional "whether the citizen . . . has $1.50 in his pocket or nothing at all").
[22] *See Jones*, at *73-74 (*citing Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-66 (2012)); *see also Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1366-67 (N.D. Ga. 2005) (paying for ID was a "material requirement" to vote amounting to a poll tax).

become a prerequisite for *voting*, period, for thousands of Georgia voters, including those who are uniquely susceptible to the virus. It forces them to pay "a price for the privilege of exercising the franchise," *Harman*, 380 U.S. at 539, violating the Twenty-Fourth and Fourteenth Amendments.

### 6.    Plaintiffs' First Amendment Claim

The Voter Assistance Ban prevents Plaintiffs from engaging in election-related speech and associational activities aimed at encouraging voters to participate in the political process—activity protected by the First Amendment. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999); *Meyer v. Grant*, 486 U.S. 414, 421 (1988). [23] Cases involving "limitation[s] on political expression [are] subject to exacting scrutiny." *Meyer*, 486 U.S. at 420. Just as the Supreme Court struck down as an unconstitutional restriction of political expression Colorado's criminalization of paying circulators to collect petition signatures, *see id*. at 428, Georgia cannot prohibit individuals from helping voters return their ballots. This

---

[23] *See Hadnott v. Amos*, 394 U.S. 358, 364 (1969) (First Amendment rights "include the right to band together for the advancement of political beliefs."); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986)) ("An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'"); *see also Buckley v. Valeo*, 424 U.S. 1, 15 (1976) ("[T]he First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas.") (internal citations omitted)).

burdens speech by "limit[ing] the number of voices who will convey [The New Georgia Project's ("NGP")] message," and "the size of the audience [it] can reach." *Id*. at 422-23. Given the current crisis, the form of speech that NGP seeks to engage in is "the most effective, fundamental, and [likely] economical avenue of political discourse," yet it is foreclosed by the Ban. *Id.* at 424; *see* Ex. 3 ¶21.

The Ban is also an unconstitutional restriction on NGP's right to associate. First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott*, 394 U.S. at 364. An organization's "attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *Tashjian*, 479 U.S. at 214; *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968). In *Tashjian*, the Supreme Court invalidated a prohibition that "limit[ed] the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community."[24] 479 U.S. at 216. So too here.

---

[24] The Ban limits NGP's associational opportunities by barring it from deploying professionals to assist their constituents in returning—and reminding voters to sign—their ballots during their get-out-the-vote efforts. NGP "wish[es] to speak and act collectively with others, implicating the First Amendment right of association. And [NGP wishes] to assist others with the process of [participating in the franchise] and thus, in due course, voting." *League of Women Voters of Fla. v. Browning*, 863

### 7.      Plaintiffs' Section 208 Preemption Claim

The Voter Assistance Ban conflicts with Section 208 of the Voting Rights Act

("VRA") by restricting voters' abilities to select the person of their choice to help

them vote. Conflict preemption occurs (1) when it is impossible to comply with state

and federal law, or (2) "where state law stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid

Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 109 (1992). Both are true here.

Section 208 states "[a]ny voter who requires assistance to vote by reason of

blindness, disability, or inability to read or write may be given assistance by a person

of the voter's choice." 52 U.S.C.A. § 10508. It imposes two limitations: voters

cannot select (1) their employer or its agent or (2) an officer or agent of their union.

*Id.* But the Ban adds limitations, restricting that choice to a family or household

member or caretaker. *See* O.C.G.A. § 21-2-385. Because the VRA promises freedom

of choice and the Ban restricts it, the laws cannot coexist.[25] Section 208 thus

---

F. Supp. 2d 1155, 1158 (N.D. 2012). Assisting with voter registration applications
is "core First Amendment activity." *Id.* The First Amendment surely extends to the
endpoint of those applications—helping voters cast their ballots. *See Priorities USA
et al. v. Nessel*, No. 4:19-cv-1334, ECF No. 59 at *28-32 (E.D. Mich. May 22, 2020).
[25] Similar restrictions have been held preempted by the VRA. *See, e.g.*, *OCA-Greater
Houston v. Texas*, 867 F.3d 604, 614-15 (5th Cir. 2017) (VRA preempted
requirement that assistor be registered in voter's county because it "impermissibly
narrows the right guaranteed by Section 208"); Ex. 65, *Minnesota v. Thao*, No. 62-

preempts the Ban, prohibiting voters from receiving assistance from the person of their choice at a crucial stage in the voting process.[26]

**B.     Plaintiffs will suffer irreparable harm absent an injunction.**

The challenged provisions put the voter Plaintiffs and others at risk of disenfranchisement, which constitutes irreparable harm. If "constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).[27] Once the election occurs, "there can be no do-over and no redress." *LWOV NC*, 769 F.3d at 247). They also restrict the

---

CR-18-827 (Minn. Dist. Ct. Oct. 23, 2018) (Section 208 preempts prohibition on candidates assisting voters). The legislative history also supports finding restrictions that "deny the assistance at some stages of the voting process during which assistance was needed" violate Section 208. S. Rep. No. 97-417, at 63 (1982).

[26] The Ban also conflicts with Section 208 because it poses an obstacle to accomplishing Section 208's purpose and objective. In *Thao*, the court explained that "the purpose of [the VRA] was to create as few barriers as possible to voting, with the understanding that [voters] are fully capable of determining who should serve as their trustworthy assistant." Ex. 65 at 4. The court found "the [State's] prohibition of a candidate as a possible trusted assistant acted as an obstacle to the accomplishment of the full purpose and objective of Congress." *Id.* at 5.

[27] *See also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000) (when an "abridgement to the voters' constitutional right to vote" is imminent, "irreparable harm is presumed and no further showing of injury need be made."); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1346 (N.D. Ga. 2018) ("[T]the disenfranchisement of the right to vote is an irreparable injury and one that cannot easily be redressed."); *Detzner*, 314 F. Supp. at 1223.

organizational Plaintiffs from participating in election-related activities, which courts routinely recognize as irreparable harm.[28] Further, they cause NGP to divert resources to help its constituency overcome the burdens imposed by them to effectuate its mission. *See* Ex. 3 ¶¶8-23. This, too, constitutes irreparable harm.[29]

**C.   The balance of the equities and the public interest favor an injunction.**

The balance of the equities favors Plaintiffs, who face impingement on their core constitutional rights. Defendants, at most, face administrative inconveniences, which cannot justify restrictions on fundamental rights.[30] "By definition, the public interest favors permitting as many qualified voters to vote as possible," and "upholding constitutional rights serves the public interest." *Ga. State Conference NAACP v. Georgia*, No. 1:17-CV-1397-TCB, 2017 WL 9435558, at *5 (N.D. Ga.

---

[28] *See Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *Browning*, 863 F. Supp. 2d at 1167.

[29] *See, e.g.*, *Ga. Coal. for People's Agenda, Inc*., 347 F. Supp. 3d at 1268 (E. Ross) (irreparable harm where "[p]laintiffs' organizational missions . . . will continue to be frustrated and . . . resources will be diverted to [address the challenged law]" . . . "mobilization opportunities cannot be remedied once lost").

[30] *See Taylor*, 419 U.S. at 535; *see also Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268 (increased administrative burden "minimal compared to the potential loss of a right to vote"); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (M.D. Fla. 2016) ("it would be nonsensical to prioritize [administrative] deadlines over the right to vote").

May 4, 2017) (quoting *LWV NC*, 769 F.3d at 247).[31] The challenged provisions also aggravate public health risks, requiring face-to-face interaction—despite warnings from public health officials. That risk of danger to public health is substantial, imminent, and ongoing.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant their motion for preliminary injunction.

Dated: June 10, 2020

Respectfully submitted,

**Adam M. Sparks**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com

---

[31] *See, e.g.*, *Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268 ("[G]ranting Plaintiffs the relief they seek would be in the public's interest to ensure that there is a procedure in place to allow every eligible Georgia citizen to register and vote."); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1310–11 (N.D. Ga. 2018) ("[T]he public interest is best served by allowing qualified absentee voters to vote and have their votes counted.").

sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
K'Shaani Smith*
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
ACallais@perkinscoie.com
KShaaniSmith@perkinscoie.com

Kevin J. Hamilton*
Stephanie R. Holstein*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
KHamilton@perkinscoie.com
SHolstein@perkinscoie.com

Lilian Timmermann*
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5222
Telephone: (303) 291-2354
Facsimile: (303) 291-2454
LTimmermann@perkinscoie.com


*Counsel for Plaintiffs*
*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: June 10, 2020

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al*.<br><br>Defendants. | Civil Action File No. 1:20-CV-01986-ELR |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 10, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: June 10, 2020

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*