# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,

      Plaintiffs,

      v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al.*,

      Defendants.

Civil Action File
No. 1:20-CV-01986-EL0052

## Expert Report of Dr. Kenneth R. Mayer, Ph.D.

### I.      Introduction and Summary of Conclusions

I have been asked by Plaintiffs in this lawsuit to offer an opinion about the effect of Georgia absentee voting practices on voters in the November 2020 general election. In particular, I have been asked to analyze the impact of (1) the election day deadline for receipt of mail absentee ballots; (2) the requirement that mail absentee voters pay the postage costs of mailing absentee ballots back to election offices; (3) the standards for notifying voters of problems with their absentee ballot applications; (4) the prohibition on third-party assistance with returning mail absentee ballots, with limited exceptions; and (5) the requirement that voters apply separately for an absentee ballot for every election unless they are 65 years of age or older.

All of these requirements impose both direct and indirect costs on voters and force voters to overcome specific burdens in order to cast a ballot in any election. In an election that will take place during a pandemic, those costs become particularly burdensome. Mail absentee voting is virtually certain to reach historically high levels in the November 2020 general election in Georgia (especially after the problems that occurred at polling places during the primary election on June 9, 2020), and those unprecedented levels will impose significant stresses on the election administration infrastructure.

This report provides that analysis and concludes that in the November 2020 general election the rate of absentee ballot rejection will likely increase from the historical pattern, and without changes to the requirements for mail absentee ballot submission—including the election day deadline, the prohibition on third-party collection, the requirement that voters pay the postage cost to return ballots, the lack of standards

1

for notifying voters of problems with their absentee ballot applications, and restrictions on how often registrants can apply for absentee ballots in an election cycle—the number of rejected ballots, and the number of voters who do not return their ballots—could increase by tens of thousands. Under the existing practices for handling, accepting, and rejecting absentee ballots, I estimate that as many as 60,000 mailed ballots could be rejected for arriving after the election day deadline in the November 2020 general election, and the number of rejected mailed ballots overall could exceed 100,000.

I am being compensated at a rate of $400 per hour for my services in this matter. This is my regular compensation rate for conducting analysis for expert testimony, research, and related work.  No part of my compensation is dependent upon the results of my analysis, report, or conclusions.

## II.     Qualifications and Expertise

I have a Ph.D. in political science from Yale University, where my graduate training included courses in econometrics and statistics. My undergraduate degree is from the University of California, San Diego, where I majored in political science and minored in applied mathematics. I have been on the faculty of the political science department at the University of Wisconsin-Madison since August 1989. My curriculum vitae is attached to this report as Appendix A.

All publications that I have authored and published in the past ten years appear in my curriculum vitae. Those publications include the following peer-reviewed journals: *Journal of Politics*, *American Journal of Political Science*, *Election Law Journal*, *Legislative Studies Quarterly*, *Presidential Studies Quarterly*, *American Politics Research*, *Congress and the Presidency*, *Public Administration Review*, *Political Research Quarterly*, and *PS: Political Science and Politics*. I have also published in law reviews, including the *Richmond Law Review*, the *UCLA Pacific Basin Law Journal*, and the *University of Utah Law Review*. My work on campaign finance has been published in *Legislative Studies Quarterly*, *Regulation*, *PS: Political Science and Politics*, *Richmond Law Review*, the *Democratic Audit of Australia*, and in an edited volume on electoral competitiveness published by the Brookings Institution Press. My research on campaign finance has been cited by the U.S. Government Accountability Office, and by legislative research offices in Connecticut and Wisconsin.

My work on election administration has been published in the *Election Law Journal*, *American Journal of Political Science*, *Public Administration Review*, *Political Research Quarterly*, and *American Politics Research*. I was part of a research group retained by the Wisconsin Government Accountability Board to review their compliance with federal mandates and reporting systems under the Help America Vote Act, and to survey local election officials throughout the state. I serve on the Steering Committee of the Wisconsin Elections Research Center, a unit within the UW-Madison College of Letters and Science. In 2012, I was retained by the United States Department of Justice to analyze data and methods regarding Florida's efforts to identify and remove claimed ineligible noncitizens from the statewide file of registered voters.

In the past nine years, I have testified as an expert witness in trial or deposition or submitted a report in the following cases:

Federal: *The Andrew Goodman Foundation v. Bostelmann*, No. 19-cv-955 (W.D. Wis. 2020); *Fair Fight Action v. Raffensperger,* No. 1:18-cv-05391-SCJ (N.D. Ga. 2019); *Kumar v. Frisco Independent School District*, No. 4:19-cv-00284 (E.D. Tex. 2019); *Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Tex. 2018); *Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Tex. 2018); *Dwight, et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga. 2018); *League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich. 2018); *One Wis. Institute*, *Inc. v. Thomsen* 198 F. Supp. 3d 896 (W.D. Wis. 2016);

*Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012).

State:   *Driscoll v. Stapleton*, No. DV 20 0408 (13th Judicial Ct. Yellowstone Cty., MT, 2020); *Priorities U.S.A, et al. v. Missouri, et al.*, No. 19AC-CC00226 (Cir. Ct. of Cole Cty., MO 2018); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Kenosha Cty. v. City of Kenosha*, No. 11-CV-1813 (Wis. Cir. Ct., Kenosha Cty., WI 2011).

Courts consistently have accepted my expert opinions, and the basis for those opinions. No court has ever excluded my expert opinion under *Daubert* or any other standard. Courts have cited my expert opinions in their decisions, finding my opinions reliable and persuasive. *See Driscoll v. Stapleton*, No. DV 20 0408 (13th Judicial Ct. Yellowstone Cty., MT, 2020); *Priorities U.S.A., et al. v. Missouri, et al.*, No. 19AC-CC00226 (Cir. Ct. Cole Cty., MO 2018); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

## III.    Summary of Conclusions

- Covid-19 is virtually certain to lead to an extraordinary increase in levels of mail absentee voting in Georgia in the November 2020 general election, orders of magnitude greater than what has been historically common. In the 2020 presidential primary election held on June 9th, over 1.9 million absentee ballots were issued, three quarters of which were mail ballots. Over 1.1 million mail ballots had been recorded as cast by election day. In 2018, by comparison, 219,760 voters cast mail ballots.

- The number of mail absentee ballots cast in the November 2020 general election could be in the range of 4 million, which is over 15 times the total in 2018 and approximately four times the number cast in the June 9 presidential primary, based on incomplete counts as of election day.

- Rejection rates for mailed absentee ballots are significantly higher than for in-person voting. Even under typical conditions in recent Georgia elections (2018), 1.56% of returned mail ballots were rejected as late, and 2.51% of returned mail ballots were rejected overall (using the rules in place in 2019). In contrast, in 2018 the rejection rate for in-person early votes was 0.00069% (13 of 1,890,646). And of those 13 voters whose in-person absentee ballots were rejected, 10 successfully cast an absentee ballot that was counted.

- When calculated on the basis of registrants who were not able to subsequently cast a valid ballot, the mail absentee ballot rejection rate in the 2018 general election was nearly 15,000 times greater than the in-person absentee ballot rejection rate.

- These rejection rates vary considerably by county. In 2018, thirty-four counties rejected 2% or more of mail ballots as late, and 7 counties had a late rejection rate exceeding 5%. Twenty-five counties, including Gwinnett and DeKalb, rejected more than 4% of mail ballots overall. Thirty-five counties did not reject any mail absentee ballots. The probability of a voter's absentee ballot being rejected depends heavily on where the voter is registered.

- Mail ballot rejection rates are strongly correlated with age and experience with absentee voting. Younger voters are far more likely to have a mailed absentee ballot rejected, an outcome that is

3

likely a function of experience. Voters who have never voted by mail absentee are up to ten times more likely to have their ballots rejected than voters who have successfully voted by mail two or more times.

- In 2018, over one-seventh of all mail ballots counted arrived at registrars' offices on election day or the day before. Nearly 30% of all mail ballots counted arrived in the last 7 days of the election cycle. Even slight delays could result in tens of thousands of mail absentee ballots being rejected for arriving late.

- The requirement that mail absentee voters attach postage to the ballot return envelope imposes both direct and indirect costs on voters. It presents voters with confusing and conflicting information regarding how much postage is required and whether their ballots will be delivered if they attach incorrect postage. Research has shown that prepaid return postage increases turnout by up to 4%.

- Georgia has consistently disenfranchised thousands of voters each election whose ballots arrive after the election day receipt deadline, and the number of late rejected ballots and the rate of rejection has risen over time: the mail ballot rejection rate was 0.7% in 2014 (805 ballots), 1.2% in 2016 (2,307 ballots), and 1.6% in 2018 (3,551 ballots). In addition, late ballots are an increasing share of all ballot rejections, constituting 39.8% of all rejected mail ballots in 2014, 47.5% in 2016, and 51.7% in 2018.

- If mail ballot rejection rates in the November 2020 general election are equivalent to what occurred in 2018 and 2016, the number of rejected mail ballots could increase by an order of magnitude: 4 million mail absentee ballots would result in over 60,000 rejected late ballots and over 100,000 rejected ballots overall. These estimates are likely conservative, as changes to election procedures—particularly shifting millions of voters from in-person voting to mail absentee voting for the first time—will almost certainly result in more errors made by voters as they navigate the new procedures for the first time.

- African Americans are over 60% more likely to have their mail absentee ballots rejected for any reason than Non-Hispanic White voters.

- The rate of absentee ballot voting for the June 9th primary election placed significant strain on Georgia election officials, with, among other errors, as many as 500,000 absentee ballots sent with incorrect instructions (including incorrect election dates), and over 400,000 unreturned mail ballots as of election day.

## IV.     Data Sources

In reaching my conclusions in this matter, I relied on the following data and materials:

- Absentee ballot request files obtained via the Georgia Secretary of State website.
- Voter history files obtained via the Georgia Secretary of State website.
- A voter file of Georgia registrants with a last registration date of March 23, 2020.
- A voter file of Georgia registrants with a last registration date of December 5, 2018.
- The 2016 and 2018 Election Administration and Voting Surveys (EAVS), produced by the United States Election Assistance Commission.
- The 2016 Survey on the Performance of American Elections.
- The 2015-2018 Five Year American Community Survey, conducted by the U.S. Census Bureau.

4

- Files provided as the result of public records requests to election officials in fourteen counties.[1]
- The peer-reviewed academic literature and other publicly available sources cited in this report.

The use of these data and materials is standard in my field of expertise as are the methodologies I used to analyze them, discussed in more detail below.

## V.    The Calculus of Voting

To evaluate the potential effects of the absentee ballot requirements, I turn first to the models and methods used to study voter turnout. For at least 60 years, political scientists and economists have accepted the model of voter turnout as a function of the costs and benefits of voting. As an intellectual framework, it is canonical.

The basic model, originally proposed by Riker and Ordeshook (1968, 28) postulates that the utility of voting is expressed in the following form:

$$\text{Utility of voting} = \text{BP} - \text{C} + \text{D}$$

Here, B is the benefit a voter receives if her candidate wins; P is the probability of a voter casting the decisive vote; C a measure of the cost of voting; and D a theoretical measure of the nonmaterial satisfaction a voter derives from the act of casting a ballot (from such sources as participating in an important civic ritual, or compliance with the social expectation of voting). The probability of an individual voting rises as the utility goes up.

Because the probability that a single vote will be decisive is extremely low (meaning that BP is very close to zero), theorists have paid attention to the cost side of the voting calculus (as measured by C). This conceptual relationship prompted decades of scholarship confirming the broad outlines of the basic theory (Sanders 1980; Rosenstone and Wolfinger 1982; Aldrich 1993; Darmofal 2010; Monroe and Sylvester 2011; Leighley and Nagler 2014; Blais et al., 2019; Cantoni 2020). As a rule, increasing the direct or indirect costs associated with voting—higher information costs, increased direct costs such as inconvenient polling place locations or times, long lines, complex administrative processes, confusing eligibility requirements—will reduce turnout, both in the aggregate and in the probability that a given individual votes. But unexpected changes to voting processes—*even those that might be designed to make voting easier*—can increase the informational and administrative costs of compliance, as voters accustomed to voting in a habitual way face new rules and unfamiliar requirements.

A clear demonstration of the validity of "cost" considerations is the connection between socioeconomic status and turnout, a relationship uncontested in the academic literature. Voters better positioned to overcome the costs of compliance with administrative and regulatory requirements for voting have higher turnout. Voters less able to overcome those costs are less likely to vote.

Education and income are the most strongly linked (Leighley and Nagler 2014, 27-29; Ojeda 2018; Burden et al. 2014). "The relationship between education and voter turnout," note Sondheimer and Green (2010, 174), "ranks among the most extensively documented correlations in American survey research." Turnout is also associated with health (Pacheco and Fletcher 2015; Blakely, Kennedy and Kawachi 2001), unemployment, poverty, and income loss (Rosenstone 1982; Sha and Wichowsky 2018). Higher income

---

[1] Cobb, Coffee, Columbia, Coweta, DeKalb, Effingham, Gwinnett, Henry, Newton, Oconee, Spalding, Towns, Walker, and Walton County.

and education levels are also associated with more accurate information about complex administrative requirements such as what types of photo identification qualify as voter ID (DeCrescenzo and Mayer 2019).

Leighley and Nagler summarize the effects of socioeconomic status as affecting the ability to absorb the costs side of the voting calculus. Higher education increases the probability of voting "by enhancing individuals' cognitive skills (and therefore reducing information costs), by increasing the gratification that individuals receive from politics (thus increasing benefits), and by providing (bureaucratic) experience that is useful in dealing with the costs of voting such as voter registration" (2014, 58-59). Similarly, income affects turnout via analogous mechanisms: people living in poverty have less time to expend on nonessential day-to-day activities; wealthy people are more likely to live in a context where political engagement is a norm, and perceive themselves to have higher stakes (2014, 58-59).

The concept of transaction costs captures the burdens associated with overcoming bureaucratic requirements, compliance costs, and administrative hurdles associated with an individual's interaction with government to attain a specific goal or fulfill a legal requirement (such as filing a tax return or enrolling in Medicare). In the context of voting, these costs include informational and learning costs, the effort required to comply with administrative requirements, indirect costs (such as time or opportunity costs), and direct monetary costs.

Another clear example of the cost of voting is the use of absentee mail ballots. While the overall characteristics of mail absentee voters are not dramatically different from those of election day or in person early voters, mail absentee voting is crucial for voters who cannot make it to a polling place on election day. "[It] should be little surprise," write Baretto et al. (2006, 227) "that absentee voting appears to be associated with older people, students, the disabled, renters, and people with young children" (internal citations omitted). Miller and Powell (2016) find that mail absentee voting is especially important for voters with disabilities.

For voters who are away from home on election day, especially those absent for extended periods, mail absentee ballots will likely be their only option: the calculus of voting means that it makes little sense to bear the direct and possibly large costs of long-distance travel (or a plane ticket for an out of state voter) to cast a ballot. And, indeed, a material fraction of mail absentee voters in Georgia are away from their permanent residences on election day. In 2016, 19.3% of mail absentee voters gave a mailing address that differed from their permanent Georgia residence – either in another city in Georgia or in another state. In 2018, 12.8% of mail absentee voters listed a different mailing address. In the 2020 June 9 primary the figure was 3.6%, although the drop was entirely due to the large increase in the number of mail absentee voters overall: more out of state voters cast mail ballots in the 2020 primary (39,965) than in the 2016 presidential election (39,147). For many of these voters, a mail ballot is the only way they can vote, and they face particular difficulties in obtaining timely notification of problems with their absentee applications or mailed ballots which gives them sufficient time to cure any deficiencies.

Considerations of transaction, informational, and compliance costs provides a framework for evaluating voting laws as well as the effects of rapidly scaling up the degree of mail absentee voting (Moynihan, Herd, and Harvey 2014), how effectively election officials will be able to efficiently adapt to the new environment, and how voters will be affected by significant changes in voting methods.[2] The changes in voting practices are likely to be fueled by voter demand and state-level response rather than a

---

[2] The public administration literature calls these costs "administrative burden" (Herd and Moynihan 2019), focusing on the costs to individuals. To avoid confusion with how the term is used in administrative law, where it refers to the cost of regulatory compliance for governmental agencies, I use transaction and compliance costs when analyzing the effect of absentee ballot processes on an individual's ability to vote.

federally imposed mandate to implement all-mail elections and will likely also be affected by resource and time constraints on election officials (Burden et al. 2012).

## VI.     Voting in November 2020 During Covid-19

There is no doubt that conducting elections during a pandemic requires very different election administration processes. The experience of states that either altered their election procedures to deal with the Covid-19 pandemic or held elections as originally scheduled is informative.

The most immediate consequence is a significant increase in mail absentee voting (Persily and Stewart 2020; Centers for Disease Control and Prevention 2020; National Conference of State Legislatures 2020).

In Wisconsin, for example, the state legislature rejected the governor's call to move the primary from April 7 to May 19 and move to an all-mail election.[3] Therefore, Wisconsin held its presidential primary election as originally scheduled on April 7. The number of mail absentee ballots increased by 400% from the normal numbers, and the rejection rate for mailed absentee ballots *submitted on time* was 1.6% (the overall rejection rate for mailed ballots was 1.77%) This was a higher than typical rate, a rate over 40 times higher than the rejection rate for in-person early voting (which was 0.04%).[4] Adding late ballots to the total of the number of rejected mail ballots would increase this disparity even more.[5] There were also complaints from voters who did not receive their absentee ballots in a timely manner, as well as reports of undelivered ballots found in U.S.P.S. facilities (Associated Press 2020).

In Ohio, which cancelled its March 17 presidential primary, the state legislature passed emergency legislation eliminating virtually all in person voting (with limited exceptions).[6] Under the new procedures, all registered voters were sent instructions on how to apply for an absentee ballot, and ballots had to be postmarked by April 27 and received by May 8 to be counted. Many voters were confused about "the multi-step process of obtaining an application for an absentee ballot, sending it in with the proper postage, getting a ballot back, and returning it by [the] deadline" (Rowland and Rouan 2020).

In both Ohio and Wisconsin, the increase in mail volume also stretched the capacity of the U.S. Postal Service. In Ohio, voters expressed frustration with delays in obtaining and submitting their absentee ballots. Five days before the April 28 election deadline, the Ohio Secretary of State Frank LaRose wrote the Ohio congressional delegation, informing them that problems with mail delivery were affecting absentee voting:

> As Ohioans rush to submit their vote-by-mail requests, and our boards work overtime to fulfill them, we are finding that the delivery of the mail is taking far longer than what is published by the United States Postal Service (USPS) as expected delivery

---

[3] Executive Order 73, April 3, 2020. See also Glauber and Marley (2020).

[4] Data from the Wisconsin State Elections Commission, 2020 General Election EL-190F: Election Voting and Registration Statistics Report, issued May 8, 2020. https://elections.wi.gov/node/6894.

[5] Notably, the U.S. Supreme Court instituted a postmark deadline in for absentee ballots, allowing ballots postmarked on or before election day and arriving within six days to be counted. Thousands of ballots arrived during this time, and had the law not changed the rejection rate would have been substantially higher with tens or thousands of voters disenfranchised. 79,054 mail absentee ballots arrived within this 6-day window (Wisconsin Elections Commission 2020, 7).

[6] https://www.ohiosos.gov/publications/2020-elections-calendar/.

times. Instead of first-class mail taking 1-3 days for delivery, we have heard wide reports of it taking as long as 7-9 days. As you can imagine, these delays mean it is very possible that many Ohioans who have requested a ballot may not receive it in time.[7]

In Wisconsin, the State Elections Commission noted that at "a local level, the extraordinary volume placed enormous stress on election officials, elections systems, and the United States Postal Service" (Wisconsin Elections Commission 2020, 3). Problems with mail delivery included voters not receiving absentee ballots, including the Minority Leader of the State Assembly; an unusually large number of ballots not returned (including one county where only 1% of one batch of absentee ballots were returned, compared a 90% return rate for other batches); large numbers of ballots erroneously sent back to election offices rather than delivered to voters; and bins of undelivered ballots discovered in post office facilities (Wisconsin Elections Commission 2020, 15-17; *see also* Marley 2020).

The increases in mail voting (despite the associated problems) are unsurprising given the shortages of poll workers that made it impossible for election officials to open the usual number of polling places in most locations. Poll workers tend to be older than the general population: estimates vary, but most sources indicate an average age over 60, and roughly 25% over age 70 (Election Assistance Commission 2017).

For example, in Milwaukee, Wisconsin, a lack of poll workers forced reductions in the number of polling places for the state's April 7th presidential primary (which took place during the Covid-19 pandemic) from 180 to five (Dirr and Spicuzza 2020). Election officials had to rely on National Guard members to assist in staffing those locations. Green Bay reduced its number of polling places from 31 to 2; Waukesha from 13 to 1.[8] In Florida, election officials in several counties had to consolidate polling places for the state's March 17 primary because poll workers backed out due to Covid-19 fears (Persaud 2020). In Palm Beach County, 800 of the expected 3,500 poll workers failed to appear on election day, and the Supervisor of Elections had to delay some openings and move some polling locations because no staff or poll workers showed up (Webb et al. 2020). In Woodbury County, Iowa, election officials opened only five polling places, down from the usual 45, for the state's June 2 general primary (Mahon 2020).

These same scenarios played out in Georgia's June 9 election. In response to the Covid-19 threat, Georgia delayed its presidential primary twice, from the original date of March 17th to May 19th, and a second time to June 9th. State election officials sent a pre-filled absentee ballot application to every active registrant and reduced the number and capacity of early voting sites. The Secretary of State called on voters to use mail absentee ballots: "[c]onsidering that most poll workers are in a high-risk group and therefore particularly vulnerable to COVID-19, there are fewer volunteers available to work the polls. Social distancing means fewer voting machines at each location and the need for extra sanitation increases the time between each voter and, therefore, the length of wait times."[9] At least 10% of the state's polling locations closed, and some counties (including Fulton) experienced large backlogs as officials struggle to process absentee ballot requests (Niesse 2020b).

---

[7] https://www.ohiosos.gov/globalassets/media-center/news/2020/2020-04-24.pdf.
[8] Election Day Blog Recap, *Milwaukee Journal Sentinel*, April 7, 2020.
https://www.jsonline.com/story/news/politics/2020/04/07/wisconsin-april-7-presidential-primary-election-updates-voting-pandemic-milwaukee-polling-places/2959757001/.
[9] *Raffensperger Encourages Absentee Ballot Voting as COVID-19 Precautions Result in Long Wait Times at The Ballot Box,* May 20, 2020.
https://sos.ga.gov/index.php/elections/raffensperger_encourages_absentee_ballot_voting_as_covid-19_precautions_result_in_long_wait_times_at_the_ballot_box.

News reports on June 9 reported long lines at precincts around the state, understaffed polling places, polling sites that did not open, malfunctioning voting machines, polling places without voting machines, insufficient ballot supplies, and poll workers unfamiliar with voting equipment.[10] The problems continued all day, with many voters unable to cast ballots and others abandoning hours-long waits. Many election day voters said they had never received the absentee ballots they had requested (Gardner et al. 2020).  Many polling places remained open after 7PM, with the last closing around 10PM.[11]

University of Florida professor Michael McDonald, a nationally known elections expert, said:

I have never seen the scale of election failures happening in Georgia today.  This does not bode well for November (Niesse 2020c).

Based on my decades of experience in studying election administration, I agree with Professor McDonald's assessment. It was in my opinion an intolerably inept performance on behalf of election officials, reflecting failures in planning, training, equipment, staffing, supplies, and execution all compounded by the COVID-19 pandemic and U.S. Postal Service breakdowns.

Prior to the June 9 primary election the number of mail absentee ballots in Georgia reached a then-all-time high in 2018, with records set for the most mail absentee ballot requests received (284,393), issued (282,826), returned to election offices (246,220), and counted (219,760), as a percentage of the total vote (5.6%). In 2020, these totals rose dramatically as the state tried to shift to a nearly all-mail election for the June 9 primary election. The effect of this change is informative as to what is likely to occur in the November 2020 general election.

As of June 10, 2020, the absentee ballot request file issued by the Georgia Secretary of State reported that 1,879,640 unique individuals had requested an absentee ballot for the June 9 primary election, with 1,876,076 of those applications approved. Election officials received 585,471 applications in May, an average of nearly 19,000 per day. The June 10 absentee file, however, does not include every registrant who requested an absentee ballot over the entire primary election period. The Secretary of State released an earlier file of absentee ballot requests made before the original March 24, 2020 primary date. That file (which I will refer to as the "March 24 file") shows 310,091 unique individuals whose applications for an absentee ballot were approved. Roughly one-third of these approved absentee requests in the March 24 file (96,418) *do not appear* in the June 10 file, most commonly because they had already submitted their absentee ballots by March 24.

The total number of unique approved absentee voters, then, is the number in the current file as of June 10 (1,876,076) plus the number in the March 24 file who do not appear in the June 10 file (96,418), or 1,972,494. Of these, 1,608,241 unique individuals submitted approved applications for mail ballots, and 1,101,818 have already been returned and counted. The number of approved mail ballots applications is 5.7 times the number in 2018, and the number of accepted mail ballots already represents a 530% increase in mail absentee turnout over 2018. There were 416,939 outstanding absentee ballots as of June 10, 98.7% of which are mail.[12] There is a minimal amount of duplication in these totals, attributed to voters who applied for a mail absentee ballot, cancelled it, and then voted in person early.

---

[10] https://www.ajc.com/news/state--regional-govt--politics/polls-open-and-voters-line-for-georgia-primary/RDkUA0eKfnge6xuWT3YwiJ/.

[11] https://www.ajc.com/news/state--regional-govt--politics/polls-open-and-voters-line-for-georgia-primary/RDkUA0eKfnge6xuWT3YwiJ/.

[12] About 60,000 of the issued or approved mail absentee ballots were cancelled by voters, and a small number spoiled.  I do not count these as outstanding.

In-person early voting closed on June 5. The data show 412,628 in-person early voters cast ballots that were accepted.

As of election day (June 9), it was not clear how many of the outstanding mail ballots had been returned by the deadline, and how many would be counted.

Crucially, most mail absentee voters in the June 9 primary election did so for the first time—1,398,659 of the roughly 1,608,000 registrants whose applications for a mail absentee ballot were approved in 2020 had not voted absentee before (87%). First time mail absentee voters, as discussed below, are more likely than experienced mail absentee voters to make a mistake that results in election officials rejecting their ballots.

The increase in the number of mail absentee ballots strained the election administration infrastructure in Georgia. The Secretary of State's office turned to a vendor in Arizona to send absentee ballots to voters, a departure from the normal practice of county election officials mailing ballots. The ballot design was changed to eliminate the inner security envelope, to allow faster processing of returned ballots by election officials. Instead, the 2020 primary ballot has a sheet of paper called a "privacy sleeve," a change made for the convenience of election officials, who no longer have to open a second envelope (Niesse 2020a). An unknown number of absentee ballot applications in Fulton County went "missing, apparently lost in the election office's swamped email system" (Niesse and Brasch 2020), and in late May election officials there had a backlog of 25,000 unprocessed *applications* that they were hoping to get through by May 31 (Brasch 2020). As of *election day*, election officials had yet to send out 651 uncancelled mail absentee ballots statewide, with over half of the unsent ballots in Fulton County (386 ballots).[13] As of June 3rd, 84,000 mail ballots had not yet been delivered to voters, and as of June 1st 3,300 absentee ballots had not even been issued statewide because election officials "entered them into computer systems incorrectly" (Niesse 2020b).

Together, these experiences demonstrate that the pressures on election administrators, poll workers, and voters, combined with the strain on postal capacity were unprecedented in Georgia and the Spring primary cycle around the country more generally. Those pressures are certain to increase from this already high level in November, with much higher turnout and continued emphasis on absentee voting due to Covid-19. It is likely that most voters will find themselves on unfamiliar ground, with many not even aware of how voting is changing until shortly before the election:

> The reality is that most voters do not spend a great deal of time thinking about the mechanics of how they vote. Most voters vote in the same manner, year after year. Over time, the process becomes comfortable, predictable and ingrained in the minds of voters as the natural way that voting occurs.

> Although it is absolutely necessary to provide a safer way for voters to cast their ballots, it is also necessary to understand that most voters will not pay much attention to how the voting process may be changed until late October (Persily and Stewart 2020).

### VII.    Estimating the Number of Mail Absentee Ballots in Georgia's November 2020 General Election

To arrive at a rough estimate of the number of absentee ballots that may be cast in the November 2020 general election in Georgia given the anticipated increase in mail absentee voting due to Covid-19,

---

[13] Calculated using the June 10, 2020 absentee voter file.

we start with a few pieces of information: turnout in 2016, the number of registered voters, and the percentage of votes cast by mail in the June 9 primary election.

In 2016, 4.2 million votes were cast, a 75.5% turnout rate as a percentage of registered voters.[14] Since then the number of registered voters has increased by nearly 28%, to 6,960,777.[15] If turnout as a percent of registered voters in the November 2020 general election remains constant from 2016—and if we assume, unrealistically, that registration will not increase between now and the registration deadline of October 5, 2020—the number of votes would exceed 5.2 million. But it is a certainty that the number of registered voters *will* go up between now and the general election. In 2016, 528,320 people registered between the primary election held on May 24, 2016 and the general election in November.[16] This could result in another 400,000 votes in the November 2020 general election.

In 2018, in-person absentee voters outnumbered mail absentee voters by nearly 8 to 1, when 6% of all votes were cast by mail, and in-person absentee votes were nearly half of all votes cast. The number of in-person absentee votes was roughly the same as the number of election day votes. In the June 9 primary election, that ratio of mail to in-person absentee votes flipped to as much as 4 to 1 in favor of mailed absentee ballots, and the number of in-person absentee votes dropped by nearly 80%. Early voting for the June 9 primary election opened on May 18 and closed on June 5, and based on early and incomplete election ay returns, it appears that the total number of mail absentee ballots will approach the number of in-person votes overall.[17] Given the failures of in-person voting in the June 9 election, it is likely that more voters will turn to mail absentee in November.

Simple extrapolation suggests that mailed ballots in the November 2020 general election could easily constitute 70-80% of votes—or up to 4 million mailed absentee ballots.[18]

4 million mail ballots is more than twice the number of mail ballots in the June 9 primary election, and nearly 15 times the number in the 2018 general election. Such a volume would also mean that several million Georgia voters will be requesting mail absentee ballots for the first time. The magnitude of this shift will place unprecedented stress on the election administration infrastructure in Georgia, and without fundamental changes will result in, potentially, hundreds of thousands of qualified voters being disenfranchised when their mail absentee ballots are rejected.

Even if mail absentee voting is half of the this forecast, or in the 2 million range, the performance of election officials on June 9 strongly suggest that it will result in unprecedented stress on election infrastructure.

---

[14] 4,165,405 ballots cast, out of 5,443,046 registered voters. https://results.enr.clarityelections.com/GA/63991/184321/en/summary.html.

[15] https://sos.ga.gov/index.php/Elections/voter_registration_statistics. The total number of active registrants was 6,960,770.

[16] Data from the Georgia Secretary of State, Historical Registration Statistics, Active Registrants, https://sos.ga.gov/admin/files/Voter%20Registration%20Statistics%20Historical%20-%20Updated%2011-26-18.pdf.

[17] Unofficial and incomplete results show roughly 1.3 million ballots counted as of election day, but this total includes at least some absentee ballots. The June 10, 2020 absentee ballot files show 1.1 million accepted mail absentee votes and over 400,000 unreturned mail ballots, but it is not clear if any of these had actually been received by election day.

[18] In Wisconsin's April 2020 presidential primary, 75% of all ballots were cast by mail. In Nebraska, nearly 400,000 of 493,000 ballots in its May 12, 2020 primary were mail, or over 80%.

## VIII.   Pre-paid Postage

The requirement that absentee voters pay postage costs on a mailed absentee ballot return is a classic example of transaction costs described above at the end of Section V– a combination of monetary, time, informational, opportunity, and learning costs in the face of ambiguous information about what is actually required to return an absentee ballot.

In order to return an absentee ballot, a voter incurs an actual monetary cost and also has to deal with incomplete and contradictory information. The information provided to Georgia absentee voters informs them that they must attach required postage to the return package, but, crucially, they are not told what that amount actually *is*. Voters themselves have to figure out if the envelope requires one $0.55 first class stamp, the postage required for a 1-ounce letter, or two (a postage-metered 2018 absentee ballot provided by Newton County as an example of a late arrival has a metered postage of $0.71, indicating that it weighed more than one ounce based on 2018 postal rates). To add to potential confusion, the U.S.P.S. also formally advises voters to affix stamps to the ballots, but has a policy of delivering official election mail even if it lacks required postage. However, this practice is not publicized by the U.S.P.S,[19] and is contrary to Georgia's instructions, which tell voters that "[i]f mailing, you must affix postage to the ballot envelope.".[20]

The ambiguity of the instructions, and conflicting sources of information presents voters with the following situation: (1) voters are told to affix proper postage by the instructions on the absentee ballot; (2) they are not told what the proper postage is; (3) the Postal Service also instructs voters to attach postage to absentee ballots; but (4) some news articles on absentee voting mention obliquely a Postal Service policy of delivering absentee ballots to election offices even if voters attach no or insufficient postage (*see* Armitage 2018; Berson 2018); and (5) the Postal Service delivery policy is neither publicized nor prominently available anywhere.[21]

The cost of a first-class stamp (currently $0.55) may be small to most voters, but it is also direct, concrete, and not the only element of the cost if a voter does not have stamps immediately at hand and must make a special trip to a post office or other location to obtain them (Schelker and Schneiter 2017, 66). For a low-income voter lacking resources or transportation, the costs could easily be insurmountable. Even very small increases in direct costs can have huge effects on voter turnout (Braconnier, Dormagen, and Pons 2017; Fauvelle-Aymar and François 2018). Given that the poverty rate among the voting age population is above 20% in 54 Georgia counties, the number of individuals who face a direct burden is substantial.[22] In the context of the pandemic, the cost burden is particularly stark as the unemployment rate in Georgia

---

[19] The only place I have been able to locate this policy is on page 19 of Postal Bulletin 22391, *2014 Election and Political Mail Update*, June 12, 2014 (https://about.usps.com/postal-bulletin/2014/pb22391/pdf/ pb22391.pdf), with the language also appearing  6,200 words into a 6,900 word web page in approximately 5-point type ("Requirements and Tips for Handling Official Election Mail and Political Campaign Mail," https://about.usps.com/postal-bulletin/2014/pb22391/html/cover_003.htm).
Other policy documents specifically note that unless an elections office has established a postage-paid system for returns, ballot return envelopes "must indicate in a prominent location on the balloting materials the specific amount of First-Class Mail postage required for return by mail to election officials." (https://pe.usps.com/text/dmm300/703.htm#ep1174014, 8.1.4 "Notification of Postage Requirement on Return Envelopes.")
[20] Ga. Sec'y of State Elections Div., Absentee Voting: A Guide for Registered Voters, at 5 (2020), https://sos.ga.gov/admin/uploads /Absentee_ Voting_Guide_20142.pdf.
[21] Armitage (2018) refers to it as "an open secret among election officials."
[22] 2014-2018 American Community Survey, item DP_0133PE.

quadrupled between February and April 2020, rising from 3.1% to 11.9%, with rates above 15% in ten counties and record rates throughout the state, leading to additional economic pressure on voters.[23]

Does the cost of a stamp affect response rates? In survey research, the answer is obvious. "It almost goes without saying," writes Mangione "that to get a good return rate you have to supply the respondent with a return envelope, already addressed to you, and return postage" (Mangione 1995, 64).[24] The data bear this out: "The increased return rate of postage-paid versus postage-required envelopes is well document by prior experiments" (Michelson et al. 2012, 288). What is true in survey research is true in voting. Schelker and Schneiter (2017, 68) estimated that the introduction of postage-paid mail voting in Swiss elections increased turnout by roughly 4 percent.[25]

Data from the U.S. show the same patterns, in 2017, King County, Washington conducted a test in special bond election in one municipality and one school district in the county, by sending voters pre-paid return envelopes for mail ballots. The result was a significant increase in turnout compared to previous similar elections, by 7 percentage points in the municipality and 10 percentage points in the school district (equivalent to a 23% and 33% increase, respectively).[26] In 2018, the county conducted another test in a special election, sending prepaid ballot return envelopes to a school district with a history of high election turnout. Turnout again exceeded historical patterns, increasing by 6 percentage points (equivalent to a 13% increase).[27] Shortly afterwards, the county board voted to use prepaid ballot return envelopes in all elections.

If pre-paid postage increases turnout by 4% over what would occur in its absence, the increase in the number of ballots returned in an election with 4 million mail absentee ballots could be as high as 160,000. A 10% increase would result in 400,000 additional mail ballots returned.

There is zero doubt that pre-paid ballot postage would substantially increase return rates, because it concretely and noticeably reduces the direct and time costs of absentee voting. While this is true generally, it is also particularly important for the November 2020 general election when the transaction costs of obtaining stamps are high. Unless voters go to a post office to return their absentee ballots or to a grocery or convenience store to purchase only the postage necessary to mail the ballot (both of which pose risks of

---

[23] Georgia Department of Labor Press Release, "Georgia Reports Record Unemployment Across State," May 28, 2020. http://meltwater.pressify.io/publication/5ed025c372a1ce0004d3b1ad/5b296714f502c80e0024fd3a?&sh=false.

[24] Far more research has been done on what *type* of return prepaid postage—metered, pre-paid notices, generic stamps, commemorative stamps—leads to improved response rates (Armstrong and Lusk 1987; Yammarino, Skinner and Childers 1991).

[25] In a field experiment Michelson et al. (2017) found that randomly offering some voters a postage-paid return envelope increased the probability that absentee voters cast their ballots in person rather than via mail.  Rather than concluding that prepaid postage does not matter, however, they attribute the result to the disruption in voting procedures to absentee voters accustomed to paying for postage, as well as confusing absentee ballot instructions provided to voters in the treatment. This result should not be interpreted as evidence that prepaid postage reduces turnout, and it is not applicable to the likely situation in Georgia when all voters will be affected by the rules for casting absentee ballots and may have less ability (or willingness) to vote in person.

[26] King County Elections, "King County Successfully Pilots Pre-paid Postage: Voter Turnout Exceeds Projections," February 24, 2017  (https://kingcounty.gov/depts/elections/about-us/newsroom/news-releases/2017/february/24-pilot-results.aspx).

[27] King County Elections, "Pre-paid Postage, Round Two," May 3, 2017 (https://kcelections.com/2017/05/03/pre-paid-postage-round-two/).

exposure to COVID-19 and, therefore, bear their own costs), stamps are typically available only in bulk.[28] Purchasing a book of stamps for $11, combined with a risk of exposure to Covid-19, could easily result in a voter concluding that the cost is prohibitive.

## IX.     Lack of Standards for Notifying Voters of Problems with Absentee Ballot Applications

### A.  Rejected Absentee Ballot Applications

Data from the Secretary of State does not systematically record whether election offices informed voters of problems with their absentee applications, how quickly voters were notified, whether election officials had sufficient information to contact voters, or whether voters were able to correct problems with their applications and obtain an absentee ballot. In some cases, election officials do not even record what type of ballot a voter had requested when an application is rejected.

Nevertheless, I can still draw a general inference about the process by examining cases where a voter had an initial application rejected and subsequently submitted an application that was accepted. I focus on rejected mail applications.

In 2018, 2,614 registrants had at least 1 application for an absentee ballot rejected. Over 98% of application rejections were either for mail ballots, or they had no ballot style specified. Among all individuals whose applications were rejected, 1,690 applied again (often more than once) and had a subsequent absentee ballot application accepted, although only 1,190 are shown in the absentee file as having an absentee ballot accepted; 1,421 are shown in the voter history file as voting absentee. The data do not uniformly indicate whether a registrar attempted to contact rejected applicants, but we can assume that all of voters with an application rejection and subsequent application acceptance were either informed of problems with their application or checked their application status online. Of the 916 registrants who never obtained an absentee ballot after the initial rejection, 272 voted on election day at the polls, a turnout rate of 29.7%.[29] Crucially, of the 916 registrants who were never able to obtain an absentee ballot, 99% (905 of 916) were present in the voter file as active (indicating that they were an eligible voter).

Thus, virtually every voter who requested a mail absentee ballot was, in fact, a qualified elector, and more than one-third of applicants whose initial application was rejected did not cast a ballot, even though they had taken two affirmative steps—by registering, and then requesting an absentee ballot.

Registrars are required to inform voters "promptly" if their absentee ballot applications are rejected. Given the errors evident in absentee ballot files—inconsistent terms and standards from one county to the next, obvious data entry errors, lags between the receipt of information in registrar offices and recording the data in voter files, missing applications, and overwhelmed election offices (*see* Appendix B and Niesse 2020b)—it is not at all clear whether this information is provided to voters in time for them to cure any deficiencies.[30]

Unequal exercise of discretion by election officials is a well-documented phenomenon in the elections administration literature (White, Nathan and Faller 2015; Atkeson et al. 2009; Atkeson et al. 2014; Cobb, Greiner and Quinn 2010; Kimball and Kropf 2006; Shino, Suttman-Lea and Smith 2020; Porter and Rogowski 2018; Page and Pitts 2009; Suttman-Lea 2020).  It is highly likely that practices vary across the

---

[28] The U.S.P.S. online store sells stamps in packages of 20 for $11. https://store.usps.com/store/home.

[29] In addition, 10 of these registrants appear in the voter history file as casting an absentee ballot even though the absentee file shows no record of an absentee ballot accepted.

[30] The absentee files do not include consistent entries concerning whether registrars attempted to contact voters whose applications were rejected, or when the information was provided.

state, with different interpretations of what "promptly" requires, and inconsistent standards for contacting rejected applicants.

In fact, in a related context, research on the processing of voter registration forms shows that election officials reject more mail registrations as the rate of applications surges before deadlines (Merivaki 2018), because of difficulties processing a large volume of applications in a short time. Merivaki found substantial differences across counties in Florida in their registration rejection rates, as well as differences based on when registration forms arrived. Based on these studies, I expect similar effects with processing of absentee ballot applications. The differences will likely be particularly evident when the number of applications will be unusually high, and when applications are received closer to deadline.

### B. Application Requirements

Under Georgia law, absentee voters must submit a separate absentee ballot application for every election, unless they are disabled or age 65 or older, in which case they can request with one application an absentee ballot for all elections in a single election cycle (which I understand to mean a single year in which election dates are scheduled).[31] Even these voters must submit a new absentee ballot request each year.

The requirement to submit a separate application for each election (including primary, general, runoff, and special elections) imposes a considerable burden on voters as well as election officials, as it requires multiple applications and overlapping voter registration and application deadlines, as well as additional work by election officials as they process applications in each election. In 2018, elections were held on nine separate dates.[32] In 2019, there were eight scheduled election dates, but separate elections held on fifteen different dates (counting special elections and special election runoffs, some held in only part of the state)[33]; in 2020, not counting the multiple changes in the presidential preference primary date, there are five election dates scheduled.[34]

Crucially, absentee ballot applications require the *voter* to fill in the date of the election; incorrect dates were a common reason for rejecting applications in 2018, with 6.2% of rejected applications citing an incorrect or missing election date. Forcing voters to manually fill out and submit as many as nine absentee ballot applications per year vastly increases the likelihood of errors like these, consequent rejections, and ensures that the election official will also have to contact voters more frequently if such rejections are to be avoided (and, as the analysis above shows, we know that at least 644 eligible voters were not able vote in 2018 because of application errors).[35]

As of 2020, there is no online application process (voters wishing to submit an application "online" through the state's voter registration system have to complete the paper application, scan it, and email the

---

[31] OCGA § 21-2-381(a)(1)(G) specifies that a voter "may request in writing on one application a ballot for a presidential preference primary held pursuant to Article 5 of this chapter and for a primary as well as for any runoffs resulting therefrom and for the election for which such primary shall nominate candidates as well as any runoffs resulting therefrom." The absentee ballot application form allows voters age 65 or older or disabled voters to "receive vote by mail ballots for the rest of the election cycle without an application" (https://sos.ga.gov/admin/files/Fillable%20Absentee%20Ballot%20Form%2020.pdf, section 10).

[32] Dates taken from the available voter history files, https://elections.sos.ga.gov/Elections/voterhistory.do.
[33] https://sos.ga.gov/admin/files/2019_State_Short_Calendar.pdf.  Actual election dates taken from voter history files.
[34] https://sos.ga.gov/admin/files/2020%20Revised%20Short%20Calendar.pdf
[35] This is calculated by subtracting the number of successful election day voters (272) from the 905 rejected absentee applications who never obtained an absentee ballot/

completed application to a registrar's office; this is not a true online system). True online application systems have demonstrably lower error rates than paper applications, because voters can be presented with drop-down menu options, and data entry filters reduce (or eliminate) the possibility of errors (Ponoroff 2019).[36]

One indication of why this matters: in 2018, 0.89% of all non-in person absentee applications were rejected (2,618 of 293,081 applications).[37] In 2020, when election officials took the extraordinary, emergency action of sending absentee ballot applications that were pre-filled with voter information, the rejection rate dropped by 2/3 (to 0.33%), and 82% of the application rejections occurred because a voter did not sign the application or did not designate which party they wanted to vote in the primary. But this procedure is not typical for Georgia elections and there is no indication that it will occur in the November 2020 general election. Moreover, even if it does, that still places a substantial number of voters at risk of rejection as occurred in the June 9 primary election: 0.33% of 4 million is still 13,200 rejected voters. A 2018-level application rejection rate would disenfranchise over 35,000 voters.

The multiple applications and the need to complete paper applications manually is an invitation for voters to make errors that result in their disenfranchisement. It also ensures that election officials have to process more applications in an election cycle, a prospect that is particularly concerning for November 2020 where historic turnout is already anticipated, and even more concerning given the problems already observed with the processing of applications in the June 9 election. Moreover, as I note above, rejection rates increase as the number and rate of applications increases.

## X.    Mail Absentee Ballot Rejection Rates

Georgia's likely switch to a mostly mail November 2020 general election will have one very clear consequence absent changes in absentee ballot procedures: a significant increase in the number of cast ballots rejected for arriving late (or not at all), or for some other reason such as a missing signature or a signature that an official deems as nonmatching against a signature on file. Rejection rates for mail absentee ballots are significantly higher than the rejection rates for in-person absentee voting, or election day voting (Alvarez, Hall and Sinclair 2008; Alvarez, Beckett, and Stewart 2013). A key reason for the disparity is that voters casting ballots in person get immediate feedback if they have made a mistake on their ballot and an opportunity to cure the deficiency on the spot (such as a lack of signature, an overvote, or a spoiled ballot) that mail voters lack, and they are interacting with trained poll workers who can alert voters to problems.

At times the disparity in mail vs. in-person ballot rejection rates can be enormous. In the 2018 election in Wisconsin, for example, only 130 of 413,336 in-person absentee ballots were rejected, a rate .31 ballots per 1,000 received. The rejection rate for mail absentee ballots was nearly fifty times

---

[36] A robust online system would also require voters to fill out all necessary information before being able to submit the application.

[37] This counts mail and electronic applications, along with applications where no ballot style is specified.

higher, 15.6 per thousand (equivalent to 1.56%).[38] In the 2020 presidential primary, the rejection rate for mailed ballots was higher, 1.91%.[39]

In Georgia the disparity between mail and in-person absentee rejection rates is far larger. In 2018, as I show below, 227,604 mailed absentee ballots were returned to registrars' offices. Of these, 6,921 were rejected combined for all reasons, for an overall rejection rate of 3.04%.[40] For voters who had their ballots rejected, 1,218 eventually cast a valid ballot at another time, either absentee or at the polls on election day. An absentee voter whose mail ballot was rejected had only a 17.6% probability of voting successfully. The rate of disenfranchised mail voters—the number of voters with rejected absentee ballots who did not cast a successful vote in 2018—was 2.51%.

 For in-person absentee voters (or early voters), 13 of 1,890,646 ballots were rejected. Of those 13, 10 successfully cast another early vote, so the rejection rate of in-person absentee ballots comparable to the 2.51% rejection rate for mail ballots is .00016%. The rejection rate for mail absentee ballots was thus over *15,000 times larger* than the rejection rate for in-person absentee ballots, and a voter whose in-person absentee ballot was rejected had a 77% probability of voting successfully.

### A.  Late Ballot Rejections

Under Georgia law, absentee ballots must be received at the county registrar's office by the close of polls on election day (and can be delivered by mail or in person). Ballots received after this deadline are rejected.[41]

The data on daily arrivals in 2018 shows that the two highest daily totals were on the Monday before election day (November 5th.) and election day (November 6th), when 29,683 mail ballots arrived. Nearly 30% of all accepted mail ballots arrived in the last 7 days before the election day (29.1%). In a general election like 2020, even a minor delivery delay of 2 or 3 days caused by a short-term surge in mail volume could result in tens of thousands—even hundreds of thousands—of mail ballots rejected for arriving late.

Table 1 shows ballots arriving late and rejected in the week following the 2018 election on November 6.

---

[38] Of the 165,017 absentee ballots returned by mail, 2,572 were rejected. This includes both mailed ballots received late (1,130), and those rejected for some other reason (1,442). Data from the Wisconsin State Elections Commission, 2018 General Election EL-190F: Election Voting and Registration Statistics Report, https://elections.wi.gov/sites/elections.wi.gov/files/2019-05/EL-190%202018%20General%20Election%20report%202019-05-07.xlsx.

[39] Wisconsin State Elections Commission, *Absentee Voting Data 2014-2020*, *https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/Exhibit%20A%20Absentee%20Voting%20Data%202016-2020.pdf*.

[40] The number of rejections was in the absentee file was 7,898, but some were the result of standards eased in 2019.  The 6,921 rejections in this calculation reflects the updated rules. This total includes ballots rejected for arriving late.

[41] Under the Uniformed and Overseas Civilian Absentee Voter Act (UOCAVA), absentee ballots from overseas and military voters are accepted if they are postmarked by election day and arrive within three days of the election.

| Table 1 Cumulative Arrival of Late Ballots By Day 2018 General Election | | | |
|---|---|---|---|
| Date Received | Days After Election | Ballots Received and Rejected as Late | Cumulative % of all late rejected mail ballots |
| 7-Nov | 1 | 1,049 | 29.3% |
| 8-Nov | 2 | 914 | 54.8% |
| 9-Nov | 3 | 464 | 67.8% |
| 12-Nov | 6 | 172[42] | 72.6% |
| 13-Nov | 7 | 446 | 85.0% |
| 14-Nov | 8 | 162 | 89.6% |
| 15-Nov | 9 | 51 | 91.0% |
| 16-Nov | 10 | 55 | 92.5% |
| After 16-Nov | > 10 | 268 | 100.0% |
| Total | | 3,581 | |

The U.S.P.S. "recommends that voters mail their marked return ballots at least 1 week before the due date to account for any unforeseen events or weather issues."[43] Accordingly, assuming that this mail period is correct, ballots mailed on Election Day would arrive within seven days (5 business days) of the election. In 2018, 3,045 ballots arrived within seven days of the election and were rejected as late. This reflects a rejection rate of 1.34% and represents 85% of all late ballots returned in that election.[44] By extrapolation, if the same rate of late arrival occurs in 2020 with 4 million mailed ballots, we would expect over 53,000 ballots arriving within a seven days of the election and rejected as late.

Thus far, the median time to return a mailed absentee ballot in Georgia's June 9 primary election is 20 days from the date that the ballot was issued.[45] Only five percent of mail ballots were issued and returned within 9 days.

In order to analyze the demographics of voters whose mail ballots were rejected in recent elections, I need individual-level data from the absentee ballot request files published by the Georgia Secretary of State. The Election Administration and Voting Survey (EAVS) conducted by the U.S. Election Assistance Commission contains county-level data on absentee ballot rejections. While the EAVS cannot be used for individual level analysis, I can use its results to assess the accuracy of the individual-level identification process I implement.

---

[42] This total includes two ballots that arrived on November 10 and 11, weekend days.

[43] Publication 632, *State and Local Election Mail–User's Guide*, January 2020, 19.

[44] The totals and the rejection rate in Table 2 are higher, because I count ballots arriving more than 1 week late.

[45] This total includes only mail absentee ballots where the application was submitted after March 17, 2020, and the ballot returned by May 31, 2020.

The absentee ballot request files I reviewed[46] contain information for each absentee ballot request made by a voter for an election. For each registrant requesting an absentee ballot, the file has the following information relevant for my analysis:

- Unique voter registration number
- The date the voter applied for an absentee ballot
- The type of absentee ballot applied for (mail or in person)
- Status of absentee ballot application (Accepted, Rejected, or Cancelled)
- The reason for not accepting an absentee ballot application
- The date the absentee ballot was issued
- The date the absentee ballot was returned
- How an absentee ballot was returned or cast
- The status of the absentee ballot (accepted, rejected, cancelled, or spoiled)
- The reason an absentee ballot was not accepted (ballot status)

In theory, it *should* be possible to easily identify absentee ballots rejected for arriving late: simply count the number of absentee ballots that (1) arrive after the relevant deadline, observable from the data in the return date field; (2) are rejected, observable from the data in the ballot status field; and (3) which contain a notation that the ballot did not arrive by the deadline (observable from the data in the status reason field).

However, because of differences in how counties handle absentee ballots, criteria for rejecting and cancelling ballots, how data are recorded in the files, entry errors, and unstandardized record-keeping practices, identifying late rejected absentee ballots in this file is not straightforward. Appendix B notes some problems in the absentee voter file, and the effect of inconsistent administrative practices across the state. These issues affect the data on absentee ballots and suggest that the true number of rejected late mailed ballots is larger than what is reported in the data.

Some late ballots were noted as rejected, while others were cancelled. Rejected late-arriving late ballots were noted in different ways in the status reason field: "Ballot Received after Deadline," "Ballot Not Returned By Election Day," "Received after deadline," "Too Late," and "RNS by 11/9," and several other versions for rejected ballots, and "Ballot dated 11-8-18," Ballot received after election," and "Received late" for cancelled ballots. Late ballots were also rejected for other reasons, the most common related to a missing signature or lack of signature match.

In addition, some *cancelled* ballots—a designation that should apply to ballots invalidated before they were actually cast, often because voters change their minds about what mode of voting they will use[47]— appear to fall into the category of not counted because they arrived late (the equivalent of being rejected). Twenty-three mail ballots were received after election day and cancelled, all noted as arriving late in the status reason field.[48] Another 263 ballots were cancelled as undelivered but have a receipt date indicating arrival in election offices. I counted the former category as late rejected, but not the latter, again because it is not recorded whether the receipt date is when the ballot arrived at election offices, or the date when officials cancelled the ballot.

---

[46] https://elections.sos.ga.gov/Elections/voterabsenteefile.do
[47] Under O.C.G.A. § 21-2-388 an absentee ballot is cancelled at the request of a voter if the ballot has not been received or returned, or if the voter has surrendered it at a polling place or election office.
[48] None of the registrants with late-cancelled ballots voted in the 2018 election.

But this is incomplete, because of inconsistencies in how election officials classified ballots. Every ballot rejected as "Ballot not Returned By Election Day" had a date of return recorded, although it is not clear whether the ballots were actually received late, or if a ballot was never returned at all and the return date is the date on which officials rejected the ballot. Similarly, some late ballots rejected as "undelivered" have a receipt date in election offices, but it is unclear if the ballot was returned by the U.S. Postal Service as undeliverable to the address on the ballot, or if it refers to a ballot returned after election day.

To account for the inconsistencies above and to ensure my analysis is conservative, I defined a rejected late mail ballot as any ballot that fell into the following category

- The ballot was issued by mail, AND
- The ballot is recorded as returning to a registrar's office after election day, AND
- The ballot is rejected or cancelled, AND
- The ballot status is noted as due to the ballot arriving late, or similar language, AND
- The registrant is not recorded in the voter history file as voting, either absentee or in person at the polls on election day

The filtering process generated the following data, shown in table 2:[49]

| Table 2 - Number of Late Rejected Mailed Ballots | | |
|---|---|---|
| | | **Number of Ballots** |
| **1** | **Mailed absentee ballots returned to election offices rejected or accepted (from absentee ballot file)** | 227,604 |
| **2** | **Rejected or cancelled ballots indicating late arrival or not returned by election day (from absentee ballot file)** | 3,582 |
| **3** | **Late rejected absentee mail registrants recorded in voter history file as voting at polls on election day (from voter history file and absentee ballot file)** | 31 |
| 4 | **Number of registrants not voting because mailed ballot rejected for not arriving by deadline (line 2 - line 3)** | **3,551** |
| | **Percentage of returned mailed ballots rejected as late (line 4 / line 1)** | **1.56%** |

[49] In this table and table 2, the red shaded cells are calculations from the underlying data. The unshaded cells are from the original data.

Overall, I estimate that at least 3,551 registrants submitted a mailed absentee ballot that was rejected because it arrived after election day. This is 1.56% of all mailed absentee ballots returned.[50]

This statewide estimate—3,551—is very close to the 3,525 late rejected mail ballots reported in the 2018 Election Administration and Voting Survey (EAVS). This confirms that the methodology I use to identify individual-level rejected ballots is reliable, insofar as the underlying data are accurate. When I aggregate the individual-level data to the county level, my numbers match the EAVS data on rejected late mailed ballots almost perfectly.

This rejection rate is a lower bound, because it is certain that the true number of late-rejected ballots is higher than what the data show. This estimate does not count late ballots rejected for other reasons (such as missing information). Moreover, because of inconsistencies in how counties recorded rejected ballots, some late uncounted absentee ballots were likely not recorded as rejected. The true rejection rate is certain to be higher.[51]

To give one example, Fulton County—the most populous county in the state, with 771,000 registered voters, and 23,201 mailed absentee ballots in 2018—recorded *zero* rejected late mailed absentee ballots. This is implausible, and it is much more likely to be an artifact of record keeping practices than a reflection of the actual data.[52]

Figure 1 shows how much of an outlier Fulton County is. The graph plots the number of late rejected ballots in each county (y-axis) as a function of the number of mailed absentee ballots (x-axis). The size of each circle is weighted by the number of mail ballots received in the county.

---

[50] This is higher than the totals in table 1, which counted only ballots arriving within 7 days of the election.

[51] In total, counting all reasons for rejection, 4,187 late arriving ballots were rejected (a rate of 1.83%).

[52] Fulton County election officials did adopt more lenient practices for rejecting absentee ballots for other reasons, such as a voter failing to record her address or date of birth on the absentee ballot oath (Ingraham 2018).  County officials rejected a single ballot that is recorded as arriving late (on November 27, 2018) for lacking a signature.



Figure 1
Late Mail Ballots Rejected in 2018 Election
Absentee File Data

Here, the red line is the weighted regression of rejected late mailed ballots on the number of mailed ballots received, with the 95% confidence interval in white. Fulton County is a clear outlier below the regression line, with zero rejected late mailed ballots (this is also the number reported in the EAVS 2018 survey). It is extremely unlikely that Fulton County actually received no late arriving ballots that were not counted.[53]

An investigation by the *Atlanta Journal-Constitution*, in which reporters contacted election officials in counties reporting no rejected ballots in 2018, found that some counties—including Fulton—simply did not report data to state election officials. Fulton County actually rejected "at least 275 ballots" for a lack of signature, and 230 ballots that arrived late. "The county," noted the reporters, "had no plans to report those rejections to the Secretary of State" (Joyner and Peebles 2018). Adding these 230 rejected late mail ballots would place Fulton County almost exactly on the red regression line in Figure 1, and would raise the late-rejection rate to 1.66%, and the total number of late rejected ballots to 3,812.

The overall 1.56% late-rejection rate for mailed absentee ballots in 2018 is higher than the rate in 2016 (1.2%), when 2,307 of 199,356 mailed absentee ballots were rejected as late, and nearly double the late-rejection rate for 2014 (0.7%), when 805 of 110,692 absentee ballots were rejected as late.[54] This pattern suggests that the *rate* of late absentee ballot rejections increases as the number of mail absentee ballots increases, and that the burden of returning mail ballots before the deadline rises in parallel.

---

[53] Fulton County rejected two ballots in 2018, one for a signature mismatch, and one for a missing signature. The rejected ballot with a missing signature is recorded as arriving at election office on November 27, 2018.

[54] I calculated the 2016 and 2014 rates using EAVS data, because the data match my own calculations so closely.

Figure 2 shows total late ballot rejection rates by county, with counties rank-ordered by the rejection rate. The size of each circle is proportional to the number of mail ballots returned, and the horizontal red line is the statewide percentage of late rejections. Fulton County is again an outlier, as the large circle in the right third of the graph, showing a rejection rate of zero. All of the other counties with no reported rejected ballots are much smaller.

Figure 2: Mail Late Rejection Rates by County
November 2018 Election



Size of circle proportional to number of received mail ballots

Figure 2 shows wide variation in late rejection rates. Fifty-one counties rejected no mailed ballots for arriving late (in some cases, as with Fulton County, this is almost certainly an artifact of poor reporting practices rather than the actual underlying data). Thirty-four counties had a rejection rate of 2% or higher, and 7 counties had a rejection rate exceeding 5%.

The election-day deadline is a barrier, both for late-deciders (who make up their minds in the last week before the election; *see* Menger and Stein 2020), and for those whose ballots might be delayed because of a surge in mailings that will occur nationwide as election day approaches. The concern about late-deciders is particularly important in the context of the November 2020 general election, because it is likely that most mail absentee voters will be accustomed to voting in person early or on election day, meaning that they are in the habit of deciding for whom they will vote later in the cycle (Menger and Stein 2020; Monroe and Sylvester 2011; Alvarez, Hall and Sinclair 2008; Pirch 2012). In 2018, only 25% of in-person votes were cast more than 7 days before the election, so a large majority of voters in 2020 will be accustomed to voting late in the election cycle.

Even under typical conditions, well over 1 out of every 100 mailed absentee ballots was rejected for arriving late in 2018, and virtually all arrived within a week of the election (and most within a few days). *See* discussion *supra* at 14, showing that 85% of late rejected ballots arrived within 7 days. The November 2020 general election will be anything but typical, with both an unprecedented number of mail ballots, an unprecedented number of registrants voting by mail for the first time, and pressure on the postal service

23

from a surge in mail voting nationwide. Even if the late-rejection remains at its 2018 level of 1.56%, 4 million mail absentee ballots would result in over 60,000 ballots rejected for arriving late. This estimate is conservative, because of the high likelihood that rejection rates will actually rise as the number of ballots increases, because voters may be especially reluctant to return ballots in person in the midst of a pandemic, and because of potential mail delivery delays. It is plausible—even likely—that the late rejection rate in November 2020 will be even higher than what has been the case in previous elections.

### B.   Other reasons for rejecting mailed ballots

Arriving late is only one of the reasons election officials can reject an absentee ballot. Officials can also reject ballots for incomplete information on the ballot return envelope (including, in 2018, a missing signature, address, incorrect information such as a different address than what is on file with election officials, and a lack of signature match). Ballots rejected for these reasons are recorded as either "rejected" or, in a very few cases, "cancelled."[55]

In 2019, the requirement that voters record their address and birth year on absentee ballot return envelopes was eliminated. I can use the status reason field to replicate which 2018 ballots would have been rejected under the new rules, by not counting ballots rejected because of incorrect address or birth date information.[56] In addition, in 2020, the standard for determining a signature mismatch was changed to require 2 of 3 election officials to agree that a signature mismatch exists.[57] This change has not yet been implemented so, at this time, it is not clear how it will change the rate of ballots rejected for signature mismatches.  But in 2018, fewer than 10% of rejected ballots involved a signature mismatch, so any decline is likely to be small.

In 2018, a total of 6,921 returned mail ballots were rejected for reasons other than incorrect or missing birth year or address information. This total includes 34 ballots in the 2018 absentee file that were mailed, received at election offices, and recorded as "cancelled" rather than "rejected" because of missing information or late arrival. As I note above, these cancellations can be treated as the functional equivalent of a "rejection" because they involve submitted ballots not counted and specifically noted as lacking information or arriving late, so I added them to the total number of received mail ballots that were rejected for any reason.[58] I also excluded 11 mail ballot rejections that were due to a voter being ineligible, and subtracted them from the total.[59]

I then subtract from this total 1,218 rejected absentee voters who were able to either cure their ballot or vote at a different time (identified from the voter history file). The result—5,703—is the number of eligible voters who did not cast a ballot after their mailed absentee ballot was rejected.[60]

---

[55] The birth year and address requirements were invalidated via litigation in 2018 and rescinded by statute in 2019.

[56] I analyzed the reasons for mail ballot rejections in 2018, removing all rejections mentioning address information or birth date or year errors from the total of rejected mail ballots

[57] *Democratic Party of Georgia v. Raffensperger*, Joint Notice of Settlement as to State Defendants, No. 1:19-ccv-5028-WMR (N.D. Ga.), March 6, 2020.

[58] Excluding these ballots makes no difference to any of my conclusions.

[59] The total includes ballots rejected for multiple reasons as long as one of the reasons was a missing or mismatched signature or arriving late.

[60] Subtracting out the number of registrants who voted will also correct for submitted ballots recorded as cancelled and then reissued and voted.

| | Table 3– Total Number of Rejected Mailed Ballots in 2018 2020 Rules | |
|---|---|---|
| | | **Number of Ballots** |
| **1** | **Mailed absentee ballots returned to election offices rejected or accepted (from absentee ballot file)** | 227,604 |
| **2** | **Returned mailed ballots received and rejected (from absentee ballot file)** | 6,921 |
| **3** | **Rejection rate (line 2/line 1)** | 3.04% |
| **4** | **Rejected absentee mail registrants recorded in voter history file as voting at polls on election day or absentee (from voter history file and absentee ballot file** | 1,218 |
| **5** | **Number of registrants not voting after mailed ballot rejected (line 4 - line 2)** | **5,703** |
| **6** | **Percentage of mailed ballots rejected (line 5 / line 1)** | **2.51%** |

The rejection rate of 2.51% represents a lower bound, because the true number of rejected ballots is certain to be higher than the reported totals (adding the 505 unreported ballot rejections in Fulton County alone would raise the statewide rejection rate to 2.84% and the total number of rejections to 7,426).

Figure 3 shows the total mail-ballot rejection rate, with counties rank-ordered by their rejection rates. Here as well counties showed wide variation. Thirty-three counties did not report any rejections of returned mailed absentee ballots, while seventy-four counties had a rejection rate of 2% or more, and twenty-four counties rejected more than 5% of returned mailed ballots. The three counties with the largest number of mail ballots received (Cobb, Gwinnett, and DeKalb) had overall rejection rates of 2%, 4.3%, and 4.1%, respectively.

25



Figure 3: Total Mail Rejection Rates by County
November 2018 Election

County-level rejection rates are not related to population size, the number of registered voters, the number of mail ballots issued, poverty rates, demographic composition, or whether a county is rural or nonrural. An inference that may be drawn from this is that a likely cause of the differences in rejection rates is that election administrators vary in how they make discretionary decisions in applying the standards for accepting or rejecting ballots. As I noted above, the literature on election administration is consistent in finding that election officials apply discretion unequally, with wide variation at local levels. (White, Nathan and Faller 2015; Atkeson et al. 2009; Atkeson et al. 2014; Cobb, Greiner and Quinn 2010; Kimball and Kropf 2006; Shino, Suttman-Lea and Smith 2020; Porter and Rogowski 2018; Page and Pitts 2009; Suttman-Lea 2020).

Applying the 2.51% rejection rate—and assuming that it does not increase based on the anticipating increase in late ballot rejections—if 4 million mail absentee votes are cast in the 2020 general election, we would expect over 100,000 rejected ballots overall.  In any event, the total rejection rate cannot be less than the late rejection rate (since the latter is included in the former), so there are limits to how far the rejection rate can decline because of changes in signature matching requirements.

## C.  The Effects of Age and Voting Experience on Rejection Rates

Mail absentee rejection rates are strongly associated with age, with younger voters far more likely to have their absentee ballots rejected. Figure 4 shows the percentage of all mail ballots submitted that were rejected overall (for any reason based on the calculations in table 3) plotted by voter ages, using the rejection standards that were put in place in 2019.



Figure 4: 2018 Returned Mail Ballot Rejection Rates by Age
2019 Rejection Rules

Size of each circle is proportional to the number of voters
in each age category who submitted a mail absentee ballot

The pattern is clear: voters 30 years of age or younger have higher than average rejection rates, while voters older than 60 have lower than average rejection rates. Voters under age 22 have rejection rates 2 to 3 times greater than the average.

The explanation is largely a function of experience: younger voters have less experience navigating the bureaucratic requirements of voting, and of absentee voting in particular. Table 4 shows rejection rates based on how much experience voters have with absentee voting. Using previous absentee ballot request files from the 2016 general election, the 2016 presidential preference primary, and the 2014 general election, I can identify voters in 2018 who had voted mail absentee previously, as well as how many times they had voted absentee. Mail absentee voters in 2018 who had no prior experience casting a mail absentee ballot had 3.8% of their ballots rejected. Those with one instance of prior experience (in any of the three earlier elections) had a lower rejection rate, 2.3%. Those with a consistent history of mail absentee voting, casting mail ballots in all three prior elections, experienced a rejection rate of 0.6%.

| Table 4: Rejection Rates for 2018 Mail Absentee Voters ||
| Number of Times Voter Cast Prior Mail Absentee Ballot | 2018 Rejection Rate |
|---|---|
| No prior experience | 3.8% |
| Once | 2.3% |
| Twice | 1.1% |
| Three Times | 0.6% |

Prior elections: 2016 presidential, 2016
presidential primary, 2014 general

The pattern is even more apparent with ballots rejected for arriving late, as shown in Figure 5:



Figure 5: 2018 Returned Mail Ballot Late Rejection Rates by Age

Size of each circle is proportional to the number of voters
in each age category who submitted a mail absentee ballot

Among voters over age 60, typically less than 1% of submitted absentee ballots are rejected for arriving late, while those under the age of 26 have rejection rates of between 4% and over 8% (for 18-year olds).

One reason is that late ballot rejection rates were concentrated in absentee ballot voters temporarily living outside of Georgia, and younger voters were more likely to live out of state than older voters. While

the overall late ballot rejection rate was 1.56%, the rejection rate was 7.2% for out-of-state absentee voters, likely because of the additional time needed to request, receive, and return absentee ballots. Of these out-of-state absentee voters, nearly half—43.2%—were between the ages of 18 and 24, far more than this age group's overall composition of all mail absentee voters (10.8%). A possible reason is that typically about 10% of Georgia high school graduates each year attend college out of state, suggesting that over any 4-year period about 40,000 college-age Georgia residents are attending an out of state school.[61]

For out-of-state absentee voters aged 18 or 19, 11.4% of returned mail absentee ballots arrived late and were rejected.

As with overall rejections, the rate drops significantly for voters of all ages with prior experience voting mail absentee (table 5).

| Table 5: Rejection Rates for 2018 Mail Absentee Voters - Late Ballots ||
|---|---|
| Number of Times Voter Cast Prior Mail Absentee Ballot | 2018 Rejection Rate |
| No prior experience | 2.0% |
| Once | 1.2% |
| Twice | 0.5% |
| Three Times | 0.2% |

For voters casting their first mail absentee ballots (who, as a group, comprised over 63% of all mail absentee ballots in 2018), 2% of their ballots were rejected for arriving late. For voters with the most experience—those who voted mail absentee in the previous 3 elections—their ballots arrived late only 0.2% of the time. The late ballot rejection rate for inexperienced voters was thus an order of magnitude greater than the rate for experienced absentee voters.

Without question, experience leads to better outcomes for voters. An 18 or 19-year-old in 2018 would have had no opportunities to cast an absentee ballot previously.

This result has immediate relevance for the November 2020 general election, as it is highly likely that most mail absentee voters will have at most *one* possible previous experience with the process (the June 9 election), and many will have had no prior experience.[62] We can expect, absent changes to absentee voting practices, that mail ballot rejection rates in 2020 will exceed these historical averages, as will the rejection rate for late arriving ballots.

---

[61] Data from the Governor's Office of Student Achievement, https://gosa.georgia.gov/high-school-graduate-outcomes-dashboard.

[62] Runoff elections, if necessary, are scheduled for August 11, but these are likely to be lower turnout compared to the presidential primary. The only possible statewide runoff is for the U.S. Democratic Senate Nomination.

### D.  Demographics of Absentee Voters and Absentee Ballot Rejections

Table 6 shows the demographic characteristics of the population of active registrants (as of December 2018) and of different categories of mail absentee voters. It shows that African Americans are more likely to rely on mail absentee voting than Non-Hispanic Whites: African Americans comprise 40.1% of mail absentee ballots sent (column 2), compared to making up 30.1% of all active registrants (column 1).

Yet, African Americans and Asian/Pacific Islanders are more likely to have their absentee ballot applications rejected; the two groups make up 32.3% of registrants, but 56.1% of application rejections (column 3).

All demographic groups of voters return their mail ballots in rough proportion to ballots sent, meaning that every group returns about the same percentage of mailed ballots (column 4 compared to column 2), and are about equally likely to have a mail ballot rejected for arriving late (column 5 compared to column 4).

However, Non-Hispanic White voters are less like to have their mail ballots rejected overall (column 6), and less likely to be shut out of the election than minority voters (column 7).

| Table 5 - Demographics of Mail Absentee Voting | | | | | | | |
|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Race | Active Registrants | Mail Ballots Sent | Mail Ballot Applications Rejected | Mail Ballots Returned | Late Rejected | All Rejected | Rejected and Did Not Vote |
| White Non-Hispanic | 53.8% | 44.3% | 31.9% | 46.5% | 45.2% | 35.1% | 38.5% |
| African American | 30.1% | 40.1% | 46.2% | 38.8% | 37.0% | 45.4% | 42.4% |
| Hispanic | 2.9% | 4.2% | 4.1% | 2.8% | 3.2% | 3.4% | 3.4% |
| Asian or Pacific Islander | 2.2% | 3.1% | 9.9% | 3.9% | 4.7% | 6.7% | 6.4% |
| Other, inc. 2 or more | 1.5% | 1.6% | 1.3% | 1.6% | 2.6% | 2.4% | 2.3% |
| Not stated | 9.5% | 6.7% | 6.6% | 6.5% | 7.3% | 7.0% | 7.0% |

Conditional upon election offices receiving a mail ballot from a voter, the probabilities of rejection in the 2018 election among different voting groups are expressed as follows:[63]

- African American voters are 62.8% more likely to have their mail ballot rejected than Non-Hispanic White voters (p=0.00).
- Hispanic voters are 68.1% more likely to have their mail ballot rejected than Non-Hispanic White voters (p=0.00).

---

[63] All probabilities were calculated using Pearson's $\chi^2$ with 1 d.f.

- Minority voters as a single group are 71% more likely to have their mail ballot rejected than Non-Hispanic White voters (p=0.00).[64]
- White voters are 10.3% more likely to have their mail ballot rejected as late (p=.01).
- Voters under age 26 are between 200% and 400% more likely to have their ballots rejected (section X(C) above) than older voters.
- Inexperienced mail absentee voters are between 500% and 900% more likely to have their mail ballot rejected than experienced absentee voters (section X(C) above).

### E.  Summary

Both the late rejection and total rejection rates show not only that a material number of otherwise eligible voters have their ballots rejected for arriving late or because of missing information. More importantly, the wide differences in county-level rejection rates show that interpretation and implementation of the standards for rejecting ballots are very likely applied inconsistently across the state.

Extrapolating these rejection rates to the potential number of mail absentee ballots likely in the November 2020 general election produces estimates of tens of thousands and even hundreds of thousands of ballots rejected. Recall that approximately 228,000 mail ballots were received at election offices in 2018, with 1.56% rejected for arriving late and 2.51% rejected for all reasons. Extrapolating these rates to possible mail absentee vote totals in 2020 produces the following. If 4 million mail ballots are cast, 62,000 ballots will be rejected as late, and 105,000 ballots overall will be rejected. These estimates are actually conservative, because it is likely that pressure on the U.S.P.S. in the wake of a nationwide surge in mail voting, as well as voter confusion resulting from millions of voters casting mail ballots for the first time, will increase mail delivery times, late ballots, and rates of voter mistakes.

### XI.  Third-Party Ballot Collection

The practice of third parties collecting and submitting completed absentee ballots in an organized fashion is prohibited in Georgia. With limited exceptions, voters must personally deliver or mail their absentee ballots to election offices.[65]

Ballot collection provides two crucial benefits to voters. First, it reduces the costs of voting by offering absentee voters an easier opportunity to return their ballots, particularly for voters living alone, those who might lack transportation, or those who worry about the Postal Service's capability of returning ballots on a timely basis. According to the 2015-2018 American Community Survey, nearly 1 million

---

[64] This calculation excludes mail absentee voters who did not specify a race, but this does not have a material effect on the calculations or probabilities.

[65] O.C.G.A. § 21-2-385(a) specifies that after completing an absentee ballot "the elector shall then personally mail or personally deliver same to the board of registrars or absentee ballot clerk, provided that mailing or delivery may be made by the elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector.  The absentee ballot of a disabled elector may be mailed or delivered by the caregiver of such disabled elector, regardless of whether such caregiver resides in such disabled elector's household.  The absentee ballot of an elector who is in custody in a jail or other detention facility may be mailed or delivered by any employee of such jail or facility having custody of such elector. An elector who is confined to a hospital on a primary or election day to whom an absentee ballot is delivered by the registrar or absentee ballot clerk shall then and there vote the ballot, seal it properly, and return it to the registrar or absentee ballot clerk."

Georgia residents live alone in a single-member household (997,979), and 338,193 of these individuals are 65 years old or over.[66]

Second, it can reduce errors that result from a lack of necessary information on the completed absentee ballot envelope (signatures, etc.). Trained ballot collectors can help voters confirm that the ballot return envelope is properly completed, which increases the likelihood that the ballot will be accepted (it is the functional equivalent of a poll worker or election official noticing and giving the voter an opportunity to correct a mistake on the ballot return envelope).

Critics of ballot collection point to events surrounding the 2018 election in North Carolina's 9th congressional district as an example of the risks. In that case, a Republican campaign operative organized a scheme to intercept absentee ballots, collect completed ballots and tamper with them, complete blank absentee ballots, and forge witness signatures (all of which was illegal). When anomalies were detected, the North Carolina Board of Elections investigated and invalidated the results (North Carolina Board of Elections 2019; Gardner 2019); the operative was charged with federal crimes (Blinder 2019).

As the Brennan Center for Justice notes, however, there is a difference between *voter fraud* and *fraud committed against voters* (Feldman 2020). In North Carolina, organized absentee ballot collection is *already* prohibited, as it is in Georgia, and the actions in 2018 would have been illegal even if third party ballot collection were allowed. Moreover, the anomalies were easily detected using basic election forensic techniques (Herron 2019). The illegal activities (ballots tampering, etc.) that occurred in North Carolina are also clearly prohibited in Georgia. The North Carolina case should not be used as a justification for restricting third-party collection efforts.

The academic literature is clear that voter fraud is a vastly overstated risk to the electoral system, with false or exaggerated allegations of fraud used to undermine confidence in electoral integrity and justify restrictive voting laws (Minnite 2010; Hasen 2013). And the risks of mail absentee voting fraud are similarly vastly exaggerated, with only143 criminal convictions for absentee fraud nationwide over the past 20 years, "an occurrence that translates to about 0.00006 percent of total votes cast" (McReynolds and Stewart 2020).

The Heritage Foundation database of election fraud lists no instances of what it calls "Fraudulent Use of Absentee Ballots" in the last 10 years in Georgia, and 2 instances in the last 20 years, involving a total of approximately 11 absentee ballots.[67] The News21 database of election fraud, a project run by the Arizona State University Cronkite School of Journalism, lists 99 cases of absentee ballot fraud in Georgia since 2000, virtually all involving small numbers of ballots and local elections, with nearly 2/3 of the cases involving election officials and none involving third party collection efforts.[68] There were only 18 cases

---

[66] 2015-2018 ACS, items DP02-0011M and DP02-0012E.

[67] https://www.heritage.org/voterfraud/search?state=GA. This database must be interpreted with caution because it is not considered a reliable source: it lumps together many types of electoral irregularities as "voter fraud" that are not actually voter fraud, and vastly overstates its claims about the extent of voter fraud (see Mehrbani 2017). For my purposes, it serves merely to represent the upper limit of the number of even potential cases of vote fraud.  The one case in the Heritage database is present in records of the State Election Board list a case in a 2008 local election runoff involving a small number of ballots (State Election Board Executive Summary, Case Number 2008-00135, https://d3gcj4nzojrapq.cloudfront.net/wp-content/uploads/2010/09/SEB-Muscogee-County-2008-135.pdf).

[68] https://votingrights.news21.com/interactive/election-fraud-database/.  The News 21 data likely *overstate* the incidence of fraud, as it includes allegations that do not result in administrative findings, pleas, or convictions.

involving voters, and only 8 of those resulted in a plea, consent order, or conviction. While it is not entirely clear how many ballots were involved, or how many were actually cast (or that a voter attempted to cast), the total number appears to be fewer than ten ballots actually submitted. Over this interval, more than 31 million votes were cast in state and federal general elections alone (not counting primary and local elections).[69] The *rate* of fraudulent absentee ballots cast by voters is approximately 0.00003%, in line with MacReynold's and Stewart's estimate of the nationwide rate.

This is orders of magnitude less than the number of voters who will be disenfranchised by absentee ballot rules in the November 2020 general election, which will likely result in 60,000-100,000 rejected absentee ballots. Moreover, it is orders of magnitude less than the number of voters who have been disenfranchised by the absentee ballot rules in past elections, for example, the 3,551 disenfranchised voters in 2018 whose ballots were rejected as late, and the 5,703 disenfranchised absentee voters in 2018 overall.

Allowing third-party collection efforts is especially important during a pandemic, when voters may be fearful of appearing in public places such as election offices; when voters may face delayed mail service; and when many—perhaps millions of—voters are using mail ballots for the first time and will be unfamiliar with the process. Menger and Stein (2020) note that many voters prefer to deliver their absentee ballots in person, in part because it more closely replicates the election day experience and allows voters to delay making their choices until late in the campaign:

> Many infrequent voters want to wait until the last day of campaigning to make their voting decisions. When the voting period stretches over several weeks, those who lack strong preferences may wait until the very end of this period to avoid casting their ballot and regretting their choice due to a last-minute scandal or some other campaign development (Menger and Stein 2020, 205).

But in a pandemic, the risks of Covid-19 infection most certainly will factor into a voter's perception of the costs of voting and reduce the feasibility of the in-person option. A voter who has to deliver her ballot in person to an election office or even a drop box may interact with multiple people. A voter who allows a third party to deliver her ballot interacts with one person (the individual who delivers the ballot). Voters concerned about the risk of infection will, under the calculus of voting logic, more likely return their ballots with this capability.

## XII.    Conclusions

The November 2020 general election in Georgia will be unprecedented in the risks to voters who vote in person in the midst of what is projected to be another wave of the most deadly pandemic since the influenza pandemic of 1918-1919; in the number of mail absentee ballots that will be cast both overall and as a percentage of all votes cast; in the number of voters who will be voting by mail for the first time; and in the stress placed on election officials and the postal service as they process, deliver, receive, and count millions of absentee ballots under time pressure.

And, without changes in the way that absentee ballots are handled, the election will be unprecedented in the number of voters whose votes will not be counted.

The analysis above shows that the 1.56% rejection rate for mail absentee ballots arriving late, and the 2.51% overall mail absentee ballot rejection rate based on the 2018 general election, are conservative. Not every county accurately reported the number of absentee ballots rejected, and inconsistencies in how counties administered absentee ballot standards strongly suggest that the actual rejection rates were higher

---

[69] Vote totals taken from the United States Election Project, http://www.electproject.org/home.

in 2018. Rejection rates for inexperienced absentee voters are up to 10 times higher than the rates for experienced absentee voters. In the 2018 general election, rejection rates for mail ballots in Georgia were 15,000 times higher than the rejection rate for in person early votes.

Moreover, the rejection rates in the November 2020 general election will almost certainly be even higher still. Millions of voters may be casting mail absentee ballots for the first time. Given what we have witnessed in elections that have already taken place in the pandemic (including what is currently happening in Georgia), election offices will be under significant stress as they attempt to process what could be 4 million mail absentee ballots, likely resulting in delays processing absentee ballot applications, issuing ballots to voters, and informing voters of problems with submitted ballots. Mail delivery times are likely to increase as U.S.P.S. faces a surge in mail delivery at a time of significant financial strain.

If 4 million Georgia registrants vote by mail in the November 2020 presidential election, a conservative estimate based on my analysis in this report suggests that current absentee ballot practices could result in over 100,000 votes rejected, and perhaps far more.

Accepting absentee ballots arriving within a week of the election could reduce the number of rejected ballots by tens of thousands. Allowing third party collection efforts would permit an additional check on the accuracy of absentee ballot return materials (e.g., making sure that voters and potential witnesses have signed the ballot return envelope) would reduce the number of rejected ballots even more.

Sending absentee ballots with prepaid postage return envelopes would undoubtedly increase the number of voters who return their ballots, with previous research showing increases of 4 percentage points or more in the number of mail ballots returned.

The result of these changes would be hundreds of thousands of additional eligible Georgia registrants having their votes counted.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

June 10, 2020
Date: _____

Kenneth R. Mayer, Ph.D.

34

Sources

Aldrich, John H. 1993. "Rational Choice and Turnout." *American Journal of Political Science* 37:246-278.

Alvarez, R. Michael, Thad E. Hall, and Betsy Sinclair. 2008. "Whose Absentee Votes Are Returned and Counted: The Variety and Use of Absentee Ballots in California," *Electoral Studies* 27:673-683

Alvarez, R. Michael, Dustin Beckett, and Charles Stewart III. 2013. "Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990-2010," *Political Research Quarterly* 66:658-670

Ansolabhere, Stephen, Barry C. Burden, Kenneth R. Mayer, and Charles Stewart, III. 2018. "Learning from Recounts." *Election Law Journal* 17:100-116.

Armitage, Susie. 2018. "Mail-In Ballot Postage Becomes a Surprising (and Unnecessary) Cause of Voter Anxiety." *ProPublica*, November 1. https://www.propublica.org/article/mail-in-ballot-postage-becomes-a-surprising-and-unnecessary-cause-of-voter-anxiety.

Armstrong, J. Scott and Edward J. Lusk. 1987. "Return Postage in Mail Surveys: A Meta-Analysis." *Public Opinion Quarterly* 51:233-248.

Associated Press. 2020. "Questions and Anger in Wisconsin over Undelivered Absentee Ballots for Tuesday's Controversial Election." April 13.

Atkeson, Lonna Rae, Lisa A. Bryant, Thad E. Hall, Kyle L. Sanders, and R. Michael Alvarez. 2009. "A New Barrier to Participation: Heterogenous Application of Voter Identification Policies." *Electoral Studies* 29:66-73

Atkeson, Lonna Rae, Yann P. Kerevel, R. Michael Alvarez and Thad E. Hall. 2014. "Who Asks for Voter Identification? Explaining Poll-Worker Discretion." *Journal of Politics* 76:944–957.

Baretto, Matt A., Matthew J. Streb, Mara Marks, and Fernando Guerra. 2006. "Do Absentee Voters Differ from Polling Place Voters?" *Public Opinion Quarterly* 70:224-234.

Berson, Scott. 2018. "Young People Don't Vote Because Stamps are Hard? Ballots Will be Delivered Without Them." *Miami Herald* November 2. https://www.miamiherald.com/news/nation-world/national/article221012585.html.

Blais, André, Jean-François Daoust, Ruth Dassonneville, Gabrielle Péloquin-Skulski. 2019. "What is the Cost of Voting?" *Electoral Studies* 59:145-157.

Blakely, Tony A., Bruce P. Kennedy, and Ichiro Kawachi. 2001. "Socioeconomic Inequality in Voting Participation and Self-Rated Health." *American Journal of Public Health* 91:99-104).

Blinder, Alan. 2019. "Election Fraud in North Carolina Leads to New Charges for Republican Campaign Operative." *New York Times*. July 30.

Braconnier, Céline, Jean-Yves Dormagen, and Vincent Pons. 2017. "Voter Registration Costs and Disenfranchisement: Experimental Evidence from France." *American Political Science Review* 111:584-604.

Brasch, Ben. 2020. "Fulton County Fixing Backlog of 25,000 Absentee Ballot Applications." *Atlanta Journal-Constitution*. May 22. https://www.ajc.com/news/local/fulton-county-fixing-backlog-000-absentee-ballot-applications/IOEQxJb7HZclRx0pwX9cKM/.

Burden, Barry, David Canon, Kenneth Mayer, and Donald Moynihan. 2012. "The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election Administration." *Public Administration Review* 72:741-751.,

Burden, Barry C., David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2014. "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science* 58:95-109.

Cantoni, Enrico. 2020. "A Precinct Too Far: Turnout and Voting Costs." *American Economic Journal: Applied Economics* 1:61-85.

Centers for Disease Control and Prevention. 2020. *Recommendations for Election Polling Locations*. March 27. https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

Cobb, Rachael V., D. James Greiner and Kevin M. Quinn. 2010. "Can Voter Id Laws Be Administered in a Race-Neutral Manner? Evidence From the City of Boston in 2008." *Quarterly Journal of Political Science* 7:1–33.

Darmofal, David. 2010. "Reexamining the Calculus of Voting." *Political Psychology* 31:149-174.

DeCrescenzo, Michael G. and Kenneth R. Mayer. 2019. "Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." *Election Law Journal* 18:342-359.

Dirr, Allison and Mary Spicuzza. 2020. "What We Know So Far about Why Milwaukee Had only 5 Voting Sites for Tuesday's Election while Madison had 66." *Milwaukee Journal Sentinel* April 9.

Election Assistance Commission. 2017. *EAVS Deep Dive: Poll Workers and Polling Places*. November.

Fauvelle-Aymar, Christine and Abel François. 2018. "Place of Registration and Place of Residence: The Non-Linear Detrimental Impact of Transportation Cost on Electoral Participation." *Public Choice* 176:405-440

Feldman, Max. 2020. "Dirty Tricks: Eight Falsehoods that Could Undermine the 2020 Election." Brennan Center for Justice, May 14. https://www.brennancenter.org/our-work/research-reports/dirty-tricks-eight-falsehoods-could-undermine-2020-election.

Gardner, Amy. 2019. "N.C. Board Declares a New Election in Contested House Race After the GOP Candidate Admitted He Was Mistaken in Testimony." *Washington Post*. February 21.

Gardner, Amy, Michelle Ye Hee Lee, Haisten Willis, and John M. Glionna. 2020."In Georgia, Primary Day Snarled by Long lines, Problems With Voting Machines---A Potential Preview of November." *Washington Post*. June 9.

Glauber, Bill and Patrick Marley. 2020. "In Matter of Seconds, Republicans Stall Gov. Tony Evers' Move to Postpone Tuesday Election." *Milwaukee Journal Sentinel*, April 4.

Hasen, Richard L. 2013. *The Voting Wars: From Florida 2000 to the Next Election Meltdown*. New Haven: Yale University Press.

Herd, Pamela and Donald P. Moynihan. 2019. *Administrative Burden: Policymaking by Other Means*. New York: Russell Sage Foundation.

Ingraham, Christopher. 2018. "Signature Mismatches, Missing Birthdays, and Errant Spouses: Why Thousands of Absentee Ballots Were Tossed Out in Georgia." *Washington Post* [wonkblog], November 16. https://www.washingtonpost.com/business/2018/11/16/signature-mismatches-missing-birthdays-errant-spouses-why-thousands-absentee-ballots-were-tossed-out-georgia/.

Joyner, Chris and Jennifer Peebles. 2018. "AJC Analysis: Absentee Ballot Pitfalls Tripped Thousands of Ga. Voters." *Atlanta Journal-Constitution*. December 20. https://www.ajc.com/news/state--regional-govt--politics/ajc-analysis-absentee-voting-pitfalls-tripped-thousands-voters/5Qu6ynxydaKrT4le1edtPL/.

Kimball, David C. and Martha K. Kropf. 2006. "The Street-Level Bureaucrats of Elections: Selection Methods for Local Election Officials." *Review of Policy Research* 23:1257–1268.

Leighley, Jan E. and Jonathan Nagler. 2014. *Who Votes Now? Demographics, Issues, Inequality, and Turnout in the United States*. Princeton: Princeton University Press

Mangione, Thomas W. 1995. *Mail Surveys: Improving the Quality*. Applied Social Research Methods, vol. 40. Thousand Oaks, CA: Sage Publications.

Marley, Patrick. 2020. "Thousands of Absentee Ballots In Wisconsin Were Not Counted Because of Mailing Problems and Tech Glitches." *Milwaukee Journal Sentinel*, May 19.

McReynolds, Amber and Charles Stewart III. 2020. "Let's Put the Vote-by-Mail Fraud Myth to Rest." *The Hill*, April 28.

Menger, Andrew and Robert M. Stein. 2020. "Choosing the Less Convenient Way to Vote: An Anomaly in Vote by Mail Elections." *Political Research Quarterly* 73:196-207.

Mehrbani, Rudy. 2017. *Heritage Fraud Database: An Assessment*. New York: Brennan Center for Justice.

Merivaki, Thessalia. 2018. "Access Denied? Investigating Voter Registration Rejections in Florida." *State Politics & Policy Quarterly* 19:53-82.

Michelson, Melissa R., Neil Mahotra, Andrew Healy, Donald P. Green, Allison Carnegie, and Ali Adam Valenzuela. 2012. "The Effect of Postage on Turnout: A Cautionary Tale for Election Administrators." *Election Law Journal* 11: 279-290.

Miller, Peter and Sierra Powell. 2016. "Overcoming Voting Obstacles: The Use of Convenience Voting by Voters with Disabilities." *American Politics Research* 44:28-55.

Minnite, Lorraine C. 2010. *They Myth of Voter Fraud*. Ithaca: Cornell University Press.

Monroe, Nathan W. and Dari E. Sylvester. 2011. "Who Converts to Vote-By-Mail? Evidence from a Field Experiment." *Election Law Journal* 10:15-35.

Moynihan, Donald, Pamela Herd, and Hope Harvey. 2014. "Administrative Burden: Learning, Psychological, and Compliance Costs in Citizen-State Interactions." *Journal of Public Administration Research and Theory* 25:43-69.

National Conference of State Legislatures. 2020. "COVID-19 And Elections." May 21. https://www.ncsl.org/research/elections-and-campaigns/state-action-on-covid-19-and-elections.aspx.

Niesse, Mark. 2020a. "Georgia Absentee Ballots Changed to Remove Inner Envelope." *Atlanta Journal-Constitution*, April 27. https://www.ajc.com/news/state--regional-govt--politics/georgia-absentee-ballots-changed-remove-inner-envelope/5VCLguuvNOR2qb4zTctOLK/.

Niesse, Mark. 2020b. "Absentee Ballots Delayed and Polls Close as Georgia Primary Approaches." *Atlanta Journal-Constitution*. June 1. https://www.ajc.com/news/state--regional-govt--politics/absentee-ballots-delayed-and-polls-close-georgia-primary-approaches/g9SP8DBcTdFt8C0YfApvyN/.

Niesse, Mark. 2020c. "Voting Machines and Coronavirus Force Long Lines on Georgia Voters." *Atlanta Journal-Constitution*. June 10. https://www.ajc.com/news/state--regional-govt--politics/voting-machines-and-coronavirus-force-long-lines-georgia-voters/VajM2D3aSHALhCz7KwDrpJ/.

Niesse, Mark and Ben Brasch. 2020. "Absentee Ballot Requests Go Missing in Fulton Ahead of Georgia Primary." *Atlanta Journal-Constitution*. May 29. https://www.ajc.com/news/state--regional-govt--politics/absentee-ballot-requests-missing-fulton-ahead-georgia-primary/kkXUUbxL0wug5niqAvKTqM/.

Ojeda, Christopher. 2018. "The Two Income-Participation Gaps." *American Journal of Political Science* 62:813-829.

Page, Anthony and Michael J. Pitts. 2009. "Poll Workers, Election Administration, and the Problem of Implicit Bias." *Michigan Journal of Race & Law* 15:1-56.

Pacheco, Julianna, and Jason Fletcher. 2015. "Incorporating Health Into Studies of Political Behavior: Evidence for Turnout and Partisanship." *Political Research Quarterly* 68: 104-116.

Persaud, Chris. 2020. "Poll Worker Havoc: About 500 Say They Won't Show Tuesday in Palm Beach County." *The Palm Beach Post*. March 16.

Persily, Nathanial and Charles Stewart, III. 2020. "Ten Recommendations to Ensure a Healthy and Trustworthy 2020 Election." *Lawfare*. March 19. https://www.lawfareblog.com/ten-recommendations-ensure-healthy-and-trustworthy-2020-election.

Pew Research Center. 2020. *Two-Thirds of Americans Expect Presidential Election Will be Disrupted by Covid-19.* April.

Ponoroff, Christoper. 2019. *Voter Registration in a Digital Age*. Brennan Center for Justice. https://www.brennancenter.org/sites/default/files/2019-08/Report_Voter-Registration-Digital-Age.pdf.

Porter, Ethan and Jon C. Rogowski. 2018. "Partisanship, Bureaucratic Responsiveness, and Election Administration: Evidence from a Field Experiment." *Journal of Public Administration Research and Theory* 28:602-617.

Riker, William H. and Peter C. Ordeshook. 2968. "A Theory of the Calculus of Voting." *The American Political Science Review* 62:25-42.

Rosenstone, Steven. 1982. "Economic Adversity and Voter Turnout." *American Journal of Political Science* 26:25-46.

Rosenstone, S.J. and R.E. Wolfinger. 1978. "The Effect of Registration Laws on Voter Turnout." *American Political Science Review* 72 45.

Rowan, Darrel and Rick Rouan. 2020. "After a Problem-Plagued Primary, Ohio Leaders Disagree About November Election Plan." *Columbus Dispatch*, April 28. https://www.dispatch.com/news/20200428/after-problem-plagued-primary-ohio-leaders-disagree-about-november-election-plan.

Sanders, Elizabeth. 1980. "On the Costs, Utilities, and Simple Joys of Voting." *Journal of Politics* 42:854-863.

Scheler, Mark and Marco Schneiter. 2017. "The Elasticity of Voter Turnout: Investing 85 Cents Per Voter To Increase Voter Turnout by 4 Percent." *Electoral Studies* 49:65-74.

Shah, Paru and Amber Wichowsky. 2019. "Foreclosure's Fallout: Economic Adversity and Voter Turnout." *Political Behavior* 41:1099-1115.

Shino, Enrijeta, Mara Suttman-Lea, and Daniel A. Smith. 2020. "Voting by Mail in a VENMO World: Assessing Rejected Absentee Ballots in Georgia." Manuscript. May 19.

Smith, Daniel A. 2019. *Expert Report of Daniel A. Smith*. Filed in *Fair Fight Action v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga.).

Sondheimer, Rachel Milstein and Donald P. Green. 2010. "Using Experiments to Estimate the Effects of Education on Voter Turnout." *American Journal of Political Science* 54:174-189.

Suttman-Lea, Mara. 2020. "Poll Worker Decision Making at the American Ballot Box." *American Politics Research* (Online First). May 27. https://doi-org.ezproxy.library.wisc.edu/10.1177/1532673X20920266.

North Carolina Board of Elections. 2019. *In the Matter of: Investigation of Election Irregularities Affecting Counties Within the 9th Congressional District*. March 13. https://dl.ncsbe.gov/State_Board_Meeting_Docs/Congressional_District_9_Portal/Order_031320 19.pdf.

Webb, Kristina, Antonio Fins, Emily Sullivan, Jodie Wagner, Jorge Milian, Lulu Ramadan, Sam Howard, and Wendy Rhodes. 2020. "Voting: At 5 p.m. Some Precincts Still Without Poll Workers Due to Coronavirus Fears." *The Palm Beach Post*. March 17.

White, Ariel R., Noah L. Nathan and Julie K. Faller. 2015. "What Do I Need to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *American Political Science Review* 109:129–142.

Wisconsin Elections Commission. 2020. *April 7, 2020 Absentee Voting Report*. May 15.

Yammarino, Francis J., Steven J. Skinner and Terry L. Childers. 1991. "Understanding Mail Survey Response Behavior: A Meta-Analysis." *Public Opinion Quarterly* 66:613-639.

**Appendix A – CV**
**Kenneth R. Mayer**

Department of Political Science                                      Phone:  608-263-2286
Affiliate, La Follette School of Public Affairs                     Email: krmayer@wisc.edu
110 North Hall / 1050 Bascom Mall
University of Wisconsin – Madison
Madison, WI 53706

## Education
Yale University, Department of Political Science, Ph.D., 1988.
Yale University, Department of Political Science, M.A., M.Phil.,1987.
University of California, San Diego, Department of Political Science, B.A., 1982.

## Positions Held
University of Wisconsin, Madison. Department of Political Science.
     Professor, July 2000-present.
     Associate Professor, June 1996-June 2000.
     Assistant Professor, August 1989-May 1996.
Fulbright-ANU Distinguished Chair in Political Science, Australian National University (Canberra,
     ACT), July-December 2006.
Director, Data and Computation Center, College of Letters and Science, University of Wisconsin-
     Madison, June 1996-September 2003
Consultant, The RAND Corporation, Washington DC, 1988-1994. Conducted study of acquisition
     reform, and the effects of acquisition policy on the defense industrial base. Performed computer
     simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986. Responsible for cost
     and price analysis, contract negotiation, and contract administration for aerial target missile
     programs in the $5 million - $100 million range.

## Awards
American Political Science Association, State Politics and Policy Section. Award for best Journal Article
     Published in the *American Journal of Political Science* in 2014. Awarded for Burden, Canon,
     Mayer, and Moynihan, "Election Laws, Mobilization, and Turnout."
Robert H. Durr Award, from the Midwest Political Science Association, for Best Paper Applying
     Quantitative Methods to a Substantive Problem Presented at the 2013 Meeting. Awarded for
     Burden, Canon, Mayer, and Moynihan, "Election Laws and Partisan Gains."
Leon Epstein Faculty Fellow, College of Letters and Science, 2012-2015
UW Housing Honored Instructor Award, 2012, 2014, 2017, 2018
Recipient, Jerry J. and Mary M. Cotter Award, College of Letters and Science, 2011-2012
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award, Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award. Awarded by the Presidency Research Group of the American Political Science
     Association, for the best book published on the American presidency in 2001. Awarded for
     *With the Stroke of a Pen: Executive Orders and Presidential Power.*
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.
Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.
Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student
     Association, March 1992.
Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

## Service as an Expert Witness

*Driscoll v. Stapleton*, No. DV 20 0408 (13th Judicial Ct. Yellowstone Cty., MT), absentee ballots (2020)

*The Andrew Goodman Foundation v. Bostelmann*, No. 19-cv-955 (W.D. Wisc.), voter ID (2020)

*Suresh Kumar v. Frisco Independent School District et al.*, No,4:19-cv-00284 (E.D. Tex.), voting rights (2019)

*Fair Fight Action v. Raffensperger* No. 1:18-cv-05391-SCJ (N.D. Ga.), voting rights (2019)

*Vaughan v. Lewisville Independent School District*, No. 4:19-cv-00109 (E.D. Texas), voting rights (2019).

*Dwight et al. v Raffensperger*, No: 1:18-cv-2869-RWS (N.D. Ga.), redistricting, voting rights (2018).

*Priorities U.S.A.et al. v. Missouri et al.,* No. 19AC-CC00226 (Cir. Ct. of Cole Cty., MO), voter ID (2018).

*Tyson v. Richardson Independent School District*, No. 3:18-cv-00212 (N.D. Texas), voting rights  (2018).

*League of Women Voters of Michigan, et al. v. Johnson*, No. 2:17-cv-14148-DPH-SDD (S.D. Mich.), redistricting (2018).

*One Wisconsin Institute, Inc., et al. v. Nichol, et al.*, 198 F. Supp. 3d 896 (W.D. Wis.), voting rights (2016).

*Whitford et al. v. Gill et* al, 218 F. Supp. 3d 837, (W.D. Wis.), redistricting (2016).

*Milwaukee NAACP et al. v. Scott Walker et. al*, N.W.2d 262 (Wis. 2014), voter ID (2012).

*Baldus et al. v. Brennan et al.,* 849 F. Supp. 2d 840 (E.D. Wis.), redistricting, voting rights (2012).

*County of Kenosha v. City of Kenosha,* No. 22-CV-1813 (Wis. Cir. Ct., Kenosha Cty.) municipal redistricting (2011).

*McComish et al. v Brewer et al.*. 2010 WL 2292213 (D. Ariz.), campaign finance (2009).

*Baumgart et al. v. Wendelberger et al.*, 2002 WL 34127471 (E.D. Wis.), redistricting (2002).

## Grants

"A Multidisciplinary Approach for Redistricting Knowledge." Principal Investigator. Co-PIs Adeline Lo (UW Madison, Department of Political Science), Song Gao (UW Madison, Department of Geography), and Barton Miller and Jin-Yi Cai (UW Madison, Department of Computer Sciences). University of Wisconsin Alumni Research Foundation (WARF), and UW Madison Office of the Vice Chancellor for Research and Graduate Education. July 1, 2020-June 30, 2022. $410,711.

"Analyzing Nonvoting and the Student Voting Experience in Wisconsin." Dane County (WI) Clerk, $44,157. November 2016-December 2017. Additional support ($30,000) provided by the Office of the Chancellor, UW-Madison.

Campaign Finance Task Force, Stanford University and New York University, $36,585. September 2016-August 2017.

Participant and Board Member, 2016 White House Transition Project, PIs Martha Joynt Kumar (Towson State University) and Terry Sullivan (University of North Carolina-Chapel Hill).

"How do You Know? The Structure of Presidential Advising and Error Correction in the White House." Graduate School Research Committee, University of Wisconsin, $18,941. July 1, 2015-June 30, 2016.

"Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs." $43,234. Co-PI. With Barry C. Burden (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI). October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute. September 2009-December 2010. $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI. October 2008- September 2009. Pew Charitable Trusts. $49,400. With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188.

January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative Elections." JEHT Foundation, New York, NY. $84,735. November 2006-November 2007.

"Does Public Election Funding Change Public Policy? Evaluating the State of Knowledge." JEHT Foundation, New York, NY. $42,291. October 2005-April 2006.

"Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and Policy Communities." Joyce Foundation, Chicago, IL. $20,900. September 2005- August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?" Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June 2005

WebWorks Grant (implementation of web-based instructional technologies), Division of Information Technology, UW-Madison, $1,000. November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election." Joyce Foundation, Chicago, IL. $15,499. April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services, University of Wisconsin. $5,000. March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens' Research Foundation, Los Angeles, CA, $2,000. May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." National Science Foundation (SBR-9511444), $60,004. September 1, 1995-August 31, 1998. Graduate School Research Committee, University of Wisconsin, $21,965. Additional support provided by the Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S. Truman Library Foundation.

The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M. Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein). June 1993-January 1995. $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin (with John M. Wood). 1992. $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards" March 1992 – February 1995. National Science Foundation (SES-9121931), $74,216. Graduate School Research Committee at the University of Wisconsin, $2,600. MacArthur Foundation, $2,500.

C-SPAN In the Classroom Faculty Development Grant, 1991. $500


**<u>Professional and Public Service</u>**

Education and Social and Behavioral Sciences Institutional Review Board, 2008-2014. Acting Chair, Summer 2011. Chair, May 2012- June 2014.

Participant, U.S. Public Speaker Grant Program. United States Department of State (nationwide speaking tour in Australia, May 11-June 2, 2012).

Expert Consultant, Voces de la Frontera. Milwaukee Aldermanic redistricting, (2011).

Expert Consultant, Prosser for Supreme Court. Wisconsin Supreme Court election recount (2011).

Chair, Blue Ribbon Commission on Clean Elections (Madison, WI), August 2007-April 2011.

Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana, Minnesota, and Wisconsin, 2006-2011.

Section Head, Presidency Studies, 2006 Annual Meeting of the American Political Science Association.

Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin, November 2003-December 2009.

Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

Presidency Research Group (organized section of the American Political Science Association) Board, September 2002-present.

Book Review Editor, *Congress and the Presidency*, 2001-2006.

Editorial Board, *American Political Science Review*, September 2004-September 2007.

Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform (Wisconsin), 1997.

**PUBLICATIONS**

**Books**

*Presidential Leadership: Politics and Policymaking*, 11th edition. Lanham, MD: Rowman and Littlefield, forthcoming 2019. With George C. Edwards, III and Steven J. Wayne. Previous editions 10th (2018).

*The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amnon Cavari and Richard J. Powell.

*The Enduring Debate: Classic and Contemporary Readings in American Government*. 8th ed. New York: W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (1997), 2nd (2000), 3rd (2002), 4th (2006), 5th (2009), 6th (2011), 7th (2013).

*Faultlines: Readings in American Government*, 5th ed. New York: W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (2004), 2nd (2007), 3rd (2011), 4th (2013).

*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield, 2014. Co-edited with Amnon Cavari and Richard J. Powell.

*Readings in American Government*, 7th edition. New York: W.W. Norton & Co. 2002. Co-edited with Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions 4th (1996), 5th (1998), 6th (2000).

*With the Stroke of a Pen: Executive Orders and Presidential Power*. Princeton, NJ: Princeton University Press. 2001. Winner of the 2002 Neustadt Award from the Presidency Studies Group of the American Political Science Association, for the Best Book on the Presidency Published in 2001.

*The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma*. Boulder, CO: Westview Press. 1999. With David T. Canon.

*The Political Economy of Defense Contracting*. New Haven: Yale University Press. 1991.

**Monographs**

*2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin Government Accountability Board, September 2009. With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald P. Moynihan.

*Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure*. September 1999.

*Public Financing and Electoral Competition in Minnesota and Wisconsin*. Citizens' Research Foundation, April 1998.

*Campaign Finance Reform in the States*. Report prepared for the Governor's Blue Ribbon Commission on Campaign Finance Reform (State of Wisconsin). February 1998. Portions reprinted in Anthony Corrado, Thomas E. Mann, Daniel Ortiz, Trevor Potter, and Frank J. Sorauf, ed., *Campaign Finance Reform: A Sourcebook*. Washington, D.C.: Brookings Institution, 1997.

"Does Public Financing of Campaigns Work?" *Trends in Campaign Financing*. Occasional Paper Series, Citizens' Research Foundation, Los Angeles, CA. 1996. With John M. Wood.

*The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward in Weapon System Acquisition*. N-3620-AF. Santa Monica: RAND Corporation. 1993.

*Barriers to Managing Risk in Large Scale Weapons System Development Programs*. N-4624-AF. Santa Monica: RAND Corporation. 1993. With Thomas K. Glennan, Jr., Susan J. Bodily, Frank Camm, and Timothy J. Webb.

**Articles**

"Voter Identification and Nonvoting in Wisconsin - Evidence from the 2016 Election." *Election Law Journal* 18:342-359 (2019). With Michael DeCrescenzo.

"Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study." *Political Research Quarterly* 71 (2019). With Robert M. Stein, Christopher Mann, Charles Stewart III, et al.

"Learning from Recounts." *Election Law Journal* 17:100-116 (No. 2, 2018). With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"The Complicated Partisan Effects of State Election Laws." *Political Research Quarterly* 70:549-563 (No. 3, September 2017). With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"What Happens at the Polling Place: Using Administrative Data to Look Inside Elections." *Public Administration Review* 77:354-364 (No. 3, May/June 2017). With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jacob R. Neiheisel.

"Alien Abduction, and Voter Impersonation in the 2012 U.S. General Election Evidence from a Survey List Experiment." *Election Law Journal* 13:460-475 No.4, December 2014). With John S. Ahlquist and Simon Jackman.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science*, 58:95-109 (No. 1, January 2014). With Barry C. Burden, David T. Canon, and Donald P. Moynihan. Winner of the State Politics and Politics Section of the American Political Science Association Award for the best article published in the *AJPS* in 2014.

"Executive Power in the Obama Administration and the Decision to Seek Congressional Authorization for a Military Attack Against Syria: Implications for Theories of Unilateral Action." *Utah Law Review* 2014:821-841 (No. 4, 2014).

"Public Election Funding: An Assessment of What We Would Like to Know." *The Forum* 11:365-485 (No. 3, 2013).

"Selection Method, Partisanship, and the Administration of Elections." *American Politics Research* 41:903-936 (No. 6, November 2013). With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald Moynihan.

"The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election Administration." *Public Administration Review* 72:741-451 (No. 5, September/October 2012). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102 (No. 2, 2011). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8, No. 3, Article 6 (2010).

"Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December 2009).

"Does Australia Have a Constitution? Part I – Powers: A Constitution Without Constitutionalism." *UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring 2008). With Howard Schweber.

"Does Australia Have a Constitution? Part II: The Rights Constitution." *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring 2008). With Howard Schweber.

"Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October 2007). With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006). With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and Materials.* Durham, NC: Carolina Academic Press, 2008.

"The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September 2005). With William Howell.

"Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May

2003).

"Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June 2002). With Kevin Price.

"Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24:24-29 (No. 4, Winter 2001).

"Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33:597-604 (No. 3 September 2000). With John Coleman.

"The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October 1999).

"Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No.2, May 1999).

"Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions and Processes." *Public Administration Review* 56:180-190 (1996). With Anne Khademian.

"Closing Military Bases (Finally): Solving Collective Dilemmas Through Delegation." *Legislative Studies Quarterly*, 20:393-414 (No. 3, August 1995).

"Electoral Cycles in Federal Government Prime Contract Awards: State-Level Evidence from the 1988 and 1992 Presidential Elections." *American Journal of Political Science* 40:162-185 (No. 1, February 1995).

"The Impact of Public Financing on Electoral Competitiveness: Evidence from Wisconsin, 1964-1990." *Legislative Studies Quarterly* 20:69-88 (No. 1, February 1995). With John M. Wood.

"Policy Disputes as a Source of Administrative Controls: Congressional Micromanagement of the Department of Defense." *Public Administration Review* 53:293-302 (No. 4, July-August 1993).

"Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an Era of Shrinking Budgets." *Defense Analysis* 9:159-169 (No. 2, 1993).

**Book Chapters**

"Is President Trump Conventionally Disruptive, or Unconventionally Destructive?" In *The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amon Cavari and Richard J. Powell.

"Lessons of Defeat: Republican Party Responses to the 2012 Presidential Election. In Amnon Cavari, Richard J. Powell, and Kenneth R. Mayer, eds. *The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield. 2014.

"Unilateral Action." George C. Edwards, III, and William G. Howell, *Oxford Handbook of the American Presidency* (New York: Oxford University Press, 2009).

"Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional Presidency*. Baltimore: Johns Hopkins University Press, 2009.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." In Gerald C. Lubenow, ed., *A User's Guide to Campaign Finance Reform*. Lanham, MD: Rowman & Littlefield, 2001.

"Everything You Thought You Knew About Impeachment Was Wrong." In Leonard V. Kaplan and Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the Presidency in the Age of Political Spectacle*. New York: New York University Press. 2001. With David T. Canon.

"The Institutionalization of Power." In Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, eds. *Presidential Power: Forging the Presidency for the 21st Century*. New York: Columbia University Press, 2000. With Thomas J. Weko.

"Congressional-DoD Relations After the Cold War: The Politics of Uncertainty." In *Downsizing Defense*, Ethan Kapstein ed. Washington DC: Congressional Quarterly Press. 1993.

"Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States." In Alex Mintz, ed. *The Political Economy of Military Spending*. London: Routledge. 1991.

"Patterns of Congressional Influence In Defense Contracting." In Robert Higgs, ed., *Arms, Politics, and the Economy: Contemporary and Historical Perspectives*. New York: Holmes and Meier. 1990.

**Other**

"Campaign Finance: Some Basics." Bauer-Ginsberg Campaign Finance Task Force, Stanford University. September 2017. With Elizabeth M. Sawyer.

"The Wisconsin Recount May Have a Surprise in Store after All." *The Monkey Cage* (Washington Post), December 5, 2016. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military Relations*. *The Forum* 9 (No. 3, 2011).

"Voting Early, but Not Often." *New York Times*, October 25, 2010. With Barry C. Burden.

Review of John Samples, *The Fallacy of Campaign Finance Reform* and Raymond J. La Raja, *Small Change: Money, Political Parties, and Campaign Finance Reform*. *The Forum* 6 (No. 1, 2008).

Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*, Christopher S, Kelley, ed.; *Presidents in Culture: The Meaning of Presidential Communication*, David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval Office*, Adam L. Warber. In *Perspective on Politics* 5:635-637 (No. 3, September 2007).

"The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center for the Study of Congress, New York University. 2007.

"Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power in the U.S. and Australia), manuscript, February 2007**.**

"Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring 2006). American Bar Association, Division for Public Education.

"Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives." *Congress and the Presidency* 29: 91-98 (No. 1, Spring 2002).

Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book*. Project Vote Smart. 2006. With Meghan Condon.

"Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia, Australian National University. October 2006.

"Return to the Norm," *Brisbane Courier-Mail*, November 10, 2006.

"The Return of the King? Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring 2004).

Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book*. Project Vote Smart. 2004. With Patricia Strach and Arnold Shober.

"Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April 2002.

"Capitol Overkill." *Madison Magazine*, July 2002.

Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart. 2002. With Patricia Strach and Paul Manna.

"Presidential Emergency Powers." *Oxford Analytica Daily Brief*. December 18, 2001.

"An Analysis of the Issue of Issue Ads." *Wisconsin State Journal*, November 7, 1999.

"Background of Issue Ad Controversy." *Wisconsin State Journal*, November 7, 1999.

"Eliminating Public Funding Reduces Election Competition." *Wisconsin State Journal*, June 27, 1999.

Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J. Rozell. *Congress and the Presidency* 24 (No. 1, 1997).

"Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31, 1996.

Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani Guinier. *Congress and the Presidency* 21: 149-151 (No. 2, 1994).

Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6 (1994).

Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87:1061-1062 (No. 4, December 1993).

Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462 (No. 3, April 1993)

Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194 (May 1993).

"Limits Wouldn't Solve the Problem." *Wisconsin State Journal*, November 5, 1992. With David T. Canon.

"Convention Ceded Middle Ground." *Wisconsin State Journal*, August 23, 1992.

"CBS Economy Poll Meaningless." *Wisconsin State Journal*, February 3, 1992.

"It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." *Los Angeles Times*, July 8, 1988.

## Conference Papers

"Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." Presented at the 2018 Annual Meeting of the Midwest Political Science Association, Chicago, IL April 5-8, 2018. With Michael G. DeCrescenzo.

"Learning from Recounts." Presented at the Workshop on Electoral Integrity, San Francisco, CA, August 30, 2017, and at the 2017 Annual Meeting of the          American Political Science Association, San Francisco, CA, August 31-September 3, 2017. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"What Happens at the Polling Place: Using Administrative Data to Understand Irregularities at the Polls." Conference on New Research on Election Administration and Reform, Massachusetts Institute of Technology, Cambridge, MA, June 8, 2015. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R Neiheisel.

 "Election Laws and Partisan Gains: What are the Effects of Early Voting and Same Day Registration on the Parties' Vote Shares." 2013 Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 11-14, 2013. Winner of the Robert H. Durr Award.

"The Effect of Public Funding on Electoral Competition: Evidence from the 2008 and 2010 Cycles." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Amnon Cavari.

"What Happens at the Polling Place: A Preliminary Analysis in the November 2008 General Election." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011.  With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R. Neiheisel.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." 2010 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 2010. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"Selection Methods, Partisanship, and the Administration of Elections. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 22-25, 2010. Revised version presented at the Annual Meeting of the European Political Science Association, June 16-19, 2011, Dublin, Ireland. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Elections." Annual Meeting of the American Political Science Association, Toronto, Canada, September 3-5, 2009. With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"Comparative Election Administration: Can We Learn Anything From the Australian Electoral Commission?" Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007.

"Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative Elections." Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007. With Timothy Werner.

"Candidate Gender and Participation in Public Campaign Finance Programs." Annual Meeting of the Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" 4th Annual State Politics and Policy

Conference," Akron, OH, April 30-May 1, 2004. With Timothy Werner and Amanda Williams.

"The Last 100 Days." Annual Meeting of the American Political Science Association, Philadelphia, PA, August 28-31, 2003. With William Howell.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." Citizens' Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies, University of California Berkeley. August 2000.

"The Importance of Moving First: Presidential Initiative and Executive Orders." Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1, 1996.

"Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Problem? What Problem? Congressional Micromanagement of the Department of Defense." Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2, 1991.

## Talks and Presentations

"Turnout Effects of Voter ID Laws." Rice University, March 23, 2018; Wisconsin Alumni Association, October 13, 2017. With Michael DeCrescenzo.

"Informational and Turnout Effects of Voter ID Laws." Wisconsin State Elections Commission, December 12, 2017; Dane County Board of Supervisors, October 26, 2017. With Michael DeCrescenzo.

"Voter Identification and Nonvoting in Wisconsin, Election 2016. American Politics Workshop, University of Wisconsin, Madison, November 24, 2017.

"Gerrymandering: Is There A Way Out?" Marquette University. October 24, 2017.

"What Happens in the Districting Room and What Happens in the Courtroom" Geometry of Redistricting Conference, University of Wisconsin-Madison  October 12, 2017.

"How Do You Know? The Epistemology of White House Knowledge." Clemson University, February 23, 2016.

Roundtable Discussant, Separation of Powers Conference, School of Public and International Affairs, University of Georgia, February19-20, 2016.

Campaign Finance Task Force Meeting, Stanford University, February 4, 2016.

Discussant, "The Use of Unilateral Powers." American Political Science Association Annual Meeting, August 28-31, 2014, Washington, DC.

Presenter, "Roundtable on Money and Politics: What do Scholars Know and What Do We Need to Know?" American Political Science Association Annual Meeting, August 28-September 1, 2013, Chicago, IL.

Presenter, "Roundtable: Evaluating the Obama Presidency." Midwest Political Science Association Annual Meeting, April 11-14, 2012, Chicago, IL.

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters, March 4, 2010.

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008." Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT, Australia. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power. University of Tasmania, Hobart (TAS); Flinders University and University of

South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT).

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, College Station, TX. February 2004.

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," American Political Science Association Meeting, August 28-31,2003, Philadelphia, PA.

Discussant, "New Looks at Public Approval of Presidents." Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL.

Discussant, "Presidential Use of Strategic Tools." American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA.

Chair and Discussant, "Branching Out: Congress and the President." Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL.

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives. *Hearing on Executive Order and Presidential Power*, Washington, DC. March 22, 2001.

"The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and William Howell), January 26, 2001.

Presenter and Discussant, Future Voting Technologies Symposium, Madison, WI May 2, 2000.

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI. August 11, 1999.

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." Midwest Political Science Association Meeting, April 15-17, 1999, Chicago, IL.

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI. June 1995.

American Politics Seminar, The George Washington University, Washington D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993.

Seminar on American Politics, Princeton University, January 16-17,1992.

Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.

Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University, Columbus OH, September 21-22, 1990, and September 19-21, 1991.

Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American Political Science Association, San Francisco, CA.

## University and Department Service

Cross-Campus Human Research Protection Program (HRPP) Advisory Committee, 2019-present.

Athletic Board, 2014-present.

General Education Requirements Committee (Letters and Science), 1997-1998.

Communications-B Implementation Committee(Letters and Science), 1997-1999

Verbal Assessment Committee (University) 1997-1998.

College of Letters & Science Faculty Appeals Committee (for students dismissed for academic reasons).

Committee on Information Technology, Distance Education and Outreach, 1997-98.
Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998.
Department Computer Committee, 1996-1997; 1997-1998, 2005-2006. Chair, 2013-present.
Faculty Senate, 2000-2002, 2002-2005. Alternate, 1994-1995; 1996-1999; 2015-2016.
Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995.
Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994.
Department Honors Advisor, 1991-1993.
Brown-bag Seminar Series on Job Talks (for graduate students), 1992.
Keynote speaker, Undergraduate Honors Symposium, April 13 1991.
Undergraduate Curriculum Committee, Department of Political Science, 1990-1992; 1993-1994.
Individual Majors Committee, College of Letters and Sciences, 1990-1991.
Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995.

**<u>Teaching</u>**
<u>Undergraduate</u>
Introduction to American Government (regular and honors)
The American Presidency
Campaign Finance
Election Law
Classics of American Politics
Presidential Debates
Comparative Electoral Systems
Legislative Process
Theories of Legislative Organization
Senior Honors Thesis Seminar

<u>Graduate</u>
Contemporary Presidency
American National Institutions
Classics of American Politics
Legislative Process

**Appendix B: Problems in Absentee Ballot Data**

For the 2018 election, key voter data exist in three files, all maintained by the Secretary of State:

- The *voter file* has a record for each registrant, containing identification data, geographic data, demographic data, and administrative data on eligibility.

- The *voter history file* contains information on each registrant who cast a ballot in the 2018 election, including information on voting method: at the polls, absentee, or provisional.

- The *absentee ballot file* contains information on each registrant who requested an absentee ballot, including date of application, date of issuance, date of return, whether an absentee vote was cast in person or by mail, whether an application rejected, whether a ballot was accepted, rejected, or cancelled, and the reasons for cancelled or rejected ballots.

In addition, the Georgia Secretary of State retains an archive of past election results at both statewide and county levels.[70]

All three files contain voter registration numbers, which are unique for every registrant. Because the registration number is a unique identifier, it can be used to link (or merge) the files using exact matching methods.

All of the common data elements in the three files should be consistent: every absentee voter in the voter file should appear in the absentee ballot file as casting an accepted ballot; every voter in the absentee voter file casting an accepted ballot should appear in the voter file as casting an absentee ballot; every voter in the voter history file should appear in the voter file, and the vote totals and methods should match across files.

As others have pointed out (Smith 2019), the comparable totals in the files do not match, and are often off by thousands. The number of records in the 2018 voter file (3,951,098), is different from the Secretary of State count of the number of ballots cast (3,949,905). One hundred fifty of one hundred fifty nine counties report different vote totals in the two data sets. The sum of the absolute values of the county-level differences is 5,307, or 0.13% of the total vote.[71]

I also found discrepancies between the voter file, the voter history file, and the absentee voter file:

- The voter history file total of absentee voters (2,117,732) does not match the absentee file total of voters casting accepted absentee ballots (2,114,409), with 3,323 more absentee voters in the voter history file than in the absentee ballot file.

- 2,390 voters recorded in the voter history file as casting an absentee ballot do not appear in the absentee ballot file as casting an accepted absentee ballot.

---

[70] https://results.enr.clarityelections.com/GA/91639/Web02-state.221451/#/.
[71] The sum absolute value of vote count differences is the preferable quantity to the sum of net differences, because the net difference will cancel out overcounts and undercounts (Ansolabhere et al. 2018, 102-103).

- 814 voters in the voter history file as casting an absentee ballot are recorded in the absentee file as receiving an absentee ballot (either mailed, electronic, or in person), but a blank ballot status field in the absentee file.

- 103 voters in the absentee file recorded as casting an absentee ballot do not appear at all in the voter history file.

- 24 voters recorded as voting at the polls on election data are recorded in the absentee file as casting an accepted absentee ballot.

- 854 voters in the absentee file who cast valid absentee ballots do not appear in the voter file as a registered voter.

- 3,334 voters in the voter history file do not appear in the voter file.

- 37,778 unique individuals in the absentee ballot file have an accepted absentee ballot application, a record of a ballot being sent or cast in person, and a blank ballot status field. 6,295 of these individuals are recorded as voting at the polls in the voter history file.

- There are a small number of records that reflect odd or implausible outcomes, such as one instance of a registrant being issued 4 mailed ballots on September 18, 2018, with 3 ballots marked as returned and cancelled the same day (2 by "administrative cancellation" and one by "other"), and a 4th ballot returned and counted on September 24, 2018. Another registrant is recorded as applying for an absentee ballot on May 17, 2018, with two ballots cancelled in September and October 2018. A third ballot from this registrant was accepted in October, but has an application date of May 16, 2018 (the day before the cancelled ballots were requested).

The absentee file contains some obvious errors, including the following dates recorded for issuing ballots: 10/11/5201, 10/31/3201, 10/17/2918, 10/16/2108, 10/25/2108, 10/30/2081, and five ballots recorded as issued in October 2019.

Ballot return dates are recorded in the years 0201 (twice), 0208 (eight times), and 0218 (four times). While these are almost certainly typographical errors or transpositions, it reflects poor system design to not have filters that reject obviously invalid input.

Twenty-four absentee ballots are recorded as returned on 1/01/1900, which is likely a default value. Seventeen of these ballots were accepted.

Additionally, the field in which clerks record the reasons for rejecting an absentee ballot application, or for rejecting or cancelling an absentee ballot, are non-standardized, and inconsistent across counties.

There are 32,733 records in the absentee file with an entry in the field giving the reason for rejection or cancellation (which I will refer to as the "status reason" field), consisting of 1,643 different entries. Election officials recorded common occurrences in multiple ways. For example, ballots or applications lacking signatures were recorded in 80 different ways, such as "signature," "no signature," "not signed," "unsigned," "sig missing," "missing sig," "missing signature," "signature missing," "ballot not signed," "no signature on oath," "oath – not signed," "no mark/signature," "did not sign application," and 67 other permutations.

Mismatched signatures are noted in 58 different ways, including "signature match," "signature mismatch," sig not a match" signature not a match," "non matched signature," signature non-match," "signature did not match," "sig does not match," "signature doesn't match," "signature not resolved," "signature does not verify," "non-signature match," and 48 other versions.

Absentee ballots cancelled because a voter wished to vote in person early or on election day were noted in at least 400 different ways, including "voted in person," "voting in person," "in person," "came in person," "in person voting," "vio,"[72] vip,"[73] "aip,"[74] "voted in office," "early voting," "early voted," "early vote," "voting early," "advance voting," "advanced voting," and hundreds of other variants.

Such a wide range of entries indicates inconsistent administration across the state, depending on where a voter lives and even which individual election official interacts with the voter. The variation also vastly complicates the task of analyzing the data, as the same incidents and situations can be noted in very different ways.

Similar problems existed in other files.  In the 2014 absentee ballot request file, 14,709 rejected mail ballots listed a ballot return date of January 15, 2015.  As this was more than two months after the November 4, 2014 election, it must be the cast that this was the date on which registrars rejected all unreturned mail ballots, not the date on which the ballots arrived.  The 2014 file also shows 8 mailed ballots accepted with a return date of October 21, 2501, and 101 ballots received in 2016 or later.

---

[72] Voting in office.
[73] Voting in person.
[74] Absentee in person.