## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| THE NEW GEORGIA PROJECT, et al. | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action File No. |
| v. | ) ) | 1:20-cv-01986-ELR |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al.*, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## STATE DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants Raffensperger, in his official capacity as Secretary of State and the Chair of the Georgia State Election Board (the "Secretary"), State Election Board ("SEB") Members Sullivan, Worley, Le, and Mashburn (collectively, the "State Defendants"), file this Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Motion").

## I.    Statement of Facts

Plaintiffs invite this Court to strike at least five longstanding Georgia laws governing elections: (1) the statute governing incomplete absentee ballot request forms, O.C.G.A. § 21-2-381(b)(4) (the "Absentee Applicant

Notification Statute"); (2) the statute allowing elderly, disabled, and Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") voters to request absentee ballots for an entire election cycle, O.C.G.A. § 21-2-381(a)(1)(G); (3) the United States Postal Service's ("USPS") policy of requiring postage to deliver mail (but not official election mail); (4) the statutory requirement that absentee ballots be delivered to a county election official by 7:00 p.m. on Election Day, O.C.G.A. § 21-2-386(a)(1)(F); and (5) Georgia's statutory prohibition on third party ballot harvesting, O.C.G.A. § 21-2-385(a) (the "Absentee Ballot Security Statute") (collectively, the "Challenged Policies").  Doc. No. [33] ¶¶ 130-38.

A.    Plaintiffs' declarations of Georgia voters.

Plaintiffs have provided 23 declarations from individual Georgians: 20 are voters discussing their respective experiences and three are community leaders, including The New Georgia Project's ("NGP") Chief Executive Officer.  Of the 20 voters, over half (13) are from Fulton County and four reside out-of-state.  Almost all of the declarants who experienced delays in receiving absentee ballots requested them via email.  See Doc. Nos. [59-9, 10, 13, 14, 18, 68-71, 90].  Plaintiffs have submitted these voter declarations relevant to the five practices they challenge.

ABSENTEE APPLICANT NOTIFICATION STATUTE.  Only one declarant, Carly Weikle, discussed the Absentee Applicant Notification Statute.  Doc. No. [59-7] ¶ 6.  About a "week after applying," she received an email asking for additional documentation based on a perceived mismatch in her signatures.  Doc. No. [59-7] ¶ 6.  She provided the information, voted absentee, and her vote counted.  [Id.]

REQUESTING ABSENTEE BALLOTS FOR EACH ELECTION.  Seven declarants said it would be "helpful" to request absentee ballots once, or that it "should" be the law, but they do not assert that the current law constitutes a burden.  Doc Nos. [59-6, 14, 68-69, 90-91].  Only three allege a burden exists.  Both Ms. Woodall and Ms. Henderson voted absentee in 2020; both recognize they must request an absentee ballot before each election, and neither identifies what makes requesting absentee ballots a burden.  Doc. Nos. [59-5, 59-17].  For her part, Ms. Pyne, a Georgia resident living in Florida, does not address the 2020 election and says requesting multiple absentee ballots is "time consuming."  Doc. No. [59-6] ¶ 12.

POSTAGE.  No declarant claimed that paying postage would prevent them from voting this November, and each appear to have voted absentee in the past.  All appear to have Internet access (each electronically signed their declarations), which suggests that each could purchase stamps online.  Six

declarants appear to have no issue obtaining postage and/or already have stamps; they just want the State to do it for them during this fiscal crisis. Doc. Nos. [59-6-7, 16, 71, 89, 91].  Five voters and Professor Watkins claimed knowledge that buying stamps created some financial difficulty.  Doc. Nos. [59-5, 10, 15, 17, 89].  None, however, said they could not vote without government assistance.  Some other voters expressed COVID-19 related concerns about purchasing stamps at the post office but did not indicate they could not buy stamps online from home.  Doc. Nos. [59-4-5, 9, 69-70].[1]

ELECTION DAY DEADLINE.  Six declarants disagree with the requirement that absentee ballots be received by county election offices by Election Day, but they cited no burden.  Doc. Nos. [59-9, 14, 15, 17, 18, 91].  Two declarants indicated that the deadline imposed a burden because it robbed them of a few extra days of information gathering before selecting a candidate, but this is true whenever someone chooses to vote early.  Doc. Nos. [59-4, 10].  One said she was "concerned" about postal delays but did not state that this constituted a burden on her ability to vote.  Doc. No. [59-6] ¶ 10.

---

[1] Declarant Pelta ordered stamps but their delivery was delayed. Presumably, he now has those stamps now.  Doc. No. [59-69] ¶ 12.

Plaintiffs have not offered any evidence of systemic harm imposed by Georgia's statute.  Instead, they offer only five cases of unfortunate but unintentional human error.  For the 2018 general election, Ms. Weikle was too "busy balancing school and work" to send her ballot until the day before Election Day.  Doc. No. [59-7] ¶ 5.  Collin Jones could only speculate that his 2018 ballot would have counted if Georgia's law were different.  Doc. No. [59-8].  In 2020, Karen Bemis requested an absentee ballot by email, but when it had not arrived a week before Election Day, she decided to vote early in-person.  Doc. No. [59-71].  Yolanda Asher sent an email requesting an absentee ballot be delivered to a North Carolina address.  Doc. No. [59-70] ¶¶ 4-5.  The ballot arrived after 1:00 pm on the day before Election Day.  [Id.] ¶ 6.  Consequently, she could not return her ballot on time and expressed "outrage[]" at DeKalb County.  [Id.] ¶ 8.  Swathi Shanmugasundaram, who resides in Michigan, had a similar experience involving the Fulton County Board of Elections.  Doc. No. [59-90] ¶¶ 2-4.  She speculated that a change in policy would have allowed her to timely cast a ballot.  [Id.] ¶ 6

BALLOT HARVESTING.  Plaintiffs argue that third parties, like NGP, should be able to collect individuals' ballots and mail or hand-deliver them to county election offices. Doc. No. [33] ¶¶ 72-78.  Most of the declarants did not express a need for such assistance and took no issue with the current law.

Doc Nos. [59-6, 7, 13-19, 69-71, 90].  Seven disagreed with the law or asserted that it would be "helpful" if someone could return their ballot.  Doc. Nos. [59-8 to 59-12, 59-89, 59-91].  Only two used the word "burden," but both failed to articulate how the current policy would prevent them from voting absentee, as they have done in the past.  Doc. No. [59-4, 5].

    B.    <u>Report of Dr. Kenneth Mayer</u>

In addition to these voters, Plaintiffs proffered the analysis of Dr. Kenneth Mayer ("Dr. Mayer").[2]  <u>See</u> Doc. No. [59-1], Ex. 1. Dr. Mayer claims that all of the Challenged Policies "impose both direct and indirect costs on voters and force voters to overcome specific burdens in order to cast a ballot in any election."  [<u>Id.</u>] at 1.  Dr. Mayer extrapolates that costs to voters in a pandemic will be "particularly burdensome" and, relying mostly on articles about Fulton County, posits that projected high levels of mail absentee voting in the November election will strain the election administration infrastructure. [<u>Id.</u>] at 3, 11.  Notably, however, Dr. Mayer does not consider the added stresses—on administrators and voters' confidence in election integrity—caused by Plaintiffs' proposed remedies.

---

[2] Although Dr. Mayer has testified as an expert witness in a number of cases in Wisconsin, Dr. Mayer has limited experience with Georgia elections, and was not qualified as an expert in the two cases he cites. [Id.] at 2-3.

PRE-PAID POSTAGE.  Dr. Mayer also analyzed the impact that postage costs have on absentee voters. [Id.] at 1.  According to Dr. Mayer, all forms of voting impose transaction costs like postage, travel, time, etc.  [Id.] at 6, 12.[3] Based on an analysis of one county in Washington State, Dr. Mayer opines that pre-paid postage for absentee ballots would increase the return rate of absentee ballots by 4%. [Id.] at 13.  Dr. Mayer acknowledges that the USPS has a policy of delivering official election mail even if it lacks postage. [Id.] at 12.  He ignores, however, other policies that reduce transaction costs for voters, such as State Election Board Rule 183-1-19-.01, which allows third parties to give postage to a person for the purpose of mailing an absentee ballot. See generally [id.]

ABSENTEE BALLOT APPLICATION NOTIFICATION.  Dr. Mayer's analysis of absentee ballot application rejections relies on admittedly incomplete information.  [Id.] at 14 n.30.  In addition to this weak foundation, Dr. Mayer does not consider why applications were rejected in 2018 or legislative changes governing absentee ballots that were enacted in 2019.  [Id.] at 14. Ultimately, Dr. Mayer cannot form an opinion on the timeliness of absentee ballot rejections, as he concludes that "it is not clear" whether voters are

---

[3] Dr. Mayer does not opine that USPS postage constitutes a poll tax.

provided notice of the rejection of their absentee ballot application in time to correct the deficiency.  [Id.]  Finally, Dr. Mayer does not cite to a single incident where election officials in Georgia did not exercise their discretion in a uniform manner when notifying individuals of problems with their absentee ballot applications.  [Id.] at 14-15.

REQUESTING ABSENTEE BALLOTS FOR EACH ELECTION.  Dr. Mayer concludes that requiring most voters to request an absentee ballot for each election imposes a "considerable [but unidentified] burden on voters as well as elections officials." [Id.] at 15.  He attempts to explain this burden by relying on rates of absentee ballot rejections, one-time absentee ballot requests could be rejected as frequently as multiple ones.  [Id.] at 16.  Moreover, in relying on the rejection rate from the 2018 elections, Dr. Mayer does not consider the reasons for the rejected absentee applications or consider legal changes governing absentee ballot application rejections.

ABSENTEE BALLOT REJECTION RATES.  Dr. Mayer generally concludes that there will be a significant number of mail absentee ballot rejections in the November election due to late (or no) arrival and other reasons such as mismatching signatures.  [Id.] at 16.  But, he fails to consider relevant information, including statutory changes that impact his analysis of mail absentee ballot rejection rates.  Further, in regard to late absentee ballots,

Dr. Mayer does not consider the date those voters submitted their absentee ballot applications or whether the ballots were correctly completed.

BALLOT HARVESTING.  Dr. Mayer concludes that allowing third-party collection of absentee ballots during a pandemic is especially important when voters are fearful of in-person voting and may face delayed mail service.  [Id.] at 33.  It is unclear what qualifies Dr. Mayer to opine on voters' fears and subsequent conduct.  Regardless, while he finds that third-party ballot collection reduces voters' cost and potential errors, he conflates assisting voters by collecting ballots and helping voters complete absentee ballots.  [Id.] at 31-32.  He also disregards potential fraud and errors associated with third-party ballot harvesting.  Nor does Dr. Mayer consider current law, which allows third parties to pay postage.  See Ga. Comp. R. and Regs 183-1-19-.01.

C.    Declaration of Dr. Robert Ball

Dr. Ball is a South Carolina physician who opines on the COVID-19 virus.  Doc. No. [59-2].  He writes that some experts believe there will be "multiple waves" of the virus throughout 2020, but he does not opine on the size of the waves or whether they will be focused on particular areas of the State.  [Id.] ¶ 27.  Nor does he opine on the "magnitude" of potential new waves of infection, so he concedes it is difficult to determine the "next best courses of action."  [Id.] at 29.

D.   <u>The Georgia Budget and The Cost of Plaintiffs' Relief.</u>

COVID-19 has significantly impacted State coffers.  For example, May tax collections were down 10.1% or $1.58 billion from May 2019.  (Beck Decl. ¶ 9.)[4]  Consequently, Georgia's 2021 budget contains about $1.57 billion fewer in State dollars than the 2020 Budget.  (<u>Id.</u> ¶ 8.)  The Secretary's budget is not immune: the Elections Division's budget decreased $175,000 to $5.43 million in the 2021 budget.  (<u>Id.</u> ¶ 10.)  At the same time, the cost of fighting the COVID-19 pandemic does not appear to be declining.[5]

The General Assembly did not appropriate funds for voters' postage. (Beck Decl. ¶ 11.)  The USPS allows entities, including the Secretary, to use a prefunded business reply mail account (a "Business Reply Account"), which allows certain mailings to be returned at no cost to the recipient.  (Sterling Decl. ¶ 6.)[6]  The Secretary maintains a Business Reply Account for limited mailings to voters, and it is not often used.  (<u>Id.</u> ¶ 7.)  Based on the

---

[4] A true and accurate copy of Stephanie Beck's declaration is attached as "Exhibit 1."

[5] Andy Sher, <u>Tennessee, Georgia, and Alabama Have Spent $240 Million So Far On Covid-19 Medical Equipment, Supplies</u>, Chattanooga Times Free Press, June 1, 2020, available at: https://www.timesfreepress.com/news/local/story/2020/jun/01/tn-ga-al-virus-spending/524286/

[6] A true and accurate copy of Mr. Sterling's Declaration is attached as "Exhibit 2."

-10-

Secretary's current understanding of the USPS's policies, prepaid postage envelopes are linked to an account by the return address.  (Id. ¶ 8.) Consequently, if the Secretary is to pay for voters' postage, the office must either manually place a stamp on each and every envelope, or the Secretary will have to collect every mailed absentee ballot and then distribute them (at cost) to 159 county election offices.  (Id.)  Using the Business Reply Account it costs the Secretary $1.40 for every absentee ballot that a voter returns; more than double the cost of that of a voter returning the absentee ballot by mail. (Sterling Decl. ¶ 9.)  Upgraded accounts, for a total fee of $965, can drop the cost of each returned absentee ballot to $0.643, which is still about 20% more than it costs a voter to return the same ballot.  (Id. ¶ 10.)

While increased use of absentee ballots is reasonably expected, it is impossible to provide an exact cost estimate of Plaintiffs' proposed relief, because it remains unknown how many 2020 General Election voters will vote absentee or the number of statewide or local runoff elections.  (Sterling Decl. ¶ 11-13.)  With these caveats, and presuming a General Election turnout at 5,000,000 total votes cast at the cost of $0.643 per ballot, the cost to the State for return postage only would be estimated at: $803,750 at a 25% vote-by-mail rate, $1,607,500 at a 50% vote-by-mail rate, and $2,441,250 at a 75% vote-by-mail rate. (Id. ¶ 13.)   Of course, at the current $1.40 per

absentee ballot rate, each of these estimates is more than doubled.  (Id.)
These numbers reflect 15% to 45% of the Secretary's entire election budget.

## II.    Standard of Review

Plaintiffs seeking a preliminary injunction show more than a
preponderance of the evidence and "clearly establish[] the 'burden of
persuasion.'" McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir.
1998).  Mandatory injunctions like the one Plaintiffs seek are "particularly
disfavored," Martinez v. Mathews, 544 F.2d 1233, 1243 (5th Cir. 1976), and
increase Plaintiffs' burden.  Exhibitors Poster Exch.. v. Nat'l Screen Serv.
Corp., 441 F.2d 560, 561 (5th Cir. 1971).[7]  This is particularly true in election
cases.  Purcell v. Gonzalez, 549 U.S. 1, 4-5 (2006).

Plaintiffs must at least "clearly" convince this Court that (1) there is a
substantial likelihood of success on the merits of the complaint; (2) absent the
preliminary injunction, the plaintiffs will suffer an irreparable injury; (3) the
threatened injury outweighs the harm to the Defendants; and (4) granting
the injunction would not be adverse to the public interest.  Black Voters

---

[7] In Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1210 (11th Cir.
1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth
Circuit adopted prior to October 1, 1981.

Matter Fund v. Raffensperger, 1:20-CV-01489-AT, 2020 WL 2079240, at *2

(N.D. Ga. Apr. 30, 2020) (denying preliminary injunction).

**III.    Argument and Citation to Authority**

For each of Plaintiffs' Counts, the State Defendants' Motion to Dismiss

("State Defendants' Motion") largely addresses the legal arguments, and the

State Defendants incorporate that Brief into this Response.  Doc No. [83-1].

A.    Plaintiffs Lack Article III Standing

Before this Court decides the merits of Plaintiffs' Motion, it should

grant the State Defendants' Motion on at least standing.  Doc. No. [83].  See

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998)

(jurisdictional issues are primary).  The NGP declaration (signed by its Chief

Executive Officer, Nse Ufot) reaffirms its mission is to register and assist

"Georgians to vote."  Doc. No. [59-3] ¶¶ 2, 9-10.  The NGP's alleged injury

involves nothing more than satisfying this mission, which does not constitute

a diversion of resources and does not establish standing.  See Jacobson v.

Florida Sec'y of State, 957 F.3d 1193, 1206 (11th Cir. 2020) (declining to find

standing for fulfilling a political mission).  NGP's updated declaration also

fails to satisfy Jacobson's requirement that parties claiming standing on a

diversion of resources theory explain (1) what it is diverting resources from;

and (2) how that diversion is connected to the alleged wrongful conduct. Id. at

1206-07.  Instead, the declaration states only that the NGP must continue its mission of voter education and turnout.  Doc. No. [59-3] ¶ 8-9.

Finally, any purported diversion is not traceable to any action of the State, but rather the COVID-19 virus itself.  Plaintiffs' "real problem … is COVID-19, which all but the craziest conspiracy theorists would concede is not the result of any act or failure to act by the Government."  <u>Coalition for Good Governance v. Raffensperger</u>, 1:20-CV-1677-TCB, 2020 WL 2509092, at *3 n.2 (N.D. Ga. May 14, 2020).[8]

B.   <u>Likelihood of Success on the Merits.</u>

Plaintiffs cannot "clearly" establish that they are likely to succeed on the merits of their misplaced attacks on the Challenged Policies.  <u>Robertson</u>, 147 F.3d at 1306.  This alone warrants denying the Plaintiffs' Motion.

i.   *Georgia's Absentee Applicant Notification Statute.*

Counts I, IV, and V of Plaintiffs' Amended Complaint challenge a portion of Georgia's Absentee Applicant Notification Statute, O.C.G.A. § 21-2-381, under <u>Anderson-Burdick</u>, Procedural Due Process, and Equal Protection theories, respectively.  Doc. No. [33] ¶¶ 126-38, 151-66.

---

[8] The declarations of the individual plaintiffs, Jennings, Woodall, and Pyne, do not change the analysis from the Defendants' Motion, and those individuals continue to lack standing to bring this lawsuit.

As a threshold matter, Plaintiffs do not ask the Court to maintain the status quo.  They seek, instead, to take over the State's executive administrative rulemaking process by drafting a State Election Board rule; compelling the SEB to promulgate that rule; and ordering the Secretary to enforce it.  The Eleventh Circuit recently rejected similar demands as outside the limited powers of the judiciary to enjoin, but not rewrite, unconstitutional laws.  Jacobson, 957 F.2d at 1209.  They also ignore the controlling SEB rule, which says that once early voting has commenced, county election officials have three days to notify individuals of any rejection of an absentee ballot request.  Ga. Comp. R. & Regs. 183-1-14-.11.  This is dispositive.

a.   ANDERSON/BURDICK (COUNT I)

Plaintiffs seek a preliminary injunction on the grounds that each of the Challenged Policies unconstitutionally burden their right to vote.  Doc. No. [33] ¶¶ 126-38.  Under Anderson-Burdick, Plaintiffs must identify an injury, Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 205 (2008) (Scalia, J., concurring in judgment).  Then, if the imposed burden is "severe," the law must be narrowly tailored to achieve a compelling state interest; but if the challenged statute imposes "only 'reasonable, nondiscriminatory

restrictions,'" the state law must be upheld so long as the State's interest is "important." <u>Burdick v. Takushi</u>, 504 U.S. 428, 434 (1992) (citation omitted).[9]

None of the individual Plaintiffs allege that their future absentee ballot requests will be rejected under the statute, and others do not identify an impacted voter.  Only Ms. Weikle's absentee ballot request was initially rejected, but it was quickly resolved without issue.  Doc. No. [59-7] ¶ 6.  The remainder of Plaintiffs' "evidence," including from Dr. Mayer, is inadmissible speculation that a voter <u>may</u> experience an improper denial and <u>may</u> not be able to timely resolve it.  <u>See</u> Doc. Nos. [59-3, 59-89].  Indeed, Dr. Mayer does not address reasons why absentee ballot applications were rejected; and consequently, his testimony speaks nothing of uniformity in administration or the lack thereof.  Doc. No. [59-1].

While the State Defendants do not dispute that Georgia voters are voting by mail at higher rates in 2020 than in the past, none of Plaintiffs' evidence or authority links the Absentee Applicant Notification Statute to any increased chance of "disenfranchisement."  Nor does any of Plaintiffs' evidence show that the law is facially flawed.  This matters.  Further,

---

[9] The burden is always on the Plaintiff to show both injury and that the injury outweighs the State's interest.  <u>Common Cause/Georgia v. Billups</u>, 554 F.3d 1340, 1353 (11th Cir. 2009).

Plaintiffs' cursory statement that there is no justification for the facially neutral statute is erroneous.  Doc. No. [58] at 26 n.11.  Defendants' Motion sets forth the facts and realities that support the law.  Plaintiffs have provided no evidence to counter these important justifications; consequently, they cannot "clearly" succeed on their <u>Anderson-Burdick</u> claim.

        **b.**     PROCEDURAL DUE PROCESS (COUNT IV)

Plaintiffs also are not entitled to a mandatory injunction on their procedural due process claim.  Critically, they ignore the current law, which limits county election officials' discretion.  Ga. Comp. R. & Regs. 183-1-14-.11.  They have articulated no authority supporting their claim that there is a fundamental right to vote by mail, and other courts have recognized that the opposite is true.  <u>See</u> <u>Zessar v. Helander</u>, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006) (citing <u>McDonald v. Board of Election Commissioners of Chicago</u>, 394 U.S. 802, 807 (1969)).  After weeks, Plaintiffs still have not identified a voter to whom the statute was unconstitutionally applied.  Nor have they made a showing that the Absentee Applicant Notification Statute always deprives voters of a "constitutionally-protected liberty interest or property interest," and always involves a "constitutionally inadequate process" to remedy that injury.  <u>Doe v. Fla. Bar</u>, 630 F.3d 1336,

1342 (11th Cir. 2011); see also Mathews v. Eldridge, 424 U.S. 319, 335,

(1976).  Thus, the facial challenge fails.

Further, the statute provides for adequate notice and an opportunity to

be heard, which is all due process requires.  Cleveland Bd. of Educ. v.

Loudermill, 470 U.S. 532, 546 (1985).  The adequacy of Georgia's post-

deprivation process is demonstrated by Ms. Weikle's declaration, Doc. No.

[59-7] ¶ 6, which satisfies Constitutional requirements.  See McKinney v.

Pate, 20 F.3d 1550, 1557 (11th Cir. 1994).  Plaintiffs have also not provided

(1) evidence of a material lack of uniformity, and under these circumstances,

or (2) a substitute procedural safeguard that would adequately remedy their

concerns.  Finally, Plaintiffs did not address any of the fiscal and

administrative burdens imposed by the arbitrary deadline suggested by

Plaintiffs.  See Doc. No. [83-1]; infra at 29. Under these circumstances,

Plaintiffs cannot clearly show a likelihood of success on the merits.

c.    COUNT V: EQUAL PROTECTION

The Constitution's Equal Protection Clause does not afford Plaintiffs a

right to a mandatory injunction either.  The legal analysis from the State

Defendants' Motion remains controlling, and Plaintiffs have not provided

evidence to satisfy their heavy burden.  Put simply, Plaintiffs have not shown

one voter who was treated differently than another based on where they

reside.  Nor have Plaintiffs demonstrated any statutory classification that treats voters differently.  See San Antonio Indep. Sch. Dist. v. Rodriguez, 411, U.S. 1, 59 (1973) (deciding the Equal Protection Clause "measures the validity of classifications created by state laws.") (Stewart, J., concurring).

        ii.    *Requesting Absentee Ballots for Each Election.*

Counts I and II raise Anderson-Burdick and 26th Amendment claims to strike a state law that allows some voters to request an absentee ballot once for each election in the cycle.  The evidence provided does not change the legal analysis from the State Defendants' Motion or save Plaintiffs' claims.

        a.    THE ANDERSON-BURDICK ANALYSIS (COUNT I).

No voter claims they cannot vote unless they are able to request absentee ballots only once.  Consequently, the burden Plaintiffs complain of— requesting absentee ballots online, by mail, or in person—is merely incidental and hypothetical.

Plaintiffs' declarants appear to agree.  Doc. Nos. [58] at 26, [59-5, 6, 17].  Most simply express a policy preference for a changed law and not an unconstitutional burden.  [Id.] "The Constitution is not offended simply because some groups find voting more convenient than" others.  Texas Democratic Party v. Abbott, 961 F.3d 389, 405 (5th Cir. 2020) (quoting McDonald, 394 U.S. at 810).  Dr. Mayer does not identify a burden, but

rather says that prefilled and online applications decrease the potential for errors by voters, which is beside the point.  [Doc. 59-1, p. 15-16].

Given the lack of an injury (or, a de minimis injury) arising out of the facially neutral statute, an "important" state interest will suffice to uphold the law.  <u>Burdick</u>, 504 U.S. at 434.  Here, the State interests are obvious, and Plaintiffs' declarations provide evidence of the State's concerns.  First, there is a strong interest in helping the most vulnerable, including Georgia's aged population.  <u>See</u> <u>Abbott</u>, 961 F.3d at 404-05 (quoting <u>McDonald</u>, 394 U.S. at 810–811).  Second, the risk of fraud is reduced when unused absentee ballots are limited.  <u>See</u> <u>Billups</u>, 554 F.3d at 1352, (describing anti-fraud efforts as "relevant and legitimate").  Third, as demonstrated by Plaintiffs' own declarants, some voters are temporarily residing in other states due to education, familial, or other obligations.  <u>See</u> Docs. No. [59-6, 7, 12, 70, 90].  As personal circumstances change, these voters may return to Georgia but their absentee ballot will be sent across the country.[10]  From both an

---

[10] Younger voters often move more frequently too.  United States Census, <u>Young Adult Migration: 2007-2009, 2010-2012: American Community Surveys</u>, (March 2015) available at https://www.census.gov/content/dam/Census/library/publications/2015/acs/acs-31.pdf.

administrative and security standpoint, this potential outcome outweighs the
de minimis harm of requesting another absentee ballot online or by mail.

> b.    THE 26ᵀᴴ AMENDMENT CLAIM (COUNT II)

Count II alleges a legal and facial violation of the 26th Amendment to
the United States Constitution. [Doc. 33, ¶¶ 139-46.]  As discussed in the
State Defendants' Motion, no court has said postage constitutes a poll tax,
and numerous rationales support the law.  This ends the inquiry.

Plaintiffs must know this, which is why they are forced to rely on
distinguishable cases.  Doc. No. [58] at 27-28 (citing <u>Walgren v. Bd. of
Selectmen of Town of Amherst</u>, 519 F.2d 1364, 1367 (1st Cir. 1975); <u>League of
Women Voters of Fla., Inc. v. Detzner</u>, 314 F. Supp. 3d 1205, 1221-23 (N.D.
Fla. 2018); <u>Ownby v. Dies</u>, 337 F. Supp. 38, 39 (E.D. Tex. 1971); <u>United
States v. Texas</u>, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978); <u>Worden v. Mercer
Cty. Bd. Of Elections</u>, 294 A.2d 233, 243 (N.J. 1972)).

<u>Ownby</u> and <u>United States v. Texas</u>, each involved a different
qualification for voting for persons under 21; no such distinction exists in
Georgia.  337 F. Supp. at 39; 445 F. Supp. at 1245.  <u>Worden</u> involved a
different residency requirement for college students.  294 A.2d at 233.
<u>Walgren</u> and <u>Detzner</u> each involved changing <u>voting</u> practices on college
campuses, not longstanding rules regarding the mere act of requesting an

absentee ballot.  <u>Abbott</u> provides the most on-point, recent analysis, as discussed at length in the State Defendants' Motion.  961 F.3d at 308-09.

<ol type="i" start="3">
<li style="list-style-type:none"><i>iii.     Postage (Counts I and III).</i></li>
</ol>

Plaintiffs ask this Court to become the first in the nation to impose on a state the constitutional obligation to pay postage for election mail.[11]  As pointed out in the State Defendants' Motion, every court that has addressed Plaintiffs' theory has rejected it.  <u>See, e.g.</u>, <u>League of Women Voters of Ohio v. LaRose</u>, No. 2:20-cv-01638-MHW-EPD (S.D. Ohio Apr. 3, 2020) (Slip Op. at 25); <u>Bruce v. City of Colorado Springs</u>, 971 P.2d 679, 685 (Colo. App. 1998).  Thus, Plaintiffs' <i>per se</i> claim (Count III) should be rejected as a matter of law because requiring voters to pay their own postage when they choose to return their absentee ballot by mail is not an unconstitutional poll tax.

Plaintiffs' evidence does not change the analysis on the <u>Anderson-Burdick</u> (Count I) claim either, as it remains true that Georgia imposes no tax on voters.  Plaintiffs' Brief concedes this when it acknowledges that postage fees benefit the USPS and not State coffers.  Doc. No. [58] at 29.

---

[11] There is no difference in the definition or analysis of a poll tax claim under either the 14th or 26th Amendments. See, e.g., Johnson v. Governor of State of Fla., 405 F.3d 1214, 1217 (11th Cir. 2005). Plaintiffs' claim under the 14th Amendment is also unlikely to succeed because Plaintiffs have not shown (or, in fact, pleaded) that Defendants acted with discriminatory intent.  <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 265 (1977).

Even Plaintiffs' authority fails on this point.  Jones v. DeSantis, No. 4:19CV300-RH/MJF, 2020 WL 2618062, at *29 (N.D. Fla. May 24, 2020). There, "the fees at issue [ ] have been directly levied by, and are paid in full to, state governmental entities." Id.  See also Vandiver v. Meriwether Cty., Georgia, 325 F. Supp. 3d 1321, 1331 (N.D. Ga. 2018) (a government entity "should not be held liable for actions it does not control or direct.").[12]

Plaintiffs' factual allegations do not save the claim either.  As recognized by the declarants, Dr. Mayer, and even the Supreme Court, all forms of voting impose some tangential burdens.  Burdick, 504 U.S. at 433; Storer v. Brown, 415 U.S. 724, 730 (1974); Bullock v. Carter, 405 U.S. 134, 143 (1972).  These costs include transportation (in-person voting), time away from work (in-person voting), or postage (voting by mail).  Such inherent costs do not render the state's election system unconstitutional or a poll tax.

Plaintiffs' own evidence shows the incidental nature of Plaintiffs' alleged burden.  Most declarants either have stamps or can get them.  Dr. Mayer acknowledges the USPS's policy of delivering election mail despite insufficient postage.  [Doc. 59-1,p. 12].  And, he ignores other means of

---

[12] Even the Jones Court conceded its ruling runs counter to "[e]very court that has considered the issue . . . ." 2020 WL 2618062, at *27.

returning ballots without coming into contact with election officials (for COVID-19 purposes).  Ga. Comp. R. & Regs. 183-1-19-.09.  For the few voters who suggested that stamps were expensive, Georgia has additional policies to assist them like allowing third parties to purchase postage.  Ga. Comp. R. & Regs. 183-1-19-.01.  Thus, if those voters <u>choose</u> to vote absentee, they have means and opportunities to do so with or without postage and with social distancing.  Plaintiffs try to make much of voters' potential confusion on the cost of the postage, but no voter indicated that confusion could prevent them from voting or that it has in the past.  Doc. No. [58] at 17-18.

This minimal injury must be weighed against the significant cost to the State (a cost that is higher, per envelope, than to individual voters).  Some Plaintiffs are very familiar with the State and its budget and should know their claim that the State "has no adequate justification for failing to pre-pay postage" is erroneous.  Doc. No. [58] at 27.  State budgets and workforces are shrinking.  As a balanced budget State, policymakers must choose between necessities like fighting the COVID-19 pandemic and buying stamps for voters (most of whom have them or can get them).  This is not a close call: if

the Court grants Plaintiffs' requested relief, the burden on the State would be significant, which  forecloses Plaintiffs' claim.[13]

        *iv.*    *Election Day Deadline*

Plaintiffs are not likely to succeed on the merits of their claims challenging the deadline for voters to return their absentee ballots.

        a.    ANDERSON/BURDICK (COUNT I)

Georgia's generally applicable deadline for receipt of absentee ballots is constitutional because it is facially neutral and imposes only a slight burden, if any, on Plaintiffs' right to vote. Burdick, 504 U.S. at 434.  Since at least 1974, the deadline for voters in Georgia to return their absentee ballots has been by the close of the polls. See 1974 Ga. Laws 71, § 9.  Georgia voters can submit absentee ballot applications up to 180 days prior to the date of the election. O.C.G.A. § 21-2-381(a)(1)(A).  Additionally, any voter may request and submit an absentee ballot so long as the absentee ballot is received by the time the polls close on Election Day. See O.C.G.A. §§ 21-2-380; 21-2-386. Georgia voters are reminded of the deadline to return absentee ballots in the

---

[13] Plaintiffs cite only the case of Taylor v. Louisiana, 419 U.S. 522, 535 (1975). That decision involved exemptions from jury service and not a fiscal cost to Louisiana.

instructions that accompany every absentee ballot; the instructions are

capitalized and in red font.

> AN ABSENTEE BALLOT MUST BE RECEIVED IN
> THE OFFICE OF THE BOARD OF REGISTRARS BY
> 7:00 P.M. (CLOSE OF THE POLLS) ON THE
> PRIMARY OR ELECTION DAY IN ORDER TO BE
> COUNTED.

(Harvey Decl. ¶ 5.)[14] The absentee voting guide issued by the Secretary

further advises voters, "We urge you to request your mail-in ballot and get it

back to your county registrar's office as soon as possible." (Harvey Decl. ¶ 6.)

This nondiscriminatory deadline imposes only a minimal burden, if

any, on the right to vote. Indeed, Georgia's policy is consistent with other

states',[15] and courts in neighboring states have recently rejected challenges to

election day deadlines for absentee ballots. See e.g., Nielsen v. DeSantis,

4:20-cv-236-RH-MJF[16]; Thomas v. Andino, 3:20-cv-01552-JMC, 2020 WL

2617329 at *26 (D.S.C. May 25, 2020).

---

[14] A true and accurate copy of Chris Harvey's declaration is attached as
"Exhibit 3."

[15] National Conference of State Legislatures, "Voting Outside the Polling
Place" report, at Table 11 (June 15, 2020), https://www.ncsl.org/research/
elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-
absentee-ballots.aspx.

[16] A true and accurate copy of the Nielsen decision is attached as "Exhibit 4."

The holdings of these other courts make sense.  Voters in Georgia have several options for voting and returning absentee ballots during the pandemic other than by mail.  On absentee ballots, every "citizen is presumed to know the law." Georgia v. Public.Resource.Org, Inc., 140 S. Ct. 1498, 1507, (2020).  "It is reasonable to expect a voter, who is voting by absentee ballot, no matter the reason, to familiarize themselves with the rules governing that procedure—especially when those procedures are provided." Andino, 2020 WL 2617329 at *25 n.25.  "Of course, voters who fail to get their vote in early cannot blame [Georgia] law for their inability to vote; they must blame 'their own failure to take timely steps to effect their enrollment.'" Andino, 2020 WL 2617329 at *26 (quoting Rosario, 410 U.S. at 758).  See also Georgia Shift v. Gwinnett Cty., 1:19-CV-01135-AT, 2020 WL 864938, at *5 (N.D. Ga. Feb. 12, 2020) (deciding courts cannot order timely mail delivery).

In this light , Plaintiffs misplace their reliance on Republican National Committee v. Democratic National Committee, 140 S.Ct. 1205 (2020) ("RNC"), where the Supreme Court stressed that "[t]he Court's decision on the narrow question before the Court should not be viewed as expressing an opinion on the broader question of whether to hold the election, or whether other reforms or modifications in election procedures in light of COVID–19 are appropriate. That point cannot be stressed enough." Id. at 1208.  Finally,

as discussed below, Georgia has important interests in not delaying the

election certification process that outweigh Plaintiffs' illusionary burden.

> b.    PROCEDURAL DUE PROCESS CLAIM (COUNT IV)

Plaintiffs also wrongly claim O.C.G.A. § 21-2-386(a)(1)(F) violates

procedural due process.  In addition to the failure to identify a

constitutionally-protected interest (as described above), Plaintiffs fail to

identify a state act as required by Doe. 630 F.3d at 1342.  Plaintiffs blame the

postal service delays and the COVID-19 pandemic for causing late delivery of

absentee ballots, Doc. Nos. [58 at 2-5, 10-11], but these are not acts of the

State.  And, as recognized by Judge Totenberg, courts cannot guarantee that

mail will be delivered on time.  Georgia Shift, 2020 WL 864938, at *5.  See

also Coalition for Good Governance 2020 WL 2509092, at *3 (blaming

COVID-19, not the State, for election issues).

In addition, Plaintiffs do not show there is a constitutionally

inadequate process.  The risk of erroneous deprivation is low as demonstrated

by Plaintiffs' reliance on speculation, Doc. Nos. [59-6 ¶ 10; 59-67 ¶ 7], or

voters' personal decisions to wait to return absentee ballots.  Doc. No. [59-7] ¶

5 (Weikle).  For example, declarants Shanmugasundaram and Jones guess

that if Georgia accepted absentee ballots postmarked on election day, their

votes would have counted.  Doc. Nos. [59-90] ¶ 6, [59-8] ¶ 7.  These isolated

incidents do not establish the "generality of cases" typically needed to show a

constitutional violation.  See Mathews, 424 U.S. at 344.

Lastly, Plaintiffs fail to articulate any meaningful additional

procedural safeguard.  Extension of the absentee ballot receipt deadline is not

a cure because any such deadline, however generous, can be missed by voters.

In contrast, the proposed relief would impose a heavy burden on the

State and frustrate the State's strong interest in conducting an efficient

election. Green Party of Georgia v. Kemp, 106 F. Supp. 3d 1314, 1319 (N.D.

Ga. 2015).  After Election Day, officials immediately begin efforts to finalize

the election by sending out required cure notifications for absentee ballots,

processing provisional ballots, conducting audits, and certifying results.

(Harvey Decl. ¶¶ 7-14.)  They also commence preparations and implement

plans for any runoffs. (Harvey Decl. ¶ 15.)  A delay in these procedures for

officials to count late absentee ballots would slow the State's efforts to

finalize the last election and prepare for the next.

Timely certification of election results also promotes certainty in

elections, itself an important state interest.  Broughton v. Douglas Cty. Bd. of

Elections, 286 Ga. 528, 528–29 (2010).  So too is maintaining the integrity of

elections.  Eu v. San Francisco Cty. Democratic Cent. Comm., 489 U.S. 214,

231(1989).  Finally, allowing voters to drop ballots in the mail after exit polls

and results begin to come in is a recipe for fraud given the ability to postmark

an envelope early and impact the outcome of elections.  <u>Purcell</u>, 549 U.S. at 4.

<u>See</u> <u>also</u> <u>Nielsen</u>, 4:20cv236-RH-MJF.

     v. *Georgia's Absentee Ballot Security Statute (Counts I, VI and*
       *VII).*

   Counts I and VI of Plaintiffs' Amended Complaint seek to strike, as

facially unconstitutional, the Absentee Ballot Security Statute, which limits

the types of persons who may "mail[] or deliver[]" absentee ballots for voters.

O.C.G.A. § 21-2-385(a); Doc. No. [33] ¶¶ 126-38, 167-72.  Count I is the

<u>Anderson-Burdick</u> claim, and Count VI alleges violations of NGP's First

Amendment rights to speech and association.  [<u>Id.</u>]  Count VII claims the

same statute violates the Voting Rights Act.[17]  [<u>Id.</u>] ¶¶ 173-80.  As with the

other counts, Plaintiffs' evidence does not change the dispositive legal

analysis in the State Defendants' Motion.

     a. P<span style="font-variant:small-caps">LAINTIFFS' </span>A<span style="font-variant:small-caps">NDERSON</span>-B<span style="font-variant:small-caps">URDICK </span>C<span style="font-variant:small-caps">LAIMS </span>(C<span style="font-variant:small-caps">OUNT </span>I)

   Plaintiffs' declarations show that few voters care about Georgia's

prohibition of ballot harvesting by third parties.  Doc Nos. [59-6, 7, 13-19, 69-

71, 90].  Those that do express only ideological preferences for a different

---

[17] As discussed in the State Defendants' Motion, Plaintiffs' Voting Rights Act
("VRA") claim fails because Plaintiffs overlooked Georgia law that is directly
on point and consistent with the VRA.  O.C.G.A. § 21-2-385(b).

policy, or they said that a policy change would be "helpful" to them.  Doc. Nos.

[59-8 to 59-12, 59-89, 59-91].  None claimed they could not vote based on the

Absentee Ballot Security Statute.  Two voters said they would like to present

their ballots to the NGP, but both voters have a history of voting absentee

without such assistance.  Doc. Nos. [59-4 and 59-5].  Indeed, the only persons

that may have benefitted from NGP's efforts are out-of-state voters.  See Doc.

Nos. [59-17, 90].  NGP does not claim to operate nationally, so the out-of-state

voters would not benefit from Plaintiffs' requested relief.

Plaintiffs remaining factual assertions are based on pure speculation

and should not be given weight.  CBS Broad., Inc. v. EchoStar Commc'ns

Corp., 265 F.3d 1193, 1206 (11th Cir. 2001) (refusing to base an injunction on

speculation).  For example, Plaintiffs claim that 27.2% of Georgians are

disabled, Doc. No. [58] at 22, which may be true.  That does not, however,

suggest that every disabled Georgian needs assistance delivering a ballot or

that Code Section 21-2-385(b) is insufficient to address their concerns.  The

remaining claims, that "trained" third parties could assist voters is

incongruent with the Plaintiffs' requested relief, which does not mandate

training and constitutes an impermissible rewriting of the statute.  Doc. No.

[58] at 22-23; Jacobson, 957 F.2d at 1209. Put simply, Plaintiffs have alleged

no actual (or, alternatively, a de minimis) burden even after gathering declarations from 20 Georgia voters.

The State Defendants' Motion also set forth various legitimate state interests that justify the law—namely, preventing fraud, verifying the eligibility of voters, and not imposing unreasonable and inflexible deadlines on county elections.  Doc. No. [83-1] at 10-11. See Burdick 504 U.S. at 433; Meyer, 486 U.S. at 427-28.  These are not "generalized interest[s] in promoting 'election integrity,'" and if it were, these interests still outweigh the non-existent or inconsequential harms purportedly suffered by Plaintiffs. Doc. No. [58] at 30.[18]

        b.    PLAINTIFF NGP'S FIRST AMENDMENT CLAIMS (COUNT VI).

As set forth in the State Defendants' Motion, state laws will withstand First Amendment scrutiny if the State's interests are sufficiently important and narrowly tailored to withstand judicial scrutiny. See, e.g., Burdick, 504 U.S. at 434; United States v. O'Brien, 391 U.S. 367, 376-78 (1968) (applying First Amendment analysis). The Absentee Ballot Security Statute satisfies this test in the light of the evidence that Plaintiffs cite.

---

[18] Plaintiffs misplaced their reliance on One Wisconsin Inst., Inc. v. Thomsen, 198 F. Supp. 3d 896, 903 (W.D. Wis. 2016), which was partially reversed by Luft v. Evers, 16-3003, 2020 WL 3496860 (7th Cir. June 29, 2020).

Indeed, Ms. Ufot's declaration contains only a conclusory statement that the Absentee Ballot Security Statute "prevents NGP from assisting voters … as such, prevents it from engaging in political speech and ultimately effectuating its mission."  Doc. No. [59-3] ¶ 21.  This is the only evidence from which NGP seeks to strike the State statute, and it is woefully insufficient to overcome the State's important interests.  Nothing in the Absentee Ballot Security Statute precludes the NGP from talking with, educating, and otherwise assisting voters.  It only prevents the NGP from collecting and delivering their ballots.

Plaintiffs' legal arguments fare no better.  See Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182, 186 (1999); Meyer v. Grant, 486 U.S. 414, 421 (1988); Tashjian v. Republican Party of Conn., 479 U.S. 208, 214-15 (1986).  None of Plaintiffs' cases address collecting or harvesting completed ballots, which acts the Ninth Circuit held do not "[c]onvey [ ] a symbolic message of any sort." Knox v. Brnovich, 907 F.3d 1167, 1181 (9th Cir. 2018); Voting for Am., Inc. v. Steen, 732 F.3d 382, 392 (5th Cir. 2013) (same).[19]  Even Meyer acknowledged that statutes regulating ballots are

_____

[19] The Steen court also distinguished collecting voter-registration applications from voter-registration drives, which is what occurred in bulk of Plaintiffs' cited authority. Id. at 388-389.

afforded more deference, because the "risk of fraud or corruption, or the appearance thereof" is greater when dealing with ballots.  486 U.S. at 427.

A.    Balancing the Equities and Public Interest

As with other cases, taking the remaining two factors—balancing the equities and public interest—"in tandem" makes sense.  See Black Voters Matter Fund, 2020 WL 2079240, at *2 . Georgia voters will be returning to the polls on August 11, 2020 for Primary runoff elections, and preparations for the November 3, 2020 have already started. (Harvey Decl. ¶¶ 3-4.) Judicial rewriting of Georgia's election laws at this juncture would seriously threaten to undermine voter confidence in the integrity of the election and cause voter confusion in both elections.  See Purcell, 549 U.S. at 4-5.  The Court has recognized states (and the judiciary) have interests in preventing these outcomes, as such orders "can themselves" negatively impact elections. Id. at 4.  See also RNC, 140 S.Ct. at 1207 ("[f]ederal courts should ordinarily not alter the election rules" just before elections).

Courts across the country are facing a flood of requests for preliminary injunctions challenging state election laws due to COVID-19.  The Supreme Court chose not to vacate stays of injunctions in two critical cases.  See Tex. Democratic Party v. Abbott, 19A1055, 2020 WL 3478784 (U.S. June 26, 2020); Thompson v. Dewine, 19A1054, 2020 WL 3456705, at *1 (U.S. June 25,

2020). The Supreme Court warned against the practice again when it stayed an order enjoining a state's election laws. RNC, 140 S. Ct. at 1207.

Courts in this District have heeded these concerns, as no preliminary injunction has been granted in Georgia election cases for the 2020 election. Coalition for Good Governance, 2020 WL 2509092, at *3; Black Voters Matter Fund, 2020 WL 2079240, at *2; Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registrations & Elections, 1:20-CV-1587-WMR, 2020 WL 2505535, at *1 (N.D. Ga. May 8, 2020); Gwinnett Cty. NAACP, 2020 WL 1031897.  See also Fair Fight Action, Inc. v. Raffensperger, Civil Action No. 1:18-cv-4391-SCJ at 10 (N.D.Ga. Dec. 27, 2019) (Slip Op.).

And, the Supreme Court's warning is applicable now.  Voters have been able to submit absentee ballot applications for the November election as early as May 7, 2020, O.C.G.A. § 21-2-381(a)(1)(A), and absentee ballots packages are already being prepared to send to voters after the August runoff elections are certified. (Harvey Decl. ¶¶ 3-40.) Plaintiffs' requests, such as a new absentee ballot application notification process and prepaid postage on absentee ballot envelopes, would significantly interfere with these ongoing administrative processes for the November election.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs Motion should be DENIED.

Respectfully submitted this 8 day of July, 2020.

> Christopher M. Carr
> Attorney General
> GA Bar No. 112505
> Brian K. Webb
> Deputy Attorney General
> GA Bar No. 743580
> Russell D. Willard
> Senior Assistant Attorney General
> GA Bar No. 760280
> **State Law Department**
> 40 Capitol Square, S.W.
> Atlanta, Georgia 30334
>
> */s/ Josh Belinfante*
> Josh Belinfante
> Georgia Bar No. 047399
> jbelinfante@robbinsfirm.com
> Vincent R. Russo
> Georgia Bar No. 242628
> vrusso@robbinsfirm.com
> Carey Miller
> Georgia Bar No. 976240
> cmiller@robbinsfirm.com
> Alexander Denton
> Georgia Bar No. 660632
> adenton@robbinsfirm.com
> Brian Lake
> Georgia Bar No. 575966
> blake@robbinsfirm.com
> Melanie Johnson
> Georgia Bar No. 466756
> mjohnson@robbinsfirm.com
> **Robbins Ross Alloy Belinfante Littlefield LLC**

500 14th Street NW
Atlanta, GA 30318
Telephone:        (678) 701-9381
Facsimile:        (404) 856-3250

*Attorneys for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

**STATE DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS'**

**MOTION FOR PRELIMINARY INJUNCTION** was prepared double-

spaced in 13-point Century Schoolbook font, approved by the Court in Local

Rule 5.1(C).

/s/ Josh Belinfante
Josh Belinfante