**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,<br><br>    Plaintiffs,<br><br>            v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board; *et al.*,<br><br>    Defendants. | CIVIL ACTION FILE No. 1:20-CV-01986-ELR |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS'
CONSOLIDATED MOTION TO DISMISS**

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................. 1

II.  ARGUMENT .................................................................................. 3

    A.  Legal Standard ..................................................................... 3

    B.  Plaintiffs have standing ........................................................ 3

        1.  The Voter Plaintiffs sufficiently allege injuries-in-fact. ......................... 4

        2.  NGP has direct organizational and associational standing ....................... 8

        3.  Plaintiffs' injuries are traceable to and redressable by Defendants. ......... 12

    C.  Plaintiffs plausibly state cognizable claims for relief. .............. 14

        1.  Plaintiffs state claims under *Anderson-Burdick*. ................................ 15

        2.  Plaintiffs sufficiently state claims that the Notification Process and Receipt Deadline violate the Due Process Clause. ................................ 24

        3.  Plaintiffs state a claim that the Notification Process violates the Equal Protection Clause. ................................................................... 27

        4.  Plaintiffs state a claim that the Voter Assistance Ban violates the First Amendment. ........................................................................... 28

        5.  Plaintiffs state a claim that the Voter Assistance Ban violates Section 208 of the Voting Rights Act. ........................................................... 30

        6.  Plaintiffs state a claim that the Absentee Age Restriction violates the Twenty-Sixth Amendment. ............................................................ 31

        7.  Plaintiffs state a claim that the Postage Tax violates the Twenty-Fourth and Fourteenth Amendments. ........................................................ 33

III.  CONCLUSION ............................................................................. 35

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Am. Civil Liberties Union v. The Fla. Bar*,
    999 F.2d 1486 (11th Cir. 1993) ........................................................10

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ........................................................................15

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ..................................................8, 9

*Bruce v. City of Colorado Springs*,
    971 P.2d 679 (Colo. Ct. App. 1998) ...........................................34

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ........................................................................15

*Bush v. Gore*,
    531 U.S. 98 (2000) ..........................................................................28

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) .....................................................6

*City of Los Angeles, Calif. v. Patel*,
    576 U.S. 409 (2015) ........................................................................18

*Coalition for Good Governance v. Raffensperger*,
    No. 1:20-CV-1677-TCB, 2020 WL 2509092 (N.D. Ga. May 14,
    2020) ..............................................................................................22

*Common Cause/Georgia v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ...................................6, 7, 9, 16

*Curling v. Raffensperger*,
    397 F. Supp. 3d 1334 (N.D. Ga. 2019) .......................................28

*Democratic Nat'l Comm. v. Bostelmann*,
    No. 3:20-cv-00249-wmc, ECF No. 217 (W.D. Wis. June 10, 2020) ...............25

# TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

*Democratic Nat'l Comm. v. Bostelmann*,
    No. 3:20-cv-249-wmc, 2020 WL 1638374 (W.D. Wis. Apr. 2,
    2020) ........................................................................................................13

*Democratic Nat'l Comm. v. Hobbs*,
    948 F.3d 989 (9th Cir. 2020) (en banc) ...........................................................22

*Democratic Party of Ga., Inc. v. Crittenden*,
    347 F. Supp. 3d 1324 (N.D. Ga. 2018).............................................................12

*Doe v. Florida Bar*,
    630 F.3d 1336 (11th Cir. 2011).......................................................................25

*Duke v. Cleland*,
    5 F.3d 1399 (11th Cir. 1993)....................................................................15, 16

*Fair Fight Action, Inc. v. Raffensperger*,
    413 F. Supp. 3d 1251 (N.D. Ga. 2019).............................................................8

*Fla. Democratic Party v. Detzner*,
    No. 4:16CV607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16,
    2016) ........................................................................................................28

*Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*,
    648 F.3d 1235 (11th Cir. 2011), *aff'd in part, rev'd in part sub*
    *nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).....................4

*Fla. State Conference of N.A.A.C.P. v. Browning*,
    522 F.3d 1153 (11th Cir. 2008)......................................................9, 11, 12, 28

*Friedman v. Snipes*,
    345 F. Supp. 2d 1356 (S.D. Fla. 2004)...........................................................17

*Fulani v. Krivanek*,
    973 F.2d 1539 (11th Cir. 1992).......................................................................27

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Georgia Coal. for People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251 (N.D. Ga. 2018)................................................10

*Georgia Muslim Voter Project v. Kemp*,
    918 F.3d 1262 (11th Cir. 2019)....................................................18

*Goldstein v. Sec'y of Commonwealth*,
    142 N.E.3d 560 (Mass. 2020) ....................................................14

*Goosby v. Osser*,
    409 U.S. 512 (1973)....................................................17

*Harman v. Forssenious*,
    380 U.S. 528 (1965)....................................................34

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966)....................................................6, 35

*Hunt v. Aimco Props., L.P.*,
    814 F.3d 1213 (11th Cir. 2016)....................................................3, 26

*Hunt v. Wash. State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)....................................................11

*Hunter v. Hamilton Cty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011)....................................................26

*TDP v. Abbott*,
    961 F.3d 389 (5th Cir. 2020)....................................................18, 32

*Jacobson v. Fla. Sec'y of State*,
    957 F.3d 1193 (11th Cir. 2020)....................................................9

*Knox v. Brnovich*,
    907 F. 3d 1167 (9th Cir. 2018)....................................................28

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Larson v. Valente*,
   456 U.S. 228 (1982) ........................................................................12

*League of Women Voters of Fla., Inc. v. Detzner*,
   314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...................................32, 33

*League of Women Voters of Fla. v. Browning*,
   863 F. Supp. 2d 1155 (N.D. Fla. 2012) ..........................................29

*League of Women Voters of N.C. ("LOWV") v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ...........................................................22

*League of Women Voters of Ohio v. LaRose*,
   No. 2:20-cv-01638-MHW-EPD (S.D. Ohio Apr. 3, 2020) ..............34

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................... 3, 4, 12, 13

*M.L.B. v. S.L.B.*,
   519 U.S. 102 (1996) ........................................................................35

*Martin v. Kemp*,
   341 F. Supp. 3d 1326 (N.D. Ga. 2018), *appeal dismissed sub nom.*
   *Martin v. Sec'y of State of Georgia*, No. 18-14503-GG, 2018 WL
   7139247 (11th Cir. Dec. 11, 2018) ...........................................passim

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ........................................................................24

*McDonald v. Board of Election Commissioners*,
   394 U.S. 802 (1969) .......................................................... 17, 18, 32

*McKinney v. Pate*
   20 F.3d 1550 (11th Cir. 1994). ......................................................26

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Meyer v. Grant*,
    486 U.S. 414 (1988)..........................................................................30

*Minnesota v. Thao*,
    No. 62-CR-18-827 (Minn. Dist. Ct. Oct. 23, 2018) ...........................31

*Mulhall v. UNITE HERE Local 355*,
    618 F.3d 1279 (11th Cir. 2010) .........................................................13

*Ne. Ohio Coal. for the Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012)......................................................22, 23

*Northshore Dev., Inc. v. Lee*,
    835 F.2d 580 (5th Cir. 1988)..............................................................18

*O'Brien v. Skinner*,
    414 U.S. 524 (1974).............................................................................17

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012)....................................................... passim

*Ownby v. Dies*,
    337 F. Supp. 38 (E.D. Tex. 1971) .....................................................33

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
    781. F.3d 1245 (11th Cir. 2015).........................................................4

*People First of Alabama v. Merrill*,
    No. 2:20-cv-00619-AKK, 2020 WL 3207824 (N.D. Ala. June 15,
    2020) ..........................................................................5, 6, 21, 25

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008)..............................................................16

*Priorities USA v. Nessel*,
    No. 4:19-cv-1334, 2020 WL 2615766 (E.D. Mich. May 22, 2020) ...... 10, 29, 31

# TABLE OF AUTHORITIES

CASES                                                                      PAGE(S)

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
   762 F. Supp. 1354 (D. Ariz. 1990) .................................................25

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
   993 F.2d 800 (11th Cir. 1993) ......................................................4

*Republican Party of Ark. v. Faulkner Cty.*,
   49 F.3d 1289 (8th Cir. 1995) ......................................................27

*Resnick v. AvMed, Inc.*,
   693 F.3d 1317 (11th Cir. 2012) ...................................................12

*Rosen v. Brown*,
   970 F.2d 169 (6th Cir. 1992) ......................................................27

*Saucedo v. Garner*,
   335 F. Supp. 3d 202 (D.N.H. 2018) ...........................................25

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) ......................................................16

*Speaker v. U.S. Dep't of Health & Human Servs. CDC*,
   623 F.3d 1371 (11th Cir. 2010) .............................................14, 15

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986) ..................................................................29

*Texas v. Johnson*,
   491 U.S. 397 (1989) ..................................................................30

*Thomas v. Andino*,
   No. 3:20-cv-1552-JMC, 2020 WL 2617329 (D.S.C. May 25, 2020) ...........7, 23

*United States v. Chem. Found., Inc.*,
   272 U.S. 1 (1926) ......................................................................19

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 669 (1973)..................................................................7

*United States v. Texas*,
    252 F. Supp. 234 (W.D. Tex. 1966), *aff'd*, 384 U.S. 155 ................25

*United States v. Texas*,
    445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v.*
    *United States*, 439 U.S. 1105 (1979)...............................................33

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013).........................................................29

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008).....................................................................19

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017)....................................................10

*Worden v. Mercer Cty. Bd. of Elections*,
    294 A.2d 233 (N.J. 1972).............................................................33

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886).....................................................................35

**CONSTITUTION AND STATUTES**

U.S. Cont. amend I................................................... 10, 28, 29, 30

U.S. Const. amend XIV ...............................................22, 34, 35

U.S. Const. amend XXIV, § 1 .............................................34

52 U.S.C. § 10508...............................................................3, 30, 31

O.C.G.A. § 21-2-380 ..............................................................7

# TABLE OF AUTHORITIES

O.C.G.A.§ 21-2-381 ...................................................................................33

CONSTITUTION AND STATUTES                                    PAGE(S)

O.C.G.A. § 21-2-385 .................................................................................31

OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)..............................................................................3

## I.    INTRODUCTION

Approximately three months into the ongoing COVID-19 pandemic, Georgia administered a statewide election that has been described as "chaotic," "disastrous," "a giant warning siren," and "a hot flaming mess."[1] Since then, the crisis has worsened. Infections have soared to over 100,000 reported cases and nearly 3,000 deaths in Georgia alone, with no abatement in sight.[2] Yet, in its Motion to Dismiss ("Motion"), State Defendants (the "State") takes the remarkable position that absentee voting by mail is a luxury, voters can easily vote in person, the State has no responsibility for ensuring voters can effectively cast their absentee ballots, and Plaintiffs' alleged burdens are speculative. These arguments are out of touch with reality and contrary to law. This Court has the power and obligation to protect Georgia's voters from being unjustifiably burdened and disenfranchised. Far from asking the Court to take extraordinary action, Plaintiffs seek to enjoin five specific provisions of Georgia's absentee voting regime—the Notification Process, Absentee Age Restriction, Postage Tax, Receipt Deadline, and Voter Assistance Ban—that

---

[1] Abby Phillip, *'A giant warning siren': Concerns about November's election grow after Georgia's disastrous primary*, CNN (June 11, 2020), https://www.cnn.com/2020/06/10/politics/2020-election-georgia-primary-disaster/index.html; Zach Montellaro, et al., *'A hot, flaming mess': Georgia primary beset by chaos, long lines*, Politico (June 9, 2020), https://www.politico.com/news/2020/06/09/georgia-primary-election-voting-309066.

[2] Ga. Dep't of Public Health, Georgia Dep't of Public Health Daily Status Rep., https://dph.georgia.gov/covid-19-daily-status-report (last visited July 10, 2020).

impose undue burdens on voters. To be clear: it is these laws that harm voters; the pandemic has merely increased—and dramatically so—the severity of those burdens and the number of voters who must bear them to vote.

This action is properly before the Court. Plaintiffs Jennings, Woodall, and Pyne ("Voter Plaintiffs") have standing because each intends to vote absentee and, as alleged, will be burdened by the challenged laws. The State's position that voters must demonstrate actual disenfranchisement to have standing to challenge election laws that will burden their right to vote is contrary to and never has been the law. Similarly, the State's argument that The New Georgia Project ("NGP") lacks standing is contrary to Circuit precedent holding that organizations—including those engaged in voter outreach—have standing to challenge election laws when they must redirect resources to assist voters in overcoming the burdens of those laws. These injuries are traceable to and redressable by the State.

Plaintiffs have also stated cognizable claims for relief. They allege that the challenged laws impose undue burdens on the right to vote and, unless enjoined, will do so with unprecedented severity in the November election due to the pandemic, which will limit in-person voting, just as it did in Georgia's June 9, 2020 elections ("June Primary"), sharply increasing the number of voters subject to those burdens. The State ignores these allegations, which must be taken as true, and asks the Court to dismiss Plaintiffs' *Anderson-Burdick* claims without even considering evidence.

But the resolution of these claims requires highly individualized factual determinations that make them unsuitable for dismissal at this stage. Plaintiffs' allegations with respect to their First, Twenty-Sixth and Twenty-Fourth Amendment, Due Process, and Section 208 claims also state claims sufficient to withstand the State's reflexive motion to dismiss. In sum, the Complaint sets forth more than sufficient grounds for a claim, and the State's Motion should be denied.

## II.    ARGUMENT

### A.    Legal Standard

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must "accept[] the allegations in the complaint as true and construe[] them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). Under the liberal pleading standard of Federal Rule of Civil Procedure 8(a), to survive a motion to dismiss "the complaint need only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rest." *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781. F.3d 1245, 1260 (11th Cir. 2015) (citations omitted); *see also* Opp'n. to Cty. Mot. at 3-4 (discussing legal standard).

### B.    Plaintiffs have standing.

Plaintiffs have alleged that they have or will suffer injuries in fact that are traceable to the challenged laws and redressable by this Court, firmly establishing

their standing to proceed with this action. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Because the State challenges standing in a motion to dismiss, the Court must accept as true all material allegations of the Complaint and construe them in favor of Plaintiffs. *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993). At this stage, "general factual allegations of injury resulting from the defendant's conduct" suffice to establish standing, because the Court must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 560-61 (quotations and citations omitted). "[S]o long as at least one plaintiff has standing to raise each claim," dismissal is improper. *Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011), *aff'd in part, rev'd in part sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).

  **1.**  **The Voter Plaintiffs sufficiently allege injuries-in-fact.**

  The Voter Plaintiffs allege that they will vote absentee in Georgia this year and are subject to and burdened by the challenged laws. *See* First Am. Compl., ECF No. 33 ¶¶ 20-22 ("Compl."). This is more than sufficient to satisfy Article III's injury-in-fact requirement. The State takes the misguided positions that (1) voters may only challenge laws related to a method of voting where there is no other voting method available to them, and (2) voters must be wholly disenfranchised by a law

to challenge it. *See* Defs.' Mot. to Dismiss, ECF No. 83-1 at 4, 5, 19-21, 22, 25, 28 ("State Mot."). This is not the law.

*First*, whether Plaintiffs have other means to vote may be a fact the Court considers when evaluating the severity of the burdens of a challenged law on the right to vote, but it is not relevant to standing. *See, e.g.*, *Obama for Am. v. Husted* ("*OFA*"), 697 F.3d 423, 431 (6th Cir. 2012). And the State ignores that, in this case, Plaintiffs have alleged that the very alternative means of voting that the State points to—in-person voting—is expected to be severely limited in November. *See* Compl. ¶¶ 98-99. For some number of voters, absentee voting will be the *only* means of voting realistically available to them. Indeed, because of the reality in which we now find ourselves, including the health risks of in-person voting and the fact that the virus has severely hampered states' abilities to offer in-person voting at anywhere near the scale they have in the past, the Secretary has explicitly *encouraged* absentee voting. *Id.* ¶90.[3] One need only look at the June Primary to conclude that the suggestion that absentee voting is a luxury and not a necessity for many cannot be squared with reality. *See* Pls.' Mot. for Prelim. Inj., ECF No. 58 at 1-2 ("PI Mot."). Defendants also ignore that at least one Voter Plaintiff affirmatively alleged that in-person voting will be *impossible* because she will be out of state. Compl. ¶ 22.

---

[3] The Centers for Disease Control and Prevention's ("CDC") has also recommended that mail voting be used to limit the spread of COVID-19. *See* Compl. ¶¶ 90-91.

*Second*, the Eleventh Circuit and the Supreme Court have rejected the notion that elections laws may only be challenged if they entirely *deny* the right to vote. *See infra* 6. To the contrary, "a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote," even if they are not disenfranchised. *People First of Alabama v. Merrill*, No. 2:20-cv-00619-AKK, 2020 WL 3207824 at *6-7 (N.D. Ala. June 15, 2020) (citing *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009)). The State's position that Plaintiffs' alleged injuries that fall short of disenfranchisement are insufficient, State Mot. at 4-5, 8, 14, contradicts binding precedent. Plaintiffs have standing because they will be subject to the challenged laws that, as alleged, make it more difficult for them to exercise their right to vote—even if they are not ultimately disenfranchised. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."); *see also Common Cause/Georgia*, 554 F.3d at 1351 (voters had standing to challenge photo ID law because they were subject to the requirement); *id.* at 1352 ("The inability of a voter to pay a poll tax . . . is not required to challenge a statute that imposes a tax on voting." (*citing Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668, (1966))). That the Voter Plaintiffs are subject to the challenged laws and must comply with them is all that is necessary for standing—even if all that entails is paying for a 55-cent stamp or completing an absentee ballot application. *See, e.g.*,

*id.* at 1351 ("a small injury, 'an identifiable trifle,' is sufficient to confer standing" (citing *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973))).

That said, Plaintiffs' risk of disenfranchisement from the challenged laws is far from "unfounded." State Mot. at 14. For example, Georgia has a documented history of disenfranchising voters via the Receipt Deadline regardless of the steps the voter takes to ensure their ballot arrives on time. *See* Compl. ¶¶ 67-69. Plaintiff Pyne was disenfranchised by the Receipt Deadline in November 2018 because she received her ballot the day before the election—despite requesting it weeks in advance. *Id.* ¶ 22. And Plaintiff Woodall's restricted budget and health conditions prevent her from safely venturing out to buy stamps—as required by the Postage Tax—placing her at serious risk of disenfranchisement. Compl. ¶ 21. The State's reliance on *Thomas v. Andino*, No. 3:20-cv-1552-JMC, 2020 WL 2617329, at *25 n.25 (D.S.C. May 25, 2020), for the proposition that it is the voter's failure to take "timely steps" to ensure their ballot is counted, State Mot. at 25-26, is sorely misplaced. Pyne's experience alone demonstrates that, in Georgia, voters *are* disenfranchised by the Receipt Deadline *despite* taking "timely steps" to submit their ballots. Compl. ¶ 22; *see also* ¶¶ 3, 9, 69-71.

In sum, Georgia has conferred on its citizens the right to vote absentee. O.C.G.A. § 21-2-380(b). "[O]nce the state creates an absentee voting regime, they

must administer it in accordance with the Constitution." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) (quotation marks and citation omitted). This year, Georgia has also actively induced voters to cast their ballots by mail. *See* Compl. ¶ 90. Plaintiffs' subjection to the challenged laws and allegations of the burdens those laws force them to overcome to successfully vote absentee are more than sufficient to establish that they have standing to challenge those provisions. *See* Compl. ¶¶ 20-22.

### 2.    NGP has direct organizational and associational standing.

***Diversion of Resources.*** An organization "has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). They may establish standing in elections cases by showing they "will need to divert resources from general voting initiatives or other missions . . . to address the impacts of election laws or policies." *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019); *see also Arcia*, 772 F.3d at 1341. It is of no consequence, as the State argues, that the organization already engages in general voter outreach or other voter assistance efforts. State Mot. at 5-6. The organization need only allege a diversion

of resources to address the challenged laws at the expense of other programs.[4] *See, e.g., Arcia*, 772 F.3d at 1341 (plaintiffs with missions to "encourage[] and safeguard[] voter rights" established injury-in-fact by "redirecti[ng] resources" to address challenged law); *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1158, 1165-66 (11th Cir. 2008) (organizations dedicated to increasing voter participation suffered injury-in-fact by diverting resources from registration and election-day education and monitoring to educating voters on challenged law); *see also Billups*, 554 F.3d at 1350.

NGP alleges that it is a non-partisan organization dedicated to registering Georgians to vote and helping them successfully exercise the franchise. Compl. ¶¶ 17-19. While engaging in voter education and turnout efforts, NGP "communicates its belief in the power and importance of participating in democratic elections." *Id.* ¶ 169. To mitigate the burdens imposed by the challenged laws, NGP will need "to *divert* resources *from* other programs and initiatives," including registration efforts and advertising to assist NGP's constituency, to educate them on how to overcome

---

[4] *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1206 (11th Cir. 2020), acknowledged that this showing of resource diversion constitutes a concrete injury. In this case, unlike in *Jacobson*, NGP has explained what activities it would divert from to combat the challenged laws. *See infra* 8-10. Further, *Jacobson* evaluated whether the plaintiffs had adduced sufficient evidence after discovery and trial of resource diversion; it certainly cannot be read to hold that the allegations like those in the Complaint here are insufficient to establish standing at this preliminary stage.

the burdens imposed by the challenged laws. *Id.* ¶ 17 (emphasis added). The resultant diversion of resources frustrates NGP's mission to register Georgians of color. *Id.* ¶¶ 18-19. At the pleadings stage, this is more than sufficient to establish NGP's standing. *See, e.g.*, *Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1258 (N.D. Ga. 2018) (NGP had standing where it diverted resources to educate and assist voters with Georgia's exact match law).

***First Amendment.*** NGP also has standing to challenge the Voter Assistance Ban because it infringes upon its speech and associational rights. Compl. ¶¶ 19, 169-72. A party has an injury-in-fact in the First Amendment context when it engages in self-censorship to avoid a credible threat of prosecution. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017); *Am. Civil Liberties Union v. The Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993). "To evaluate the nature of the plaintiff's claimed injury, courts 'have asked whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure.'" *The Fla. Bar*, 999 F.2d at 1492 (citation and quotation omitted). NGP would engage in the activity proscribed by the Ban but is prevented from doing so. Compl. ¶ 19. The State could have disavowed enforcement of the statute as applied to NGP; it has not done so. NGP thus has standing to challenge the Ban. *See, e.g.*, *Priorities USA v. Nessel*, No. 4:19-cv-1334, 2020 WL 2615766, at *6 (E.D. Mich. May 22, 2020) (plaintiff had standing to challenge statute prohibiting

voter assistance because "Plaintiffs' plan involves the expression of core political speech and defendant did not disavow enforcement").

***Associational Standing.*** Contrary to the State's assertion, NGP does not have to identify specific members or constituents who are harmed to confer associational standing.[5] An organization has standing to bring suit on behalf of its members or constituents when: (a) its members or constituents would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires individual members or constituents to participate in the lawsuit. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). NGP asserts that its constituents—primarily Georgia voters of color who it has helped register, all of whom would have standing to sue—will be harmed by the challenged laws and that their interest in voting absentee safely and effectively are germane to NGP's purpose. Compl. ¶¶ 17-19. NGP seeks injunctive relief so their individual participation is not required. *Browning*, 522 F.3d at 1160. "When the alleged harm is prospective," as here, the Eleventh Circuit has recognized that courts "have not

---

[5] The State's assertion that NGP cannot establish associational standing "because it must divert resources from its missions of registering and encouraging voters to vote to its mission of registering and encouraging voters to vote," State Mot. at 5, conflates associational and diversion of resources standing and is addressed by Plaintiffs, *supra* 8-10, regarding diversion of resources.

required that the organizational plaintiffs name names," to have standing to sue on their members' behalves. *Id.*; *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) ("The organization need only show that its members face a probability of harm in the near and definite future to establish injury [] sufficient to confer standing to seek prospective relief."). Because the Complaint alleges each prong of the associational injury test, NGP sufficiently alleges standing.

### 3. Plaintiffs' injuries are traceable to and redressable by Defendants.[6]

While the State disclaims responsibility for the burdens the challenged laws impose on Georgia's voters, Georgia statutes prove otherwise. To establish standing, a plaintiff must allege that its injuries are "fairly traceable to the challenged action of the defendant," *Lujan*, 504 U.S. at 560, which "require[s] less than a showing of proximate cause." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quotation and citation omitted). "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions" is sufficient. *Id*. And "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that [it] will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). "At the pleading stage, general

---

[6] Plaintiffs' injuries are also traceable to and redressable by County Defendants, as Plaintiffs explain in their response to those Defendants' motion to dismiss.

factual allegations of injury resulting from the defendant's conduct may suffice, [because courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010) (quoting *Lujan*, 504 U.S. at 561).

And though the State blames the postal service, the pandemic, Plaintiffs themselves, and Georgia voters writ large for their injuries, *see* State Mot. at 2-3, 21-22, 26, in truth it is Georgia law that is responsible. *See* Compl. ¶¶ 2-10; *see also supra* 1-2.  A comparable case, *Democratic Nat'l Comm. v. Bostelmann*, No. 3:20-cv-249-wmc, 2020 WL 1638374, at *12 n.14 (W.D. Wis. Apr. 2, 2020), demonstrates this. There the court "quickly dismissed" the state's argument that "the additional burdens placed on voters [were] due not to state action, but the COVID-19 pandemic itself," and explained that the state "cannot enforce laws that, even due to circumstances out of its control, impose unconstitutional burdens on voters." *See id*. The Supreme Court later imposed an Election Day postmark deadline for absentee ballots in that state—as a result, more than 80,000 ballots that would have otherwise been discarded were counted. *See* Compl. ¶ 95. Pandemic or no pandemic, Plaintiffs have clearly alleged that it is the challenged laws that fail to provide adequate notice of problems with absentee ballot applications, discriminate against voters based on age, require voters to pay for postage, and prohibit assistance from anyone other than select individuals to return those ballots. *See generally id*.

Given the State's atrocious administration of the June Primary, it is remarkable that the State Defendants, Georgia's chief elections officials, are standing idly by and disclaiming responsibility for ensuring that Georgia voters can effectively cast their ballots in the coming November election. *See* State Mot. at 21. But as another court faced with evaluating the burdens imposed by elections laws in the context of the current pandemic noted, "statutory requirements that in ordinary times impose only modest burdens on [the electoral process] may significantly interfere with the fundamental right [to participate in the electoral process] in a time of pandemic." *Goldstein v. Sec'y of Commonwealth*, 142 N.E.3d 560, 570 (Mass. 2020). Plaintiffs' injuries are ultimately attributable to State enforcement of the challenged laws; the State holds the key to redressing the injuries that will follow to Plaintiffs as a result. The State tellingly makes no substantive argument about redressability (except to state, as a conclusory matter, that there is none, State Mot. at 4). But this is belied by their express responsibilities for the administrative of elections in Georgia. *See also* Opp'n. to Cty. Mot. at 7-11 (discussing redressability).

## C.    Plaintiffs plausibly state cognizable claims for relief.

The State's arguments that Plaintiffs fail to state claims for relief are also meritless. The Court must accept all factual allegations in the Complaint as true and make inferences in the light most favorable to Plaintiffs. *See Speaker v. U.S. Dep't of Health & Human Servs. CDC*, 623 F.3d 1371, 1379 (11th Cir. 2010). A plaintiff

"need not prove his case on the pleadings," but "must merely provide enough factual material to raise a reasonable inference." *Id.* at 1386. Plaintiffs have done so here.

### 1.   Plaintiffs state claims under *Anderson-Burdick*.

The State's argument that Plaintiffs have not sufficiently alleged an undue burden on the right to vote misunderstands the law and broadly ignores the facts pleaded in the Complaint. Claims that facially non-discriminatory election laws burden the right to vote are evaluated under the *Anderson-Burdick* balancing test. That test requires courts to carefully balance the character and magnitude of injury to the rights the plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Because the inquiry is highly fact-specific, dismissal of such claims at the pleadings stage is generally inappropriate.

In *Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993), for example, a candidate and his supporters brought an *Anderson-Burdick* claim after the candidate was excluded from the primary ballot. On appeal from a grant of a motion to dismiss, the Eleventh Circuit vacated and remanded, finding it was "impossible [] to undertake the proper" *Anderson-Burdick* analysis without a record. *Id*. at 1405. The Eleventh Circuit instructed the district court to reassess, noting, "it is possible that

upon remand the state's interests may not justify the burden upon the plaintiffs' rights," because "[t]he existence of a state interest . . . is a matter of proof." *Id.* at 1405 & 1405 & n.6; *see also, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008).

The same holds true here—this Court cannot dismiss Plaintiffs' *Anderson-Burdick* claims in favor of the State without considering an evidentiary record demonstrating the magnitude of the burden on Plaintiffs' rights and the validity of the state interests. Tellingly, the State fails to cite any case supporting dismissal of an *Anderson-Burdick* case at the pleadings stage, relying instead on cases decided at other stages of litigation. *See, e.g.*, State Mot. at 10 (citing *Billups*, 554 F.3d at 1352 (post-trial)). And Plaintiffs have pleaded ample facts alleging burdens resultant from all five of the challenged laws. *See* Compl. ¶¶ 35-45 (burdens related to Notification Process); *id.* ¶¶ 46-56 (Absentee Age Restriction); *id.* ¶¶ 57-64 (Postage Tax); *id.* ¶¶ 65-71 (Receipt Deadline); *id.* ¶¶ 72-78 (Voter Assistance Ban).[7] Plaintiffs have also, in many instances, countered the very justifications that the State raises in its Motion. *See, e.g.*, Compl. ¶ 114 (discussing lack of justification for Notification Process and defining proposed procedure); *id.* ¶ 116 (Postage Tax); *id.* ¶¶ 121-123 (Receipt

---

[7] Notably, while not necessary for the Court's determination of this Motion, Plaintiffs have compiled a substantial record of such burdens in support of their pending Motion for Preliminary Injunction. ECF Nos. 59-01 to -91.

Deadline); *id.* ¶ 24 (voter fraud justification and Voter Assistance Ban). All of those allegations must be accepted as true for the purposes of this motion.  Dismissal of any of Plaintiffs' *Anderson-Burdick* claims would be inappropriate at this stage.

Further, the State's assertion that the burdens imposed by the challenged laws are not actionable because they apply to absentee voting is wrong. *See* State Mot. at 9-10, 14, 17, 22, 24. The State relies principally on *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969), for this proposition, but *McDonald*—which predates *Anderson-Burdick*—most assuredly does not hold that *Anderson-Burdick* is inapplicable to absentee voting. Rather, "[t]he *McDonald* plaintiffs failed to make out a claim for heightened scrutiny because they had presented no evidence to support their allegation that they were being prevented from voting."[8] *OFA*, 697 F.3d at 431; *see also O'Brien v. Skinner*, 414 U.S. 524, 529 (1974); *Goosby v. Osser*, 409 U.S. 512, 520-22 (1973). This question is fundamentally different from that at issue here: whether having conferred the right to vote absentee and induced voters to rely on it precisely *because* safe alternatives are not expected to be realistically or broadly available, a state may nevertheless *curtail* that right without adequate justification?

---

[8] The State also cites to *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1373 (S.D. Fla. 2004), but that case, which was filed on Election Day, involved a preliminary-injunction order, meaning that the court was not asked to consider the *sufficiency* of the plaintiffs' claims, but the likelihood of their *merit*. *See* 345 F. Supp. 2d at 1373.

Georgia courts have decisively found that, even in ordinary times, the answer is no. *Martin*, 341 F. Supp. 3d at 1338 ("[O]nce the state creates an absentee voting regime, they must administer it in accordance with the Constitution.").[9]

Finally, the State incorrectly argues that Plaintiffs' attack is facial, and asserts that means Plaintiffs must establish "no set of circumstances" exists under which the challenged laws would be valid. *See* State Mot. at 8-9, 11-13, 20, 27, 30. In fact, Plaintiffs' challenge is *not* facial, but regardless the State's assertion is wrong as a matter of law. Plaintiffs challenging elections laws need not show the laws "always" deprive voters of their right to vote. Quite the opposite. "The proper focus of the constitutional inquiry is the group for whom the law is a *restriction*, not the group for whom the law is *irrelevant*." *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270 (11th Cir. 2019) (quoting *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 444 (2015)); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1337 (N.D. Ga. 2018).

Plaintiffs have pleaded real burdens imposed by the challenged laws. *See supra* 4-12; *infra* 19-24. That the State can think of hypothetical instances in which a voter might not be burdened or completely disenfranchised as a result, *see* State

---

[9] The State cites a motions panel decision on a stay application in the matter of *TDP v. Abbott*, 961 F.3d 389 (5th Cir. 2020), ignoring that the Fifth Circuit has held that such decisions are not even precedential in that Circuit (much less in others), *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 583 (5th Cir. 1988) (citations omitted), and that its discussion of *McDonald* was in relation to the plaintiffs' Twenty-Sixth Amendment claims, not to analogous undue burden claims.

Mot. at 9, 11, 30, is of no moment. *See Martin*, 341 F. Supp. 3d at 1337 ("[T]he Court need not . . . 'speculate about "hypothetical" or "imaginary" cases.'") (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Following the State's proposed approach would affect a radical departure from established standards of review of laws affecting fundamental rights and turn the judiciary into little more than a rubber stamp, permitting all but the most extreme deprivations so long as counsel could think of one constitutional application of a challenged statute. This is not the law. Plaintiffs sufficiently state a claim.

### a.    The Notification Process burdens voters.

Plaintiffs sufficiently allege that the Notification Process imposes substantial burdens on the right to vote at any time. Because "promptly" is not defined, counties may contact voters about issues with their applications at their leisure.[10] Compl. ¶ 41. Thus, voters risk learning their application is insufficient too late to vote absentee, and disenfranchising those for whom in-person voting is unrealistic. *Id.* ¶ 45. Or voters must follow up with election officials repeatedly to determine if their request has been processed to verify that they will, in fact, receive an absentee ballot. *Id.* ¶ 18 (discussing NGP's repeated confirmations of absentee application receipts

---

[10] That "[f]ederal law presumes the law is followed as written," State Mot. at 9 (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)), is precisely the problem with the Notification Process—the law lacks any definition of promptly, allowing local election officials to interpret it in non-uniform and burdensome ways.

for constituents). During the pandemic, where an influx of absentee ballots has inundated election officials and led to slower processing, *id.* ¶¶ 100-101, this risk of disenfranchisement grows, *see id.* ¶ 45. In-person voting hardly makes these burdens "minute." State Mot. at 10. And, the State ignores both the present difficulties of administering in-person voting, as in the meltdown of the June Primary, *see supra* 2, 5, 14, and the allegations that absentee voting will be a necessity for many in November, *see* Compl. ¶¶ 45, 107.[11] The silence on this point is deafening.

### b.   The Absentee Age Restriction burdens voters.

Plaintiffs also sufficiently allege that the Absentee Age Restriction substantially burdens voters under age 65, by forcing them to apply for absentee ballots each election and increasing the risk of application errors, resulting in longer processing times, and risking late ballot returns. Compl. ¶¶ 46-56. These burdens are not speculative. They are the obvious result of the law's differential treatment of voters under age 65. During the pandemic, these risks are even greater as absentee ballot requests skyrocket, placing more pressure on election officials and corresponding delays in processing and ballot mailing. *Id.* ¶¶ 52-53, 100-101. As

---

[11] The State ignores that Plaintiffs allege that the Notification Process could employ the same safeguard used for uniformly contacting voters of absentee ballots that have been rejected due to signature discrepancies. Compl. ¶ 114 (citing Ga. Comp. R. and Regs. 183-1-14-.13, which requires notification of rejected absentee ballots within three business days or, closer to Election Day, the next business day).

Plaintiffs have alleged, there are no state interests that could justify these burdens, Compl. ¶¶ 114-16, 121-25, particularly in light of the very public problems that Georgia has with processing absentee ballot applications. *Id.* ¶¶ 22, 50, 53-55, 70-71, 77; *see also* PI Mot. at 7, 10-11. This is more than sufficient to state a claim.

### c.    The Postage Tax burdens voters.

Plaintiffs' Postage Tax claim amply alleges a burden on voters. Compl. ¶¶ 5, 8, 19-22, 57-64, 104-07, 133. The crux of the State's argument is that Plaintiffs only allege "incidental" burdens associated with purchasing stamps.[12] State Mot. at 20-22. *First*, these supposedly "incidental" costs include the dangerous risks of exposure to and contraction of COVID-19, which grow more acute by the day as the virus rapidly spreads in Georgia. *Second*, Plaintiffs' allege that some voters (including NGP's constituents) cannot afford postage and the actual cost of postage burdens them.[13] Compl. ¶¶ 19-22, 57-64, 104-107. Balancing these burdens against the State's interests is a factual matter inappropriate for resolution at this stage.[14]

---

[12] To make this argument, the State must acknowledge that the Voter Plaintiffs have alleged that they are burdened by the Postage Tax, yet this directly undermines their simultaneous assertion that Plaintiffs have made a facial challenge. State Mot. at 20.
[13] Indeed, it is so significant that NGP will be purchasing stamps for its constituents. Compl. ¶ 19. The severe health risks voters must endure are wholly distinct from the "incidental" costs described in the cases the State cites, which involve mostly transportation costs and are outside the context of a pandemic. *See* State Mot. at 20.
[14] The State's budgetary argument, State Mot. at 21, fails to mention that funds that are available from the CARES Act that could offset the cost of providing prepaid

###### d.   The Receipt Deadline burdens voters.

Plaintiffs allege sufficient facts to state First and Fourteenth Amendment claims challenging the Receipt Deadline. Since 2016, over 40% of all absentee ballots rejected in Georgia have been rejected for arriving after the Receipt Deadline; in 2018, over 3,500 voters were disenfranchised as a result of this law. Compl. ¶¶ 67-68. Such widespread disenfranchisement unconstitutionally burdens voters, even in ordinary times. These facts alone suffice to support Plaintiffs' claims.[15] *See Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1015 (9th Cir. 2020) (en banc) (disenfranchisement of 3,709 voters is not trivial); *League of Women Voters of N.C. ("LOWV") v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (disenfranchisement of 3,348 voters is substantial); *see also Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012).

The State ignores that Plaintiffs repeatedly allege that disenfranchisement occurs as a result of Georgia's Receipt Deadline through no fault of the voter. *See*

---

postage. *See* Compl. ¶116 (noting "Congress . . . has authorized $400 million to help states transition to voting-by-mail," which may be used for postage).

[15] The State's reliance on *Coalition for Good Governance v. Raffensperger*, No. 1:20-CV-1677-TCB, 2020 WL 2509092, at *3 n.2 (N.D. Ga. May 14, 2020), to assert that they should not be held responsible for the effects of the pandemic is also misplaced. State Mot. at 26; *see also supra* 13-14.

*supra* 7 (discussing *Thomas v. Andino*).[16] Courts have found burdens on voting rights to be especially serious in these circumstances. *See, e.g.*, *OFA*, 696 F.3d at 597 (law resulting in disenfranchisement due to poll worker error "substantially" burdened voters). The other burdens that the State disputes—informational costs of discerning the Deadline and the loss of information about candidates—as well as the State's justifications, are not appropriately weighed at this time. *See supra* 15-17.

### e.   The Voter Assistance Ban burdens voters.

The State's arguments regarding the Voter Assistance Ban suffer from the same legal misunderstandings that underly much of their Motion. The State contends that Plaintiffs' allegations fail because they have not alleged they are unable to vote without assistance. State Mot. at 28. But, again, Plaintiffs need not allege disenfranchisement to establish burden. *See supra* 6. Rather, Plaintiffs need only allege (as they do) that the Ban makes it more difficult for them or their constituents to exercise the franchise, and particularly so during the pandemic. Compl. ¶¶ 19-21, 72-78, 110, 112. The Ban prohibits voters from receiving assistance from anyone other than a very limited group of people to ensure their ballot is received in time to be counted. *Id*. This prohibition burdens "voters who require assistance turning in

---

[16] Reliance on *Thomas* is also misplaced because that court was assessing *the likelihood of success* on the merits at the preliminary injunction stage, rather than the *sufficiency* of the plaintiffs' claims. 2020 WL 2617329, at *25-26.

their absentee ballots, but lack access to a family or household member who is able to provide such assistance." *Id.* ¶ 137. These burdens are severe. *Id.* ¶¶ 73, 76-78.

Plaintiffs also allege that Georgia's interests in the Ban are minimal, paling in comparison to the law's burdens—particularly now, where a substantial increase in absentee voting is causing delays in delivering ballots, and the pandemic has caused a severe rise in unemployment making more voters sensitive to postage costs, among many other consequences. *See id.* ¶¶ 104-08, 110, 112. To extent the State challenges the burdens or justifications that Plaintiffs' allege, these are fact-intensive inquiries that cannot be summarily resolved on a motion to dismiss. *See supra* 15-17.

2.    **Plaintiffs sufficiently state claims that the Notification Process and Receipt Deadline violate the Due Process Clause.**

Plaintiffs also sufficiently allege violations of the Due Process Clause. *See* Compl. ¶¶ 35-45, 65-71. Courts engage in a three-step inquiry to analyze procedural due process claims, considering (1) "the nature of the interest that will be affected by the official action, and in particular, to the 'degree of potential deprivation that may be created,'" (2) the "fairness and reliability" of the existing procedures and the "probable value, if any, of additional procedural safeguards," and (3) the public interest, which "includes the administrative burden and other societal costs that would be associated with" additional or substitute procedures. *Mathews v. Eldridge*, 424 U.S. 319, 334-47 (1976). Plaintiffs allege all three of these factors as to the

Notification Process and Receipt Deadline and thus state a claim for relief. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, No. 3:20-cv-00249-wmc, ECF No. 217 at 10-13 (W.D. Wis. June 10, 2020) (Plaintiffs "plausibly alleged" a procedural due process claim against Wisconsin's receipt deadline).

*First*, as alleged, the nature of the private interest—voting and having one's ballot counted—is extraordinarily important. Compl. ¶¶ 1-11, 17-22; *see, e.g.*, *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990); *United States v. Texas*, 252 F. Supp. 234, 250 (W.D. Tex. 1966), *aff'd*, 384 U.S. 155. This extends to mail voting and includes the application process that is a prerequisite to obtaining an absentee ballot. *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1338; *Saucedo v. Garner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018). Contrary to the State's assertion, and as explained, Plaintiffs need not demonstrate that voters will "always" be deprived of the right to vote to allege their claims. *See supra* 18-19.[17]

*Second*, as alleged, the existing procedures are neither fair nor reliable. Thousands of voters' absentee ballots have been rejected as late every election cycle. *See* Compl. ¶¶ 67-69. The blame cannot be laid at the voters' feet when, as alleged, the State's delays in printing and delivering ballots is what puts Plaintiffs at

---

[17] Neither *Doe v. Florida Bar*, 630 F.3d 1336 (11th Cir. 2011), nor *Matthews* state, or even stand for the proposition, that plaintiffs must show a challenged law always deprives voters of the right to vote and always involves a constitutionally inadequate process. The State provides no support for that assertion. State Mot. at 11.

"increased risk of receiving their ballots late, and in turn making it all the more likely they are disenfranchised" by the Receipt Deadline, as one Plaintiff has already experienced. *Id.* ¶¶ 22, 67-69, 71. Contrary to the State's assertion, State Mot. at 12, the Notification Process, which on its face leaves the timing of notification wholly to the discretion of local officials, fails to provide adequate notice and, as a result, adequate opportunity to cure.[18] *See, e.g.*, *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("To disenfranchise citizens whose only error was relying on poll-worker instructions [is] fundamentally unfair."). Because of these inadequate procedures, the risk of erroneous deprivation is high, particularly in the pandemic. Compl. ¶¶ 43-44, 69-71. Plaintiffs need not identify a voter who has been disenfranchised by either the Notification Process or the Receipt Deadline to bring this challenge. *See Martin*, 341 F. Supp. 3d at 1339 (signature match law violated due process without plaintiffs identifying any disenfranchised voters).

*Third*, Plaintiffs allege that these procedures are neither fair nor reliable and that voters would substantially benefit from additional safeguards. Compl. ¶¶ 156, 158. They seek a modest but clear extension of the Receipt Deadline—five business

---

[18] The State's reliance on *McKinney v. Pate*, State Mot. at 12, is misplaced, as the case evaluated a "facially" adequate, but biased procedure. 20 F.3d 1550, 1557 (11th Cir. 1994). Here, Plaintiffs allege that, as written, the law is not adequate to ensure voters receive uniform, adequate notice, *see* Compl. ¶¶ 67-69, not that any election official is biased against particular voters.

days—for ballots mailed on or before Election Day to be accepted and counted. The public interest would be served by the proposed substitute procedure, as more voters would have their liberty interests in voting vindicated. These additional safeguards would impose little administrative burden on Georgia. *Id.* ¶¶ 123, 159. Likewise, requiring election officials to uniformly notify voters about missing information would put little additional burden on the State, particularly where it provides clear rules for notification in other contexts. Compl. ¶ 114; *see also* PI Mot. at 25. Plaintiffs sufficiently allege deprivations of their procedural due process rights.

### 3. Plaintiffs state a claim that the Notification Process violates the Equal Protection Clause.

The State incorrectly asserts that Plaintiffs' equal protection claim fails because it is subject to rational basis review. *See* State Mot. at 13. But where, as here, "a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, [courts] review the claim using" *Anderson-Burdick*'s "flexible standard." *OFA*, 697 F.3d at 429-30; *see also, e.g.*, *Republican Party of Ark. v. Faulkner Cty.*, 49 F.3d 1289, 1293 n.2 (8th Cir. 1995); *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992); *Rosen v. Brown*, 970 F.2d 169, 178 (6th Cir. 1992); *Fla. Democratic Party v. Detzner*, No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *1, *3, *6 (N.D. Fla. Oct. 16, 2016). For the same reasons detailed above, *see supra* 19-20, Plaintiffs' allegations that the Notification Process's lack of uniform

guidelines leaves "counties . . . at liberty to notify voters that they are unable to process their absentee application at their leisure," Compl. ¶ 41—coupled with their allegations that the process burdens the right to vote, *id.* ¶¶ 35-45—are sufficient to state an equal protection claim.[19] For that same reason, the State's separate contention that a showing of intentional discrimination is required also fails.

### 4.   Plaintiffs state a claim that the Voter Assistance Ban violates the First Amendment.

The State's contention that the collection or delivery of completed absentee ballots does not constitute speech protected by the First Amendment is misguided. State Mot. at 28-29. The State relies principally on *Knox v. Brnovich*, but that case is inapposite. First, *Knox* was decided after a bench trial, and the decision hinged on evidence presented at trial. 907 F.3d 1167, 1181 (9th Cir. 2018). It certainly does not support dismissal at the pleading stage.[20]

---

[19] The State contends *Bush v. Gore*, 531 U.S. 98 (2000), does not advance Plaintiffs' claim, State Mot. at 12-13, but that argument goes to the merits, not whether Plaintiffs state a claim. Nevertheless, courts have repeatedly applied *Bush v. Gore* when voters are treated disparately based on where they reside, just as Plaintiffs allege here. *See, e.g.*, *OFA*, 697 F.3d at 428; *Browning*, 522 F.3d at 1186; *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1403 (N.D. Ga. 2019).

[20] The State's reliance on *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), is also misplaced because it involved a preliminary injunction. Indeed, the court recognized the factually intensive "nuanced analysis" required when considering election-related constitutional challenges. *Id.* at 396.

*Knox* also fails to address violations of the associational rights that NGP alleges the challenged laws at issue here infringe upon. *See* Compl. ¶¶ 170-71. An organization's "attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986). Where plaintiffs "wish to speak and act collectively with others," including in the "process of registering and thus, in due course, voting," "the First Amendment right of association" is implicated. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158-59 (N.D. Fla. 2012). Arguments to the contrary are "plainly wrong." *Id.* at 1158; *see also Priorities USA*, 2020 WL 2615766, at *13 (plaintiffs stated a First Amendment Claim when challenging similar assistance ban).

Moreover, the burden on NGP's First Amendment rights is far from "incidental." State Mot. at 31. Rather, by prohibiting NGP from collecting ballots, much like the criminalization of paying circulators to collect petition signatures that the Supreme Court struck down in *Meyer v. Grant*, 486 U.S. 414, 425 (1988), the Voter Assistance Ban "limits the number of voices who will convey [NGP's] message," and "the size of the audience [it] can reach," *id.* at 422-23.[21] As such, the

---

[21] Notably, in *Texas v. Johnson*, 491 U.S. 397, 407 (1989), relied upon by the State for the proposition that the Ban's burden on NGP's expressive rights is incidental, the court reviewed the facts in the trial record, not the allegations of a complaint on

Ban's effects are also not narrowly tailored to advance the State's asserted interest in preventing voter fraud.[22] *See* Compl. ¶¶ 171-72. In sum, NGP has adequately pleaded that the Ban violates its First Amendment speech and associational rights.

> **5.    Plaintiffs state a claim that the Voter Assistance Ban violates Section 208 of the Voting Rights Act.**

Section 208 of the Voting Rights Act ("VRA") states that "any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance *by a person of the voter's choice*, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508 (emphasis added). Plaintiffs allege that the Voter Assistance Ban conflicts with and is pre-empted by Section 208 because it prohibits voters from choosing someone to assist them unless they belong to very limited categories of people who are exempted from the Ban. Compl. ¶ 72; O.C.G.A. § 21-2-385(a).

The State contends that O.C.G.A. § 21-2-385(b) allows anyone to assist voters who have disabilities or are illiterate with "preparing" their ballot, but this misunderstands Plaintiffs' claim. Plaintiffs assert that the plain language of Section 208 extends beyond just preparing the ballot to include the actual collection and

---

a motion to dismiss, and ultimately found that the state's interest was not narrowly tailored to justify infringing on expressive conduct. *Id.* at 407, 420.

[22] The State's reference to any investigations regarding NGP's activities is irrelevant to the sufficiency of Plaintiffs' Complaint and this Court's consideration of the Motion and should be disregarded out of hand.

delivery of the ballot such that it can be counted. *See* Compl. ¶¶ 175-176 (Section 208 extends to "all action necessary to make a vote effective"). Such action is plainly limited to certain categories and, as such, violates Section 208.

While the State argues, in a footnote, that Plaintiffs' claim "is based on an impermissible expansion of the VRA," State Mot. at 34 n.18, the Ban expands barriers to voter assistance that are inconsistent with the VRA. Tellingly, the State implausibly asserts that the Ban allows disabled and illiterate voters "to receive assistance from whomever they choose *subject to limited restrictions*." *Id.* (emphasis added). Because "the purpose of [the VRA] was to create as few barriers as possible to voting, with the understanding that [voters] are fully capable of determining who should serve as their trustworthy assistant," *Minnesota v. Thao*, No. 62-CR-18-827 (Minn. Dist. Ct. Oct. 23, 2018), the restrictions imposed by the Ban, however "limited," conflict with that purpose and must be removed. *See Priorities USA*, 2020 WL 2615766, at *14 (finding plaintiffs stated preemption claim in challenge to similar voter assistance ban).

### 6.    Plaintiffs state a claim that the Absentee Age Restriction violates the Twenty-Sixth Amendment.

Plaintiffs allege that the Absentee Age Restriction violates the Twenty-Sixth Amendment because it makes it more difficult for voters under 65 to vote on account of their age. Compl. ¶¶ 46-56. Where a law is "unexplainable on grounds other than

age because it bears so heavily on younger voters than all other voters," it is "facially discriminatory." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1222 (N.D. Fla. 2018). Accordingly, Plaintiffs' allegations are more than sufficient to state a claim.

The State relies on a single, nonprecedential opinion from a motions panel in another Circuit, *see supra* n.10, to argue that the Absentee Age Restriction cannot violate the Twenty-Sixth Amendment because it "expands" opportunities for *some* voters.[23] State Mot. at 15-16. But this misses the point. The Twenty-Sixth Amendment asks whether a law denies opportunities to voters that are available to others based on their age—which the Absentee Age Restriction decidedly does. *See League of Women Voters of Fla., Inc.*, 314 F. Supp. 3d at 1222; *see also Ownby v. Dies*, 337 F. Supp. 38, 39 (E.D. Tex. 1971) (statute requiring heightened standard for individuals under 21 to establish residency for voting violated Twenty-Sixth Amendment); *United States v. Texas*, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (same); *Worden v.*

---

[23] *TDP v. Abbott,* 961 F.3d 389 (5th Cir. 2020), like most of the cases the State cites, considered the validity of a *preliminary injunction order*, not an order of dismissal. 961 F.3d at 394. In addition, the majority opinion inexplicably relied upon on *McDonald* to conclude that the Plaintiffs were unlikely to succeed on their Twenty-Sixth Amendment claims, despite the fact that *McDonald* was decided *two years before* the Twenty-Sixth Amendment was ratified and that none of the other courts to have considered such a challenge have adopted the same approach.

*Mercer Cty. Bd. of Elections*, 294 A.2d 233, 245 (N.J. 1972) (same). Indeed, the State glosses over the tying of "expanded" opportunities to vote is specifically based to age. O.C.G.A.§ 21-2-381(a)(1)(G). The State provides no credible argument that Plaintiffs fail to state a claim under the Twenty-Sixth Amendment.

### 7.   Plaintiffs state a claim that the Postage Tax violates the Twenty-Fourth and Fourteenth Amendments.

The State wrongly argues that because the cost of postage "is a service charge" for using the Postal Service, rather than a charge collected by the State, Plaintiffs fail to state a claim under the Twenty-Fourth and Fourteenth Amendments. *See* State Mot. at 18. Not so, especially when absentee voting has become, for many voters, the only safe and practicable way to vote. *See* Compl. ¶¶ 19-22, 48.

The Twenty-Fourth Amendment does not require that the State impose and profit from the challenged tax on voting; rather, it prohibits the State from *causing* the right to vote to be conditioned upon a tax, such that the tax might "den[y] or abridge[]" the right to vote.[24] U.S. Const. amend XXIV, § 1. That prohibition can

---

[24] The State's assertion that the postal service is to blame for imposing postal fees, State Mot. at 21-22, directly contradicts its guidance to voters that they must affix sufficient postage to return their ballots by mail. *See* Ga. Sec'y of State Elections Div., Absentee Voting: A Guide for Registered Voters, at 5 (2020), https://sos.ga.gov/admin/uploads/Absentee_Voting_Guide_20142.pdf ("If mailing, you must affix postage to the ballot envelope."); *see also* Compl. ¶ 23. It is of no consequence that the State does not have a formal law on the books for this; that they instruct voters to do this as a practice is enough.

hardly be evaded with the simple expedient of re-branding an illegal poll tax as a suddenly-permissible "service charge." Here, Plaintiffs have alleged that many Georgia voters can only exercise their right to vote by paying for postage. However labeled, this Postage Tax does precisely what the Constitution prohibits.

The cases the State cites for their proposition that the cost of postage cannot constitute an unconstitutional poll or other tax *during a global pandemic* are easily distinguishable. For example, in denying that claim in *League of Women Voters of Ohio v. LaRose*, the court made clear that its denial was in large part because the plaintiffs had seemingly abandoned the claim and failed to prosecute it. No. 2:20-cv-01638-MHW-EPD, slip op. at 25 (S.D. Ohio Apr. 3, 2020). And the decision in *Bruce v. City of Colorado Springs*, was a state court decision that was not based on the Fourteenth Amendment or any federal case law. 971 P.2d 679, 685 (Colo. Ct. App. 1998). Lastly, the State mischaracterizes the holding in *Harman v. Forssenious*, which found not only that the challenged poll tax violated the Twenty-Fourth Amendment, but the alternative requirement to file a certificate of residence "constitute[d] an abridgment of [the] right to vote by reason of failure to pay the poll tax." 380 U.S. 528, 541-42 (1965).

And, though the State only addresses in a footnote Plaintiffs' allegations under the Fourteenth Amendment, State Mot. at 18 n.11, which similarly prohibits the imposition of fees as a precondition to access the franchise, the Postage Tax violates

the Amendment as well. *See Harper v. Va. State Bd. of Elect.*, 383 U.S. 663, 666 (1966). "[V]oting cannot hinge on ability to pay . . . for it is a 'fundamental political right . . . preservative of all rights.'" *M.L.B. v. S.L.B.*, 519 U.S. 102, 124 n.14 (1996) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This analysis is the same whether a voter can pay or not. *See Harper*, 383 U.S. at 668 (finding imposition of a fee unconstitutional "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all"). Plaintiffs sufficiently allege poll tax claims under both the Twenty-Fourth and Fourteenth Amendments.

## III.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request this Court deny the State's Consolidated Motion to Dismiss on all grounds.

**[signature block on following page]**

Dated:  July 10, 2020

**<u>Adam M. Sparks</u>**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN AND HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
K'Shaani Smith*
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
ACallais@perkinscoie.com
KShaaniSmith@perkinscoie.com

Kevin J. Hamilton*
Stephanie R. Holstein*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
KHamilton@perkinscoie.com
SHolstein@perkinscoie.com

Lilian Timmermann*
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5222
Telephone: (303) 291-2354
Facsimile: (303) 291-2454
LTimmermann@perkinscoie.com

Christian R. Ruiz
Georgia Bar No. 548611
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8417
Facsimile: (602) 648-7417
Cruiz@perkinscoie.com

Counsel for Plaintiffs
*Admitted Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,<br><br>      Plaintiffs,<br><br>                    v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al*.<br><br>            Defendants. | Civil Action File No. 1:20-cv-01986-ELR |

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document has been prepared with one of the fonts and point selections approved by the Court in Local Rule 5.1(C).  Specifically, this document has been prepared using 14-point Times New Roman font.

Dated: July 10, 2020                    **Adam M. Sparks**
                                        *Counsel for Plaintiffs*

- 38 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,<br><br>    Plaintiffs,<br><br>        v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al*.<br><br>        Defendants. | Civil Action File No. 1:20-cv-01986-ELR |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send a notice of electronic filing to all counsel of record.

Dated: July 10, 2020                              **<u>Adam M. Sparks</u>**
                                                                    *Counsel for Plaintiffs*