# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,<br><br>      Plaintiffs,<br><br>         v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board; *et al.*,<br><br>      Defendants. | CIVIL ACTION FILE<br>No. 1:20-CV-01986-ELR |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

The June Primary sounded a "warning siren" that, unless this Court acts, thousands of lawful, eligible Georgia voters will be severely burdened (and, in many cases, entirely disenfranchised) in November as a result of the unconstitutionally (and in the present pandemic, unconscionably) restrictive challenged laws. Rather than heed that warning, Defendants deny evidence of systemic problems and astonishingly lay the blame for catastrophic elections failure at voters' feet. At least 100 voters have submitted declarations detailing how Georgia's absentee system and the challenged laws—only exacerbated by the ever more alarming COVID-19 crisis—disenfranchised them in June and threaten to do so again. Plaintiffs have also submitted unrebutted, credible expert testimony establishing that there are thousands more stories where these came from. This is more than enough evidence to establish that Plaintiffs' need for an injunction is real, concrete, and supported by law. This Court should grant Plaintiffs' request for preliminary relief.

## II.    LEGAL STANDARD

The remedy Plaintiffs seek—to prohibit Defendants from enforcing unconstitutional restrictions on fundamental constitutional rights—is a prohibitory injunction. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 n.2 (11th Cir. 1998). But even if it were "mandatory," it is warranted because "the facts and law

clearly favor" its issuance. *Id.* There is no "particular magic in" describing an injunction as preserving or modifying the "status quo." *Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1349 (N.D. Ga. 2015) (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). "If the . . . status quo itself is causing . . . irreparable injury," courts retain an obligation "to alter the situation so as to prevent the injury" by issuing an injunction. *Canal Auth. of Fla.*, 489 F.2d at 576 (citations omitted).[1]

## III.   ARGUMENT

### A.   The New Georgia Project and the Voter Plaintiffs have standing.[2]

*First*, The New Georgia Project ("NGP") has standing because it "will need to divert resources from general voting initiatives or other missions . . . to address the impacts of election laws or policies." *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019). That voter education is part of NGP's mission has no bearing on this. *See, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). NGP must "divert additional resources" to help its constituents overcome the challenged laws, which "would otherwise [be] spen[t] on

---

[1] Fifth Circuit decisions issued on or before September 30, 1981 are binding in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).
[2] Most of Defendants' arguments were addressed in Plaintiffs' oppositions to the motions to dismiss, ECF Nos. 96 and 97, incorporated here by reference.

its core registration and civic engagement activities." ECF No. 59-3, ¶ 18; *see also id.* ¶¶ 8, 11, 13, 17, 20; Ex. 5 ¶¶ 3-4. This is all that is required. *See* ECF No. 96 at 8-10.[3]

*Second*, the Voter Plaintiffs—all of whom will vote absentee in Georgia in November and are subject to and burdened by the challenged laws—have certainly suffered injuries in fact. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (voters had standing to challenge ID law because they were subject to it); *see also* ECF No. 96 at 4-8. The Counties indicate that a plaintiff must be disenfranchised to have standing, but that is not the law and never has been. "[A] voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote," even if they are not disenfranchised. *People First of Ala. v. Merrill*, No. 2:20-cv-00619-AKK, 2020 WL 3207824 at *6-7 (N.D. Ala. June 15, 2020) (citation omitted); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."). In any event, Plaintiff Pyne *was in fact disenfranchised* by the Receipt Deadline in 2018, ECF No. 59-6 ¶¶ 4-9, and in the June Primary by Gwinnett County's poor notification procedures, Ex. 3 ¶¶ 3-6 (Pyne

---

[3] The exhibits cited herein are attached to the Declaration of Kevin J. Hamilton in support of this reply that is filed herewith.

Suppl. Decl.); *see also* ECF No. 96 at 7. *Finally*, the challenged laws cause Plaintiffs' injuries, not the pandemic, which merely exacerbates their impact. Plaintiffs satisfy Article III's traceability requirement. *See* ECF Nos. 96 at 12-14; 97 at 8-12.

**B.    Plaintiffs are likely to succeed on the merits.**

The State not only misstates the applicable law but misconstrues Plaintiffs' evidence. The applicable legal standards, as applied to the record here, makes Plaintiffs' likelihood of success on the merits is clear. *First*, Plaintiffs need not show they will be *prevented* from voting. Neither the First, Fourteenth, Twenty-Fourth, or Twenty-Sixth Amendments or the Voting Rights Act ("VRA") requires a plaintiff to prove a law will disenfranchise them to succeed. It is enough that their rights are *burdened* or *abridged*. *See, e.g.*, U.S. Const. amend. XXVI, §1 ("The right of citizens of the United States, who are eighteen years of age or older, to vote, shall not be denied or *abridged*." (emphasis added)); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (weighing "character and magnitude of the asserted injury" against the state's "justifications for the burden imposed by its rule" (quotation marks and citations omitted)); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) ("The First Amendment provides that Congress "shall make no law . . . *abridging* the freedom of speech" (emphasis added)); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668, (1966) ("The inability of a voter to pay a poll tax . . . is not required to challenge a . . . tax

on voting."); *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1336 (N.D. Ga. 2019) ("Voters . . . enjoy a Fourteenth Amendment right to participate equally in the electoral process." (quotation marks omitted)); *see also* ECF No. 96 at 4-6, 15-17.

*Second*, Georgia has conferred the right to vote absentee on its voters. O.C.G.A. § 21-2-380(b). "[O]nce the state creates an absentee voting regime, they must administer it in accordance with the Constitution." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) (quotation marks and citation omitted); *see also* ECF No. 96 at 7-8. Thus, Georgians' right to vote absentee is protected by the U.S. Constitution and the VRA.

## 1. The Notification Process

**_Anderson-Burdick_**. "[I]t is a certainty that the standard" that election officials use to evaluate absentee applications and "notify voters of problems differ[s] across the state." Ex. 1 at 11 (Mayer Rebuttal Rpt.); *see also* ECF No. 59-1 at 14-15. The Counties' declarations confirm this. *See, e.g.*, ECF Nos. 90-11 ¶¶ 5-8 (Gwinnett: notification within three business days); 90-15 ¶¶ 3-4 (Newton: three calendar days); 90-13 ¶ 3 (Macon-Bibb: generally within one to three days); 90-6 ¶ 6 (DeKalb: generally three days, but unable to do so in June Primary); 90-10 ¶ 3 (Fulton: two days). Multiple voters have similarly confirmed there is broad variability, recounting

personal experiences that demonstrate that the estimates provided by the counties do not always match reality.[4] *See* Exs. 3 ¶¶ 3-6 (notice three weeks after election); 4 ¶¶ 3-4 (no notice); 7 ¶¶ 3-6 (six weeks' notice). The result of ineffective notice on ballots application status: repeated, burdensome follow-up with counties, *see, e.g.*, ECF Nos. 59-3 ¶¶ 8-10; 59-9 ¶ 4; 59-11 ¶ 10; 59-13 ¶ 4; 59-14 ¶¶ 4-5; 59-16 ¶¶ 6-13; 59-17 ¶ 9; 59-68 ¶¶ 5-8; 59-70 ¶ 5; 59-71 ¶¶ 3-4; 59-90 ¶ 3; *see also* Exs. 9 ¶ 4; 20 ¶¶ 4-6; 24 ¶¶ 6-9; 28 ¶ 4; 29 ¶¶ 5-6; 30 ¶ 6; 34 ¶¶ 3-4; 38 ¶¶ 4-6; 43 ¶¶ 4-7; 57 ¶¶ 4-5; 60 ¶¶ 9-10; 65 ¶¶ 4-5; 87 ¶¶ 3-6; 88 ¶¶ 3-5; 89 ¶ 7; 90 ¶ 5; 91 ¶ 8; 92 ¶¶ 5-7; 96 ¶ 5, and, in some instances, disenfranchisement, *see, e.g.*, ECF Nos. 59-70 ¶¶ 5-8; 59-90 ¶¶ 3-7; *see also* Exs. 3 ¶¶ 3-6; 4 ¶¶ 3-4; 7 ¶¶ 3-6; 10 ¶ 6; 12 ¶ 9; 13 ¶¶ 3-6; 14 ¶¶ 4-8; 15 ¶¶ 3-6; 16 ¶ 3; 17 ¶¶ 4-7; 18 ¶¶ 3-6; 19 ¶¶ 8-10; 20 ¶¶ 6-7; 21 ¶ 6; 22 ¶¶ 4-5; 23 ¶¶ 4-6; 24 ¶¶ 5-11; 25 ¶¶ 3-5; 26 ¶¶ 3-13; 27 ¶¶ 3-5; 28 ¶¶ 3-5; 29 ¶¶ 4-7; 30 ¶ 3; 31 ¶¶ 4-7; 32 ¶ 6; 33 ¶¶ 3-5; 34 ¶¶ 3-5; 35 ¶ 8; 36 ¶¶ 3-5; 37 ¶¶ 3-7; 38 ¶¶ 3-8; 39 ¶¶ 3-8; 40 ¶¶ 3-8; 41 ¶¶ 3-7; 42 ¶¶ 7-12; 43 ¶ 10; 44 ¶¶ 4-7; 45 ¶¶ 4-9; 46 ¶¶ 3-4; 47 ¶ 4; 48 ¶¶ 3-18; 50 ¶ 3; 51 ¶¶ 3-9; 52 ¶¶ 3-9; 53 ¶¶ 3-8; 54 ¶¶ 7-8; 55 ¶¶ 5-10; 56 ¶¶ 7-17; 57 ¶¶ 4-7; 58 ¶¶ 3-5; 59 ¶¶ 3-5; 60 ¶¶ 5-11; 61 ¶¶ 4-12; 62 ¶¶ 5-8; 63 ¶¶ 3-7; 64 ¶¶ 9-17; 65 ¶¶ 3-6, or potential exposure to COVID-19, *see, e.g.*, ECF Nos.

---

[4] The individual experiences testified to by declarants call the estimates provided by the counties into question.

59-14 ¶¶ 4-12; 59-16 ¶¶ 5-20; 59-17 ¶¶ 9-10; 59-18 ¶¶ 3-9; 59-67 ¶¶ 4-5; 59-68 ¶¶ 5-11; 59-69 ¶¶ 4-10; 59-71 ¶¶ 3-9; *see also* Exs. 8 ¶¶ 4-5; 49 ¶¶ 3-7; 87 ¶¶ 8-15; 88 ¶¶ 3-7; 89 ¶¶ 6-7; 90 ¶¶ 3-8; 91 ¶¶ 5-13; 92 ¶¶ 5-13; 93 ¶¶ 3-14; 94 ¶¶ 3-8; 95 ¶¶ 4-9; 96 ¶¶ 3-10; 97 ¶¶ 5-14; 98 ¶¶ 4-5. It will only worsen in November as absentee applications will no longer be prefilled—a process that previously decreased rejections. ECF No. 59-1 at 16.

The justifications posited do not outweigh these burdens. Voter fraud—which occurs at a *rate* of 0.0003%, or approximately one per 3.1 million votes in Georgia— is virtually nonexistent. Ex. 1 at 12; *see also* ECF No. 59-1 at 32-33. But more fundamentally, Defendants have not explained how uniformly notifying voters of deficiencies contributes to fraud. And while flexibility may be necessary to a degree, it is not adequate reason to burden the right to vote under these circumstances. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975). Plaintiffs have established that they are likely to succeed under *Anderson-Burdick*. *See* ECF No. 96 at 27.

**<u>Due Process</u>**. Georgians have the right to vote absentee and have their ballot counted when they do. As explained in ECF No. 96 at 18, Plaintiffs have not lodged a facial claim and need not demonstrate that voters will "always" be deprived of the right to vote. Rather, "'[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.'"

*Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270 (11th Cir. 2019)

(quoting *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 444 (2015)).

Plaintiffs need only show (as they have) that existing procedures are neither

fair nor reliable. On its face and in practice, the Notification Process leaves the

timing of notification entirely to the discretion of local officials, fails to provide

adequate notice and, as a result, adequate opportunity to cure.[5] *See, e.g.*, *Hunter v.*

*Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("To

disenfranchise citizens whose only error was relying on poll-worker instructions [is]

fundamentally unfair."). Where disenfranchisement may result, the process is

anything but adequate. *See* Exs. 3 ¶¶ 3-6 (unable to vote due to late notice); 4 ¶¶ 3-

4 (same); 7 ¶¶ 3-6 (same); 49 ¶¶ 3-4 (forced to vote in person during pandemic due

to inadequate notice); 98 ¶¶ 4-5 (same).

Rather than address the evidence of burden, Defendants ignore most of it, and

mischaracterize what they do discuss. For example, the State is wrong to suggest

that the Weikle Declaration demonstrates that the Notification Process is adequate.

ECF No. 91 at 18 ("State Br."). Ms. Weikle explains that the week's delay in

notification delayed processing and receipt of her ballot. *See* ECF No. 59-7 ¶ 6. Her

---

[5] As explained in ECF No. 96 at 26 n.18, the State's reliance on *McKinney v. Pate*,
20 F.3d 1550 (11th Cir. 1994), is misplaced.

declaration further shows that the county notice estimates may not be accurate. But more to the point, it is bizarre for the State to focus on one voter's experience to argue that the Notification Process is adequate, while ignoring evidence from others demonstrating it is not. *See, e.g.*, ECF Nos. 59-67 ¶ 4; 59-17 ¶¶ 9-10.[6]

## 2.    Absentee Age Restriction

<u>***Anderson-Burdick***</u>. The evidence is overwhelming that Georgia's election-by-election absentee request process does not work. Voters should not be subjected to this process and repeatedly risk disenfranchisement or exposure to COVID-19, simply because of their age. *See supra* 6-7. This risk is not hypothetical and the request to apply for an absentee ballot just once per cycle is not a "policy preference." State Br. 19. It is basic math. Voters who must apply to vote absentee more often are more likely to be subjected to rejection and disenfranchisement; alleviating the need for repeated requests helps ensure that they are able to safely

---

[6] The State's reliance on Ga. Comp. R. & Regs. 183-1-14-.11 is misplaced. State Br. 15, 17. That regulation relates to notices of rejection when an applicant is found ineligible due to a signature mismatch under O.C.G.A. § 21-2-381(b)(1)-(3). Plaintiffs have challenged § 21-2-381(b)(4), involving notification prior to rejection of an application because the identity of the applicant cannot be determined. Thus, 183-1-14-.11 does not apply or limit discretion in this context. It does, however, demonstrate that implementing a *similar* rule to limit discretion is well within the State's purview and the State already has procedures available for it to follow.

and effectively exercise their right to vote. *See* Ex. 1 at 13; *see also, e.g.*, ECF Nos. 59-6 ¶¶ 8, 12; 59-5 ¶¶ 8-9; 59-17 ¶¶ 12-13; Exs. 49 ¶ 9; 98 ¶¶ 6-7.

The real risk of disenfranchisement is not a *de minimus* injury, and the State's justifications cannot overcome these burdens. *See, e.g.*, *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1267-68 (N.D. Ga. 2018) ("GCPA"). *First*, the State's "interest in helping the most vulnerable, including Georgia's aged population," State Br. 20, is not diminished by extending that protection to the ever-rising number of Georgians now at risk of contracting COVID-19. *See* Ex. 2 ¶¶ 8-11 (Ball Suppl. Rpt.). *Second*, there is no evidence that adding more voters to the permanent absentee list and sending more ballots out because of that will increase voter fraud.[7] Multiple states have permanent absentee lists and report no increases in voter fraud. *See* Ex. 1 at 12. *Third*, while it is true that young voters (ages 18-29) are more likely to move than older voters, *see* State Br. 20, these differences in residential mobility rates do not extend across all ages excluded by the Age Restriction. *See* Ex. 1 at 13 (no appreciable mobility difference for those 55-64 and over 65). Thus, this justification does not explain why Georgia imposes these

---

[7] The State cites to *Billups*, 554 F.3d at 1352, for this proposition, but *Billups* does not discuss limitations on mailing ballots to registered, eligible absentee voters who have requested them for a full cycle nor does it discuss the reduction of fraud "when unused absentee ballots are limited." State Br. 20.

burdens on all voters under 65.[8] Finally, while the Counties assert that granting relief would result in more work, that alone is not sufficient to outweigh the burdens on voters. *See Taylor*, 419 U.S. at 535. Indeed, Plaintiffs understand that as of this filing, the State is preparing to take over management of the very "roll over lists" that the Counties assert are burdensome to process, eliminating those claimed burdens.

***Twenty-Sixth Amendment***. The Absentee Age Restriction discriminates on account of age, and it does so explicitly. As demonstrated above, the justifications proffered by the State are at best tenuous, and in no case sufficient to justify the Restriction's facial burden on voting rights based on age. *See* ECF No. 97 at 14-18 (discussing standard of review for Twenty-Sixth Amendment claims). Thus, Plaintiffs are likely to succeed on the merits of this claim, as well. *See, e.g.*, *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1221-23 (N.D. Fla. 2018) (holding law "facially discriminatory" in violation of the Twenty-Sixth Amendment as "[i]t is unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters").

### 3.   Postage Tax

---

[8] The State's assertion the Age Restriction protects voters temporarily living in other states overlooks an obvious point: the Restriction is based not on age, not location.

*__Anderson-Burdick__*. While the State disputes the legal characterization of Georgia's postage requirement as a poll tax, it does not (and cannot) dispute that requiring voters to pay postage to vote absentee imposes monetary, time, informational, opportunity, and learning costs on voters. ECF No. 59-1 at 12-14; *see also* State Br. 23 (noting "inherent costs" in postage requirement). The testimony affirms this, *see* ECF Nos. 59-3 ¶ 17 (purchasing stamps is a financial burden); 59-5 ¶¶ 2, 5-6 (same); 59-17 ¶ 13 (same); 59-10 ¶¶ 4-7 (same); 59-89 ¶ 7 (same); *see also* 59-4 ¶¶ 4-7 (difficult to go to post office); 59-15 ¶¶ 6-7 (spent $12.30 for book of stamps online); 59-69 ¶ 12; (bought stamps online and did not receive them); 59-67 ¶ 9 (buying stamps exposes her to COVID-19); 59-16 ¶ 24 (same); 59-9 ¶ 7 (same); 59-6 ¶ 11 (amount of required postage is unclear); 59-7 ¶ 8 (same); 59-70 ¶ 11 (same); 59-71 ¶ 11 (same); Exs. 8 ¶ 8 (same); 66 ¶ 6 (same); 67 ¶¶ 3-4 (same), as does the prevailing academic literature on voting, ECF No. 59-1 at 12. All voters voting absentee in November—many of whom must do so to protect their health—are subject to and burdened by these costs. *See, e.g.*, Exs. 9 ¶ 5 (disabled voter struggles to comply with postage requirement); 11 ¶¶ 3-6 (no postage to mail ballot).

The State's assertions that these burdens are ameliorated by the USPS policy of delivering ballots without postage, drop boxes, or third-party postage payments are unavailing. *First*, there is no indication voters are *aware* of USPS's policy. ECF

No. 59-1 at 12. The evidence demonstrates the opposite: not only are voters broadly unaware, *even postal workers* believe that ballots may not be mailed without proper postage. *See* Exs. 67 ¶ 3; 68 ¶ 5; 102 ¶¶ 7-8. *Second*, Defendants *affirmatively tell voters* that postage *is required* to send back their ballot. *See* ECF No. 59-48 at 7 ("If mailing, you must affix postage to the ballot envelope."). *Third*, voters have been repeatedly disenfranchised when using (or attempting to use) drop boxes or drop-off locations. *See* ECF Nos. 59-10 ¶ 5 (ballot dropped off at county office rejected as late); 59-12 ¶¶ 7-8 (same); *see also* Exs. 69 ¶¶ 4-5 (drop box ballot rejected as late); 70 ¶¶ 7-9 (drop box ballot not recorded); 71 ¶ 7 (drop box removed); 72 ¶¶ 6-8 (cannot confirm receipt of ballots dropped in box); 73 ¶ 5 (same); 74 ¶¶ 4-9 (same). *Finally*, allowing third parties to pay for postage simply confirms that the cost of stamps may be insurmountable for some voters such that outside assistance is needed. *See Ohio NAACP v. Husted*, 43 F. Supp. 3d 808, 812-13 (S.D. Ohio 2014), (evidence of "Souls to the Polls" programs spoke to burdens associated with changes to early voting), *aff'd*, 768 F.3d 524 (6th Cir. 2014), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). While it is of course helpful to voters to have assistance from third parties, this merely shifts the burden from individual voters to organizations like NGP which assist them. It does not make the underlying burden any more constitutional. *See* Ex. 99, *League of Women Voters of*

*NH v. Gardner*, No. 226-2017-CV-00433, *slip op*. 39 (NH Sup. Ct. April 9, 2020)
("[T]o conclude that an otherwise unconstitutional burden is lawful because of the
actions of third parties would be a dangerous precedent to set.").

The State's interests—an alleged monetary burden—do not weigh in favor of
constitutionality. Georgia's request for over 11 million dollars from the federal
government to use toward election administration in 2020 was granted. CARES Act,
Pub. L. 116-136, 134 Stat. 281 (2020); ECF No. 59-62. The cost of prepaid postage
on absentee ballots—between $803,750 and $2.4 million, *see* ECF No. 91-2 ¶ 13—is
minimal in comparison. Moreover, the State's reliance on USPS's unadvertised
policy for paying postage belies the tenuousness of their monetary burden argument.
When operating under this policy USPS does not pay for the missing postage.
Rather, it shifts postage costs from the sender to the recipient. ECF No. 59-42 at 7.
Thus, if every mail-in voter followed the State's advice, USPS would bill Defendants
for the missing postage, which would cost just as much as prepaying it in the first
place (unless, of course, the failure to prepay postage suppresses voter turnout, as
Plaintiffs allege, and Defendants deny).

***Poll Tax***. Absentee voting has become, for many voters, the only safe way to
vote. *See, e.g.*, Exs. 16 ¶¶ 3-4; 17 ¶¶ 3-7; 19 ¶¶ 4-10; Ex. 22 ¶¶ 3-5; 24 ¶¶ 3-12; 29
¶¶ 3-7; 42 ¶¶ 4-12; 50 ¶¶ 3-5; 55 ¶¶ 4-10; 56 ¶¶ 7-17; 59 ¶¶ 3-5; 65 ¶¶ 3-6.

Nevertheless, Georgia conditions these voters' access to the franchise on a tax that, as demonstrated, denies or abridges their right to vote. U.S. Const. amend XXIV, § 1. Just as Georgia could not charge voters 55 cents to enter a polling location, it cannot require them to pay that (or more) to cast their absentee ballots.[9] *See also* ECF No. 96 at 33-35.

### 4. Election Day Receipt Deadline

***Anderson-Burdick***. The burden imposed by the Election Day Receipt Deadline is anything but illusory; it is a concrete nightmare. In 2018 alone, over 3,500 voters were fully disenfranchised by the law, ECF No. 59-1 at 4; a number that doubled to more than 7,000 disenfranchised voters in the June Primary, Ex. 1 at 13; and that will explode to an estimated 60,000 voters likely to be disenfranchised if this Court does not enjoin the law before November, ECF No. 59-1 at 4; *see also* ECF Nos. 59-3 ¶¶ 6-7; 59-4 ¶¶ 8-9; 59-6 ¶¶ 4-7; 59-7 ¶ 5; 59-8 ¶¶ 4-7; 59-10 ¶¶ 5, 9; 59-12 ¶¶ 6-8; 59-89 ¶ 4; 59-91 ¶ 4; Exs. 6 ¶¶ 6-9; 9 ¶ 4; 75 ¶¶ 5-8; 77 ¶¶ 10-12; 78 ¶¶ 5-7; 79 ¶¶ 6-8; 81 ¶¶ 6-9; 82 ¶¶ 4-8. These voters have not been disenfranchised because they fail to follow the rules, as the State implies. *See* State Br. 27. They were disenfranchised as a direct result of Georgia's poor administration of absentee

---

[9] The State is incorrect to assert that *Jones v. DeSantis*, No. 4:19CV300-RH/MJF, 2020 WL 2618062 (N.D. Fla. May 24, 2020), found that cost could serve as a poll tax only if the fees from it were directly imposed by the state.

balloting and the Deadline, which work together to deny thousands of lawful, eligible voters the right to vote, through no fault of their own. *See* Exs. 6 ¶¶ 6-9; 75 ¶¶ 5-8; 76 ¶¶ 10-15; 77 ¶¶ 10-12; 78 ¶¶ 5-7; 79 ¶¶ 6-8; 82 ¶¶ 4-8. In fact, a recent USPS Inspector General report found that Georgia voters are at "high risk" of ballots "not being delivered, completed [], and returned to the election offices in time. . . . *due to the time required for election commissions to produce ballots* and Postal Service delivery standards," not voters. Ex. 100 at 6-7; *see also* Ex. 101. Neither drop boxes nor in-person voting can save the constitutionality of the Deadline; as noted, both operate to disenfranchise Georgia voters. *See supra* 13; *see also* ECF No. 59-11 ¶ 16 (30-minute roundtrip to drop box); Exs. 8 ¶ 5 (required to cast out-of-precinct provisional ballot which is not counted in Georgia); 9 ¶¶ 7-8 (travel to drop box puts health at risk); 83 ¶ 7 (60-minute roundtrip to drop box); 84 ¶¶ 5-11 (not permitted to vote in person after requesting absentee ballot). Likewise, for many, neither may be an option during the pandemic. *See supra* 6. Even where voters are not disenfranchised, Georgia's poor administration of absentee voting and Receipt Deadline combine to force voters to risk their health by waiting in hours-long lines to vote in person. *See, e.g.*, Ex. 85 ¶¶ 3-10; *supra* 6-7.

The fact that other states employ election day receipt deadlines hardly lessens the burden that Georgia's law imposes on its voters, nor does it provide a basis for

Georgia's interest in the law. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) ("Rather than applying any litmus test . . . a court must identify and evaluate the interests put forward by the State . . . and then make the hard judgment that our adversary system demands." (quotation marks omitted)). The State attempts to convince this Court to ignore the clear direction provided by the U.S. Supreme Court in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020), in favor of two district court opinions that rejected challenges to deadlines in other states based on different evidence than the Court has been presented here, but as Plaintiffs have explained, both are easily distinguishable. *See* ECF No. 96 at 22-23. And, in doing so, the State ignores the very recent state court decision that invalidated a virtually identical law. *See* ECF No. 59-55, *Driscoll, et al. v. Stapleton*, No. DV 20-408 (Mont. D. Ct. May 22, 2020).

Nor will a postmark deadline "frustrate the State's strong interest in conducting an efficient election," as the State baldly claims. State Br. 26. If anything, postmark deadlines promote efficiency and increase voter confidence by protecting against the serious risk that their ballots will arrive late and be rejected due to no fault of their own. *See* Ex. 86 ¶¶ 5-11 (postmark deadlines decrease administrative burdens, increase the number of voters participating, and increase confidence in elections). Further, it is feasible to implement a postmark deadline, as demonstrated

by the experience of Wisconsin in the recent primary, as well as the many other states that have a postmark deadline as a matter of statutory law.[10]

The claim that the timely certification of election results "promotes certainty" in Georgia's elections has it exactly backwards. The Deadline injects needless *uncertainty* into voting, threatening substantial numbers of voters with disenfranchisement based on an indiscernible target—no one, not voters or elections officials, can accurately predict when a ballot must be mailed to ensure it arrives in time to be counted. *See, e.g.*, ECF Nos. 59-8 ¶¶ 4-7 (ballot mailed early rejected as late); Exs. 75 ¶¶ 5-8 (same); 83 ¶¶ 9-11 (two ballots mailed same day, but one rejected as late); 6 ¶¶ 6-9 (ballot mailed by deadline to request absentee ballots arrived and rejected as late); 77 ¶¶ 10-12 (same). Nor is there any actual threat to the certainty of the election either—by law, Georgia's election results are not certain until *17 days* after Election Day, a full ten days after Plaintiffs' proposed deadline. O.C.G.A. § 21-2-499. Thus, extending the Deadline will not "open a Pandora's

---

[10] *See, e.g.*, Alaska Stat. Ann. § 15.20.081(e)(h); Cal. Elec. Code § 3020; D.C. Code Ann. § 1-1001.05(a)(9A); 10 Ill. Comp. Stat. Ann. 5/19-8(c); Iowa Code Ann. § 53.17(2); Kansas Stat. Ann. § 25-1132(b); Md. Code Regs. 33.11.02.04; N.J. Stat. Ann. 19:63-22; N.Y. U.C.C. § 8-412; N.C. Gen. Stat. Ann. § 163A-1310(b); N.D. Cent. Code Ann. § 16.1-07-09; 16.1-15-17; Nev. Rev. Stat. Ann. § 293.323(3); Ohio Rev. Code Ann. § 3509.05(B); Tex. Elec. Code Ann. § 86.007(2); Utah Code Ann. § 20A-3a-204(2)(a), 20A-4-301(b); Was. Rev. Code § 29A.40.091(4), 29A.60.190; W. Va. Code § 3-3-5(g)(2), 3-5-17.

Box," ECF 91 at 20 ("Cty. Br."), and accepting and tabulating ballots from lawful voters that arrive a mere five business days after Election Day will not impose any meaningful hardship on Defendants. Moreover, there is no threat to election integrity because voters may drop ballots in the mail after exit polls. This assertion is entirely unfounded. The State provides no support for it, and there is no evidence that postmark states experience this.[11]

***Due Process.*** While mail delays and the pandemic have exacerbated the time voters need for their ballot to arrive, they are not the cause of voters' disenfranchisement, as the State misrepresents. *See* State Br. 28. The Receipt Deadline is responsible.[12] *See supra* 15-16. There is no question that the risk of erroneous deprivation is high, not only are thousands of eligible voters disenfranchised each election, *see supra* 15, but in 2018 alone at least 3,045 of those

---

[11] The *Purcell v. Gonzalez*, 549 U.S. 1 (2006), case that the State cites to does not discuss the ability to postmark early. And, while the *Nielsen v. DeSantis*, 4:20-cv-236-RH-MJF (N.D. Fla. June 24, 2020), case does cite this as a rationale, it does not provide any indication that this hypothetical even occurs.

[12] The State's reliance on *Georgia Shift v. Gwinnett County*, No. 1:19-CV-01135, 2020 WL 864938 (N.D. Ga. Feb. 12, 2020), proves Plaintiffs' point. It is precisely because no one can guarantee the timing of mail delivery that the State should ensure that its deadlines for ballot receipt reflect that reality and provide sufficient opportunity for absentee ballots to be received and counted despite mail delays. That's particularly true during a global pandemic, when absentee ballot use is likely to increase exponentially and when the postal service is under extreme stress.

ballots arrived within a week of Election Day, indicating that they had been mailed either on or before the election.[13] ECF No. 59-1 at 18. Finally, the assertion that a postmark deadline is not an adequate cure because it, too, can be missed, defies logic. Voters are used to postmark deadlines because in virtually every other area in which they interact with their government through mail, including at tax time, their submissions are timely if postmarked by the deadline. *See* ECF No. 58 at 12 n.8; *see also* ECF No. 59-67 ¶ 7; Exs. 80 ¶ 9; 81 ¶ 6; 82 ¶ 5; 88 ¶ 4 (told by elections official ballot must be "postmarked by June 9, 2020"). Even if some voters would still miss the postmark deadline, Georgia would ensure the enfranchisement of far more lawful voters than it does now. In 2018, over 85% of ballots of voters disenfranchised by the Deadline arrived within the timeframe proposed by Plaintiffs. *See* ECF No. 59-1 at 18. Thus, if the State is truly concerned about disenfranchised voters, the solution is clearly *not* to maintain the Receipt Deadline.

### 5.     Voter Assistance Ban

Thousands of Georgia voters—including Plaintiffs Jennings, Woodall and NGP's constituents—are impacted by the Voter Assistance Ban. ECF Nos. 59-4 ¶

---

[13] The State's critiques of the voter declarations fall flat. *See* State Br. 28.  For example, Shanmugasundaram and Jones both took steps to request and receive their ballots before Election Day. ECF Nos. 59-8 ¶ 4; 59-90 ¶ 3. Had the Receipt Deadline not been in place, their ballots could have been received in time to be counted.

10; 59-5 ¶ 8; 59-10 ¶ 10; 59-89 ¶ 6; Exs. 5 ¶ 5; 9 ¶ 9; 11 ¶¶ 3, 6; 49 ¶¶ 8-10; 76 ¶ 7; 98 ¶¶ 6-7. The need for relief from the Ban is even more pressing now where thousands are homebound due to COVID-19 and cannot risk leaving their homes to vote or even having a family or household member do so for fear of exposing themselves to the virus.[14] ECF No. 59-1 at 7-10, 31-32. *Cf. supra* 6. There is no question that the Ban burdens these voters.

Concerns about voter fraud are insufficient to justify these burdens. There is virtually no reported voter fraud in Georgia, no reported incidents of ballot collection fraud, and the State offers no evidence to support such a contention. ECF No. 59-1 at 32-33; Ex. 1 at 12-13. Nonexistent allegations of voter fraud cannot outweigh actual burdens on voters. *See e.g.*, *Paher v. Cegavske*, No. 320CV00243, 2020 WL 2089813, at *2 (D. Nev. Apr. 30, 2020) (maintaining "high level of access to the ballot, while protecting the safety of voters and poll workers—[] at high risks for severe illness from COVID-19" outweighed concern for voter fraud). And, even if the state had produced such evidence, it has not explained how this the Ban is narrowly tailored to address this issue. This is particularly true given the protections Georgia already has to protect against fraud. *See* ECF No. 58 at 21; *see also Common*

---

[14] That voters have in the past not needed assistance, *see* State Br. 31, ignores the unique circumstances under which the November election will proceed.

*Cause Ind. v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 928 (7th Cir. 2015) (state interests cannot outweigh burdens where they can "be served through other means, making it unnecessary to burden the right to vote").

***First Amendment***. The State's arguments regarding Plaintiffs' First Amendment claims are identical to those made in its motion to dismiss. Plaintiffs' response to those arguments is incorporated in full here. *See* ECF No. 96 at 28-30.

## C.   Plaintiffs have established irreparable harm.

"When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Plaintiffs have alleged both. The arguments to the contrary reflect the same legal errors that Defendants have embraced throughout: complete disenfranchisement is not necessary to challenge a voting law, *see supra* 4-5, burdening absentee voting threatens the right to vote, *see supra* 5, and the existence of other voting methods does not mean that Plaintiffs will not be harmed,[15] *see* ECF No. 96 at 4-8; *see also supra* 13. These principles are underscored in the current circumstances, where COVID-19 makes absentee voting the only safe way to exercise the franchise for

---

[15] The Counties' reliance on *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registrations & Elections*, Cty. Br. 18, is misplaced. Unlike Plaintiffs here, the plaintiffs there did not challenge the validity of Georgia's laws or policies and failed to "articulate any specifics as to [their] injury." No. 1:20-cv-00912-SDG, 2020 WL 1031897, *6, *8-*9 (N.D. Ga. March 3, 2020).

many voters. *See* ECF No. 59-2 ¶¶ 23-31; Ex. 2 ¶¶ 13-15. Once the election occurs, "there can be no do-over and no redress"—of the burdens imposed on the Voter Plaintiffs' rights, or of those imposed on NGP. *League of Women Voters of N.C. v. N.C.*, 769 F.3d 244, 247 (4th Cir. 2014); *see also GCPA*, 347 F. Supp. 3d at 1268.

**D.  The balance of the equities and public interest favors Plaintiffs.**

Georgia voters currently "suffer from an ad hoc and chaotic election process." Cty. Br. 20. The relief requested would hardly make this system worse; as demonstrated, it would make it far better. *See* Ex. 1 at 13-16. For that very reason, courts have repeatedly rejected claims of administrative burdens as reason to deny relief in voting cases.[16] *See, e.g.*, *GCPA*, 347 F. Supp. 3d at 1268 ("[R]ecogniz[ing] the administrative burden the Court's order may place on Defendant, particularly close to the election . . . [but] find[ing] that this burden . . . is minimal compared to the potential loss of a right to vote altogether by a group of people".); *see also Martin*, 341 F. Supp. 3d at 1341 (administrative processes "not so burdensome as to outweigh Georgians' right to vote"). This case is no different.

Defendants' claim that Plaintiffs did not "exercise due diligence," Cty. Br. 22, is wrong on the facts and law. The County insinuates this case is like *Benisek v.*

---

[16] Notably, the administrative burden asserted by the counties is the timely certification of elections, but as discussed *supra* 18-19, Georgia has more than enough time to count late ballots and certify elections.

*Lamone*, 138 S. Ct. 1942 (2018), but it is not. There, plaintiffs "did not move for a preliminary injunction . . . until . . . over three years after the plaintiffs' first complaint was filed." *Id*. at 1944. Here, Plaintiffs filed their motion for preliminary injunction just four weeks after their initial Complaint and just one week after their First Amended Complaint. *See* ECF Nos. 1, 33 & 57. In any event, there is no requirement that voting rights plaintiffs bring suit as soon as they are aware of a constitutional violation. *Cf. Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) (plaintiff need not "search and destroy every conceivable potential unconstitutional deprivation, but could catch its breath, take stock of its resources, and study the result of its efforts"). That Plaintiffs filed a preliminary injunction in June to vindicate the public's interest in voting cannot be taken as a strike against the public. Rather, "allowing for easier and more accessible voting for all segments of society serves the public interest." *Detzner*, 314 F. Supp. 3d at 1224.

The State's argument that ordering relief is improper more than three-and-one-half months before November is baseless. The August primary runoff elections have not even happened yet. State Br. 34. The candidates for November have not been finalized, nor have the ballots been printed—let alone mailed to voters. Indeed, the Counties helpfully point out that absentee ballots for November do not go out *for another two months*. Cty. Br. 23. All of the relief Plaintiffs seek is easily

implemented in time for the election. This case is thus nowhere near as close to the election as the decision at issue in *Purcell v. Gonzalez*, in which the district court "enjoined operation of voter identification procedures just weeks before an election." 549 U.S. 1, 4 (2006). Because we are nowhere near the "eve of an election," *Purcell* does not apply. *Republican Nat'l Comm.*, 140 S. Ct. at 1207.[17]

Finally, it is beyond credible dispute that it "would be in the public's interest to ensure that there is a procedure in place to allow every eligible Georgia citizen to register and vote." *GCPA*, 347 F. Supp. 3d at 1268. Similarly, "[t]he public interest is best served by allowing the qualified absentee voters to vote and have their votes counted." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1310-11 (N.D. Ga. 2018). Thus, this factor, too, weighs in favor of granting Plaintiffs' requested relief.

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request this Court grant their Motion for Preliminary Injunction.

---

[17] None of the cases Defendants cite from this Court involve a dismissal on *Purcell* grounds. State Br. 35.

Dated: July 16, 2020                     Respectfully submitted,

                                          **Adam M. Sparks**
                                          Halsey G. Knapp, Jr.
                                          Georgia Bar No. 425320
                                          Joyce Gist Lewis
                                          Georgia Bar No. 296261
                                          Adam M. Sparks
                                          Georgia Bar No. 341578
                                          **KREVOLIN AND HORST, LLC**
                                          One Atlantic Center
                                          1201 W. Peachtree Street, NW, Ste. 3250
                                          Atlanta, GA 30309
                                          Telephone: (404) 888-9700
                                          Facsimile: (404) 888-9577
                                          hknapp@khlawfirm.com
                                          jlewis@khlawfirm.com
                                          sparks@khlawfirm.com

                                          Marc E. Elias*
                                          Amanda R. Callais*
                                          K'Shaani Smith*
                                          **PERKINS COIE LLP**
                                          700 Thirteenth Street, N.W., Suite 600
                                          Washington, D.C. 20005-3960
                                          Telephone: (202) 654-6200
                                          Facsimile: (202) 654-6211
                                          MElias@perkinscoie.com
                                          ACallais@perkinscoie.com
                                          KShaaniSmith@perkinscoie.com

Kevin J. Hamilton*
Stephanie R. Holstein*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
KHamilton@perkinscoie.com
SHolstein@perkinscoie.com

Lilian Timmermann*
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5222
Telephone: (303) 291-2354
Facsimile: (303) 291-2454
LTimmermann@perkinscoie.com

Christian Ruiz
Georgia Bar No. 548611
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile:  (602) 648-7000
cruiz@perkinscoie.com

Counsel for Plaintiffs
*Admitted Pro Hac Vice*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

THE NEW GEORGIA PROJECT, REAGAN JENNINGS, CANDACE WOODALL, and BEVERLY PYNE,

    Plaintiffs,

        v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al*.

    Defendants.

Civil Action File No. 1:20-CV-01986-ELR

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: July 16, 2020

**Adam M. Sparks**
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THE NEW GEORGIA PROJECT,
REAGAN JENNINGS, CANDACE
WOODALL, and BEVERLY PYNE,

    Plaintiffs,

          v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State
and the Chair of the Georgia State Election
Board, *et al*.

    Defendants.

Civil Action File No.
1:20-CV-01986-ELR

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 16, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: July 16, 2020

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*