## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THE NEW GEORGIA PROJECT, *et al.*,     )
)
     Plaintiffs,     )
)
v.     )
)     Civil Action File No.
)
BRAD RAFFENSPERGER, in his     )     1:20-cv-01986-ELR
official capacity as the Georgia     )
Secretary of State and the Chair of the     )
Georgia State Election Board, *et al.*,     )
)
     Defendants.     )
)

## STATE DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to this Court' Order of August 3, 2020, Doc. No. [121], State Defendants file this Sur-Reply in Opposition to Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction.[1]

## SUR-REPLY

Having insufficient evidence to satisfy their heavy burden for a mandatory preliminary injunction on the eve of a presidential election, Plaintiffs resorted to changing their claims and more than doubling their

---

[1] The abbreviations in the Motion to Strike, Doc. No. [109], are used herein.

declarations. As a consequence, this Court permitted State Defendants to respond to the new testimony and arguments, but the fact remains: Plaintiffs have fallen short of their burdens, and the preliminary injunction should be denied.[2] Indeed, recent studies show that there are no best practices for administering elections during a pandemic, but an independent assessment determined that Georgia is one of the most prepared states in the country to address challenges of conducting elections during a pandemic.[3]

The United States Supreme Court has repeatedly, including again yesterday, cautioned against court ordered experimentation with election processes, particularly when such experimentation is ill-defined and occurs too close to the election itself. See Clarno v. People Not Politicians, 20A21 (August 11, 2020) (staying preliminary injunction issued by the Ninth

---

[2] As discussed below, Judge Totenberg ruled this week that an identical poll tax claim arising under the 24th Amendment fails as a matter of law, and the State's interests outweigh voters' burdens on the question of whether the State must provide a stamp for every absentee ballot return application. Black Voters Matter Fund v. Raffensperger, No. 1:20-CV-01489-AT, at *68 (N.D. Ga. Aug. 11, 2020).

[3] See Kavanagh, Jennifer, Quentin E. Hodgson, C. Ben Gibson, and Samantha Cherney, An Assessment of State Voting Processes: Preparing for Elections During a Pandemic. Homeland Security Operational Analysis Center operated by the RAND Corporation, 2020. https://www.rand.org/pubs/research_reports/RRA112-8.html. A true and accurate copy of the report is attached hereto as Exhibit 1.

Circuit)[4]; <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 140 S. Ct. 1205, 1207 (2020) (citing <u>Purcell v. Gonzalez</u>, 549 U. S. 1 (2006) (per curiam)) ("This Court has repeatedly emphasized that lower federal courts should not alter the election rules on the eve of an election.").  Plaintiffs ask this Court to re-write virtually every aspect of absentee voting administration in Georgia, fewer than three months before the November election.  Worse yet, they seek to do so on an expedited basis without the benefit of discovery.

Their strategy of submitting more declarations in a reply brief has moved this Court's hearing to a time even closer to the election.  Timing is now fatal to Plaintiffs' claims.  In addition to the <u>Clarno</u> case, the Supreme Court recently stayed a decision from the Eleventh Circuit that would have been far less disruptive to Alabama's elections.  <u>Merrill v. People First of Ala.</u>, 2020 U.S. LEXIS 3541, *1 (U.S., July 2, 2020).[5]  The Court has done the same in virtually every other election case recently decided, with the Chief Justice noting the need for "clear and administrable guidelines from the courts." <u>Little v. Reclaim Idaho</u>, No. 20A18, 2020 U.S. LEXIS 3585, at *2

---

[4] A true and accurate copy of the <u>Clarno</u> order is attached as Exhibit 2.

[5] It is also telling that Plaintiffs' counsel has filed yet another lawsuit in this district seeking similar relief.  <u>See</u> <u>Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.</u>, No. 1:20-CV-03263-MLB (N.D. Ga. Aug. 6, 2020).

(U.S. July 30, 2020). <u>Accord</u> <u>Republican Nat'l Comm.</u>, 140 S. Ct. at 1207; <u>Purcell</u>, 549 U. S. 1; <u>Frank v. Walker</u>, 574 U.S. 929 (2014); <u>Veasey v. Perry</u>, 574 U.S. 951 (2014); <u>Tex. Democratic Party v. Abbott</u>, 140 S. Ct. 2015 (2020); <u>Thompson v. DeWine</u>, No. 19A1054, 2020 U.S. LEXIS 3376, at *1 (U.S. June 25, 2020). Thus, whether this Court considers the Plaintiffs' evidence or the proximity to the presidential election, Plaintiffs' fall far short of their burden for a preliminary injunction, and this Court should reject changes of the magnitude that Plaintiffs seek on this expedited basis.

On the merits, Plaintiffs' Reply Brief does not enhance their case. Previously, Plaintiffs provided declarations from 20 voters: half (13) were from Fulton County and four reside out-of-state. <u>See</u> Doc. Nos. [59-9, 10, 13, 14, 18, 68-71, 90]. Plaintiffs have added 95 more declarations, but the fact remains that there is no evidence of systemic issues across the State:

- 56 of the new declarations (59% of new declarations, 60% overall) are from Fulton County residents;

- 11 of the new declarations (12% of new declarations 10% overall) are from DeKalb County.

- 6 of the new declarations (6% of new declarations 5% overall) are from Gwinnett County residents.

While Plaintiffs managed to find three declarants from Cobb, Clarke, and Fayette counties, every other county with a declaration (ten others in the Reply Brief and three in the Preliminary Injunction Brief) has two or fewer declarations. Even with the 115 voter declarations provided (85% of which were in the Reply Brief), Plaintiffs have not shown a systemic, statewide constitutional violation. Instead, they have shown that 60% of the problems they allege occurred in one county, and about three-quarters of their evidence comes from three metro-Atlanta counties. With this evidence, Plaintiffs have fallen quite short of satisfying their heavy burden of demonstrating that duly enacted statutes violate the United States Constitution. Leib v. Hillsborough Cty. Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009) (applying Equal Protection and rational basis analysis).

1. **Election Day Receipt Deadline.**

Plaintiffs challenge to the Election Day Receipt Deadline for absentee ballots is a policy issue, not a legal one. Nothing in their latest round of declarations changes this. For example:

- Kylah Mason claims she received the ballot on June 4, but it was not received by the election office until after the election. Doc. No. [105-6], ¶ 6. Ms. Mason does not claim that the deadline is a burden, but

instead states, "I can't control when the ballot arrives. That is determined by our postal system, which is subject to delays." Doc. No. [105-6], ¶ 9. According to the absentee report for Ms. Mason, her absentee ballot was mailed to her on June 3, 2020.[6] (Harvey Decl. at Ex. A).

- <u>Kelly Williams</u> raises general assertions (but no injury) about the Election Day Receipt Deadline, Doc. No. [105-9], but she has previously mailed multiple absentee ballots in prior elections, including voting absentee by mail seven times since 2016. (Harvey Decl. at Ex. B). Mr. Williams' requests for mail absentee ballots for the remaining elections this cycle have also been processed. (<u>Id</u>.).

- <u>Kenneth Menefee</u> states that he read the instructions accompanying his absentee ballot and understood that the ballot had to be "received at the county election office *by* election day, June 9, 2020." Doc. No. [107-10], ¶ 9 (emphasis in original). Nonetheless, he placed the absentee ballot in the mail on June 8. [<u>Id</u>.], ¶ 10. Mr. Manefee subsequently received a letter stating that his ballot was received after

---

[6] A true and correct copy of the declaration of Chris Harvey is attached hereto as Exhibit 3.

the deadline, which he expected. [Id.], ¶ 12.

- <u>Sean Rauls</u> states that he completed an absentee ballot application on May 12 and it was issued that day. Doc. No. [107-12], ¶ 3. Because he was out of town, Mr. Rauls had a friend check his mail and send his absentee ballot to him in Valdosta, which he received on June 8. [Id.], ¶ 4. Mr. Rauls does not indicate when his friend got his absentee ballot, but Mr. Rauls states, "when I read the ballot, it said that it had to be received at the Elections Office by 7:00 p.m. on June 9, 2020." [Id.], ¶ 5. As such, Mr. Rauls placed the ballot in the mail on June 8 "knowing that it would probably not reach Brunswick by the next day." [Id.], ¶ 7. He was subsequently notified that his absentee ballot was rejected because it arrived late. [Id.], ¶ 8.

- <u>Alexandra Lampert</u> states that she requested an absentee ballot and returned it by mail. Doc. No. [107-15], ¶ 3. On election day, however, her absentee ballot was listed as "not received" on the Secretary's website. [Id.], ¶ 4. As such, Ms. Lampert decided to vote in person. [Id.], ¶¶ 4, 10. However, upon review of Ms. Lampert's absentee voter record, Ms. Lampert's absentee ballot was returned on June 7 and accepted. (Harvey Decl. at Ex. C).

In the light of this anecdotal and easily explained evidence, the State's interest in maintaining its current policies has only been bolstered by recent elections that implemented Plaintiffs' requested relief. For example, New York's recent primary shows how allowing absentee ballots to arrive after an election can be a disaster and result in significant delays certifying the elections.[7] The results of New York's primary election in the 12th Congressional District remained unknown six weeks after the election. Id. Here, weeks before absentee ballots start being mailed out to Georgia voters, Plaintiffs ask this Court to similarly require counting of absentee ballots without postmarks that arrive after Election Day. Doc. No. [57], n.1.

If Plaintiffs' preferred policy could delay one New York Congressional election for six weeks, it is not difficult to see the potential harm in applying their relief statewide in an election that will decide the next President, two United States Senators, numerous highly contested Congressional elections,

---

[7] The Wall Street Journal Editorial Board, AN AUTOPSY OF NEW YORK'S MAIL-VOTE MESS, August 7, 2020, https://www.wsj.com/articles/an-autopsy-of-new-yorks-mail-vote-mess-11596841128. A true and correct copy of this article is attached as Exhibit 4. See also Edward Isaac-Dovere, THE CHAOS IN NEW YORK IS A WARNING, July 24, 2020, The Atlantic, available at https://www.theatlantic.com/politics/archive/2020/07/new-york-election-failure-mail-in-voting/614446/

and the entire slate of members of the Georgia General Assembly. For this reason, Plaintiffs cannot show that their alleged burden outweighs the State's interest, certainly in light of the standard applied to mandatory preliminary injunctions. Nor can they show that the current law fails to satisfy procedural due process.

## 2. __Absentee Ballot Postage__.

Courts in this district have long recognized that "[e]lection laws will invariably impose some burden upon individual voters" but that "the imposition of tangential burdens does not transform a regulation into a poll tax." Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups, 439 F. Supp. 2d 1294, 1354-55 (N.D. Ga. 2006) (Billups II) (quoting Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 827 (S.D. Ind. 2006), aff'd sub nom. Earlier this week, in another case in this District, Judge Totenberg found:

> The fact that any registered voter may vote in Georgia on election day without purchasing a stamp, and without undertaking any "extra steps" besides showing up at the voting precinct and complying with generally applicable election regulations, necessitates a conclusion that stamps are not poll taxes under the Twenty-Fourth Amendment prism.

Black Voters Matter Fund v. Raffensperger, No. 1:20-CV-01489-AT, at *68

(N.D. Ga. Aug. 11, 2020). This reasoning is sound and should foreclose Plaintiffs' likelihood of success on the Twenty-Fourth Amendment poll tax claim in this lawsuit. The <u>Black Voters Matter</u> Court went further, however, and it denied Plaintiffs' motion for preliminary injunction on an <u>Anderson-Burdick</u> claim as well (Count I in this lawsuit). <u>Id</u>. at *35-36. There is no reason this Court should not do the same here.

Plaintiffs' Reply Brief declarations on postage do not compel a different conclusion:

- <u>William Joseph Brock Jr.</u>, intentionally mailed his absentee ballot without any postage. Doc. No. [106-33], ¶ 6. When he checked the Secretary of State's website on May 21, it indicated that his absentee ballot had been returned and accepted. [<u>Id</u>.], ¶ 7. According to the absentee voter report for Mr. Brock, his absentee ballot for the June election was returned on May 20 and accepted. (Harvey Decl. at Ex. F). Of note, Mr. Brock also submitted an absentee ballot on July 7 for the August runoff election, and his absentee ballot for that election was returned on July 16 and accepted. (<u>Id</u>.).

- <u>Flavia Costa</u> claims that she was unsure how much postage was needed to return her ballot, but family and friends told her one stamp

was enough.  Doc. No. [106-31], ¶ 6.  According to the absentee voter

report for Ms. Costa, her absentee ballot request was processed on

March 27 and her ballot was returned on May 6, and accepted.

(Harvey Decl. at Ex. D).

- <u>Sheila Samuels</u> states that she did not know the correct amount of

  postage for her absentee ballot, so she went to the post office to mail

  her absentee ballot in person. Doc. No. [106-32], ¶ 3.  She also called

  the postmaster to ask if her ballot would be delivered even if it did not

  include the correct amount of postage, and she was told that absentee

  ballots are never returned to the voter for insufficient postage.  [<u>Id</u>.], ¶

  4.  According to the absentee voter report for Ms. Samuels, her

  absentee ballot request was processed on April 15, and her absentee

  ballot was returned on May 29 and accepted.  (Harvey Decl. at Ex. E).

- <u>Brenda Louise Jackson</u> submitted her absentee ballot application by

  email and received her ballot on May 20. Doc. No. [107-32], ¶ 5.  Ms.

  Jackson is a retired USPS employee and did not know that USPS

  returns election mail even if the voter omits postage.  [<u>Id</u>.], ¶¶ 6-7.

  Ms. Jackson inquired about the USPS policy of delivering mail

  without sufficient postage when she went to mail her absentee ballot

and was told by an unidentified postal worker her ballot would be returned. [Id.], ¶ 8.[8] Ms. Jackson does not state who she spoke with at her local post office, but Ms. Jackson mailed her ballot nonetheless, which was processed and accepted according to her absentee voter history. See (Harvey Decl. at Ex. G).

These declarations do not show that the current policy—which is the same one adopted by most states—is an unconstitutional poll tax or an unconstitutional burden on voting. Indeed, a vote counted when a voter intentionally did not use postage when returning his absentee ballot. Doc No. [106-33]. This ends the inquiry.

More importantly, no number of declarations changes the abject fact that the State imposes no revenue-generating tax or fee and does not benefit from postage: by definition, the challenged policy is not a poll tax. Moreover, the State cannot afford to purchase postage for all absentee ballots (which begin to be delivered in weeks) during the midst of the greatest fiscal crisis in

_____

[8] This Court is permitted to consider hearsay evidence at a preliminary injunction hearing, but it is equally authorized to assign it less weight or credibility than evidence that would be admissible at trial. See Gulf Coast Commercial Corp. v. Gordon River Hotel Associates, 2:05CV564-FTM-33SPC, 2006 WL 1382072, at *2 (M.D. Fla. May 18, 2006).

decades.  See generally Beck Decl. Doc. No. [91-1].  Plaintiffs have not

"clearly established" anything to the contrary and their motion fails.

McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).

3.    **Absentee Ballot Application Rejection Notification.**

Plaintiffs have submitted numerous declarations from voters claiming

that they did not receive an absentee ballot despite submitting an absentee

ballot application.  See, e.g., Doc. Nos. [105-8]; [105-10]; [105-12]; [105-13];

[105-14]; [105-15]; [105-16]; [105-17]; [105-18]; [105-19]; [105-20]; [105-21];

[105-22]; [105-23]; [105-24]; [105-25]; [105-26]; [105-27]; [105-28]; [105-29];

[105-30]; [105-31]; [105-32]; [105-33]; [105-34]; [105-35]; [106-1]; [106-2]; [106-

3]; [106-4]; [106-5]; [106-6]; [106-7]; [106-8]; [106-9]; [106-10]; [106-11]; [106-

12]; [106-13]; [106-14]; [106-15]; [106-16]; [106-17]; [106-18]; [106-19]; [106-

20]; [106-21]; [106-22]; [106-23]; [106-24]; [106-25]; [106-26]; [106-27]; [106-

28]; [106-29]; [106-30]; [107-17]; [107-18]; [107-19]; [107-22]; [107-23]; [107-

24]; [107-25]; [107-26]; [107-27]; [107-28]; [107-32].

To address this issue of county election administration, Plaintiffs

misfire and challenge "the lack of standards governing the process for

notifying voters regarding incomplete absentee ballot applications ("Absentee

Applicant Notification Process"), O.C.G.A. § 21-2-381(b)(4)."  Doc. No. [33], ¶

5.  The Reply Brief declarations submitted by Plaintiffs do not contend that absentee ballot applications were <u>rejected</u> without timely notice of the rejection, which is the basis of Plaintiffs' challenge.  <u>See</u> Doc. No. [33].  They simply claim that they requested a ballot and did not timely receive one (if at all).  This is a different injury than having a request reviewed and rejected without having notice to correct the issue.  So viewed, Plaintiffs' facts do not support the legal challenge they actually brought.

An even cursory review of the Reply Brief declarants proves the point. The reasons why some declarants did not receive their absentee ballots does not appear to be due to State action or Georgia law, and other declarants subsequently voted by absentee ballot in the August election.  Specifically:

- <u>Marsha Albert</u> states that her absentee ballot application submitted in February was rejected and that she submitted a new application in May.  Doc. No. [105-4], ¶¶ 3-5.  Without any evidence to corroborate her claim (and Plaintiffs' unwillingness to allow Ms. Albert to sit for a deposition), Ms. Albert states that she never received notice that her absentee ballot request was denied and that she discovered her application was rejected through the Secretary of State's My Voter Page website.  [<u>Id</u>.], ¶ 4.  Ms. Albert's absentee voter report indicates

that she placed a request for a mail absentee ballot on February 26, but the ballot was not returned. (Harvey Decl. at Ex. H). Ms. Albert indicated that she intended to vote absentee by mail for the August runoff election, Doc. No. [105-4], ¶ 8, and according to her absentee voter report, she requested an absentee ballot on July 9, 2020, which was returned on July 22, 2020 and accepted. (Harvey Decl. at Ex. H).

- Jeffrey Wright submitted an absentee ballot application in April and claims he never received the absentee ballot. Doc. No. [105-10], ¶¶ 3-4. However, Mr. Wright admits that he had the ballot mailed to his home address and forwarded using a USPS mail-forwarding service to Blairsville, where he was living. Doc. No. [105-10], ¶ 4. As shown in Mr. Wright's absentee voter report, his absentee ballot application was processed on April 20, 2020 and the ballot was mailed to his address in Decatur. (Harvey. Decl. at Ex. I).

- Ross Barnard claims that he submitted a request for an absentee ballot in May but never received the ballot. Doc. No. [105-12], ¶¶ 3-5. However, by his own testimony, Mr. Barnard moved residences in Fulton County prior to submitting his absentee ballot request. Doc. No. [105-12], ¶ 6. He did not, however, update his voter registration

address, but instead he requested that his absentee ballot be mailed to his new address in Fulton County.  Doc. No. [105-12], ¶ 6.  According to his absentee ballot report, Mr. Barnard's absentee ballot was mailed to his residence (his former residence).  (Harvey Decl. at Ex. J).

- Victoria Clark states that she submitted an absentee ballot request "well before the deadline, but it never arrived."  Doc. No. [105-16], ¶ 3.  Similar to other Reply Brief declarants, the voter history report for Ms. Clark does not contain information indicating that an absentee ballot request was submitted for Ms. Clark.[9]  (Harvey Decl. at Ex. K).

- Jennifer Bae states that she submitted her application on May 31 through "voteamerica.com," a third-party website, but never received her absentee ballot.  Doc. No. [105-33], ¶¶ 4-5.  Ms. Bae does not indicate why she attempted to submit her absentee ballot application through voteramerica.com.  However, Ms. Bae's voter record does not contain any information indicating that an absentee ballot application was submitted for Ms. Bae in the June election.  (Harvey Decl. at Ex. L).  Moreover, Plaintiffs provide no evidence that voteamerica.com ever

---

[9] Should this case proceed to normal discovery, a deposition of Ms. Clark may help resolve the issue.

transmitted Ms. Bae's absentee ballot application—further demonstrating why third-party organizations should not be allowed to submit absentee ballot applications or absentee ballots on behalf of Georgia voters.  See O.C.G.A. §§ 21-2-381, 21-2-385.

- Ann Jordan states that she submitted an absentee ballot application by mail in May, which was processed but never received.  Doc. No. [106-7], ¶¶ 7, 9.  Ms. Jordan's absentee voter report indicates that a ballot request was processed on June 2, but never returned.  (Harvey Decl. at Ex. M).  However, Ms. Jordan also requested an absentee ballot for the August election, and according to her absentee voter report, her absentee ballot was processed and returned on July 13.  (Id.).

- Julianne Garner states that she completed an absentee ballot application and had her boyfriend mail it.  Doc. No. [107-19], ¶ 6.  Other packages that her boyfriend mailed at the same time he mailed her absentee ballot request were delivered, so she assumed her absentee ballot request was also delivered.  Doc. No. [107-19], ¶ 7.  She contacted the Muscogee County registrar's office when she had not received the ballot and was told that the county never received her absentee ballot request in the mail.  [Id.].  Due to the June 9 election

date, Ms. Garner decided to vote in person. [Id.]. According to Ms. Garner's absentee voter report, she voted in person during early voting in March and June of this year, but there is no record of the absentee ballot application referenced in her declaration. See (Harvey Decl. at Ex. N).

Additionally, many of the Reply Brief declarants who stated that they did not receive their absentee ballots submitted their absentee ballot requests by email. See, e.g., Doc. Nos. [105-13]; [105-14]; [105-15]; [105-17]; [105-18]; [105-20]; [105-21]; [105-22]; [105-23]; [105-24]; [105-25]; [105-26]; [105-27]; [105-29]; [105-30]; [1015-31]; [105-34]; [105-35]; [106-1]; [106-2]; [106-3]; [106-4]; [106-6]; [106-8]; [106-9]; [106-10]; [106-12]; [106-13]; [106-14]; [106-15]; [106-16]; [106-17]; [106-18]; [106-21]; [106-22]; [106-24]; [106-25]; [106-26]; [106-28]; [106-29]; [107-17]; [107-18]; [107-26]; [107-28]; [107-32].

Although the assertions of these declarants are not relevant to Plaintiffs' challenge to the Absentee Application Rejection Notification Statute, recent action by State Defendants nonetheless addresses online submission of absentee ballot applications. Specifically, State Election Board Emergency Rule 183-1-14-1.0-.16, promulgated after Plaintiffs' filed their Reply authorizes the Secretary to develop an absentee ballot portal that

allows registered voters to submit an absentee ballot application online. (Harvey Decl. at Ex. O).

Finally, Plaintiffs claims challenging the Absentee Application Rejection Notification Statute, O.C.G.A. § 21-2-381(b)(4), were mooted by State Election Board Rule 183-1-14-.11, promulgated in February of this year. As provided by State Election Board Rule 183-1-14-,11, "The board or clerk shall make such determination and mail or issue official absentee ballots . . . or notices of rejection of absentee ballot applications to such additional applicants within 3 business days after receiving the absentee ballot applications." Ga Comp. R. & Regs. 183-1-14-.11 (emphasis added). Plaintiffs facial challenge to the statute thus fails, and as shown by the evidence cited herein, Plaintiffs have not met their burden for a successful as-applied challenge.

**4. <u>Ballot Harvesting</u>.**

Plaintiffs continue to perpetuate a myth that ballot harvesting does not implicate significant voter fraud concerns. In the declaration of NGP's corporate representative filed with the Reply Brief, Ms. Ufot states that assisting voters is needed. Doc. No. [105-5], ¶ 5. Other declarations is equally uncompelling and mirrors that of the preliminary injunction motion:

some voters would like someone to gather their ballot but will still vote if the current law is upheld.

Moreover, federal law already addresses some of Plaintiffs' concerns. For example, none of the Individual Plaintiffs allege to have a disability or other condition protected by Section 8 of the Voting Rights Act. <u>See</u> Doc. No. [33], ¶¶ 20, 21, 22. Additionally, of the declarations from voters submitted with the Reply Brief, voters with disabilities were able to obtain legally authorized assistance with absentee applications and ballots. <u>See</u>, <u>e.g.</u>, Doc. Nos. [105-9], ¶¶ 6-7; [105-19], ¶ 7 (husband assisted with absentee application). Additionally, Felicia Jones-Shaw, who has a disability that prevents her from driving, did not testify about third-party assistance that NGP seeks in the PI Motion. Doc. No. [107-6].

Plaintiffs' latest submissions does not overcome the State's interest in prohibiting ballot harvesting. As the Seventh Circuit Court of Appeals stated in <u>Griffin v. Roupas</u>, "absentee voting is to voting in person as a take-home exam is to a proctored one." 385 F.3d 1128, 1131 (7th Cir. 2004). Media outlets have also long recognized that, "[o]n the most basic level, absentee voting replaces the oversight that exists at polling places with something

akin to an honor system."[10]  As the New York Times has reported, "Voters in nursing homes can be subjected to subtle pressure, outright intimidation or fraud. The secrecy of their voting is easily compromised. And their ballots can be intercepted both coming and going." Id.  If nothing else, these news reports demonstrate that the State has a legitimate interest in the Absentee Ballot Security Statute, and it overcomes Plaintiffs' purported burdens of going to a mailbox or talking a voter through the process—all the way to ballot drop off.

Indeed, NGP's own history warrants upholding the Absentee Ballot Security Statute against Plaintiffs' various challenges.  Other courts have addressed their own conduct:

> As of September 17, 2014 the Secretary of State informed the Petitioners that over 50 of the voter registration applications submitted by **NGP** were either fraudulent or were suspected of being fraudulent. Approximately three weeks later, the Secretary of State informed the Petitioners that 134 applications were possibly fraudulent. Ultimately, by the time the Petition was filed, 50 applications were deemed to be fraudulent, 49 were suspicious, and 39 were legitimately submitted.

---

[10] Adam Liptak, ERROR AND FRAUD AT ISSUE AS ABSENTEE VOTING RISES, October 6, 2012, https://www.nytimes.com/2012/10/07/us/politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html.  A true and correct copy of the 2012 article from the New York Times is attached as Exhibit 5.

<u>Third Sector Development, Inc. et v. Kemp et al.</u>, No. 2014CV252546, at *4

(Fulton Cty. Sup. Ct. Oct. 28, 2014).[11]  Under these circumstances, Plaintiffs

have failed to meet their burden for a preliminary injunction on their third-

party voter assistance claims, and even if they could meet their burden of

proof, the State has a legitimate interest in preventing absentee ballot fraud.

**5.** **<u>Dr. Robert Ball's Testimony Regarding COVID-19 Transmission</u>.**

Plaintiffs attempt to bolster the testimony of Dr. Robert Ball through a

supplemental declaration accompanying the Reply Brief.  Doc. No. [105-2].

Dr. Ball claims that airborne transmission is highly virulent and dominant

for the spread of COVID-19.   Doc. No. [105-2], ¶ 5.  He relies on an article

that is intended to be an appeal to the medical community to recognize the

"potential" for airborne transmission.  Doc. No. [105-2], ¶ 6.  Whatever

disagreements exist in the medical community, they demonstrate the need

for elected officials to have flexibility in responding to COVID.  <u>See also</u> <u>Black</u>

<u>Voters Matter Fund</u>, 2020 WL 4597053 at *35 (suggesting deference to

governments' ability to respond to COVID-19 matters).  As an example, the

---

[11] A true and accurate copy of the Order in <u>Third Sector Development, Inc.</u>,
No. 2014CV252546, at *4 (Fulton Cty. Sup. Ct. Oct. 28, 2014) is attached as
Exhibit 6.

State Election Board also just adopted a new rule on absentee voting, and there is no reason to think that the elected branches of State government will continue to respond to the virus without the inflexibility imposed by a last-minute court mandate.

Other federal courts have joined the court in <u>Black Voters Matter Fund</u> and deferred to states during the pandemic. The District Court for the Middle District of North Carolina recently found that "the evidence is too speculative at the present time to support a finding that aerosol droplets are capable of being infective over distance and time." <u>Democracy North Carolina v. North Carolina State Board of Elections</u>, No. 1:20-CV-457, 2020 WL 4484063, at *30 (M.D.N.C. Aug. 4, 2020).[12]

Plaintiffs' rely on Dr. Ball's testimony as support for their assertion that voters are burdened by the risk of catching COVID-19 if they vote in person. However, there is no definitive evidence that voters could contract

---

[12] A copy of the August 4, 2020 decision is attached hereto as Exhibit 7. Further, As the experts in that case discussed, "airborne spread has not been reported for COVID-19 and it is not believed to be a major driver of transmission based on available evidence" based on an analysis of 75,465 COVID-19 cases in China. <u>Id</u>. at *29 (quoting Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), WHO (Feb. 28, 2020), https://bit.ly/3eCvjfp). A copy of the WHO "Report of the WHO-China Joint Mission on Coronavirus Disease 2019" is attached hereto as Exhibit 8.

COVID-19 by airborne transmission, and Plaintiffs do not seek to shut down in-person voting altogether. As Plaintiffs' own declarants have testified, responsible measures are being taken when voting in person to minimize risk of COVID-19 transmission, such as social distancing and wiping voting machines. See Doc. Nos. [107-20], ¶ 7 (social distancing and voting machines sanitized between each voter); [107-26], ¶ 7 ("Everyone was wearing a mask, there were measures in place to prevent COVID-19 from spreading, and the machines were sprayed down between voters."). Ultimately, therefore, Dr. Ball's testimony does not matter much. It shows physicians disagree; it does not claim that no one can go outside, nor does it logically lead to an end to in-person voting. Indeed, the state conducted runoff elections just yesterday.

## CONCLUSION

Plaintiffs have failed to satisfy their heightened burden for the sweeping relief they seek in the PI Motion. The documents Plaintiffs rely on is either speculative or remotely supports their claims, if at all. Given the proximity to the upcoming election and Plaintiffs' failure to satisfy their burden for a preliminary injunction, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 12th day of August, 2020.

Christopher M. Carr
Attorney General
GA Bar No. 112505
Bryan K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
Charlene McGowan
Asst. Attorney General
Ga. Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Vincent R. Russo*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
**Robbins Ross Alloy Belinfante Littlefield LLC**

500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3250

*Attorneys for State Defendants*

## L.R. 7.1(D) CERTIFICATION

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing

STATE DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS'

REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR

PRELIMINARY INJUNCTION was prepared double-spaced in 13-point

Century Schoolbook font, approved by the Court in Local Rule 5.1(C).

_/s/ Vincent R. Russo_
Vincent R. Russo
Georgia Bar No. 242628