**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, *et al.*,<br><br>　　　Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board, *et al.*,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil Action File No.<br>)<br>)　1:20-cv-01986-ELR<br>) |

**STATE DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND BRIEF IN SUPPORT[1]**

Defendants Raffensperger, in his official capacity as Secretary of State and the Chair of the Georgia State Election Board (the "Secretary"), State Election Board ("SEB") Members Sullivan, Worley, Le, and Mashburn (collectively, the "State Defendants"), request a stay of this Court's Order of August 31, 2020 (the "Order") granting in part preliminary injunctive relief

---

[1] There exists good cause for treating this as an emergency motion and waiving the time requirements of Local Rule 7.1. This Court's injunction requires substantial changes to the State's voting process while such is currently ongoing, and it will continue to cause irreparable harm as long as it remains in place. State Defendants thus asks this Court to rule on the Motion as soon as possible.

to Plaintiffs, pending appeal of the Court's Order to the Eleventh Circuit Court of Appeals. [Doc. 134].

The United States Supreme Court has consistently cautioned against court ordered experimentation with election processes, particularly when such experimentation is ill-defined and occurs in close proximity to the election itself. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam). When other district courts have entered injunctive relief in close proximity to elections this year, the Supreme Court and circuit courts across the country have repeatedly stayed those orders. *See id.*; *Clarno v. People Not Politicians*, 20A21 (U.S. Aug. 11, 2020); *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897, at *2 (U.S. July 30, 2020); *Merrill v. People First of Ala.*, No. 19A1063, 2020 WL 3604049, *1 (U.S. July 2, 2020); *Tex. Democratic Party v. Abbott*, 140 S. Ct. 2015 (June 26, 2020) (denying motion to vacate stay); *Thompson v. DeWine*, No. 19A1054, 2020 WL 3456705, at *1 (U.S. June 25, 2020) (denying motion to vacate stay); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. June 4, 2020); *Thompson v. DeWine*, 959 F.3d 804, 813 (6th Cir. May 26, 2020) (per curiam).

Nearly two weeks before absentee voting starts for the 2020 General Election, the Order materially changes the rules for voting in Georgia. The

Order preliminarily enjoins State Defendants and 17 county boards of elections, including "their officers, employees, and agents, all persons acting in active concert or participation with Defendants, or under Defendants' supervision, direction, or control" from enforcing Georgia law, O.C.G.A. § 21-2-386(a)(1)(F), requiring ballots to be returned to county boards of registrars by 7:00 p.m. on Election Day to be counted. [Doc. 134 at 69].[2] The Order further directs State Defendants and County Defendants to "accept and count otherwise valid absentee ballots from qualified voters that are postmarked by Election Day, and arrive at their respective county's office within three (3) business days of Election Day by 7:00 p.m." [Doc. 134 at 69-70]. There are 142 counties in Georgia that are not subject to the Order.

In the wake of the Order, two things are certain. One, there will be voter confusion because the instructions accompanying absentee ballots contradict this Court's Order. The pre-printed absentee ballot instructions inform voters to have ballots to county officials by the statutory deadline of 7:00 PM on Election Day. Two, the cure period for voters whose absentee ballots are rejected due to failure to sign the oath, a signature mismatch, or failure to provide required information will also have to be delayed. *See*

---

[2] Where this brief provides a pinpoint cite following an ECF stamp number, the pinpoint cite is referring to the ECF page numbers.

3

O.C.G.A. § 21-2-386(a)(1)(C); *see also* Ga. Comp. R. & Regs. 183-1-14-.13. Coupled with the postmark directive in the Order (which will require each county election official to determine whether a ballot received after Election Day has an imprint applied by the postal service indicating the location and date the postal service accepted custody of the ballot based on bar codes, circular stamps, or other tracking marks on the envelope [Doc. 134 at n.34]), the uniform administration of elections and timely certification of the results is threatened by the very terms of the Order.  Put differently, the Order's impact on election administration is neither discrete nor easily manageable.

The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve an election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (citations omitted). Courts have long held that last-minute challenges to longstanding election procedures are strongly disfavored because they threaten to disrupt the orderly administration of elections, which is essential to the functioning of our participatory democracy.  *See, e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). This Court's preliminary injunction is a case in point. While perhaps seeming small (and certainly not as drastic as some of the Plaintiff's other requested relief), changing the deadline to return absentee ballots will introduce delay and confusion in the election process. This, in turn, risks

delaying the Electoral College process and disenfranchising voters in Georgia, including preventing voters from casting ballots in runoff elections.

State Defendants are not obligated to eliminate all burdens on voting. The current deadline for county elections officials to receive absentee ballots has been in place for nearly fifty years, and it is not an unconstitutional burden on the right to vote, even in the COVID-19 era. The emergence of COVID-19 "has not suddenly obligated [Georgia] to do what the Constitution has never been interpreted to command." *Abbott*, 2020 WL 2982937, at *14. Staying the preliminary injunction to allow review by the Eleventh Circuit will ensure at least a measure of careful deliberation before upending the State's election processes in the middle of a General Election. Indeed, it is the most consistent act this Court can take in light of binding precedent.

## **ARGUMENT AND CITATION OF AUTHORITY**

Under Fed. R. Civ. P. 62(c), a court may stay an injunction pending appeal. Courts consider four factors to determine whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir.

2018) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors of the traditional standard are the most critical." *Nken,* 556 U.S. at 434. Each of these factors favors granting a stay pending State Defendants' appeal of this Court's order granting a preliminary injunction.

## I.   Likelihood of Success on the Merits of the Appeal.[3]

### A.   *Purcell* and the Doctrine of Laches Bar Plaintiffs' Claims.

Court orders that change election laws on the eve of an election threaten to undermine voter confidence in the integrity of the election and provide an incentive to remain away from the polls. *See Purcell*, 549 U.S. at 4-5; *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages participation in the democratic process."). The Supreme Court has repeatedly cautioned against court-ordered experimentation with election processes, particularly when such experimentation is ill-defined and, like this case, occurs too close to the

---

[3] The merits of Plaintiffs' claims are addressed in State Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction [Doc. 91], Sur-Reply in Opposition to Plaintiffs' Reply Brief [Doc. 126], and Brief In Support Of State Defendants' Motion to Dismiss [Doc. 82-1]. As the Court is already familiar with these arguments, State Defendants include here only a brief recitation of their main points in the interests of efficiency. The complete arguments in State Defendants' Response, Sur-Reply, and Motion to Dismiss regarding the merits of Plaintiffs' claims are incorporated herein by reference.

election itself. *See Clarno*, 20A21 (U.S. Aug. 11, 2020) (staying preliminary injunction); *Republican Nat'l Comm.*, 140 S. Ct. at 1207. Absentee voting begins in nearly two weeks, with instructions that ballots must be received by county election officials by 7:00 P.M. on November 3, 2020. The Order changes these rules in 17 of the 159 counties in Georgia.

Many courts have concluded that laches bar a last-minute challenge to longstanding election laws during or on the eve of elections. *See, e.g., Perry v. Judd*, 471 Fed. App'x. 219 (4th Cir. 2012) (laches barred "last-minute lawsuit" challenging Virginia election laws and seeking injunctive relief where the laws had been "on the books for years"); *Marshall v. Meadows*, 921 F. Supp. 1490, 1493-94 (E.D. Va. 1996) (laches barred challenge to Virginia open primary law when plaintiffs filed suit 95 days before the challenged primary was scheduled to take place, noting that "plaintiffs have slept on their rights"). Laches bars a request for equitable relief when (1) the plaintiff delays in asserting the claim; (2) the delay is not excusable; and (3) the delay causes the non-moving party undue prejudice. *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005); *Kason Indus. v. Component Hardware Group*, 120 F.3d 1199, 1203 (11th Cir. 1997); *see also Costello v. United States*, 365 U.S. 265, 282 (1961). Each element is met here.

The deadline for voters in Georgia to return their absentee ballots has been the close of the polls since at least 1974. *See* 1974 Ga. Laws 71, § 9. Indeed, Plaintiff Beverly Pyne is the only individual Plaintiff to ever return an absentee ballot after the deadline, which she did in 2018 as noted in the Order. [Doc. 134 at 13]. Additionally, while Governor Kemp issued the first state of emergency on the COVID-19 pandemic on March 14, 2020, Plaintiffs waited until May 2020 to bring their challenge to the entirety of Georgia's absentee ballot administration. They then delayed another month before filing a preliminary injunction motion. [Doc. 34].

Courts have found delays of far less than Plaintiffs' delay in this case as grounds to deny injunctive relief. *See*, *e.g.*, *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980) (applying laches where candidate waited to file suit until two weeks after he knew he would not be listed on ballot). Here, Plaintiffs waited months after the COVID-19 pandemic to file this action, and given the nature of their challenge, Plaintiffs could have brought their claims years earlier. Thus, the delay challenging ballot receipt deadline is inexcusable.

The prejudice inherent in denying the stay is also clear. As an initial matter, if an absentee ballot is rejected for any reason other than being returned after the deadline, Georgia law requires notice to be given to the voter and an opportunity to cure the problem causing the rejection of the

8

absentee ballot until the end of the period for verifying provisional ballots, which is the Friday following Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(C); O.C.G.A. § 21-2-419(c); *see also* Ga. Comp. R. & Regs. 183-1-14-.13 ("for any timely submitted absentee ballot that is rejected within eleven days of Election Day, the board of registrars or absentee ballot clerk shall send the elector notice of such rejection and opportunity to cure. . . no later than close of business on the next business day."). Because the Order requires absentee ballots postmarked on Election Day and received by 7:00 P.M. on the Friday after Election Day to be counted, voters whose absentee ballots are rejected due to missing information or a signature mismatch may not have the opportunity to cure the problem causing the rejection without extending the cure period set forth in O.C.G.A. § 21-2-386(a)(1)(C).  The Court's Order did not address this, and the Plaintiffs did not raise it in any pleading.

Delaying the ballot receipt deadline also puts at risk Georgia's newly required post-election, pre-certification audits. *See* O.C.G.A. § 21-2-498. Delaying the ballot receipt deadline shortens the amount of time for counties to complete the audit, which will make timely completion of the audit more difficult and could lead to mistakes. Instead of increasing confidence in election results, altering the longstanding ballot receipt deadline threatens to decrease voter confidence and create meaningful delays in certification.

Additionally, any delay tabulating and certifying the returns risks having a significant impact on the selection and voting of Georgia's presidential electors. Upon receiving the certified returns from the counties, the Secretary is required by law "to tabulate, compute, and canvass the votes cast for each slate of presidential electors" and provide them to the Governor by 5:00 P.M. no later than 17 days after Election Day, which is November 20, 2020. *See* O.C.G.A. § 21-2-499(b). Thereafter, the Governor must "enumerate and ascertain the number of votes for each person so voted and shall certify the slates of presidential electors receiving the highest number of votes," no later than 18 days after Election Day, which is November 21, 2020. *See id.* Federal law requires that "[t]he electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct," which is December 14, 2020, at noon. *See* 3 U.S.C. § 7; *see also* O.C.G.A. § 21-2-11.

Finally, any delay in tabulating and certifying returns in the November 3, 2020, General Election threatens voting in any runoff elections for local, state, and federal offices. Runoff elections for state and local offices in Georgia are scheduled for December 1, 2020. *See* O.C.G.A. § 21-2-501(a)(4) ("the runoff shall be held on the twenty-eighth day after the day of holding

the preceding general election."). Runoff elections for federal offices are scheduled for January 5, 2021. *See* O.C.G.A. § 21-2-501(a)(3) ("the runoff shall be held on the Tuesday of the ninth week following such general election."). Absentee ballots and early voting in runoff elections for state and local offices starts as soon as possible prior to the December 1 runoff election. *See* O.C.G.A. 21-2-384(a)(2); 21-2-385(d)(1)(D). For any runoff elections for federal offices, federal law requires absentee ballots to be mailed forty-five days prior to the January 5, 2021 runoff election, which is November 21, 2020, this year. *See* 52 U.S.C. § 20302(a)(8).

These three examples are likely not the only unintended consequences that will arise as a result of the Order; it is the unknown as well as the foreseen consequence of last-minute changes to long-standing election procedures that informs the reluctance of the Supreme Court and the circuit courts to impose or permit such changes in the midst of the election cycle. These last-minute challenges to election procedures result not only in prejudice to governmental defendants who must administer and supervise the elections, but also to the public, since governmental defendants "are charged with ensuring the uniformity, fairness, accuracy, and integrity of [the state's] elections." *Perry*, 471 Fed. App'x. at 227. Serious disruption to

state electoral processes is thus directly against the public interest in having

an orderly and fair election. *Id.* The facts of this case are no exception.

> B.    Plaintiffs are unlikely to prevail on the merits of their claim that the Election Day Receipt Deadline constitutes an unconstitutional burden on the fundamental right to vote (Count I of Plaintiffs' Amended Complaint) under an Anderson/Burdick Analysis.

Plaintiffs allege that the Election Day Receipt Deadline imposes severe

burdens on the right to vote in light of COVID-19. [Doc. 58 at 18-20]. This

Court agreed. [Doc. 134 at 60]. According to the Court's Order, because the

number of absentee ballots rejected as late in the June 2020 Primary was

nearly double the number of absentee ballots rejected as late in the 2018

General Election, it suggested that the Election Day Receipt Deadline

imposed a severe burden on many voters. [Doc. 134 at 58]. As an initial

matter, however, the Court's rationale does not mention or recognize that the

number of absentee ballots cast in the June 2020 Primary increased over

500% from the number cast in the 2018 General Election, which was

approximately 219,760 absentee ballots. [Doc. 59-1 at 4, 19].

In an *Anderson/Burdick* analysis, the evaluation of voting regulations

under a fundamental-right-to-vote claim takes place under a sliding scale,

which considers the alleged burden on the right to vote against the interest of

government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations

imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Importantly, the *Anderson/Burdick* analysis does not impose on states any burden of proof or evidentiary showing; the burden remains with the Plaintiffs. *Billups*, 554 F.3d at 1353.

> 1.  *Plaintiffs have failed to establish a severe burden.*

Plaintiffs have failed to show any unconstitutional burden on their right to vote, much less a severe burden on their right to vote, as a result of the deadline to vote in Georgia. The affidavits provided by the Plaintiffs do not show that anyone will actually be unable to vote in any upcoming election, nor do they show any meaningful burden. To the contrary, the evidence presented by Plaintiffs indicates that the rate in which absentee ballots were rejected as late in the June 2020 Primary was significantly less than the rejection rate in the pre-COVID-19 era—a rejection rate of 0.6% in 2020 (7,281 late ballots of over 1.1 million absentee ballots cast) compared to 0.7% in 2014, 1.2% in 2016, and 1.6% in 2018. [*See* Doc.59-1 at 4-5].

Despite these numbers, the Court found that the "burden imposed on *voters* by Georgia's current absentee ballot receipt deadline is severe." [Doc. 134 at 60 (emphasis added)]. However, under the *Anderson/Burdick* analysis, the Court considers the burden on the right to vote, not the burden on the individual. *See Crawford*, 553 U.S. at 205 (2008) (Scalia, J., concurring in judgment) ("[T]he first step is to decide whether a challenged law severely burdens the right to vote."). "Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe." *Id.* (citations omitted). Likewise, mere inconveniences are not severe burdens. *See Storer v. Brown*, 415 U.S. 724, 728–729 (1974). Deadlines may be inconvenient, but as shown by the evidence cited in the Order, the Election Day Receipt Deadline during the COVID-19 pandemic is not severely burdening the right to vote. Thus, strict scrutiny should not have been applied.

Also, while the Court credited the State for providing solutions to potential mail delays (e.g., drop boxes) in other sections of the Order, the portion addressing the burden imposed by the receipt deadline did not address drop boxes alleviating concerns about mail delays. [*See* Doc. 134 at 45, 47]. It is axiomatic that voters concerned about mail delays and COVID-19 can simply drop off their ballot either in-person at their county election

14

office or in a secure drop box on or before 7:00 P.M. on Election Day.  This significantly weakens any claim of burden.

The Court reached a contrary conclusion based largely on the decision in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020) ("*RNC*"). There, the District Court ordered broad relief—allowing ballots to be returned after election day with or without a postmark—and the Seventh Circuit affirmed. By the time the case reached the Supreme Court, the question was a narrow one: "whether absentee ballots now must be mailed and postmarked by election day, Tuesday, April 7, as state law would necessarily require, or instead may be mailed and postmarked after election day, so long as they are received by Monday, April 13." *Id.* The holding of *RNC*, however, weighs strongly in favor of a stay of the Order: "By changing the election rules so close to the election date and by affording relief that the plaintiffs themselves did not ask for in their preliminary injunction motions, the District Court contravened this Court's precedents and erred by ordering such relief. This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* Thus, the Order relies on the portion of *RNC* that the Supreme Court disfavored and addressed. Whatever weight the decision has for the Order, it weighs strongly in favor of imposing a stay pending appeal.

15

2.     *The State's interest is important.*

The Court found that State Defendants' interests—conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud—are "strong." [Doc. 134 at 60]. Additionally, the Court recognized the State Defendants interests as "important interests." [*Id.*]. Because the burden is not severe, the Election Day Receipt Deadline policy must be upheld so long as it satisfies an "important" goal: "the State need not establish a compelling interest to tip the constitutional scales in its direction." *Burdick*, 504 U.S. at 434, 439. This is also true because of the "minimal" nature of the Plaintiffs' alleged burden. *See Timmons*, 520 U.S. at 358; *De La Fuente v. Padilla*, 930 F.3d 1101, 1105 (9th Cir. 2019) (citing *Timmons*), cert. denied, 140 S. Ct. 676, 205 L. Ed. 2d 440 (2019).

As demonstrated above, extending the Election Day Receipt Deadline threatens to cause voter confusion, delay the cure period for rejected absentee ballots, delay post-election audits, and delay certification of election returns. The Court recognizes State Defendants' interests in conducting efficient elections, maintaining order, quickly certifying election results, and preventing voter fraud as important interests. [Doc. 134 at 60]. Because the burden is not severe, "the States' regulatory interest is generally enough to

16

uphold a reasonable, nondiscriminatory restriction on voting rights."
*Timmons*, 520 U.S. at 358.

Plaintiffs are likely to lose on the merits of their fundamental-right-to-vote claim in Count I. Absentee ballots returned by mail were rejected for late return in the June 2020 Primary at a lower rate than pre-pandemic elections. Moreover, voters can return absentee ballots in person to County election offices or drop boxes, or by mail. The best way to avoid voter confusion and delays certifying the results is to conduct this election like all prior elections. Thus, a stay is warranted while State Defendants appeal the Order.

C.  <u>Plaintiffs are unlikely to prevail on the merits of their claim that the Election Day Receipt Deadline violates Procedural Due Process (Count IV of Plaintiffs' Amended Complaint).</u>

Plaintiffs are also unlikely to succeed on their procedural due process claim challenging the Election Day Receipt Deadline in O.C.G.A. § 21-2-386(a)(1)(F). In asserting a procedural due process claim, there must be an initial showing that the Plaintiffs have been deprived of a liberty interest. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). Courts next apply the *Mathews* balancing test and consider three factors: 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of

additional safeguards; and 3) the government's interest, including the burden of additional safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

As shown above, the burden on Plaintiffs' right to vote due to the Election Day Receipt Deadline is minimal. As for the second *Mathews* factor, Plaintiffs blame the postal service delays and the COVID-19 pandemic for causing late delivery of absentee ballots. [Doc. 58 at 2-5, 10-11]. The Order similarly finds that any deprivation is "due to massive delays and exigent circumstances caused by COVID-19." [Doc. 134 at 62]. Moreover, Plaintiffs fail to identify a state act. *See Doe v. Fla. Bar*, 630 F.3d 1336, 1342 (11th Cir. 2011); *see also Mathews*, 424 U.S. at 335. Postal delays and COVID-19 are not actions of the State. *See Georgia Shift*, 2020 WL 864938, at *5; *see also Coalition for Good Governance*, 2020 WL 2509092, at *3 (blaming COVID-19, not the State, for election issues). Furthermore, a deadline to vote is not an erroneous deprivation because voters do not have the right to cast a ballot at any time they wish or to disregard generally applicable regulations regarding timing of elections. *See Burdick*, 504 U.S. at 433 ("It does not follow, however, that the right to vote in any manner. . .[is] absolute."). Indeed, if the opposite were true, it would apply to any temporal constraint, including the early riser who wishes to vote in-person before 7:00 A.M. on Election Day. As reflected in the record, voters are reminded of the deadline to return absentee ballots in

the instructions that accompany every absentee ballot. [Doc. 91-3 at ¶ 5]. The record shows that voters are aware of the deadline, [Doc. 107-10 at ¶ 9], and the notice alleviates the risk of an erroneous deprivation.

In considering the third *Mathews* factor, the Court found that extending the deadline to return absentee ballots "would be a valuable measure to address the risk of absentee voter disenfranchisement," although the Court "acknowledge[d] that Defendants have a strong interest in certifying election results and maintaining the integrity of elections." [Doc. 134 at 62-63]. Extending the deadline for county elections officials to receive absentee ballots is not an additional procedural safeguard. It is a different policy altogether—and directly contravenes the policy choice made by the elected representatives in this state. Moreover, the extension required by the Order does not redress the injury that Plaintiffs allege is caused by the Election Day Receipt Deadline. Instead, the extension directed in the Order will impose a heavy burden on Defendants and frustrate the State Defendants' interests. *See supra* section II, at 20-21. Timely certification of election results promotes certainty in elections, itself an important state interest. *Broughton v. Douglas Cty. Bd. of Elections*, 286 Ga. 528, 528–29 (2010).  So too is maintaining the integrity of elections. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231(1989). Because the Order

applies only in 17 counties and contradicts the instructions that accompany

the actual absentee ballots, voter confusion and uncertainty is all but assured.

## II. State Defendants Will Suffer Irreparable Harm if the Court Does Not Grant the Requested Stay.

As the Eleventh Circuit has said, along with likelihood of success on

the merits, whether the stay applicant will be irreparably injured absent a

stay is a "most critical" factor in the analysis whether to grant a stay pending

appeal. *Hand*, 888 F.3d at 1207. Here, this factor weights strongly in favor of

Defendants. As addressed above, the imposition of Plaintiffs' requested relief

will not only create voter confusion, but it will delay the cure period for

rejected absentee ballots and, in turn, threaten delaying certification of the

results, which will impact the ability of voters to cast ballots in runoff

elections and possibly voting by Georgia's Presidential Electors.

The Supreme Court has repeatedly recognized the harm caused by

upsetting a state's election process with last minute changes to its process.

*See, e.g.*, *Purcell*, 549 U.S. at 4-5; *Benisek*, 138 S. Ct. at 1942. The State "has

a substantial interest in avoiding chaos and uncertainty in [statewide]

election procedures, and likely should not be forced to employ" a set of new,

ad hoc procedures "created on an artificial deadline." *Id.* Enjoining "the State

from conducting this year's elections pursuant to a statute enacted by the

Legislature . . . would seriously and irreparably harm the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). The harm is amplified during an election. *Republican Nat'l Comm.*, 149 S. Ct. at 1207. This Court should be "reluctant to upset the system now in place—particularly since [its] order creates so truncated a schedule—when there is a good chance [its] order may be overturned, and the system would need to be changed still again . . . Put another way, there is wisdom in preserving the status quo ante until" the Eleventh Circuit "has had an opportunity on full briefing to come to grips" with the constitutional issues raised in this case. *Purcell*, 549 U.S. at 4-5.

## III.   Plaintiffs will not suffer irreparable injury.

By contrast, Plaintiffs will not suffer an irreparable injury. A stay pending appeal will not threaten Plaintiffs with irreparable harm because it maintains the status quo. Plaintiffs will not be harmed by a stay because they will still be able to vote by absentee ballot or in person. Moreover, Plaintiffs have alleged only a speculative threat of harm from the absence of a preliminary injunction. [*See, e.g.,* Doc. Nos. 59-6 at ¶ 10; 59-67 at ¶ 7].

A preliminary injunction requires a showing of "irreparable harm" that is likely, not merely possible. *See, e.g., Winter v. NRDC*, 555 U.S. 7, 22 (2008). Plaintiffs have not shown that existing measures to protect voters are so deficient that the absence of additional federal-court-ordered measures

21

threatens them with imminent harm. *See Ledford v. Comm'r, Georgia Dep't of Corr.*, 856 F.3d 1312, 1315 (11th Cir. 2017) (whether "the threatened injury outweighs the harm the [stay] would cause the other litigant").

To the extent that Plaintiffs may respond that any constitutional violation warrants the imposition of an injunction, *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000), involving a challenged 2000 presidential election in Florida, forecloses such proposition and shows why a stay is appropriate:

> Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however. … The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether.

234 F.3d at 1177–78. Accordingly, this factor weighs in favor of granting a stay.

## IV.   A Stay of the Court's Order Granting Preliminary Injunctive Relief Would Not Result In Any Harm to the Public Interest.

A stay of the Court's Order would not result in any harm to the public interest. "Because the State is the appealing party, its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam) (citing *Nken*, 556 U.S. at 435). Putting this injunction into effect days before absentee ballots are mailed and absentee voting starts will

undermine the public's confidence. *Purcell*, 549 U.S. at 4 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."). Adding new, *ad hoc* processes to the mix risks creating uncertainty and confusion, and disenfranchise voters and threaten the Electoral College process. Granting a stay will assure the public that both the judiciary and the State will "ensur[e] proper consultation and careful deliberation" before disrupting the election process. *Hand*, 888 F.3d at 1215.

## V.   The Court Lacks Jurisdiction

### A.   Plaintiffs Lack Standing.

Regardless of the Court's finding that Plaintiffs had an injury-in-fact to support standing for each claim in the Complaint, Plaintiffs' claims challenging the Election Day Receipt Deadline are neither traceable to nor redressable by State Defendants for standing. State Defendants do not receive absentee ballots from voters pursuant to O.C.G.A. § 21-2-386(a)(1)(F)—the challenged statute enjoined by the Order.

Conversely, Plaintiffs did not sue 142 of the 159 county boards of election that do receive absentee ballots from voters pursuant to O.C.G.A. § 21-2-386(a)(1)(F). State Defendants also do not have authority to enter mandamus orders or mandatory injunctions forcing county boards of election to count ballots received after the statutorily mandated deadline of 7:00 P.M.

on Election Day, unlike a court of competent jurisdiction which could so order *if those counties were parties to an action before it*.

Finally, the Order leaves the State in no different position than the State of Florida in *Jacobson v. Florida Sec'y of State*, No. 19-14552 (11th Cir. Sept. 3, 2020). There, the plaintiffs did not sue any county officials. Accordingly, the district court's decision that a particular statute—that, like the one here, was implemented by county election officials—was unconstitutional was neither traceable to nor redressable by the other parties. "'Because the [Secretary] didn't do (or fail to do) anything that contributed to [their] harm,' the voters and organizations 'cannot meet Article III's traceability requirement.'" *Id*. at *30-31 (quoting *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc)). Moreover, "nonparties … [were] not 'obliged … in any binding sense … to honor an incidental legal determination [this] suit produce[s]." *Id*. at *33 (quoting *Lewis*, 944 F.3d at 1302). The nonparty county elections officials remain lawfully entitled to act under the challenged law. *Id*. These facts preclude Plaintiffs from having standing to bring the claims at issue against State Defendants.

B.     The Political Question Doctrine.

In addition to Plaintiffs' lack of standing to assert the Election Day Receipt Deadline claims against State Defendants, the challenge to the

24

deadline presents a political question into which "the judicial department has no business entertaining [a] claim of unlawfulness." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (citation omitted). The deadline for voters to vote is a policy choice, and the Order overrides that policy choice.

As referenced in Defendants prior briefing, in a similar case in this District, plaintiffs' preliminary injunction motion was recently denied and that court granted State Defendants motion to dismiss in its entirety based, among other things, on the political question doctrine. *Coalition for Good Governance v. Raffensperger*, 2020 WL 2509092, at *1, *3 (N.D. Ga. May 14, 2020) (citing *Rucho* and *Jacobson v. Fla. Sec'y of State*, No. 19-14552, 2020 WL 2049076, at *18 (11th Cir. Apr. 29, 2020) (William Pryor, J., concurring)). Plaintiffs here similarly asked this Court to interfere in the minutiae of election administration in the context of COVID-19. This is an important issue for appeal given the state of election litigation across the country.

## **CONCLUSION**

For the reasons herein, State Defendants respectfully request that the Court grant their Motion to Stay Preliminary Injunction Pending Appeal.

Respectfully submitted, this 4th day of September, 2020.

                                      Christopher M. Carr
                                      Attorney General
                                      GA Bar No. 112505

Bryan K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
Charlene McGowan
Asst. Attorney General
Ga. Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Vincent R. Russo*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
**Robbins Ross Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone:   (678) 701-9381
Facsimile:    (404) 856-3250

*Attorneys for State Defendants*

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Motion and Brief in Support has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).  Specifically, this Motion has been prepared using 13-pt Century Schoolbook font.

*/s/ Vincent R. Russo*
Vincent R. Russo
Georgia Bar No. 242628

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the within and foregoing

**STATE DEFENDANTS' MOTION AND BRIEF IN SUPPORT OF**

**MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

with the Clerk of Court using the CM/ECF system, which automatically sent

counsel of record e-mail notification of such filing.

This 4th day of September, 2020.

<u>*/s/ Vincent R. Russo*</u>
Vincent R. Russo
Georgia Bar No. 242628